**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Asset Forfeiture and Money Laundering Section ) | |
| Criminal Division ) | |
| United States Department of Justice ) | |
| 1400 New York Avenue, NW, 10th Floor ) | |
| Washington, DC 20005, ) | |
| ) | |
| Plaintiff, ) | UNDER SEAL |
| ) | |
| v. ) | Case No._____ |
| ) | |
| ALL ASSETS HELD IN ACCOUNT NUMBER ) | |
| 80020796, IN THE NAME OF ) | |
| DORAVILLE PROPERTIES CORPORATION, ) | |
| AT DEUTSCHE BANK INTERNATIONAL, ) | |
| LIMITED IN JERSEY, CHANNEL ISLANDS, ) | |
| AND ALL INTEREST, BENEFITS, OR ASSETS ) | |
| TRACEABLE THERETO; ) | |
| ) | |
| ALL ASSETS HELD IN ACCOUNT NUMBER ) | |
| S-104460, IN THE NAME OF MOHAMMED ) | |
| SANI, AT HSBC FUND ADMINISTRATION ) | |
| (JERSEY) LIMITED AND ALL INTEREST, ) | |
| BENEFITS, OR ASSETS TRACEABLE ) | |
| THERETO; ) | |
| ) | |
| ALL ASSETS HELD IN ACCOUNT NUMBER ) | |
| 223405880IUSD, IN THE NAME OF RAYVILLE ) | |
| INTERNATIONAL, S.A. AT BANQUE SBA, ) | |
| AND ALL INTEREST, BENEFITS, OR ASSETS ) | |
| TRACEABLE THERETO; ) | |
| ) | |
| ALL ASSETS HELD IN ACCOUNT NUMBER ) | |
| 223406510PUSD, IN THE NAME OF ) | |
| STANDARD ALLIANCE FINANCIAL ) | |
| SERVICES LIMITED AT BANQUE SBA, AND ) | |
| ALL INTEREST, BENEFITS, OR ASSETS ) | |
| TRACEABLE THERETO; ) | |
| ) | |
| ALL ASSETS HELD IN ACCOUNT NUMBERS ) | |
| 100130688 AND 100138409, IN THE NAME OF ) | |
| MECOSTA SECURITIES, INC., AT STANDARD ) | |

BANK LONDON LIMITED AND ALL )
INTEREST, BENEFITS, OR ASSETS )
TRACEABLE THERETO; )
)
ALL ASSETS HELD AT HSBC LIFE )
(EUROPE) LIMITED, FORMERLY )
HELD IN ACCOUNT NUMBER 37060762 )
IN THE NAME OF MOHAMMED SANI AT )
MIDLAND LIFE INTERNATIONAL LIMITED )
AND ALL INTEREST, BENEFITS, OR ASSETS )
TRACEABLE THERETO; )
)
ALL ASSETS HELD IN ACCOUNT NUMBER )
38175076, IN THE NAME OF MOHAMMED )
SANI AT HSBC BANK PLC., AND ALL )
INTEREST, BENEFITS, OR ASSETS )
TRACEABLE THERETO; )
)
ALL ASSETS HELD IN THE INVESTMENT )
PORTFOLIO OF BLUE HOLDING (1) )
PTE. LTD., ON BEHALF OF OR TRACEABLE )
TO RIDLEY GROUP LIMITED, AND/OR )
THE RIDLEY TRUST AT J.O. HAMBRO )
INVESTMENT MANAGEMENT LIMITED )
AND ALL INTEREST, BENEFITS, OR ASSETS )
TRACEABLE THERETO; )
)
ALL ASSETS HELD IN THE INVESTMENT )
PORTFOLIO OF BLUE HOLDING (2) )
PTE. LTD., ON BEHALF OF OR TRACEABLE )
TO RIDLEY GROUP LIMITED, AND/OR )
THE RIDLEY TRUST AT J.O. HAMBRO )
INVESTMENT MANAGEMENT LIMITED )
AND ALL INTEREST, BENEFITS, OR ASSETS )
TRACEABLE THERETO; )
)
ALL ASSETS HELD IN THE INVESTMENT )
PORTFOLIO OF BLUE HOLDING (1) )
PTE. LTD., ON BEHALF OF OR TRACEABLE )
TO RIDLEY GROUP LIMITED, AND/OR )
THE RIDLEY TRUST AT JAMES HAMBRO )
& PARTNERS LLP AND ALL INTEREST, )
BENEFITS, OR ASSETS TRACEABLE )
THERETO; )

ALL ASSETS HELD IN THE INVESTMENT )
PORTFOLIO OF BLUE HOLDING (2) )
PTE. LTD., ON BEHALF OF OR TRACEABLE )
TO RIDLEY GROUP LIMITED, AND/OR )
THE RIDLEY TRUST AT JAMES HAMBRO )
& PARTNERS LLP AND ALL INTEREST, )
BENEFITS, OR ASSETS TRACEABLE )
THERETO; )
 )
DORAVILLE PROPERTIES CORPORATION, )
A BRITISH VIRGIN ISLANDS CORPORATION, )
TOGETHER WITH ITS ASSETS AND ALL )
PROPERTY TRACEABLE THERETO; )
 )
MECOSTA SECURITIES, INC., A BRITISH )
VIRGIN ISLANDS CORPORATION, )
TOGETHER WITH ITS ASSETS AND ALL )
PROPERTY TRACEABLE THERETO; )
 )
RAYVILLE INTERNATIONAL, S.A., )
A BRITISH VIRGIN ISLANDS CORPORATION, )
TOGETHER WITH ITS ASSETS AND ALL )
PROPERTY TRACEABLE THERETO; )
 )
RIDLEY GROUP LIMITED, A BRITISH )
VIRGIN ISLANDS CORPORATION, )
TOGETHER WITH ITS ASSETS AND ALL )
PROPERTY TRACEABLE THERETO; AND )
 )
STANDARD ALLIANCE FINANCIAL )
SERVICES LIMITED, A BRITISH VIRGIN )
ISLANDS CORPORATION, )
TOGETHER WITH ITS ASSETS AND ALL )
PROPERTY TRACEABLE THERETO, )
 )
             Defendants. )
_____ )

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Comes now the Plaintiff, United States of America, through its undersigned attorneys,

and alleges, upon information and belief, as follows:

## I.     INTRODUCTION

1.        This is an action *in rem* to forfeit five corporate entities and more than $500

million in other assets involved in an international conspiracy to launder proceeds of corruption

in Nigeria during the military regime of General Sani Abacha.  General Abacha, his son

Mohammed Sani Abacha, their associate Abubakar Atiku Bagudu, and others embezzled,

misappropriated, defrauded, and extorted hundreds of millions of dollars from the government of

Nigeria and others, including through the three criminal schemes described herein.  They then

transported and laundered the proceeds of those crimes through conduct in and affecting the

United States.  The defendants *in rem* are subject to forfeiture as property involved in money

laundering offenses in violation of U.S. law.

2.        As alleged herein, in one scheme, General Abacha, together with Mohammed

Sani Abacha, Bagudu, and others, systematically embezzled public funds worth billions of

dollars from the Central Bank of Nigeria (CBN) on the false pretense that the funds were

necessary for national security.  After causing the CBN to disperse the funds, often in cash,

General Abacha and Bagudu then moved the funds overseas, including through U.S. financial

institutions (the "Security Votes Fraud").  In another scheme, General Abacha and his finance

minister, Anthony Ani, caused the government of Nigeria to purchase non-performing

government debt from a company controlled by Bagudu and Mohammed Abacha at vastly

inflated prices, generating a windfall of over $282 million for Mohammed Abacha and Bagudu

through U.S. financial transactions (the "Debt Buy-Back Fraud").  Finally, in the third scheme

alleged herein, General Abacha and his associates extorted more than $11 million from a French

company and its Nigerian affiliate in connection with payments on government contracts (the

"Dumez Extortion").

3.        Proceeds of the Security Votes Fraud were transported into and out of the United

States in violation of U.S. law and pooled into bank accounts in London, where they were used

to purchase hundreds of millions of dollars of U.S. dollar-denominated Nigerian bonds.  The

bonds generated tens of millions of dollars in interest paid through Citibank in New York and

guaranteed by the United States; in effect the conspirators lent money stolen from Nigeria back

to Nigeria with zero risk and at enormous profit.  By 2007, the bonds were liquidated, and the

proceeds from the sale of the bonds, together with the proceeds of the Debt Buy-Back Fraud and

Dumez Extortion, were deposited into the defendant accounts, using the defendant corporate

entities and through U.S. financial transactions, as described herein.  The defendant corporate

entities are registered in the British Virgin Islands, and bank accounts and investment firms

holding the other defendant assets are located in the United Kingdom, France, and the Bailiwick

of Jersey.

## II.        THE DEFENDANTS *IN REM*

4.        By this Complaint, the United States seeks forfeiture of all right, title, and interest

in the following property:

> (a)        All assets held in **account number 80020796**, in the name of
> **Doraville Properties Corporation**[1], located at Deutsche Bank
> International Limited in the Bailiwick of Jersey, and all interest, benefits,
> or assets traceable thereto.  These assets were last valued at approximately
> $287 million;
>
> (b)        All assets held in **account number S-104460**, in the name of
> Mohammed Sani, at HSBC Fund Administration (Jersey) Limited in the
> Bailiwick of Jersey, and all interest, benefits, or assets traceable thereto.[2]
> These assets were last valued at approximately $12 million;
>
> (c)        All assets held in **account number 223405880IUSD**, in the name
> of **Rayville International, S.A.,** at Banque SBA in Paris, France, and all

---

[1] For ease of reading, the defendants *in rem* appear in bold throughout this Complaint.
[2] HSBC Fund Administration was formerly Midland Bank Offshore Limited.

interest, benefits, or assets traceable thereto.  These assets were last valued at approximately $1 million;

(d)      All assets held in **account number 223406510PUSD**, in the name of **Standard Alliance Financial Services Limited** located at Banque SBA in Paris, France, and all interest, benefits, or assets traceable thereto. These assets were last valued at approximately $144 million;

(e)      All assets held in **account numbers 100130688** and **100138409**, in the name of **Mecosta Securities**, at Standard Bank in the United Kingdom, and all interest, benefits, or assets traceable thereto.  These assets were last valued at approximately £21.7 million;

(f)      All assets held at HSBC Life (Europe) formerly held in **account number 37060762** in the name of Mohammed Sani at Midland Life International Limited, and all interest, benefits or assets traceable thereto;[3]

(g)      All assets in **account number 38175076**, in the name of Mohammed Sani, at HSBC Bank Plc., and all interest, benefits, or assets traceable thereto.  These assets were last valued at approximately $1.6 million;

(h)      All assets held in the name of **Blue Holding (1) Pte. Ltd.**, on behalf of or traceable to **Ridley Group Limited** and/or the Ridley Trust, at J.O. Hambro Investment Management Limited in the United Kingdom, and all interest, benefits, or assets traceable thereto.  These assets were last valued at approximately €6,806,900;

(i)      All assets held in name of **Blue Holding (2) Pte. Ltd.**, on behalf of or traceable to **Ridley Group Limited** and/or the Ridley Trust, at J.O. Hambro Investment Management Limited in the United Kingdom, and all interest, benefits, or assets traceable thereto.  These assets were last valued at approximately €21,846,983;

(j)      All assets held in the name of **Blue Holding (1) Pte. Ltd.**, on behalf of or traceable to **Ridley Group Limited** and/or the Ridley Trust, at James Hambro & Partners LLP, in the United Kingdom, and all interest, benefits, or assets traceable thereto.  These assets were last valued at approximately €10,293,343.58;

(k)      All assets held in of the name of **Blue Holding (2) Pte. Ltd.**, on behalf of or traceable to **Ridley Group Limited** and/or the Ridley Trust, at James Hambro & Partners LLP, in the United Kingdom and all interest,

---

[3] The branch of Midland Life International Limited holding account number 37060762 was acquired by HSBC Life (Europe).

benefits, or assets traceable thereto.  These assets were last valued at approximately €56,962,996.26;

(l) **Doraville Properties Corporation**, a corporate entity registered in the British Virgin Islands, together with all its assets and all property traceable thereto;

(m) **Mecosta Securities, Inc.**, a corporate entity registered in the British Virgin Islands, together with all its assets and all property traceable thereto;

(n) **Rayville International, SA**, a corporate entity registered in the British Virgin Islands, together with all its assets and all property traceable thereto;

(o) **Ridley Group Limited**, a corporate entity registered in the British Virgin Islands, together with all its assets and all property traceable thereto;

(p) **Standard Alliance Financial Services Limited**, a corporate entity registered in the British Virgin Islands, together with all its assets and all property traceable thereto.

### III.      JURISDICTION AND VENUE

5.      This Court has jurisdiction over this subject matter.  28 U.S.C. §§ 1345 and 1355(a), and 18 U.S.C. § 981(a)(1)(A).

6.      This Court has *in rem* jurisdiction over the named defendant properties. 28 U.S.C. §§ 1345 and 1355(a).

7.      Venue for this action is proper in this district because the named defendant properties are presently located in foreign countries.  28 U.S.C. § 1355(b)(2).

### IV.      FACTUAL ALLEGATIONS

**A.      <u>Key Participants – General Abacha, his Associates, and their Corporate Entities</u>**

8.      *General Sani Abacha* was a military officer in Nigeria who assumed the office of the President of the Federal Republic of Nigeria through a military coup on November 17, 1993. He held the office of the President until his death on June 8, 1998.  Prior to assuming the

presidency, he served as Chief of Army Staff (1985-1989), Chairman of the Joint Chiefs of Staff

(1989-1990), and Minister of Defense (1990-1993).  As described herein, General Abacha

conspired with others to steal and defraud hundreds of millions of dollars from Nigeria, extort

money from third parties wishing to do business in Nigeria, and launder the proceeds of that

theft, embezzlement, misappropriation, and extortion throughout the world.

9.      *Ibrahim Sani Abacha* was the first son of General Sani Abacha.  Ibrahim Abacha

participated in the conspiracy to steal hundreds of millions of dollars from the Nigerian

government and launder the proceeds around the world.  He died in a plane crash in

January 1996.

10.      *Mohammed Sani Abacha* is the second son of General Sani Abacha.  After

Ibrahim Abacha's death, Mohammed Abacha assumed his brother's role in the conspiracy to

steal hundreds of millions of dollars from Nigeria and launder the criminal proceeds throughout

the world.  Mohammed Abacha received and helped to launder more than $700 million in cash

stolen directly from Nigeria's public coffers.  He also is a signatory and/or a corporate

representative designated on many of the defendant assets.

11.      *Abubakar Atiku Bagudu* was an associate of General Abacha and his

sons who participated in the conspiracy to steal and launder hundreds of millions of dollars.

Among other things, Bagudu played an instrumental role in setting up and executing the

complicated financial transactions used to launder the proceeds of the conspiracy.  He is also a

signatory and/or corporate representative designated on many of the defendant assets.

12.      *Ismaila Gwarzo* held the position of National Security Advisor (NSA) during the

presidency of General Sani Abacha, and Gwarzo participated in the conspiracy to steal and

launder hundreds of millions of dollars.  Among other things, Gwarzo prepared and executed the

false paperwork that caused the CBN to release hundreds of millions of dollars worth of U.S., U.K., and Nigerian currency as part of the Security Votes Fraud described below.

13.     *Alhaji Ahmadu Daura* was an associate of the Abacha Family and operated the Sunshine Bureau de Change, a money exchange business located in Nigeria.  Daura participated in the conspiracy by moving criminal proceeds out of Nigeria to accounts he controlled in England and by transferring criminal proceeds into and out of the United States to accounts controlled by the Abacha Family.

14.     *Chief Anthony Ani* held the position of Nigeria's Minister of Finance during the presidency of General Abacha.  Minister Ani authorized the disbursement of Nigerian government funds in furtherance of the Security Votes Fraud and the Debt Buy-Back Fraud, both described below.

15.     *David Umaru* was an attorney and associate of the Abacha family.  Umaru participated in the conspiracy by communicating General Abacha's extortion demands to third parties wishing to do business in Nigeria, including as described below to the owners of Dumez Group, a French-based construction company.

16.     **Defendant Doraville Properties Corporation (Doraville)** was incorporated in the British Virgin Islands on July 2, 1997.  Bagudu was a director and authorized signatory on its bank accounts at Deutsche Bank AG and at Deutsche Bank International Limited (Jersey) (DBIL).

17.     *Eagle Alliance International Limited (Eagle Alliance)* was incorporated in Ireland on August 9, 1994.  Bagudu was an authorized signatory on its accounts at Australia and New Zealand (ANZ) Grindlays Plc, in London, England, and at Goldman Sachs & Co. in Zurich,

Switzerland.[4]  As discussed herein, in 1996 Eagle Alliance's assets were transferred to **Mecosta Securities, Inc.**

18.     *Harbour Engineering and Construction Limited (Harbour Engineering)* was incorporated in the British Virgin Islands.  Bagudu was an authorized signatory on its account at Banque SBA in Paris.

19.     **Defendant Mecosta Securities, Inc. (Mecosta)** was incorporated in the British Virgin Islands on October 9, 1995.  Bagudu was an authorized signatory on accounts in the name of **Mecosta** at ANZ (London); Standard Bank in London, England (Standard Bank); Credit Agricole Indosuez in London, England; Goldman Sachs in Zurich, Switzerland; and Banque Baring Brothers in Geneva, Switzerland.

20.     *Morgan Procurement Corporation (Morgan Procurement)* was incorporated in the British Virgin Islands on January 24, 1995.  Bagudu was an authorized signatory on its four accounts at the Union Bank of Nigeria Plc in London, England.

21.     **Defendant Rayville International, S.A. (Rayville)** was incorporated in the British Virgin Islands.  Bagudu was an authorized signatory on its account, number 223405880IUSD, at Banque SBA in Paris.

22.     *The Ridley Trust* was created by Indosuez Trust Services Limited at the request of Bagudu and registered in Guernsey, Channel Islands, on September 22, 1997.  The Ridley Trust is the sole shareholder of the **Ridley Group**.  Bagudu is the Ridley Trust's prime beneficiary.

23.     **Defendant Ridley Group Limited (Ridley Group)** was incorporated in the British Virgin Islands on June 10, 1997.

---

[4] Australia and New Zealand (ANZ) Banking Group Limited, with headquarters in Australia, purchased Grindlays Bank, another international bank, in 1984.  After its acquisition, the bank operated in London, England, under the name of ANZ Grindlays Bank Plc.  In early 1996, the London bank's name was again changed to ANZ Banking Group London.  For purposes of this Complaint, the financial institution known as Grindlays Bank, ANZ Grindlays Bank Plc, and ANZ Banking Group London will hereinafter be referred to as ANZ (London).  ANZ Banking Group's New York branch will be referred to ANZ (New York).

24.     **Defendant Standard Alliance Financial Services Limited (Standard Alliance)** was incorporated in the British Virgin Islands.  Bagudu was an authorized account signatory for **account number 223406510PUSD** in the name of **Standard Alliance** at Banque SBA.

**B.     The Security Votes Fraud**

25.     Between January 1994 and June 1998, General Sani Abacha, National Security Advisor Gwarzo, and others stole more than $2 billion from Nigeria by fraudulently and falsely representing that the funds were to be used for national security purposes.  As described below, General Abacha and Gwarzo executed false national security letters directing the withdrawal of funds from the CBN, referred to as "security votes" letters after a practice by which Nigerian governors received a budgetary allocation for security purposes.  Rather than use the funds for national security purposes, the stolen money was transported out of Nigeria and deposited into accounts controlled by General Abacha's associates, including Mohammed Abacha and Bagudu.

**i.     Embezzlement of over $2 billion from the Central Bank of Nigeria**

26.     In order to steal public funds from Nigeria, National Security Advisor Gwarzo, at General Abacha's direction, prepared one- to- two page letters to General Abacha purporting to request millions of U.S. dollars, British pounds sterling, and Nigerian naira to address unidentified "emergencies" that threatened Nigeria's national interests.  General Abacha endorsed each letter with his signature, thereby approving the disbursement of the requested monies.  The endorsed security votes letters were sent to the CBN, located in Abuja, Nigeria, and the CBN, acting in accordance with the letters, disbursed the funds as directed in cash or traveler's checks, or through wire transfers.

27.     Using these security votes letters to take money from the CBN violated what the CBN has described as Nigeria's "accepted government procedures."  The proper government

procedures required the Minister of Finance and the Accountant-General to each approve

disbursements in accordance with Nigeria's budget.  The security votes withdrawals were not

properly approved by both the Minister of Finance and the Accountant-General, and were also

not included in Nigeria's budget for the relevant fiscal years.

28.    Over sixty false security votes letters were addressed to and endorsed by General

Abacha, each of which resulted in the withdrawal of Nigeria's public funds from the CBN.

Subsequently, the funds were deposited into accounts controlled by, or used to purchase assets

for the benefit of, General Abacha, Bagudu, or other members of the conspiracy.  For example:

    (a)    By letter, dated June 2, 1994, Gwarzo falsely stated:

    "In view of the on-going negative campaign against this country, a small
    international operation has been mounted to cover it…please approve as a matter
    of urgency, the sum of Five Million Dollars…for this operation."

    (b)    By letter, dated November 30, 1994, Gwarzo falsely stated:

    "[$100 million dollars are requested] to combat an economy that was deflected
    and distorted through the black market."

    (c)    By letter, dated August 20, 1996, Gwarzo falsely stated:

    "In light of the current political situation in the country, coupled with the increase
    in security operations….there is need for a lot of funds to handle the challenges
    outlined above such that I require Three hundred and fifty million Naira
    [N350,000,000.00] plus Thirty million dollars [$30,000,000] and Fifteen million
    Pounds [£15,000,000.00] …Please consider desperate need and approve."

Each of these letters, and others like them, were endorsed by General Abacha.

29.    Shortly after General Abacha's death, the government of Nigeria established a

Special Investigation Panel (SIP), which found that General Abacha and his co-conspirators had

used the false security votes letters to steal and defraud more than $2 billion in public funds,

including: (1) at least $1.1 billion and £413 million pound sterling (GBP) in cash; (2) at least

$50,465,450 and £3,500,000 GBP in traveler's checks; and (3) at least $386,290,169 through wire transfers.

      ii.     **Transfer of the Embezzled Funds Out of Nigeria and Through the United States**

30.     The conspirators transported the proceeds of the Security Votes Fraud out of Nigeria to accounts in Europe that were under the conspirators' private control, including the **Rayville** and **Standard Alliance** accounts at Banque SBA, the Eagle Alliance and **Mecosta** accounts at ANZ (London), and the **Mecosta** account at Standard Bank as described below.

31.     The CBN staff and other individuals known and unknown to the United States generally would deliver the currency stolen with the security votes letters to Gwarzo at his residence.  Gwarzo and others acting at his direction would repackage the currency in secure bags and then deliver it to General Abacha at his residence in Abuja, Nigeria.

32.     General Abacha, or those acting at his direction, delivered more than $700 million of these funds to Mohammed Abacha in bags or boxes full of cash.

33.     Mohammed Abacha gave the cash he received to Bagudu, who later arranged for the money to be transferred to accounts controlled by Bagudu and Mohammed Abacha in foreign countries.  Transfers included deposits into accounts in the name of **defendants Mecosta, Doraville**, **Standard Alliance**, and **Rayville**, as well as Eagle Alliance and Harbour Engineering.

34.     In order to move the money overseas, Bagudu deposited the cash proceeds of the Security Votes Fraud into at least one of two Nigerian commercial banks, Union Bank of Nigeria and/or Inland Bank of Nigeria.  Bagudu referred to the money deposited into Union Bank and Inland Bank as his "cash swaps."  Bagudu and/or Mohammed Abacha then instructed Union Bank or Inland Bank to transfer the stolen funds to other accounts under Bagudu or Mohammed

Abacha's control, such as accounts in the name of **Mecosta**, **Rayville**, and Eagle Alliance. Inland Bank or Union Bank made the necessary arrangements to transfer the money overseas.[5] The funds were transferred from Union Bank or Inland Bank back to the CBN, to an account held by Union Bank or Inland Bank at the CBN.  The CBN then transferred the funds from the account of Union Bank or Inland Bank to their respective overseas domiciliary accounts held at banks in either London or New York.[6]  The specific London or New York account varied depending on which Nigerian commercial bank had been used in the first instance.

35.     Through these "cash swaps," at least $137 million was transported into and out of the United States, and into accounts held in the name of the defendant corporations.  For example:

(a)     Between July 1995 and April 1996, $18.3 million was deposited into accounts in Nigeria at Union Bank and Inland Bank controlled by Mohammed Abacha and Bagudu.  These funds were subsequently wire transferred into and out of correspondent accounts at financial institutions in the United States for deposit into accounts held in the names of Eagle Alliance or **Mecosta** at ANZ (London).  The transfer of these funds was accomplished through transactions including, but not limited to, the following:

(i)     On or about October 10, 1995, Bagudu caused the wire transfer of $5 million from an account at Union Bank of Nigeria into and out of a correspondent account at Barclays Bank Plc., New York, into a correspondent account at ANZ (New York), for credit to the Eagle Alliance account at ANZ (London).

---

[5] Starting at least as early as August 1995, the Nigerian Ministry of Finance required Nigeria's commercial banks to transfer foreign currency out of Nigeria through the CBN.
[6] A domiciliary account is a bank account held in the name of an individual or corporate entity operated with foreign currency.

(ii)     On or about November 5, 1995, Bagudu caused the wire transfer of $6 million from a domiciliary account of Union Bank of Nigeria into and out of a correspondent account at Barclays Bank Plc., New York, and then into and out of a correspondent account at ANZ (New York), for credit to the Eagle Alliance account at ANZ (London).  This $6 million was credited to the Eagle Alliance account on or about November 13, 1995.

(iii)    On or about January 3, 1996, Bagudu caused the wire transfer of approximately $320,000 from Inland Bank of Nigeria into and out of a correspondent account at Morgan Guaranty Trust Bank, New York, and then into and out of a correspondent account at ANZ (New York), for credit to the Eagle Alliance account at ANZ (London).

(b)     Between August 1995 and November 1995, at least $7.2 million in proceeds from the Security Votes Fraud was deposited into the Eagle Alliance account at ANZ (London) by or on behalf of Alhaji Ahmadu Daura, an associate of Mohammed Abacha.  These funds included monies withdrawn from the CBN in the form of cash and traveler's checks.  The monies were first deposited into accounts controlled by Daura at London Trust Bank in Nigeria and then wired to the Eagle Alliance account at ANZ (London).

(c)     In 1997, an additional $20 million in proceeds from the Security Votes Fraud were wire transferred from the Inland Bank of Nigeria Plc's domiciliary account at Commerzbank AG in London, into and out of correspondent bank Credit Lyonnais, New York, for deposit into account number 223405880IUSD held in the name of **Rayville** at Banque SBA in Paris.

(d)     On or about July 17, 1997, another $10 million in proceeds from the Security Votes Fraud were wire transferred from the Inland Bank of Nigeria Plc's domiciliary account at Commerzbank AG in London into and out of correspondent bank Credit Lyonnais,

New York, for deposit into an account in the name of Harbour Engineering located at Banque SBA in Paris.

(e)    Between November 1997 and January 1998, an additional $59 million in proceeds from the Security Votes Fraud were transferred into and out of the United States for deposit into account number 100024969, held in the name of **Mecosta** at Standard Bank in London as follows:

(i)    First, the $59 million in proceeds were transferred from Inland Bank of Nigeria Plc to the CBN;

(ii)    Second, the CBN credited the proceeds to an Inland Bank of Nigeria Plc domiciliary bank account held at Citibank (New York);

(iii)    Third, Citibank (New York) transferred the money into a correspondent bank account at Barclays Bank, New York; and

(iv)    Fourth, Barclays, New York transferred the proceeds into **Mecosta's** account at Standard Bank.

(f)    In 1997, an additional $24 million in criminal proceeds from the Security Votes Fraud were transferred into and out of the United States for deposit into account number 100024969, held in the name of **Mecosta** at Standard Bank.

**C.    Debt Buy-Back Fraud**

**i.    The Conspirators Defrauded Nigeria of More than $282 Million by Causing Nigeria to Repurchase Its Own Government Debt at a Grossly Inflated Price**

36.    Mohammed Abacha, Bagudu, and others defrauded Nigeria of more than $282 million by causing the government of Nigeria to repurchase Nigeria's own debt from one of their companies for more than double what Nigeria would have paid to repurchase the debt on the open market.

37.     In 1979, the Nigerian Steel Development Authority (an entity owned by the Nigerian government and later known as Ajaokuta Steel Company) entered into an agreement with Tiajpromexport (TPE), a Russian company, to construct a steel plant in Nigeria for 5 billion German Deutschmarks (DM).  The government of Nigeria agreed to give TPE debt instruments guaranteeing payment of $2 billion to finance part of the construction.

38.     The government of Nigeria later suspended payment on these debt instruments because of a dispute that arose with TPE.  TPE, in turn, stopped work on the steel plant, and Nigeria defaulted on the outstanding debt instruments.

39.     Subsequently, Bagudu learned, through his contacts at ANZ (London), about TPE's interest in selling the debt.  Employees of ANZ (London) told Bagudu that they had a client who would be willing to sell the debt to one of Bagudu's companies (in this case, **Mecosta**). The client was later identified as Parnar Shipping Corporation (Parnar), a Liberian company.

40.     Bagudu, in turn, approached Ibrahim Abacha and Finance Minister Anthony Ani and received assurances that the government of Nigeria would buy back the debt from Bagudu if one of Bagudu's companies purchased it from TPE.  To guarantee that Nigeria would purchase the debt, Ani entered into an agreement on behalf of Nigeria to buy the debt from **Mecosta** on April 14, 1996, more than four months *before* either Parnar or **Mecosta** actually acquired the debt.  As a result of this agreement, the Nigerian government paid millions of dollars more than necessary to cancel its debt, as described below.

41.     Bagudu orchestrated a series of transactions through which **Mecosta** received money in escrow from Nigeria, used that money to purchase the debt from Parnar, and sold the debt back to Nigeria at a significant markup.

42.     Specifically, Bagudu arranged for TPE to sell approximately 1.6 billion DM of its Nigerian debt instruments to Parnar on or about September 30, 1996, for 350 million DM.  That same day, Parnar resold the same debt to **Mecosta**, raising the price to 486 million DM. **Mecosta** immediately marked up the price again and sold it back to Nigeria for 972 million DM, which the Nigerian government paid in two installments of 486 million DM.

43.     Mohammed Abacha and Bagudu, as the owners of **Mecosta**, yielded a profit of approximately 481 million DM or $282,506,664.

44.     Nigeria's purchase of the debt was personally approved by General Abacha, even though Nigeria would have saved hundreds of millions of dollars by buying the debt on the open market at the price TPE was willing to sell it, which was nearly two-thirds less than Nigeria ultimately paid for the debt.

**ii.      The Disposition of the Debt Buy-Back Fraud Proceeds**

45.     The CBN paid **Mecosta**, Bagudu, and Mohammed Abacha as follows:

(a)     On or about May 17, 1996, the CBN transferred 486 million DM to an escrow account held in the name of Parnar and **Mecosta** at ANZ (London), 481million DM of which was then used by **Mecosta** to pay Parnar for the debt instruments.

(b)     In April 1997, Ani caused the CBN in Lagos, Nigeria, to wire an additional 486 million DM—in two tranches—to accounts held in the name of Eagle Alliance and Morgan Procurement.  Specifically:

(i)     On or about April 15, 1997, the CBN transferred $141,253,333 (equivalent to approximately 243 million DM) into and out of a correspondent bank account at Citibank (New York) to Goldman Sachs in Zurich, Switzerland, for credit to accounts held in the names of Eagle Alliance and Morgan Procurement.

(ii)    On or about April 22, 1997, the CBN transferred $141,253,331 (equivalent to approximately 243 million DM) into and out of a correspondent bank account at Citibank (New York) to Goldman Sachs in Zurich, Switzerland, for credit to the **Mecosta** account, but, instead, these funds were deposited into an account of Eagle Alliance.

46.    Later in 1997, officials at Goldman Sachs informed Bagudu and Mohammed Abacha that the bank was ending their relationship over concerns about the source of the money in the accounts held by Eagle Alliance and Morgan Procurement.  As a result, Bagudu and Mohammed Abacha transferred approximately $202.3 million in cash and securities from the Eagle Alliance accounts at Goldman Sachs in Zurich to a **Mecosta** account at Banque Baring Brothers, located in Geneva, Switzerland, and they transferred approximately $90 million in cash and securities from the Morgan Procurement accounts to a **Mecosta** account at Credit Agricole Indosuez in London.

47.    On or about February 1998, officials at Banque Baring Brothers informed Bagudu and Mohammed Abacha that the bank was terminating its relationship with **Mecosta** over false representations made by Bagudu and Mohammed Abacha about the source of their money. Bagudu and Mohammed had falsely represented to Banque Baring Brothers that the funds came from the oil and gas industry.

48.    Bagudu and Mohammed Abacha then approached DBIL located in Jersey.  DBIL officials, relying upon the false representations of Bagudu and Mohammed Abacha and false documents purportedly showing legitimate sources of the **Mecosta** money, approved their request to open an account in the name of **Mecosta**.  For example, Bagudu and Mohammed Abacha represented to DBIL that the **Mecosta** funds were the proceeds of oil, construction, and

energy trading, when in truth and in fact the **Mecosta** funds were the proceeds of theft and corruption.

49.     When the DBIL account was opened on or about April 3, 1998, Bagudu and Mohammed Abacha changed the name on the account from **Mecosta** to "**Doraville Properties Corporation**" and transferred approximately $137.1 million in proceeds of the Debt Buy-Back Fraud from their **Mecosta** account at Banque Baring Brothers into this **Doraville** account at DBIL.

50.     In 1998, after General Abacha's death, approximately $115 million of the funds deposited into the **Doraville** account were transferred to the government of Nigeria voluntarily by the Abacha family, leaving only $1,000 remaining.  This $1,000 was later comingled with funds from the purchase and sale of Nigerian Par Bonds as described herein.

51.     Approximately $3.2 million of the funds Eagle Alliance (on behalf of **Mecosta**) obtained in this scheme were transferred into **Mecosta's** account at ANZ (London) where it was intermingled with proceeds from the Security Votes Fraud and used to purchase Nigerian Par Bonds as described below.

**D.     The Laundering of the Proceeds of the Security Votes Fraud and the Debt Buy-Back Fraud through the Purchase and Transfer of U.S.-Backed Securities, Nigerian Par Bonds**

52.     Mohammed Abacha, Bagudu, and others invested the proceeds of the schemes described above in Nigerian Par Bonds (NPBs), reaping more than $175 million in interest paid by the Nigerian government and backed by the United States.

53.     Through the use of their corporate entities, including **defendants Mecosta**, **Rayville**, **Standard Alliance**, and **Doraville**, Bagudu and Mohammed Abacha pooled proceeds of the Security Votes Fraud, the Debt Buy-Back Fraud, and other criminal activity into the

purchase of NPBs and related Payment Adjustment Warrants (PAWs) through a complex series of monetary transactions in or affecting the United States.  As set forth herein, transactions involving these Nigerian government securities are traceable to the defendant assets held in the name of the five defendant corporations.

      **i.**      **Background on Nigerian Par Bonds**

54.     NPBs were U.S. dollar-denominated securities whose interest (known as "coupon interest") payments were guaranteed by the U.S. Treasury.  This type of security was created as part of the Brady Bond program to help developing countries holding substantial debt to restructure their debt into bonds.  Under this program, U.S. zero-coupon (i.e., interest free) bonds were held in escrow to guarantee the payment of interest on bonds issued by developing nations, such as Nigeria.  The U.S. dollar-denominated securities, issued by developing nations, were offered for sale around the world through commercial financial institutions that elected to participate in this market.

55.     Bonds are valued by the issuer at the amount due to the bond holder on the bond's maturity date (known as the "par value" or simply "par").  The bond's par value is also referred to as the bond's "face value."

56.     Nigeria first offered NPBs under the Brady Bond program in 1992.  To encourage investors to purchase NPBs, the Nigerian government also issued PAWs, another type of investment, with each purchase of NPBs.  A set formula determined how many PAWs would accompany each NPB purchase.  The NPBs and PAWs could be traded together or separately.  The PAWs yielded dividend payments, which were paid twice per year.

57.     Citibank NA, New York (Citibank (New York)) served as the Fiscal Agent, Registrar, and Calculation Agent for the Nigerian government in connection with the issuance

and sale of NPBs and PAWs.  In this capacity, Citibank (New York) was responsible for disbursement of coupon interest payments on the NBPs and for payment of dividends on the related PAWs.  The Nigerian government periodically transferred money to Citibank (New York) to fund these payments.  Coupon interest payments and dividend payments were then made from the United States by Citibank (New York) in U.S. dollars to the financial institution designated by each bond holder.

58.     Over the course of the conspiracy, Bagudu and Mohammed Abacha transferred approximately $190 million in proceeds of their criminal schemes into accounts in the name of Eagle Alliance and **Mecosta** at ANZ (London) and approximately $83 million into accounts in the name of **Mecosta** at Standard Bank, also in London.  These funds were used to purchase NPBs worth $572 million (face value), including $490 million at ANZ (London) and at least $82 million at Standard Bank.

59.     Of the $190 million deposited at ANZ (London), approximately $126.5 million originated from the Security Votes Fraud.  An additional $15 million was transferred to ANZ (London) from Morgan Procurement, a company owned and controlled by Mohammed Abacha and Bagudu.  Between 1995 and 1997, Morgan Procurement received two public contracts for the procurement of vaccines from Nigeria's National Commission for Women and Federal Ministry of Health, both of which were under the control of Maryam Abacha, General Abacha's wife and Mohammed Abacha's mother. The $15 million was a portion of the more than $110 million received by Morgan Procurement for these contracts, of which only approximately $48 million was used to purchase vaccines.

60.     The NPBs purchased by Bagudu and Mohammed Abacha generated substantial income.  For example, from November 1995 through November 2006, a total of at least

$166 million in coupon interest payments, funded by Nigeria and traceable to NPBs purchased with the proceeds of the Security Votes Fraud alleged herein, was transferred from Citibank (New York) into bank accounts in the name of Eagle Alliance and **Mecosta** at ANZ (London) and **Doraville** at DBIL.

      **ii.**      **The Purchase of Nigerian Par Bonds at ANZ (London) By Defendant Mecosta**

      61.      In September 1995, Eagle Alliance entered into a Master Deferred Purchase Agreement (MDPA) with ANZ (London) to buy NPBs through the bank's "emerging markets" program.  This umbrella agreement authorized Eagle Alliance to enter into subsequent, specific deferred purchase agreements with ANZ (London) to acquire NPBs using funds from Eagle Alliance and financing from ANZ (London).  Pursuant to the MDPA, Eagle Alliance provided approximately 30 percent of the purchase price from its deposits, and the remainder was financed by ANZ (London), with the NBPs serving as collateral for the loans.  In accordance with the MDPA, payments were made in U.S. dollars to ANZ (New York).

      62.      All told, Eagle Alliance paid approximately $29.8 million to purchase NPBs worth $200 million (face value), all of which were paid using funds transferred through ANZ (New York) and financed by ANZ (London).

      63.      For example, on October 24, 1995, Eagle Alliance paid $1.4 million to purchase NPBs worth $10 million (face value) using funds transferred through ANZ (New York) to ANZ (London) coupled with financing from ANZ (London).

      64.      On or about February 8, 1996, **Mecosta** entered into a similar MDPA with ANZ (London), which authorized **Mecosta** to buy NPBs using its own funds combined with financing provided by ANZ (London).  In accordance with the MDPA, and subsequent, specific deferred purchase agreements, payments were made in U.S. dollars to ANZ (New York).

65.     On or about February 13, 1996, Mohammed Abacha and Bagudu transferred all remaining assets held by Eagle Alliance to **Mecosta**.

66.     By early May 1998, **Mecosta** owed over $200 million to ANZ (London).  To pay down this debt, on or about May 15, 1998, Bagudu arranged for the transfer of £40 million GBP (the equivalent of $64.3 million) from Inland Bank Nigeria Plc, Lagos, Nigeria, to **Mecosta's** account at ANZ (London).  These funds were converted into U.S. dollars, which **Mecosta** used to reduce the debt owed to ANZ (London).

67.     From November 1995 through November 1998, Citibank (New York) disbursed coupon interest payments on the NPBs to ANZ (New York) that were later transferred into the accounts of Eagle Alliance and **Mecosta** located at ANZ (London) as follows.  The coupon interest payments were used to pay down the debt owed to ANZ (London) for the NPB purchases:

| Date of Payment | Amount of Coupon Payment |
| --- | --- |
| 11/15/1995 | $ 4,687,500 |
| 5/15/1996 | $ 9,375,000 |
| 11/15/1996 | $13,125,000 |
| 5/15/1997 | $15,312,500 |
| 11/15/1997 | $15,312,500 |
| 5/15/1998 | $15,312,500 |
| 11/15/1998 | $15,312,500 |

68.     By November 1998, Bagudu and Mohammed Abacha, through **Mecosta**, had purchased and held through ANZ (London) NPBs worth $490 million (face value), but **Mecosta** also owed ANZ (London) $95 million that it had borrowed to finance the purchase of the bonds.

    **iii.     The Transfer of Nigerian Par Bonds from ANZ (London) to Defendant Doraville's Account at DBIL**

69.     In November 1998, ANZ (London) notified Bagudu, as the authorized

representative of **Mecosta**, that ANZ (London) was closing its "emerging markets" operation

through which the NPBs were held in **Mecosta's** account.  As a result, on November 20, 1998,

Bagudu and Mohammed Abacha transferred $400 million of the $490 million (face value) NPBs

held in the **Mecosta** account at ANZ (London) to Deutsche Bank AG in London through DBIL

in Jersey. Later, as described below, NPBs worth $325 million (face value) from this tranche

were transferred to **Doraville's account at DBIL**.  Bagudu transferred the remaining NPBs

worth $90 million (face value) to Credit Agricole Indosuez in London.

70.     Mohammed Abacha and Bagudu accomplished the transfer of NPBs from

**Mecosta** to **Doraville** through a series of U.S.-dollar transactions on or about

November 20, 1998, involving ANZ (London), Deutsche Bank AG London, DBIL in Jersey, and

U.S. financial institutions, as described below.  Ultimately NBPs worth $325 million (face value)

were transferred to the account of **Doraville** at DBIL.

(a)     First, NPBs worth $400 million (face value) were transferred from the

**Mecosta** account at ANZ (London) to **Doraville's** account located at DBIL.

(b)     Next, DBIL transferred the NPBs to an account held in the name of

**Doraville** at Deutsche Bank AG London.

(c)     The NPBs at Deutsche Bank AG London were held as collateral for a

$95 million loan that **Doraville** received from Deutsche Bank AG London through transactions

into and out of correspondent banks in New York.

(d)     **Doraville**, in turn, wired the $95 million in loan money into and out of

Morgan Guaranty Trust Company, New York (now J.P. Morgan) to ANZ (London) to pay off

the outstanding debt that **Mecosta** owed on these bonds.

71.     Approximately one year later, in November 1999, Bagudu and Mohammed Abacha paid Deutsche Bank AG London a total of $98 million (reflecting the $95 million loan amount plus $3 million in fees) to pay off **Doraville's** loan.  This debt was paid using funds from the sale of NPBs held as collateral for the loan and proceeds from the following transactions:

(a)     A wire transfer of $25 million, including proceeds from the Security Votes Fraud, on November 18, 1999, from bank account 223405880IUSD held in the name of **Rayville** located at Banque SBA in Paris into and out of a correspondent bank account at Deutsche Bank New York, and to Deutsche Bank AG London;

(b)     A wire transfer of $10 million of Security Votes Fraud proceeds on or about November 18, 1999, from bank account number 223406510PUSD held in the name of **Standard Alliance** located at Banque SBA into and out of a correspondent bank account at Deutsche Bank New York, and to Deutsche Bank AG London;

(c)     A wire transfer of at least $9.5 million of the Debt Buy-Back Fraud proceeds on or about November 26, 1999, from another **Mecosta** investment account, located at Credit Agricole Indosuez London, to Bankers Trust Company, New York, for deposit at Deutsche Bank AG London; and

(d)     The sale of NPBs worth $75 million (face value) of the original $400 million (face value).

72.     Upon Bagudu's and Mohammed Abacha's repayment of the $98 million debt, Deutsche Bank AG London transferred the remaining $325 million (face value) of the NPBs and related PAWs on or about December 13, 1999, to **Doraville's** bank account at DBIL in Jersey.

73.     From April 2000 to November 2006, Bagudu and Mohammed Abacha sold the remaining NPBs worth $325 million (face value) held in the account of **Doraville** at DBIL in

Jersey on the open market or back to the Nigerian government, yielding at least $149,986,000. The proceeds from the sale and redemption of NPBs were deposited into **account number 80020796** in the name of **Doraville** located at DBIL in Jersey.  For example, on or about September 22, 2005, NPBs worth $25,676,215.28 were sold, and on or about October 13, 2005, NPBs worth $10,231,944.44 were sold.  The proceeds of both sales were deposited into **account number 80020796** held in the name of **Doraville** at DBIL in Jersey.

74.     Citibank (New York) disbursed coupon interest payments on the NPBs to **Doraville's** account at DBIL between the time that **Doraville** acquired the bonds and the time that they were sold or transferred.

75.     In addition to the coupon interest payments, from at least April 2001 through November 2006, Citibank (New York) transferred at least $19 million in proceeds from the sales of PAWs into **account number 80020796** held in the name of **Doraville** at DBIL in Jersey.

76.     From November 2001 through November 2006, Citibank (New York) disbursed dividend payments related to the PAWs worth over $6 million into and out of Deutsche Bank Trust Company in New York for deposit into the account of **Doraville** at DBIL by means of multiple wire transfers.

77.     On May 18, 2003, Bagudu was arrested in Houston, Texas, for extradition on warrants issued by the Bailiwick of Jersey.  Bagudu subsequently entered into an agreement with Nigeria and Jersey to return more than $163 million of **Doraville's** assets to the Nigerian government in exchange for Jersey's withdrawal of its extradition request and his return to Nigeria for possible prosecution.  Bagudu transferred $163,719,820 from **Doraville's** DBIL bank account to Nigeria.  According to Bagudu, this sum represented his half of the **Doraville** assets.

78.     The assets currently held in the **Doraville** account (valued at approximately $287 million) include the funds remaining after the transfer and liquidation of the NPBs.  All of the NPBs are believed to have been sold or redeemed by 2007.

> **iv.     Transfer of NPBs from ANZ (London) to the Defendant Blue (1) and Blue (2) Investment Portfolios**

79.     In July 1997, Bagudu acquired the **Ridley Group**.  In September 1997, at Bagudu's request, Indosuez Trust Services Limited formed the Ridley Trust in Guernsey, with Bagudu as the prime beneficiary.  By the Declaration of Trust, the Ridley Trust became the sole shareholder of **Ridley Group**.

80.      On or about November 30, 1998, Bagudu caused the transfer of NPBs worth $90 million (face value) of the original $490 million from ANZ (London) to an account in the name of the **Ridley Group** at Credit Agricole Indosuez, London.  To accomplish this transfer, he first had to repay the remaining debt owed by **Mecosta** to ANZ (London) against the bonds.

81.     To do so, Bagudu caused the wire transfer of approximately $2.4 million of Debt Buy-Back Fraud proceeds on or about November 24, 1998, from an investment account in the name of **Mecosta** at Credit Agricole Indosuez, London, to Marine Midland Bank N.A., New York, to ANZ (New York), and then to the account of **Mecosta** at ANZ (London).

82.     NPBs worth $90 million (face value) remained in the **Ridley Group** account at Credit Agricole Indosuez, London at least as late as November 30, 2001, after which Credit Agricole Indosuez, London moved the **Ridley Group** account to Indosuez Trust Services Limited.

83.     Coupon interest payments were transferred to **Ridley Group** at Credit Agricole Indosuez and Indosuez Trust Services Limited in connection with the NPBs.  For example, on or

about November 22, 2000, a payment of $2.8 million was transferred into and out of Citibank (New York) to the **Ridley Group** at Credit Agricole Indosuez, London.

84.     On or about January 21, 2005, Indosuez Trust Services Limited transferred all funds, NPBs, and related PAWs held by **Ridley Group** and the Ridley Trust to J.O. Hambro Investment Management Limited, an investment firm located in London, England.

85.     Subsequently, the NPBs were liquidated and the proceeds from each sale were deposited into J.O. Hambro Investment Accounts.  Because Citibank (New York) served as the Fiscal Agent, Registrar, and Calculation Agent for Nigeria in connection with the issuance and sale of NPBs and PAWs, the transactions that liquidated the bonds occurred, in part, in the United States.

86.     In August 2010, J.O. Hambro Investment Management Ltd transferred the assets of the Ridley Trust to the investment portfolios of **Blue Holding (1)** and **Blue Holding (2)**, two corporations registered in Singapore.

(a)     On or about September 20, 2010, approximately €70 million were transferred from the two investment portfolios held at J.O. Hambro Investment Management Limited in the name of the Ridley Trust to investment portfolios **Blue Holding (1) Pte Ltd** and **Blue Holding (2) Pte Ltd** held at another investment firm, James Hambro & Partners LLP, also located in London, England.

(b)     As of December 2011, the balances of the investment portfolios held in the names of **Blue Holding (1) Pte Ltd** and **Blue Holding (2) Pte Ltd** at J.O. Hambro Investment Management Limited were approximately €6,806,900 and €21,846,983, respectively; and the balances of the investment portfolio accounts of **Blue Holding (1) Pte Ltd** and **Blue**

**Holding (2) Pte Ltd** at James Hambro & Partners LLP were €10,293,343.58 and

€56,962,996.26, respectively.

>        **v.      The Purchase of Nigerian Par Bonds at Standard Bank by Defendant
>                 Mecosta**

87.      From on or about August 8, 1997, through January 27, 1998, Bagudu caused the

transfer of $83 million in Security Votes Fraud proceeds from Bagudu's account at Inland Bank

Nigeria, Plc, Lagos, Nigeria, to Standard Bank in London for credit to account number

100024269 held in the name of **Mecosta**.  This transfer was conducted through transactions from

Inland Bank, through the CBN and into an Inland Bank Nigeria, Plc, domiciliary bank account

located at Citibank (New York).  These funds were then transferred out of Citibank (New York)

into and out of a correspondent bank account at Barclays Bank, New York, to Standard Bank in

London where they were comingled with funds already in **Mecosta's** account.

88.      Bagudu and Mohammed Abacha used the funds in **Mecosta's** account at Standard

Bank to purchase NPBs and related PAWs using a combination of cash and financing from

Standard Bank, with the NPBs held as collateral.

>        **vi.     The Transfer of Defendant Mecosta's NPBs from Standard Bank to
>                 Defendant Standard Alliance at Banque SBA in Paris, France**

89.      In late 1998 to early 1999, Standard Bank also withdrew from the emerging

markets program.  As a result, Bagudu and Mohammed Abacha transferred **Mecosta's** NPBs

from Standard Bank.

90.      In order to transfer the NPBs, Bagudu and Mohammed Abacha paid off the debt

leveraged against those bonds by selling some of the NPBs.  After the debt was paid, on

February 5, 1999, Bagudu caused the transfer of NPBs worth $82 million (face value) and

related PAWs from **Mecosta's** account at Standard Bank, London to **account number 223406510PUSD,** held in the name of **defendant Standard Alliance**, located at Banque SBA.

91.    In addition, on or about February 23, 1999, Bagudu caused the transfer of approximately $2.5 million in cash from **Mecosta's** account at Standard Bank to bank account **number 223406510PUSD**, held in the name of **Standard Alliance** and located at Banque SBA. The transaction was conducted through Credit Lyonnaise Bank, New York.

92.    On information and belief, the remaining funds held in **Mecosta's** account number 100024269 at Standard Bank, after the NPBs and cash were transferred, were moved to **account numbers 100130688 and 100138409**, also in the name of **Mecosta** at Standard Bank.

93.    On or about December 6, 2006, **Standard Alliance** sold a tranche of NPBs for $84,562,500.  The proceeds of this sale were transferred through Credit Lyonnais, New York and were deposited back into **account number 223406510PUSD**, held in the name of **Standard Alliance** and located at Banque SBA.  Coupon interest payments were also transferred from Citibank (New York) to **Standard Alliance** at Banque SBA and **Mecosta** at Standard Bank during the time when those accounts held NBPs. For example, **Standard Alliance** received semi-annual coupon interest payments of $2,549,687.50 between May 28, 2002, and December 5, 2006.

**E.**    **Dumez Extortion**

    **i.**    **Extortion for the Payment of a Nigerian Government Contract**

94.    During his regime, General Abacha dominated the government and economy of Nigeria, exercising plenary control over the military and security forces, as well as government contracting, the award of oil and gas concessions, and other lucrative government benefits.  In November 1993, he stopped payment on Nigerian government contracts with foreign companies,

including the Dumez Group, a French civil engineering firm.  Although the Dumez Group later restructured itself as a Nigerian-based company, Dumez Nigeria Limited (Dumez), it was unable to collect approximately $469 million in connection with these contracts.

95.     David Umaru, an attorney and associate of the Abacha family, advised the owners of Dumez that payments could be restarted if they agreed to kick back 25 percent of those payments to the Abacha family.  Dumez agreed.  Dumez entered into an agreement with Allied Network LTD, a Nigerian corporation created by Umaru to receive kickbacks for Abacha family members.  Allied Network LTD was listed under "Mohammed Sani" and "Abba Sani," which referred to Mohammed Abacha and his brother Abba Abacha.

96.     In December 1996, Umaru opened an account in the name of Allied Network LTD at Union Bancaire Privée (UBP) in Geneva, Switzerland.  This account was used to funnel kickback payments to the Abacha organization.  Dumez also opened an account at UBP to receive the payments from the Nigerian government, once they were restarted.

97.     Between August 16, 1996, and May 22, 1998, the CBN transferred $389,787,400 to the Dumez account at UBP in Geneva.  Of this amount, $97,375,543, or 25 percent, was then transferred by Dumez to Allied Network LTD for distribution to members of the Abacha organization.

98.     In late 1997, Mohammed Abacha caused a total of $11,114,983 of payments from Dumez, intended for Allied Network LTD, to be transferred into **defendant account number 38175076**, held in the name of "Mohammed Sani" at Midland Bank London (now HSBC Bank Plc.), where it was comingled with $2.12 million in proceeds of the Security Votes Fraud that had previously been wired directly from the CBN into this account. [7]

---

[7] HSBC Holdings acquired Midland Bank in 1992.  In 1999 HSBC Holdings phased out the Midland Bank name in favor of HSBC Bank.

ii.    **The Laundering of the Dumez Extortion Proceeds and Transfer of the Proceeds to the Defendant HSBC Accounts**

99.    The transfer of the $11,114,983 in Dumez Extortion proceeds to **defendant account number 38175076** at Midland Bank London occurred through financial institutions in the United States.

100.    The funds in **defendant account number 38175076** at Midland Bank London were deposited into two of the defendant accounts, each held in the name of "Mohammed Sani," as follows:

(a)    Wire transfers of $2,500,000 on or about July 14, 1997, $5,000,000 on or about January 15, 1998, and $1,000,000 on or about June 10, 1998, into and out of a correspondent bank account at Chase Manhattan Bank, New York, and then into and out of a correspondent bank account at Bankers Trust Company, New York, to account 04-082-437 at Midland Bank Offshore Limited, which is now known as **account number S-104460 at HSBC Fund Administration (Jersey) al Limited**; and

(b)    Wire transfers of $1,000,000, and $3,000,000 on or about June 9, 1998, into and out of a correspondent bank account at Marine Midland Bank, New York, to **account number 37060762** in the name of Mohammed Sani at Midland Life International Limited, which is now held at HSBC Life (Europe).

## V.    BASIS FOR FORFEITURE

101.    At all times relevant to this complaint, conduct constituting theft; conversion; fraud; extortion; and the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official were criminal offenses under Nigerian law, as enumerated in the Nigerian Criminal and Penal Codes, including but not limited to Nigerian Criminal Code Act

1990, CAP.77, Part 3, Chapters 12 and 34, and the Nigerian Penal Code Law 1963, CAP. 89

(1987), Chapters X, and XIX.  Copies of relevant provisions are set forth in Attachment A.

102.    As described below, the following entities were used by Abacha and his

associates to execute these financial transactions, and each constitutes a "financial institution," as

defined under 31 U.S.C. § 5312(a)(2) for purposes of 18 U.S.C. §§ 1956 and 1957:

> (a)    ANZ Banking Group, New York;
>
> (b)    Bankers Trust Company, New York;
>
> (c)    Barclays Bank, New York;
>
> (d)    Citibank NA, New York;
>
> (e)    Chase Manhattan Bank, New York;
>
> (f)    Chemical Bank, New York;
>
> (g)    Commerzbank AG, New York;
>
> (h)    Marine Midland Bank, New York (now HSBC USA, NA); and
>
> (i)    Morgan Guaranty Trust Company, New York (now JP Morgan Chase).

### FIRST CLAIM FOR FORFEITURE
### (18 U.S.C. § 981(a)(1)(A))

103.    Paragraphs 1-102, above, are incorporated by reference as if fully set forth herein.

104.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved

in a transaction or attempted transaction in violation of sections 1956 [or] 1957… of [Title 18],

or any property traceable to such property" is subject to forfeiture to the United States.

105.    Title 18, United States Code, Section 1957 imposes a criminal penalty on any

person who, "[k]nowingly engages or attempts to engage in a monetary transaction in

criminally derived property of a value greater than $10,000 and is derived from specified

unlawful activity."  A "monetary transaction" includes the "deposit, withdrawal, transfer or

exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument…by,

through, or to a financial institution."  18 U.S.C. § 1957(f)(1).

106.    For the purposes of 18 U.S.C. § 1957, the term "specified unlawful activity"

includes the transportation, transmission, or transfer in interstate or foreign commerce of $5,000

or more in securities or money that is known by the defendant to have been stolen, converted, or

taken by fraud in violation of 18 U.S.C. § 2314.

107.    For the purposes of 18 U.S.C. § 1957, the term "specified unlawful activity" also

includes the receipt, possession, concealment, storage, sale, or disposal "of securities or money

of a value of $5,000 or more," or the pledge or acceptance "as security for a loan any goods . . .

or securities, of the value of $500 or more, which have crossed a State or United States boundary

after being stolen, unlawfully converted, or taken, knowing the same to have been stolen,

unlawfully converted, or taken" in violation of 18 U.S.C. § 2315.

108.    As set forth above, the following defendants *in rem* constitute property involved

in money laundering transactions and attempted money laundering transactions in violation of

18 U.S.C. § 1957, and therefore are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A):

(a)    All assets held in account number 80020796, in the name of Doraville Properties
Corporation, at Deutsche Bank International, Limited in the Bailiwick of Jersey,
and all interest, benefits, or assets traceable thereto;

(b)    All assets held in account number S-104460, in the name of Mohammed Sani, at
HSBC Fund Administration (Jersey) Limited, and all interest, benefits, or assets
traceable thereto;

(c)    All assets held in account number 223406510PUSD, in the name of Standard
Alliance Financial Services Limited at Banque SBA in Paris, and all interest,
benefits, or assets traceable thereto;

(d)     All assets held in account number 223405880IUSD, in the name of Rayville International at Banque SBA in Paris, and all interest, benefits, or assets traceable thereto;

(e)     All assets held in account numbers 100130688 and 100138409, in the name of Mecosta Securities, at Standard Bank in London, and all interest, benefits, or assets traceable thereto;

(f)     All assets held in the name of Blue Holding (1) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, located at J.O. Hambro Investment Management Limited, and all interest, benefits, or assets traceable thereto;

(g)     All assets held in the name of Blue Holding (2) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, located at J.O. Hambro Investment Management Limited, and all interest, benefits, or assets traceable thereto;

(h)     All assets held in the name of Blue Holding (1) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, located at James Hambro & Partners LLP, and all interest, benefits, or assets traceable thereto; and

(i)     All assets held in the name of Blue Holding (2) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, located at James Hambro & Partners LLP, and all interest, benefits, or assets traceable thereto.

## SECOND CLAIM FOR FORFEITURE
### (18 U.S.C. § 981(a)(1)(A))

109.    Paragraphs 1-102, 104 and 105 are incorporated by reference as if fully set forth herein.

110.    For purposes of 18 U.S.C. § 1957, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(B)(iv) to include foreign offenses involving "the misappropriation, theft or embezzlement of public funds by or for the benefit of a public official."

111.    As set forth above, the following defendants *in rem* constitute property involved in money laundering transactions and attempted money laundering transactions in violation of 18 U.S.C. § 1957, and therefore are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A):

(a)     All assets held in aaccount number 80020796, in the name of Doraville Properties Corporation, at Deutsche Bank International, Limited in the Bailiwick of Jersey, and all interest, benefits, or assets traceable thereto;

(b)     All assets held in account number 223406510PUSD, in the name of Standard Alliance Financial Services Limited at Banque SBA in Paris, and all interest, benefits, or assets traceable thereto;

(c)     All assets held in account numbers 100130688 and 100138409, in the name of Mecosta Securities, at Standard Bank in London, and all interest, benefits, or assets traceable thereto;

(d)     All assets held in the name of Blue Holding (1) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, located at J.O. Hambro Investment Management Limited, and all interest, benefits, or assets traceable thereto;

(e)     All assets held in the name of Blue Holding (2) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, located at J.O. Hambro Investment Management Limited, and all interest, benefits, or assets traceable thereto;

(f)     All assets held in the name of Blue Holding (1) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, located at James Hambro & Partners LLP, and all interest, benefits, or assets traceable thereto; and

(g)     All assets held in the name of Blue Holding (2) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, located at James Hambro & Partners LLP, and all interest, benefits, or assets traceable thereto.

## THIRD CLAIM FOR FORFEITURE
### (18 U.S.C. § 981 (a)(1)(A))

112.    Paragraphs 1-102, 104, 105 -107 and 110 are incorporated by reference as if fully set forth herein.

113.    Title 18, United States Code, Section 1956(h) imposes a criminal penalty on any person who conspires to commit any offense defined in 18 U.S.C. §§ 1956 or 1957.

114.    As set forth above, the following defendants *in rem* were involved in a conspiracy to commit money laundering transactions and attempted money laundering transactions in violation of 18 U.S.C. §§ 1956(h) and 1957, and therefore are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A):

(a)     All assets held in account number 80020796, in the name of Doraville Properties Corporation, at Deutsche Bank International, Limited in the Bailiwick of Jersey, and all interest, benefits, or assets traceable thereto;

(b)     All assets held in account number S-104460, in the name of Mohammed Sani, at HSBC Fund Administration (Jersey) Limited, and all interest, benefits, or assets traceable thereto;

(c)     All assets held in account number 223405880IUSD, in the name of Rayville International at Banque SBA in Paris, and all interest, benefits, or assets traceable thereto;

(d)     All assets held in account number 223406510PUSD, in the name of Standard Alliance Financial Services Limited at Banque SBA in Paris, and all interest, benefits, or assets traceable thereto;

(e)     All assets held in account numbers 100130688 and 100138409, in the name of Mecosta Securities, at Standard Bank in London, and all interest, benefits, or assets traceable thereto;

(f)     All assets held in the name of Blue Holding (1) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, located at J.O. Hambro Investment Management Limited, and all interest, benefits, or assets traceable thereto;

(g)     All assets held in the name of Blue Holding (2) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, located at J.O. Hambro Investment Management Limited, and all interest, benefits, or assets traceable thereto;

(h)     All assets held in the name of Blue Holding (1) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, located at James Hambro & Partners LLP, and all interest, benefits, or assets traceable thereto; and

(i)     All assets held in the name of Blue Holding (2) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, located at James Hambro & Partners LLP, and all interest, benefits, or assets traceable thereto.

**FOURTH CLAIM FOR FORFEITURE**
**(18 U.S.C. § 981(a)(1)(A))**

115.     Paragraphs 1-102, 104, 105 -107, 110 and 113 are incorporated by reference as if
fully set forth herein.

116.     As set forth above, the following defendants *in rem* constitute property involved
in money laundering transactions and attempted money laundering transactions, and were
involved in a conspiracy to commit money laundering transactions and attempted money
laundering transactions in violation of 18 U.S.C. §§ 1956(h) and 1957, and therefore are subject
to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A):

    (a)     Doraville Properties Corporation, a corporate entity registered in the British
Virgin Islands, together with all its assets and all property traceable thereto;

    (b)     Mecosta Securities, Inc., a corporate entity registered in the British
Virgin Islands, together with all its assets and all property traceable thereto;

    (c)     Rayville International, SA, a corporate entity registered in the British Virgin
Islands, together with all its assets and all property traceable thereto;

    (d)      Ridley Group Limited, a corporate entity registered in the British Virgin Islands,
together with its assets and all property traceable thereto; and

    (e)     Standard Alliance Financial Services Limited, a corporate entity registered in the
British Virgin Islands, together with all its assets and all property traceable
thereto.

**FIFTH CLAIM FOR FORFEITURE**
**(18 U.S.C. § 981(a)(1)(A))**

117.     Paragraphs 1-102, 104 and 105 are incorporated by reference as if fully set forth
herein.

118.     For purposes of 18 U.S.C. § 1957, "specified unlawful activity" is defined in
18 U.S.C. § 1956(c)(7)(B)(ii) to include foreign offenses involving extortion.

119.     As set forth above, the following defendants *in rem* constitute property involved in money laundering transactions and attempted money laundering transactions in violation of 18 U.S.C. § 1957, and therefore are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A):

(a)      All assets held in account number 38175076, in the name of Mohammed Sani at HSBC Bank Plc., and all interest, benefits, or assets traceable thereto;

(b)      All assets held in account number S-104460, in the name of Mohammed Sani, at HSBC Fund Administration (Jersey) Limited, and all interest, benefits, or assets traceable thereto; and

(c)      All assets held at HSBC Life (Europe) formerly held in account number 37060762 in the name of Mohammed Sani at Midland Life International Limited and all interest, benefits, or assets traceable thereto.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that judgment be entered in its favor against the defendant properties; that pursuant to law, notice be provided to all interested parties to appear and show cause why the forfeiture should not be decreed; that the defendant properties be forfeited to the United States of America and delivered into its custody for disposition according to law; that the Plaintiff be awarded its costs and disbursements in this action; and for such and further relief as this Court may deem just and proper.

Respectfully submitted,

JAIKUMAR RAMASWAMY, CHIEF
ASSET FORFEITURE AND MONEY
LAUNDERING SECTION

By: ____/s/ Elizabeth A. Aloi_____
DANIEL H. CLAMAN
Assistant Deputy Chief
ELIZABETH A. ALOI
Trial Attorney
Asset Forfeiture and Money Laundering Section
Criminal Division
U.S. Department of Justice
1400 New York Avenue, NW, 10th Floor
Washington, DC  20530
Tel:    (202) 514-1263
Fax:    (202) 514-5522

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## VERIFICATION

I, Debra LaPrevotte, am a Supervisory Special Agent of the Federal Bureau of Investigation (FBI) and a case agent assigned responsibility for this case.

I have read the contents of the foregoing Verified Complaint for Forfeiture *In Rem*, and the statements contained therein are true to the best of my knowledge and belief, and I base my knowledge for this verification of the Complaint for Forfeiture *In Rem* on the following:

      (a)    Information I have learned during, or been given by special agents of the FBI and other law enforcement officials who also participated in the investigation of Nigerian General Sani Abacha, Ibrahim Abacha, Mohammed Abacha, Abubakar Bagudu and other individuals engaged in illegal fraud schemes involving the Federal Republic of Nigeria and others;

      (b)    My review of the interviews and testimony of various cooperating witnesses, and my knowledge of other such interviews, relating to the investigation of General Sani Abacha, Ibrahim Abacha, Mohammed Abacha, Abubakar Bagudu and other individuals engaged in illegal fraud schemes involving the Federal Republic of Nigeria; and

      (c)    My experience in foreign corruption, fraud and embezzlement investigations, and the experience of other law enforcement officers related to foreign corruption, fraud, and embezzlement investigations.

I declare under penalty of perjury as provided by 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 15th day of November, 2013.

Debra LaPrevotte
Supervisory Special Agent
Federal Bureau of Investigation