## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-cv-1832 (JDB) |
| | ) | |
| ALL ASSETS HELD IN ACCOUNT NUMBER | ) | **ORAL HEARING REQUESTED** |
| 80020796, IN THE NAME OF | ) | |
| DORAVILLE PROPERTIES CORPORATION, | ) | |
| AT DEUTSCHE BANK INTERNATIONAL, | ) | |
| LIMITED IN JERSEY, CHANNEL ISLANDS, | ) | |
| AND ALL INTEREST, BENEFITS, OR ASSETS | ) | |
| TRACEABLE THERETO, *ET AL.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CLAIMANTS' MOTION TO DISMISS GOVERNMENT'S
## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Claimants Aisha Atiku Bagudu, Ibrahim Atiku Bagudu, Zainab Shinkafi Bagudu, Ibrahim Bagudu, M.A.B., I.A.B., F.A.B., M.A.B., H.A.B., and R.A.B. (collectively, "Claimants"), by and through their undersigned counsel and pursuant to Federal Rule of Civil Procedure 12(b) and Supplemental Rule for Admiralty or Maritime Claims and Asset Forfeiture Actions G(5)(b), move to dismiss the Government's Verified Complaint for Forfeiture *In Rem* as to the following defendants *in rem*:

    a.  All assets held in the name of Blue Holding[s] (1) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, at J.O. Hambro Investment Management Limited in the United Kingdom, and all interest, benefits, or assets traceable thereto.

    b.  All assets held in the name of Blue Holding[s] (1) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, at James Hambro & Partners LLP, in the United Kingdom, and all interest, benefits, or assets traceable thereto.

c.  All assets held in the name of Blue Holding[s] (2) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, at J.O. Hambro Investment Management Limited in the United Kingdom, and all interest, benefits, or assets traceable thereto.

d.  All assets held in the name of Blue Holding[s] (2) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, at James Hambro & Partners LLP, in the United Kingdom, and all interest, benefits, or assets traceable thereto.

The grounds for dismissing the Government's Verified Complaint for Forfeiture *In Rem* are set forth in the Memorandum of Points and Authorities attached hereto and incorporated herein by reference.

Dated:  July 7, 2014

Respectfully submitted,

/s/ Jonathan R. Barr
Jonathan R. Barr (D.C. Bar No. 437334)
BAKER & HOSTETLER LLP
1050 Connecticut Ave. NW, Suite 1100
Washington, DC 20036
Tel:  202-861-1500
Fax:  202-861-1783
jbarr@bakerlaw.com

Jonathan B. New
jnew@bakerlaw.com
Patrick T. Campbell
pcampbell@bakerlaw.com
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111-0100
Tel: (212) 589-4650

## **CERTIFICATE OF SERVICE**

I certify that on July 7, 2014, I caused to be filed and served the foregoing via the Court's CM/ECF system, which will serve the following attorneys of record:

Elizabeth A. Aloi                                          Jude C. Ezeala
Trial Attorney                                             CAVA LEGAL GROUP PLLC
Asset Forfeiture and Money Laundering Section              1325 G Street, NW
Criminal Division                                          Suite 500
U.S. Department of Justice                                 Washington, DC 20005
1400 New York Avenue, NW
Suite 10100
Washington, DC 20005

Kenneth A. Nnaka
Law Offices of Nnaka & Associates, PLLC
2650 Fountain View Drive, Suite 332
Houston, TX 77057

/s/ Jonathan R. Barr

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-cv-1832 (JDB) |
| | ) | |
| ALL ASSETS HELD IN ACCOUNT NUMBER | ) | **ORAL HEARING REQUESTED** |
| 80020796, IN THE NAME OF DORAVILLE | ) | |
| PROPERTIES CORPORATION, AT DEUTSCHE | ) | |
| BANK INTERNATIONAL, LIMITED IN JERSEY, | ) | |
| CHANNEL ISLANDS, AND ALL INTEREST, | ) | |
| BENEFITS, OR ASSETS TRACEABLE | ) | |
| THERETO, *ET AL.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**CLAIMANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
CLAIMANTS' MOTION TO DISMISS THE GOVERNMENT'S
<u>COMPLAINT FOR FORFEITURE *IN REM*</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF THE FACTS ...........................................................3

      A.    Claimants and the Claimed Property ............................................3

      B.    Government's Alleged Basis for Forfeiture and the U.K. Freezing
          Injunction .............................................................................4

      C.    Nigeria's Initial Requests for Assistance and the U.S. Senate's
          Investigation..........................................................................6

      D.    Nigeria's Investigation, Additional Requests for Assistance, and
          Asset Freeze Orders ................................................................7

      E.    The 2003-2004 U.S. Extradition Proceedings ............................9

      F.    The Settlement Agreement ....................................................11

      G.    2004 to Present....................................................................12

ARGUMENT ..............................................................................14

    I.    THE GOVERNMENT'S INEXCUSABLE, MORE THAN TEN-YEAR
        DELAY IN FILING THIS FORFEITURE ACTION VIOLATES DUE
        PROCESS AND REQUIRES DISMISSAL OF THE COMPLAINT...................14

      A.    The Court Should Not Toll the Five-Year Statute of Limitations in
          This Case............................................................................16

      B.    The Government's Oppressive Delay in Filing this Forfeiture
          Action Has Prejudiced Claimants' Defense and Denied Them Due
          Process ..............................................................................19

    II.    THE COURT LACKS JURISDICTION TO ADJUDICATE
        CLAIMANTS' INTERESTS IN THE CLAIMED PROPERTY .........................24

    III.    THE GOVERNMENT FAILS TO STATE A CLAIM UPON WHICH
        RELIEF MAY BE GRANTED ...................................................29

      A.    The Government's Heightened Pleading Burden ......................29

      B.    The Allegations In The Complaint Fail to Establish All of the
          Elements of Money Laundering or Conspiracy .........................30

          1.    To the Extent that Counts One Through Three Are
               Premised Upon the Debt Buy-Back Transaction, the

## TABLE OF CONTENTS
(continued)

**Page**

Complaint Wholly Fails to Establish the Requisite
Specified Unlawful Activity ............................................................31

2.   The First Claim for Forfeiture Should Be Dismissed
Because the Allegations are Insufficient to Establish Any
Violation of 18 U.S.C. §§ 2314 or 2315 .......................................34

3.   The First And Second Claims Should Be Dismissed
Because The Allegations Fail to Establish the Required
Scienter for Money Laundering ......................................................36

4.   The Complaint Fails to Establish a Conspiracy for the
Purposes of the Third Claim for Forfeiture....................................38

C.   The Government Fails to Allege Facts Sufficient to Show the
Claimed Property is Derived From or Traceable to Illicit Activity ..........39

1.   The Government Overstates the Amounts Traced from
Nigeria............................................................................................41

2.   The Government Improperly Attempts to Taint the Full
Balances of Funds on Deposit at ANZ ..........................................42

3.   The Government Fails to Sufficiently Trace Nigerian
Proceeds to the Purchase of NPBs .................................................43

4.   The Complaint Lacks Any Basis to Forfeit the Full Value
of the Claimed Property .................................................................46

IV.   THIS COURT SHOULD DISMISS THE COMPLAINT ON GROUNDS
OF INTERNATIONAL COMITY AND THE ACT OF STATE
DOCTRINE ..............................................................................................47

CONCLUSION..................................................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano Cnty.*,
480 U.S. 102 (1987)............................................................................................28

*\*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................32, 38, 42, 46

*Barker v. Wingo*,
407 U.S. 514 (1972)............................................................................................20

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................30, 33

*Bi v. Union Carbide Chem. and Plastics, Inc.*,
984 F.2d 582 (2d Cir. 1993)...............................................................................50

*Bolton v. U.S. Nursing Corp.*,
NO. C 12-04466 LB, 2012 WL 5269738 (N.D.Cal. Oct 23, 2012)......................6

*Boumediene v. Bush*,
553 U.S. 723 (2008)............................................................................................19

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)......................................................................................25, 28

*Casualty Assur. Risk Ins. Brokerage Co. v. Dillon*,
976 F.2d 596 (9th Cir. 1992) ..............................................................................28

*Colony at Holbrook, Inc. v. Strata C.G., Inc.*,
No. 95 CV 913(NG); 1999 WL 172350 (E.D.N.Y. March 25, 1999) ..................42

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
407 F.3d 1220 (D.C. Cir. 2005)............................................................................6

*In re Cyberonics Inc. Sec. Litig.*,
NO. CIV.A. H-05-2121, 2006 WL 2050696 (S.D.Tex. Jul 20, 2006) ..................6

*De Csepel v. Republic of Hungary*,
714 F.3d 591 (D.C. Cir. 2013)............................................................................48

*Doe I v. State of Israel*,
400 F. Supp. 2d 86 (D.D.C. 2005)......................................................................48

*Dowling v. United States*,
473 U.S. 207 (1985)............................................................................................35

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Farah v. Esquire Magazine*,
    736 F.3d 528 (D.C. Cir. 2013) ..................................................................6

*Gabelli v. Sec. Exch. Comm'n*,
    133 S. Ct. 1216 (2013) ............................................................................15

*Gerena v. Korb*,
    617 F.3d 197 (2d Cir. 2010) ..................................................................17

*Glen v. Club Mediterranee, S.A.*,
    450 F.3d 1251 (11th Cir. 2006) .............................................................47

*Griffin v. Oceanic Contractors Inc.*,
    458 U.S. 564 (1982) ..............................................................................17

*Han Kim v. Democratic People's Republic of Korea*,
    950 F.Supp.2d 29 (D.D.C. 2013) .............................................................6

*Harrods Ltd. v. Sixty Internet Domain Names*,
    302 F.3d 214 (4th Cir. 2002) ................................................................25

*Heller v. Nicholas Applegate Capital Mgmt., LLC*,
    498 F. Supp. 2d 100 (D.D.C. 2007) ......................................................25

*Hilton v. Guyot*,
    159 U.S. 113 (1895) ..............................................................................48

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ..............................................................................25

*Jifry v. F.A.A.*,
    370 F.3d 1174 (D.C. Cir. 2004) ............................................................19

*Johnson v. Eisentrager*,
    339 U.S. 763 (1950) ..............................................................................19

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
    412 F.3d 418 (2d Cir. 2005) ..................................................................47

*Marshall Cnty. Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993) ...............................................................6

*McKesson Corp. v. Islamic Republic of Iran*,
    539 F.3d 485 (D.C. Cir. 2008) ..............................................................48

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*McQueen v. Woodstream Corp.*,
    248 F.R.D. 73 (D.D.C. 2008)............................................................................32

*Meyer v. Paschal*,
    498 S.E.2d 635 (S.C. 1998) ...........................................................................17

*Mikes v. Straus*,
    274 F.3d 687 (2d Cir. 2001)...........................................................................33

*In re Moffitt, Zwerling & Kemler, P.C.*,
    875 F.Supp. 1152 (E.D.Va. 1995) ...................................................................45

*Mwani v. bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005) .......................................................................25, 28

*National Fed. of Independent Business v. Sebelius*,
    132 S.Ct. 2566 (2012).....................................................................................17

*Parsons v. Bedford*,
    3 Pet. 433, 7 L.Ed. 732 (1830) .......................................................................17

*Phillips v. Bureau of Prisons*,
    591 F.2d 966 (D.C. Cir. 1979) ..........................................................................6

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    294 F.3d 82 (D.C. Cir. 2002) ..........................................................................24

*R.S.M. Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
    682 F.3d 1043 (D.C. Cir. 2012).......................................................................33

*Runkle v. Gonzales*,
    391 F.Supp. 2d 210 (D.D.C. 2005) ....................................................................6

*Shaffer v. Heitner*,
    433 U.S. 186 (1977).....................................................................25, 26, 28, 29

*Soma Med. Int'l v. Standard Chartered Bank*,
    196 F.3d 1292 (10th Cir. 1999) .......................................................................26

*Stewart v. National Educ. Ass'n*,
    471 F.3d 169 (D.C. Cir. 2006) ..........................................................................6

*T.J. Raney & Sons, Inc. v. Sec. Sav. & Loan Ass'n of Salina, Kansas*,
    749 F.2d 523 (8th Cir. 1984) ..........................................................................26

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...................................................................................................6

*United States v. Alaniz*,
   726 F.3d 586 (5th Cir. 2013) .....................................................................................37

*United States v. Alderman*,
   423 F. Supp. 847 (D. Md. 1976) ................................................................................23

*United States v. All Assets Held at Bank Julius Baer & Co.*,
   571 F.Supp.2d 1 (D.D.C. 2008) ...........................................................................30, 36

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*,
   772 F. Supp. 2d 205 (D.D.C. 2011) ...........................................................................28

*United States v. All Funds in Account Nos. 747.034/278, 747.009/278, &
   747.714/278 Banco Español de Credito, Spain*,
   295 F.3d 23 (D.C. Cir. 2002) ............................................................................. passim

*United States v. BCCI Holdings (Luxembourg), S.A.*,
   961 F.Supp. 287 (D.D.C. 1997) .................................................................................40

*United States v. Bornfield*,
   145 F.3d 1123 (10th Cir. 1998) .................................................................................46

*United States v. Braxtonbrown-Smith*,
   278 F.3d 1348 (D.C. Cir. 2002) .....................................................................39, 40, 43

*United States v. Bridgeman (Matthews)*,
   523 F.2d 1099 (D.C. Cir. 1975) .................................................................................21

*United States v. Broughton*,
   689 F.3d 1260 (11th Cir. 2012) .................................................................................38

*United States v. Certain Accounts, Together With all Monies on Deposit Therein*,
   795 F.Supp. 391 (S.D. Fla. 1992) ..................................................................41, 43, 44

*United States v. Contents in Account No. 059-644190-69*,
   253 F.Supp.2d 789 (D.Vt. 2003)....................................................................39, 40, 41, 46

*United States v. Contents of Nationwide Life Insurance Annuity Account No. 0961
   In the Name of Warshak*,
   No. 1:05-cv-00196, 2009 WL 961223 (S.D. Ohio Apr. 8, 2009)..............................47

*United States v. Cooper*,
   No. 86-422, 1987 WL 9508 (D.D.C. Apr. 6, 1987)...................................................23

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States v. Davis*,
226 F.3d 346 (5th Cir. 2000) .................................................................43

*United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in
United States Currency*,
461 U.S. 555 (1983).................................................................20, 21

*United States v. Greenidge*,
495 F.3d 85 (3d Cir. 2007).................................................................38

*United States v. Harmon*,
379 F.Supp. 1349 (D.N.J. 1974) .................................................................23

*United States v. Huff*,
641 F.3d 1228 (10th Cir. 2011) .................................................................37

*United States v. Kashamu*,
94 CR 172-15, 2014 WL 1647790 (N.D. Ill. Apr. 23, 2014) .................................................................19

**United States v. Lovasco*,
431 U.S. 783 (1977).................................................................19, 20, 21

*United States v. Mahoney*,
698 F. Supp. 344 (D.D.C. 1988) .................................................................20, 21

**United States v. Marion*,
404 U.S. 307 (1971).................................................................19, 20, 21

*United States v. Moore*,
27 F.3d. 969 (4th Cir. 1994) .................................................................43

**United States v. One Gulfstream G-V Jet Aircraft*,
941 F.Supp.2d 1 (D.D.C. 2013) ................................................................. *passim*

*United States v. One Partially Assembled Drag Racer*,
899 F. Supp. 1334 (D.N.J. 1995) .................................................................39

*United States v. Portrait of Wally*,
No. 99 Civ. 9940 (MBM), 2002 WL 553532 (S.D.N.Y. Apr. 12, 2002) .................................................................49, 51

*United States v. Rosa*,
17 F.3d 1531 (2d Cir. 1994).................................................................35, 42

*United States v. Salti*,
579 F.3d 656 (6th Cir. 2009) .................................................................21

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Seventy-Nine Thousand Three-Hundred Twenty-One Dollars*,
522 F.Supp.2d 64 (D.D.C. 2007) ........................................................................42

*United States v. Sum of $70,990,605*,
Civil Action No. CV 12-1905 (RWR), 2014 WL 824048 (D.D.C. Mar. 4,
2014) ...........................................................................................................48, 51

*United States v. Tchibassa*,
452 F.3d 918 (D.C. Cir. 2006) ...........................................................................19

*United States v. Tencer*,
107 F.3d 1120 (5th Cir. 1997) ...........................................................................40

*United States v. Wanigasinghe*,
545 F.3d 595 (7th Cir. 2008) .............................................................................19

*United States v. Ward*,
197 F.3d 1076 (11th Cir.1999) ..........................................................................43

**Statutes**

18 U.S.C. § 981 .......................................................................................16, 39, 40, 41

18 U.S.C. § 984 .................................................................................................40

18 U.S.C. § 1956 ........................................................................................ *passim*

18 U.S.C. § 1957 ........................................................................................ *passim*

18 U.S.C. § 2314 ........................................................................................ *passim*

18 U.S.C. § 2315 ...............................................................................34, 35, 42

19 U.S.C. § 1621 ................................................................................16, 17, 19

28 U.S.C. § 1355 .......................................................................................17, 24

U.S. Const. amend. V ...............................................................................19, 24, 25

**Foreign Law**

Penal Code Act, 1990, CAP 532 of the Laws of the Federation of Nigeria ..................................33

Penal Code Law, 1963, CAP 89 of the Laws of Northern Nigeria § 115 ................................33, 34

Penal Code Law, 1963, CAP 89 of the Laws of Northern Nigeria § 116 ......................................34

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Penal Code Law, 1963, CAP 89 of the Laws of Northern Nigeria § 117......................................34

**Rules & Regulations**

31 C.F.R. § 1010.306...............................................................................................................22

31 C.F.R. § 1010.410...............................................................................................................22

31 C.F.R. § 1010.415...............................................................................................................22

31 C.F.R. § 1010.430...............................................................................................................22

Fed. R. Civ. P. 44.1.................................................................................................................33

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture
    Actions G(2)(f)..................................................................................................................30

**Other Authorities**

Peter A. Anyebe, *Sentencing in Criminal Cases in Nigeria and the Case for
    Paradigmatic Shifts*, 1 NIALS JOURNAL ON CRIMINAL LAW AND JUSTICE 151
    (2011), *available at* http://www.nials-
    nigeria.org/journals/Peter%20A.%20Anyebe.pdf ................................................................33

Courtney J. Linn, *International Asset Forfeiture and the Constitution: The Limits
    of Forfeiture Jurisdiction over Foreign Assets Under 28 U.S.C.
    § 1355(b)(2)*, 31 AM. J. CRIM. L. 251 (2004)..........................................................................27

Federal Republic of Nigeria Senate website: Sen. Abubakar Atiku Bagudu,
    *available at*
    http://www.nassnig.org/nass/portfolio/profile.php?id=sen.abubakarbagudu .........................13

PERMANENT SUBCOMMITTEE ON INVESTIGATIONS OF THE COMMITTEE ON
    GOVERNMENTAL AFFAIRS, PRIVATE BANKING AND MONEY LAUNDERING: A
    CASE STUDY OF OPPORTUNITIES AND VULNERABILITIES, S. DOC. NO. 106-428,
    106th Cong., 1st Sess...........................................................................................................7

12 Charles A. Wright, et al., Federal Practice and Procedure § 3242 (West. Supp.
    2014) ..................................................................................................................................46

## PRELIMINARY STATEMENT

A decade after the United States (the "U.S.") declined to pursue any action related to the events and transactions at issue in this case, it now seeks to divest ten innocent claimants ("Claimants"), including six minors, of their property rights in contravention of fundamental notions of justice, finality, and due process.  The Government overreaches in seeking to forfeit assets worth more than 95 million Euros held in trust for Claimants in accounts outside the U.S. (the "Claimed Property") based upon alleged events that occurred in Nigeria dating back nearly twenty years.  While the Government claims that it is pursuing this action for the benefit of Nigeria, it well knows that Nigeria long ago relinquished any rights it might have had to the Claimed Property as part of a settlement agreement with Abubakar Atiku Bagudu.  In fact, the Government supported and facilitated the execution of that settlement, and Claimants justifiably relied on its terms and the passage of time to achieve a sense of repose.  In the intervening years, memories have faded, witnesses have relocated and become more difficult to find, and important evidence has been lost to Claimants.  The Court should not allow the Government to benefit from its inexcusable delay and to break the spirit, if not the letter, of the settlement agreement with Mr. Bagudu based upon the stale and inadequate allegations contained in the Complaint.

The Government has known of the existence of the allegedly forfeitable funds and their origin since at least 2003.  In that year, the Government detained Mr. Bagudu and initiated extradition proceedings upon the request of the United Kingdom (the "U.K.") on behalf of Jersey ("Jersey") based upon allegations similar to those raised in the Complaint.  Yet, in the course of those proceedings, the Government agreed to allow Mr. Bagudu to travel to Nigeria to resolve various charges and controversies related to the Claimed Property.  Once Mr. Bagudu reached a global settlement with Nigeria and other interested countries and the U.K. withdrew its extradition request, the Government dismissed the extradition proceedings against him.

At no point prior to the instant action did the Government seek to initiate any action against either Mr. Bagudu or the Claimed Property.  To the contrary, through its actions, the Government tacitly embraced the terms of the settlement.  Indeed, as recently as 2011, the Government did not oppose a request by Mr. Bagudu for the U.S. District Court for the Southern District of Texas to expunge all records of the extradition proceedings—a rare and extraordinary remedy—in order to avoid any unwarranted criticism of Mr. Bagudu in his successful campaigns for elected office in Nigeria.  It is therefore outrageous and inexplicable that the Government would now seek to forfeit the very same funds that were the subject of the settlement agreement.  Against that backdrop, the Government's delay in bringing this forfeiture action violates Claimants' due process rights and the applicable statute of limitations without tolling, warranting dismissal of the Complaint.

The Government's action is deficient in several other respects, each an independent basis for dismissal of this case.  First and foremost, this Court lacks jurisdiction to even entertain this case, where there are virtually no contacts between the Claimed Property and the U.S. and where Claimants—Nigerian residents including minors who have never been to the U.S.—have less than the required minimum contacts with the U.S.

Compounding these significant due process concerns, the Government, despite being in possession of volumes of information concerning the alleged events that transpired in Nigeria under General Abacha's government and purported transfers of funds outside of Nigeria for more than ten years, fails to state a claim to support forfeiture of the Claimed Property.  The Complaint fails to allege that any person knowingly engaged in money laundering and fails to sufficiently trace the proceeds of the alleged criminal activity to the Claimed Property.

Finally, the Complaint should be dismissed under the doctrines of international comity and/or act of state.  The victim of the alleged misappropriation of funds that took place under General Abacha—the Federal Republic of Nigeria—has already dismissed its litigation against Mr. Bagudu and agreed to a binding settlement agreement which allows Mr. Bagudu and his family to retain their interests in the Claimed Property and declares the Claimed Property free from any claims "by the FRN *or in whole or part at its behest or on its behalf or for its benefit*." This Court, and the Government, should respect the decisions and acts of the sovereign nation for whose benefit the Government claims to be acting.

## STATEMENT OF THE FACTS

### A.    Claimants and the Claimed Property

Claimants are relatives of Mr. Bagudu—his brother, Ibrahim Bagudu; his wives, Aisha Atiku Bagudu and Zainab Shinkafi Bagudu; and seven of his children, Ibrahim Atiku Bagudu, M.A.B., I.A.B., F.A.B., M.A.B., H.A.B., and R.A.B., six of whom are minors—who all reside in Nigeria.  *See* Verified Claims and Statements of Interest, Doc. Nos. 17-26; Decl. of Aisha Atiku Bagudu ¶¶ 2-3 ("Aisha Decl."), annexed to the accompanying Decl. of Patrick T. Campbell dated July 7, 2014 ("Campbell Decl.") as Ex. A; Decl. of Zainab Shinkafi Bagudu ¶¶ 2-3, annexed to Campbell Decl. as Ex. B ("Zainab Decl.").  Claimants are not implicated in any of the Government's allegations of wrongdoing.  Indeed, several of the minor children—who range in age from 4 to 17—have never visited the U.S. and were not even alive when General Abacha governed Nigeria or when the alleged criminal acts and subsequent money laundering took place. Aisha Decl. at ¶¶ 2, 4-6; Zainab Decl. at ¶¶ 2-3.  Aisha Bagudu and three of her children— Ibrahim Atiku Bagudu, M.A.B., and M.A.B.—have not been in the U.S. since 2003; two of her other children have never been to the U.S. at all.  Aisha Decl. at ¶¶ 3, 5-6.  Zainab Bagudu, a pediatrician who is the Chief Medical Director of a hospital in Abuja, Nigeria, has not been in

3

the U.S. since 2002, and her daughter, R.A.B., has never visited the U.S.  Zainab Decl. at ¶ 3.

These Claimants maintain no bank accounts and own no property in the U.S.  Aisha Decl. at ¶ 7;

Zainab Decl. at ¶ 4.

     Claimants are beneficiaries of two trusts, Blue Family Trust I and Blue Family Trust II,

which were established in or about July 2010 as part of a re-settlement of the Ridley Trust funds.

These trusts hold the Claimed Property through investment vehicles known as Blue Holdings (1)

Pte. Ltd. and Blue Holdings (2) Pte. Ltd. (collectively, the "Blue Holdings Companies").  *See*

Verified Claims and Statements of Interest, Doc. Nos. 17-26.  The Complaint seeks to forfeit

more than 95 million Euros held in the name of the Blue Holdings Companies.  Compl. ¶¶ 4, 86.

Except for vague allegations about the liquidation of U.S. dollar-denominated Nigerian Par

Bonds  ("NPBs") held by the Ridley Group and Ridley Trust at some point after January 2005,

the Complaint only alleges that certain assets allegedly traceable to the Claimed Property had

some contact with the U.S. prior to 2005.  *Id*. at ¶¶ 84-86.

### B.     Government's Alleged Basis for Forfeiture and the U.K. Freezing Injunction

     The Government seeks to deprive these innocent Claimants of their interest in the

Claimed Property by alleging that the Claimed Property is "involved in" or traceable to

purported money laundering offenses related to two allegedly fraudulent schemes in Nigeria

regarding so-called national security votes (the "Security Votes Transaction") and a commercial

deal involving Nigeria's repurchase of large amounts of its own debt (the "Debt Buy-Back

Transaction").  Compl. ¶¶ 1-2, 25-29, 36-44.[1]  As alleged in the Complaint, the Security Votes

Transaction occurred between 1994 and 1998, when General Abacha, using his executive

---

[1] The Complaint includes a third alleged scheme, referred to as the "Dumez Extortion," in which General Abacha and his representatives allegedly extorted kickbacks from a French civil engineering company in exchange for permitting payments on certain government contracts.  Compl. ¶¶ 94-100.  As the Complaint does not allege that any of the Claimed Property was derived from the Dumez Extortion, these allegations are not further addressed here.

powers, directed the Nigerian government to disburse more than $2 billion in public funds, and then misappropriated these funds rather than spending them on the national security purposes for which they had been allocated.  *Id*. at ¶¶ 25-29.  The Complaint further alleges that certain of these funds were transferred out of Nigeria, some passing through U.S. correspondent banks.  *Id*. at ¶¶ 30-35.  Regarding the Debt Buy-Back Transaction, the Complaint alleges that, in 1996 and 1997, Mr. Bagudu and others arranged for the Nigerian government to repurchase certain of its own debt instruments from Mecosta Securities Inc. ("Mecosta"), a company affiliated with Mr. Bagudu and Mohammed Abacha, at a discount of several hundred million Deutsche Marks (DM), but at a higher price than what Mecosta paid for those same instruments.  *Id*. at ¶¶ 36-44. The Complaint in conclusory fashion alleges that this transaction "defrauded" Nigeria.  *Id*. at ¶ 36.

The Complaint further alleges that once transferred outside of Nigeria, the proceeds from the Security Votes and Debt Buy-Back Transactions were laundered through the purchase of NPBs and Payment Adjustment Warrants ("PAWs").  *Id*. at ¶¶ 52-93.  Certain of these NPBs were purchased and held at Australia and New Zealand Bank ("ANZ") in London.  *Id*. at ¶ 58. The Government alleges that the Claimed Property consists of the proceeds of the sale of $90 million (face value) of NBPs and related PAWs from ANZ sometime after January 21, 2005.  *Id*. at ¶¶ 79-86.

Before the Complaint was unsealed, on February 25, 2014, the Government obtained an *ex parte* freezing injunction from the Commercial Court, Queens Bench Division of the High Court in the U.K. (the "Commercial Court"), in relation to the assets held in the name of the Blue Holdings Companies (*U.S. v. Abacha*, Claim No. 2014 Folio 209) (the "U.K. Proceedings").  In the U.K. Proceedings, the Government assured the Commercial Court that if it prevails in this

forfeiture action, "the assets which it is able to forfeit and recover ***will be used for the benefit of***

***the people of Nigeria*** (less any direct costs of the asset recovery process)."  Respondent's

[United States'] Skeleton Argument, Doc. No. 39-7, p. 8 (emphasis added); *see also* Skeleton

Argument of the Proposed Claimant [United States], Doc. No. 50-5, p. 13.  The validity of the

freezing injunction is currently being challenged in the U.K. Court of Appeal (*U.S. v. Blue*

*Holding (1) PTE Ltd.*, Appeal No. 2014/1224).

### C.    Nigeria's Initial Requests for Assistance and the U.S. Senate's Investigation

The Government references in passing Mr. Bagudu's U.S. extradition proceedings and an

agreement he entered into with Nigeria to repatriate over $163 million to Nigeria.  Compl. ¶ 77.

However, the Complaint fails to provide the Court with the broader context of the Government's

involvement in the various international investigations into the alleged corruption of General

Abacha's administration which began shortly after his death.[2]

Little more than a year after General Abacha's death, media sources reported that the

Nigerian government requested assistance from the U.S. and U.K. to locate the funds allegedly

---

[2] To provide such context and to address the Government's many omissions in the Complaint, Claimants have included documentation of the facts set forth herein for the Court's consideration and requests that the Court, where necessary, take judicial notice of the same.  *See* Campbell Decl., Exs. C-O.  The district court on a motion to dismiss may consider documents incorporated by reference into the complaint "and matters of which it may take judicial notice."  *Stewart v. National Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The court may take judicial notice of facts that "can be accurately and readily determined from sources who accuracy cannot reasonably be questioned."  Memorandum Opinion & Order, Doc. No. 54, p. 6, n. 3 (citation omitted).  In the D.C. Circuit, district courts have considered on motions to dismiss documents referred in or central to the complaint, matters of record in the case or of general public record, public filings in other domestic and foreign judicial proceedings, and documents submitted for purposes other than testing the factual allegations of the complaint.  *See Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (considering "publicly available historical articles"); *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005) (considering public filings of other judicial proceedings); *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (considering documents for purposes other than testing the factual allegations of complaint); *Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C. Cir. 1979) (considering matters of record in the case or matters of general public record); *Han Kim v. Democratic People's Republic of Korea*, 950 F.Supp.2d 29, 35 (D.D.C. 2013) (considering foreign judgment); *Runkle v. Gonzales*, 391 F.Supp. 2d 210, 216 n. 1 (D.D.C. 2005) (reasoning that documents referred in or central to the complaint may be considered on a motion to dismiss).  Courts in other jurisdictions have also taken judicial notice of the existence or contents of U.S. Senate committee reports.  *See, e.g., Bolton v. U.S. Nursing Corp.*, No. C 12-04466 LB, 2012 WL 5269738, at *2 n.4 (N.D.Cal. Oct 23, 2012) (contents); *In re Cyberonics Inc. Sec. Litig.*, NO. CIV.A. H-05-2121, 2006 WL 2050696, at *3 (S.D.Tex. Jul 20, 2006) (existence).

misappropriated by General Abacha.  *U.S., Britain Offer Help Recovering Nigerian Funds*, REUTERS, Sept. 20, 1999, annexed to Campbell Decl. as Ex. C.  The Government reportedly pledged the assistance of the Federal Bureau of Investigation to assist in tracing money allegedly transferred to the U.S.  *Id.*

Around this same time, the U.S. Senate Permanent Subcommittee on Investigations (the "PSI") conducted an investigation into U.S. private banking and ***money laundering concerns*** during General Abacha's administration.  PERMANENT SUBCOMMITTEE ON INVESTIGATIONS OF THE COMMITTEE ON GOVERNMENTAL AFFAIRS, PRIVATE BANKING AND MONEY LAUNDERING: A CASE STUDY OF OPPORTUNITIES AND VULNERABILITIES, S. DOC. NO. 106-428, 106th Cong., 1st Sess., annexed to Campbell Decl. as Ex. D. (the "Senate Report").  In November 1999, the PSI released a report which discussed—among other case studies into private banking and money laundering—General Abacha's alleged theft of over $3.5 billion while he was in power and referenced, among other things, the Debt Buy-Back Transaction and the movement of Nigerian funds in and out of banks outside of Nigeria.  *Id.* at 54-56, 60-62.

Even though Nigeria requested the Government's assistance in tracing funds allegedly transferred to the U.S., and the Government did conduct an investigation into money laundering activities that purportedly occurred during General Abacha's rule, the U.S. did not at that time bring any action against any of General Abacha's family members or purported associates or against any of the assets allegedly traceable to proceeds transferred outside of Nigeria.

> **D.**     **Nigeria's Investigation, Additional Requests for Assistance, and Asset Freeze Orders**

Shortly after General Abacha's death, the Nigerian government commissioned its own criminal investigation into the events that occurred during General Abacha's rule.  Aff. of Charley A. Davidson ("Davidson Aff."), annexed to Campbell Decl. as Ex. E, Ex. CAD 1,

Amended Motion for Bond and Extradition Hearing at 18 ("Motion for Bond").  During the course of the investigation, Mr. Bagudu provided Nigerian authorities with documentation regarding the whereabouts of more than $700 million transferred out of Nigeria of which he was the caretaker on behalf of the Nigerian government and information concerning the Debt Buy-Back Transaction.  *Id.* at 3-4, 18-19, 21-22.  Mr. Bagudu returned to the Central Bank of Nigeria the more than $700 million he disclosed to the Nigerian investigators.  Motion for Bond at 4; *id.* at Respondent Bagudu's Exhibit "A."  Nigerian investigators ultimately concluded that Mr. Bagudu had not committed a crime in Nigeria.  Motion for Bond at 22.  Nevertheless, in 2000, the subsequent Nigerian government brought criminal charges against Mohammed Abacha and Mr. Bagudu, which have since been dismissed.

In late 1999 and 2000, Nigeria also issued requests for legal assistance to recover funds purportedly transferred outside of Nigeria during General Abacha's rule to Switzerland, Liechtenstein, Jersey, and France.  *See Id.* at 20-22; *see also* Campbell Decl., Ex. C.  In connection with a subsequent Swiss criminal investigation, on August 14, 2000, Swiss authorities submitted a request for assistance to the U.S. Attorney General.  Swiss International Letters Rogatory, annexed to Campbell Decl. as Ex. F.  The request, referencing sums of money that were transferred out of Nigeria during General Abacha's rule—and specifically the Debt Buy-Back Transaction—sought documents from U.S. banks.  On December 28, 2000 and January 24, 2001, the U.S. Attorney's Office for the Southern District of New York, through the Department of Justice's Office of International Affairs, provided Swiss authorities with the requested documents.  *Id.*

In addition, civil litigation concerning the Security Votes and Debt Buy-Back Transactions had been ongoing against Mr. Bagudu and others in the U.K. courts since before

March 1999 (*Compagnie Noga, et al. v. Abacha*, 1999 Folio 404 and 405; *Federal Bank of Nigeria v. Union Bank of Nigeria, et al.*, No. HCO1C03260).  The U.K. courts issued asset freezes in connection with these actions which, among other things, restricted transactions in the NPBs, identified banks which held NPBs and Mr. Bagudu's assets, and froze all of Mr. Bagudu's assets worldwide, including the $90 million (face value) of NPBs the Government alleges was held in the name of the Ridley Group for the Ridley Trust at Credit Agricole Indosuez (London) and Indosuez Trust Services Limited at this time—funds from which the Claimed Property allegedly derives.  Compl. ¶¶ 80-83; *see* Motion for Bond at 12; Order, *Compagnie Noga, et al. v. Abacha,* annexed to Campbell Decl. as Ex. G, at 3-5 ("*Noga* Order"); Order, *Federal Bank of Nigeria v. Union Bank of Nigeria, et al.*, annexed to Campbell Decl. as Ex. H, at 1-4, 16-17 ("*Federal Bank of Nigeria* Order").

Despite receiving further details of General Abacha's alleged fraud and the transfer of funds outside of Nigeria from Swiss Authorities, and despite knowing that the funds allegedly traceable to the Claimed Property were effectively frozen as early as March 1999, the Government did not commence an action against any of General Abacha's family members or purported associates or against the assets allegedly traceable to funds transferred out of Nigeria during General Abacha's rule.

### E.      The 2003-2004 U.S. Extradition Proceedings

The clearest illustration of the U.S. Government's purposeful decision to refrain from any action against Mr. Bagudu or the assets the Government allegedly traces to the Claimed Property in connection with the alleged corruption of General Abacha's administration is its conduct in response to the U.K.'s request for Mr. Bagudu's extradition to Jersey.  On May 22, 2003, the Government detained Mr. Bagudu, who was then residing in Texas, based upon a provisional arrest warrant from the U.K.  Motion for Bond at 1-2.  The U.K. was acting on behalf of Jersey,

which issued a warrant for Mr. Bagudu's arrest based on allegations that he and Mohammed

Abacha defrauded Nigeria in the Security Vote and Debt Buy-Back Transactions and then failed

to disclose to a Jersey bank that funds derived from those activities comprised the origin of the

deposited funds. *Id*. at 16. On May 23, 2003, the Government filed in the U.S. District Court for

the Southern District of Texas (the "Houston District Court") (Case No. H-03-434M) a

complaint and summary of Jersey's case against Mr. Bagudu, which described the Security

Votes and Debt Buy-Back Transactions. *Id*. at 2; Davidson Aff. at Ex. CAD 5, Docket Report

("Docket Report") at 05/23/2003 entry. In the course of the ensuing extradition proceedings, the

Government received substantial, additional information from the U.K. related to Jersey's case

against Mr. Bagudu, Davidson Aff. at Ex. CAD 2, Motion to Continue at 2, including

connections to the U.S. banking system.

While he was incarcerated in the U.S. pending resolution of the extradition proceeding,

Mr. Bagudu concluded an arms-length global settlement agreement with Nigeria—the purported

victim in Jersey's case against Mr. Bagudu—that: a) resolved all of Nigeria's claims against him

and his assets stemming from his purported involvement in the alleged misappropriation of funds

during General Abacha's regime and b) also required Jersey and Switzerland to transfer their

criminal charges to Nigeria for disposition. August 21, 2003 Settlement Agreement Between the

Federal Republic of Nigeria and Abubakar Atiku Bagudu, annexed to Campbell Decl. as Ex. I

(the "Settlement Agreement").[3] On November 19, 2003, at the request of both Mr. Bagudu and

the Government, the Houston District Court set a bond to allow Mr. Bagudu to travel back to

Nigeria to further resolve the remaining charges against him. Davidson Aff. at Ex. CAD 3,

---

[3] The Settlement Agreement and Escrow Agreement annexed thereto were subsequently amended. *See* Campbell Decl. Ex. K. As the amendment was procedural and did not relate to the resolution of Nigeria's claims against Mr. Bagudu and corresponding release of the Ridley Group funds, all subsequent references to the Settlement Agreement herein shall be to the original, August 21, 2003 version.

Motion to Dismiss Complaint and Request for Extradition at 1 ("Motion to Dismiss"); Docket Report at 03/08/2004 entry; Davidson Aff. at Ex. CAD 6, Amended Motion to Expunge Judicial Records at 2 ("Amended Motion to Expunge").  The U.K. subsequently withdrew its extradition request and, on March 8, 2004, the Government moved the Houston District Court to dismiss the complaint filed against Mr. Bagudu.  *See* Motion to Dismiss.  The Houston District Court granted the Government's motion on the same day.  Davidson Aff. at Ex. CAD 4, Order; Docket Report at 03/08/2004 entry.

Despite receiving volumes of additional documentation regarding the Security Votes and Debt Buy-Back Transactions, and after having Mr. Bagudu in custody for more than four months in Texas with his assets effectively frozen worldwide, the Government still did not bring any proceedings against Mr. Bagudu or attempt to forfeit his property.  To the contrary, the Government facilitated Mr. Bagudu's resolution with Nigeria which, as described below, resulted in Mr. Bagudu retaining the funds from which the Claimed Property allegedly derives without limitation.

### F. The Settlement Agreement

The Settlement Agreement effectively resolved all outstanding criminal actions against Mr. Bagudu and allowed Mr. Bagudu to retain and use without restriction the assets allegedly traceable to the funds the U.S. Government now seeks to forfeit.  In exchange for paying an additional approximately $163 million to Nigeria, Nigeria agreed to release Mr. Bagudu and his Affiliates—defined at Sections 17 and 18 of the Settlement Agreement as, among others, Mr. Bagudu's ***wife, children, brothers, and sisters,*** and any trusts and companies in which Mr. Bagudu had a beneficial interest)—from all claims and liabilities related to, among other things, the Security Votes and Debt Buy-Back Transactions.  Settlement Agreement at §§ 3, 4.  Nigeria also agreed to

11

> renounce any interest whatsoever whether of a legal or beneficial nature to the
> assets set out in Schedule 6 of [the] Agreement (the AB Assets).  No claim of any
> kind at all will attach to the AB Assets and they will be held by AB free from any
> claims existing or future, direct or indirect, contemplated or otherwise by the FRN
> ***or in whole or part at its behest or on its behalf or for its benefit***.

Settlement Agreement at § 7.10(b) (emphasis added).  Schedule 6 of the Settlement Agreement

defined the "AB Assets" to include "[a]ny and all accounts in the name of the Ridley Group

Limited at Credit Agricole Indosuez, London," which, allegedly, have become the precise assets

the Government now seeks to forfeit.  Compl. ¶¶ 83-86.

As part of the Settlement Agreement, Nigeria withdrew its above-referenced letters of

request sent to various European countries, noting that a final settlement had been reached

between Nigeria and Mr. Bagudu, and requesting that any pending investigations or actions by

those countries be transferred to Nigeria for disposition.  *See* Letters of Withdrawal from

Nigerian Attorney General to authorities in Geneva, Switzerland, Liechtenstein, France, and the

U.K, annexed to Campbell Decl. as Ex. L.[4]   In addition, the Nigerian Attorney General

exonerated Mr. Bagudu of the criminal charges Nigeria brought against him, representing that

"no evidence will be offered by the prosecution" and "the prosecution will invite the Court to

acquit him."  *See id*. at Aug. 15, 2003 Side Letter from Nigerian Attorney General to Mr.

Bagudu.  Nigeria also agreed to drop the proceedings transferred from the other jurisdictions

with no finding of guilt against Mr. Bagudu.  *Id*.

### G.      2004 to Present

Reasonably believing that he finally had repose from actions concerning the events that

occurred during General Abacha's rule, Mr. Bagudu focused on returning to Nigeria and

resettling the assets to which Nigeria had relinquished any interest for the benefit of Claimants,

---

[4] The Letters of Withdrawal and Side Letters annexed at Ex. L are executed versions of the Letters of Withdrawal and Side Letters issued in conjunction with the Settlement Agreement.  *See* Campbell Decl. at Ex. J.

his family members.  In 2008, Mr. Bagudu was elected to a three-year term to the Nigerian

Senate, 6th National Assembly (Kebbi Central Senatorial District).  Mr. Bagudu was reelected in

2011 and currently serves as the Chairman of the Interior Affairs Committee and is a member of

the Foreign Affairs Committee.[5]  As noted above, in 2010 the Ridley funds in which Nigeria

relinquished any interest under the Settlement Agreement and declared free from all claims were

resettled into the Blue Family Trusts, held in the name of the Blue Holdings Companies for the

ultimate benefit of Claimants.

      Adding to Mr. Bagudu's sense of repose, in early January 2011, the Government did not

oppose Mr. Bagudu's request to the Houston District Court to expunge the judicial records

related to the U.S. extradition proceedings.  *See* Amended Motion to Expunge at 7.  The public

availability of these documents was harming Mr. Bagudu's ability to obtain work and hold

public office in Nigeria.  *Id.* at 1.  The Houston District Court granted Mr. Bagudu's request to

expunge his judicial records.  Davidson Aff. at Ex. CAD 7, Order.

      Despite all of its indications that it would not be pursuing Mr. Bagudu or the Claimed

Property, the U.S. Government unsealed this action on March 5, 2014.  Yet even as this action

continues—purportedly for the benefit of the Nigerian people—on April 10, 2014, the High

Court of the Federal Capital Territory Abuja (Nigeria) formally dismissed all criminal charges

pending against Mr. Bagudu after a lengthy procedural delay.  *See* Court Order, *Federal*

*Republic of Nigeria v. Mohammed Abacha & Another*, Suit No. FCT/HC/CR/20-24/2000,

annexed to Campbell Decl. as Ex. M.

---

[5] *See* Federal Republic of Nigeria Senate website: Sen. Abubakar Atiku Bagudu, *available at*
http://www.nassnig.org/nass/portfolio/profile.php?id=sen.abubakarbagudu [last accessed July 3, 2014].

## ARGUMENT

I.   **THE GOVERNMENT'S INEXCUSABLE, MORE THAN TEN-YEAR DELAY IN FILING THIS FORFEITURE ACTION VIOLATES DUE PROCESS AND REQUIRES DISMISSAL OF THE COMPLAINT**

It indisputable from the face of filings and orders in the 2003 extradition proceedings the Government pursued against Mr. Bagudu that the Government was well aware of the allegations that form the basis of the Complaint in this action as early as May 2003.  Not only was Mr. Bagudu detained during these extradition proceedings and under the Government's jurisdiction and control, but the Government knew that Mr. Bagudu's assets were frozen under freezing orders obtained in U.K. civil suits.  These freezing orders identified several of the banks and entities the Government alleges received proceeds traceable to General Abacha's fraud.  *See Noga* Order at 3-5; *Federal Bank of Nigeria* Order at 1-4, 16-17.  Indeed, it is highly likely, given the Government's cooperation with the 2000 Swiss request for assistance with its criminal case relating to the General Abacha transfers, and the public 1999 Senate PSI investigation into money laundering allegations involving Mohammed, Ibrahim, and Abba Sani Abacha, that the Government was fully apprised of the allegations that form the basis of this action more than fourteen years ago.

An Assistant United States Attorney examined the allegations and information that forms the substance of the Complaint in the instant action when the U.S. litigated the extradition proceedings during the period May 2003 through March 2004.  The Government did not institute forfeiture proceedings at that time, or seek an order repatriating funds.  Indeed, the U.S. agreed to bail conditions for Mr. Bagudu that allowed him to leave the U.S. to facilitate a global settlement with Nigeria.  The Government acknowledges—buried amongst other unrelated allegations and out of chronological order—this Settlement Agreement that it helped facilitate, whereby Mr. Bagudu transferred more than $163 million to the Federal Republic of Nigeria to

14

resolve all claims against Mr. Bagudu and his immediate family relating to the alleged transfer of funds out of Nigeria during the rule of General Abacha.  Compl. ¶ 77.  In fact, between 1998 and 2004, Mr. Bagudu returned a staggering amount of money to the Federal Republic of Nigeria— in excess of $860 million—to resolve all outstanding issues and remove any cloud over certain of his assets for his benefit and the benefit of his family.  *See* Motion for Bond at 4; *id.* at Respondent Bagudu's Exhibit "A."; Settlement Agreement at § 7.5.1.  After the Settlement Agreement was concluded, the extradition proceedings were dismissed without further action. *See* Davidson Aff. at Ex. CAD 4, Order.

　　　　After dismissing those charges and allowing Mr. Bagudu to return to Nigeria, the Government inexcusably decided to wait nearly ten years to file these forfeiture proceedings involving allegations that stretch back more than nineteen years, knowing the significant risk that memories would fade and witnesses and evidence would disappear.  As the Supreme Court recently reiterated, such risks are precisely the ones that statutes of limitations are designed to avoid:

> This reading sets a fixed date when exposure to the specified Government enforcement efforts ends, advancing the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities. Statutes of limitations are intended to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. They provide security and stability to human affairs.  We have deemed them vital to the welfare of society and concluded that even wrongdoers are entitled to assume that their sins may be forgotten.

*Gabelli v. Sec. Exch. Comm'n*, 133 S. Ct. 1216, 1221 (2013) (citations and quotations omitted).

　　　　As discussed below, the Government obviously stands to reap other additional tactical advantages from its secret and unjustifiable decision to delay action, including creating the potential for double recovery and taking advantage of growth in funds that the Government

suggests were subject to forfeiture a decade ago.  Additionally, the Government, having kept

secret its apparent desire to seek a later double recovery, now apparently seeks to benefit

tactically from a settlement it facilitated, which may have included the transfer of non-forfeitable

assets to Nigeria to the significant disadvantage of the settling parties.

### A.      The Court Should Not Toll the Five-Year Statute of Limitations in This Case

The Government's more than ten-year delay in filing this forfeiture action far exceeds the

five-year statute of limitations period that normally governs a forfeiture action where, as here,

the Government was well aware of the grounds for forfeiture.  Section 981(d) adopts the general

provisions governing customs actions, including the statute of limitations found in 19 U.S.C. §

1621.  *See* 18 U.S.C. § 981(d).  Under that section, the limitations period is five years "after the

time when the alleged offense was discovered" or two years "after the time when the

involvement of the property in the alleged offense was discovered," whichever is later.

19 U.S.C. § 1621.  However, under 19 U.S.C. § 1621(2), the running of the limitations period is

tolled during any "absence of the property" from the United States.  *See* 19 U.S.C. § 1621(2).

In *United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278

Banco Español de Credito, Spain*, 295 F.3d 23, 27 (D.C. Cir. 2002) (hereinafter "*Banco

Español*"), the D.C. Circuit addressed the meaning of the statutory language "absence of

property" and concluded that property is absent from the United States, "when property is not

here," even if the property had not been in the United States prior to removal.  The court also

found tolling appropriate due to absence even in circumstances where the foreign country, within

which the property was located, would cooperate to assist a U.S. forfeiture action seeking its

return.  *Id.*  Significantly, however, the *Banco Español* court clarified earlier in its opinion that

its rulings were made in the context of a claimant who had "***raised no constitutional objections

at all***."  *Id.* (emphasis added).  Rather, *Banco Español*'s statutory construction was based solely

on the plain meaning of the term "absence," without any consideration of whether the

interpretation would lead to absurd results or a violation of a claimant's constitutional rights.  *See*

*National Fed. of Independent Business v. Sebelius*, 132 S.Ct. 2566, 2593 (2012) ("No court

ought, unless the terms of an act rendered it unavoidable, to give a construction to it which

should involve a violation, however unintentional, of the constitution.") (quoting *Parsons v.*

*Bedford*, 3 Pet. 433, 448-49, 7 L.Ed. 732 (1830)); *Griffin v. Oceanic Contractors Inc.*, 458 U.S.

564, 575 (1982) ("It is true that interpretations of a statute which would produce absurd results

are to be avoided if alternative interpretations consistent with the legislative purpose are

available.").  Although Claimants disagree with the D.C. Circuit's interpretation of the statutory

language "absent" to be satisfied where the property is within the Court's jurisdiction but outside

of U.S. territorial borders,[6] *Banco Español* is binding precedent.

However, *Banco Español* is distinguishable from the case at bar, because under the

unique circumstances of this case not considered by *Banco Español,* the D.C. Circuit's

interpretation of the statute of limitations tolling provision violates Claimants' constitutional

right to due process of law.  According to the Government, the bulk of the alleged misconduct

justifying forfeiture—the embezzlement and laundering of funds derived from the Security Votes

and Debt Buy-Back Transactions—occurred between 1994 and 1998.  *See* Compl. ¶¶ 25-70.  As

discussed above, the Government knew details of those transactions, the alleged laundering of

---

[6] The D.C. Circuit's interpretation is difficult to square with the court's expansive interpretation of the jurisdiction provision of 28 U.S.C. § 1355.  The D.C. Circuit interpreted 28 U.S.C. § 1355 as granting U.S. courts worldwide jurisdiction over property in forfeiture actions yet incomprehensibly concluded that property located abroad is still "absent" from the country for purposes of Section 1621's tolling provision.  *Banco Español*, 295 F.3d at 26-27.  The Government should not be permitted to have it both ways.  Such an interpretation improperly departs from the traditional principle that provisions tolling statutes of limitations for defendants located outside of a given territory apply only where the court otherwise lacks jurisdiction over the defendant or is unable to perfect service on a defendant.  *See, e.g., Gerena v. Korb*, 617 F.3d 197, 205 (2d Cir. 2010) (noting that Connecticut's law which "allows for tolling when a defendant is absent from the state . . . applies only when by reason of the defendant's absence, it was impossible to commence an action in personam against the defendant") (citations and quotations omitted); *Meyer v. Paschal*, 498 S.E.2d 635, 638-39 (S.C. 1998) (collecting cases to the same effect).

their proceeds, and alleged connections to the U.S. banking system by the time of Mr. Bagudu's extradition proceedings in 2003, if not years earlier.  The Government's unjustified delay in bringing this action until ***November 2013*** has severely prejudiced Claimants and puts them in the absurd position of having to defend against allegations of events that occurred almost 20 years ago.

In addition, application of a perpetual tolling provision in this case would be fundamentally unjust.  As a result of the Government's actions in facilitating the Settlement Agreement in 2003, and its inaction in pursuing any claims of its own, Mr. Bagudu and his family members reasonably believed that the Settlement Agreement fully and finally resolved all disputes relating to their interests in the assets from which the Claimed Property allegedly derives.  The present action thus upsets the settled expectations of the Claimants—expectations that were fostered by the Government itself.  Additionally, the Government apparently seeks to take advantage of an indefinite tolling provision to seek forfeiture of not only the property that it could have sought in 2003, but also a decade's worth of growth on those investments.  Finally, the absurdity of a limitless statute of limitations is manifest where, as here, it would allow the Government to wait, potentially, decades before seeking to forfeit property from innocent minors who were not even alive at the time of the alleged acts of misconduct.

Because the application of the tolling provision as interpreted by the D.C. Circuit would clearly lead to due process violations in this case, the court should decline to toll the statute of limitations and simply apply the five-year statute of limitations to the Government's action.  As the Government clearly "discovered" the alleged money laundering offenses and the alleged involvement of assets that it claims are traceable to the Claimed Property more than five years prior to the filing of the Complaint, the complaint should be dismissed as untimely.

**B.      The Government's Oppressive Delay in Filing this Forfeiture Action Has Prejudiced Claimants' Defense and Denied Them Due Process[7]**

The excessiveness of the Government's delay in pursuing claims against the Claimed Property runs far afoul of the protections afforded Claimants by the Fifth Amendment's Due Process Clause.  U.S. CONST. amend. V.  The Supreme Court has recognized that while statutes of limitations provide "the primary guarantee against bringing overly stale" claims, the Due Process Clause also has a role to play in protecting against oppressive Government delay, even when the claim is brought within the applicable statute of limitations.  *United States v. Marion*, 404 U.S. 307, 322-23 (1971) (citation and quotations omitted); *United States v. Lovasco*, 431 U.S. 783, 788-89 (1977).  Indeed, here, the guarantees of due process assume even greater significance, because, under the D.C. Circuit's incorrect interpretation of the tolling provision of Section 1621, there is, in effect, no statute of limitations.  Thus, even if this Court finds that Section 1621 tolls the statute of limitations indefinitely for actions against the Claimed Property no matter what the circumstances, the Government's inexplicable delay in bringing this forfeiture action nevertheless fails to withstand constitutional scrutiny.

---

[7] The D.C. Circuit previously has sidestepped the question of whether foreign nationals located outside the country could assert constitutional claims in a civil forfeiture proceeding, *see Banco Español*, 295 F.3d at 27 n.*. In other contexts, the D.C. Circuit and Supreme Court have suggested that such persons lack due process rights unless they have sufficient ties to the United States. *See Jifry v. F.A.A.*, 370 F.3d 1174, 1182-83 (D.C. Cir. 2004) (citing, *inter alia*, *Johnson v. Eisentrager*, 339 U.S. 763 (1950)). However, in the analogous area of speedy trial challenges, courts have entertained such claims by foreign nationals. In *United States v. Tchibassa*, 452 F.3d 918, 921 n.1 (D.C. Cir. 2006), the D.C. Circuit assumed, *arguendo*, that a foreign national could be entitled to Sixth Amendment speedy trial rights while located outside of the United States, although the court did not expressly address the issue because it had not been raised by the parties. More recently, in *United States v. Wanigasinghe*, 545 F.3d 595, 597 (7th Cir. 2008), the Seventh Circuit called the government's argument that constitutional rights "do not extend to noncitizens beyond its borders" an "oversimplification," noting that the Supreme Court's decision in *Boumediene v. Bush*, 553 U.S. 723 (2008), "cautions against broad pronouncements" about denying constitutional rights to foreign nationals.  Additionally, the Northern District of Illinois very recently considered a similar speedy trial challenge from a foreign defendant residing outside of the country over the government's insistence that "the Fifth and Sixth Amendments are inapplicable to a foreign national living abroad who is not in the United States . . . ." *United States v. Kashamu*, 94 CR 172-15, 2014 WL 1647790 (N.D. Ill. Apr. 23, 2014). Likewise, here, Claimants should be permitted to present a constitutional challenge to the Government's excessive delay in bringing this forfeiture action, irrespective of their citizenship, present location, or contacts to the United States. However, even if such considerations were relevant, one of the Claimants, I.A.B., *is* an American citizen. *See* Aisha Decl. ¶ 3.

Where the Government has grounds to bring charges but declines to do so for an extended period, the delayed initiation of the action can violate due process where the delay offends "fundamental conceptions of justice" or "the community's sense of fair play and decency." *Lovasco*, 431 U.S. at 790 (citation and quotations omitted).  Governmental delays in bringing an action can seriously impair an individual's ability to defend against the Government's claims:

> The impairment of the ability to defend oneself may become acute because of delays in the pre-indictment stage.  Those delays may result in the loss of alibi witnesses, the destruction of material evidence, and the blurring of memories.  At least when a person has been accused of a specific crime, he can devote his powers of recall to the events surrounding the alleged occurrences.  When there is no formal accusation, however, the State may proceed to methodically to build its case while the prospective defendant proceeds to lose his.

*Marion*, 404 U.S. at 331 (Douglas, J., concurring in result).  To succeed on a due process challenge, a defendant must show that the Government's delay in bringing the action: a) prejudiced his ability to defend himself, and b) "was a purposeful device to gain a tactical advantage over the accused."  *United States v. Mahoney*, 698 F. Supp. 344, 346 (D.D.C. 1988).

In *United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in United States Currency*, 461 U.S. 555 (1983) (hereinafter, "*8,850 in United States Currency*"), the Supreme Court recognized that due process rights are implicated in the civil forfeiture context when the Government engages in excessive delay in initiating a forfeiture action after seizing the defendant property.  The Government had urged the Court to adopt the *Lovasco* test in such post-seizure situations, but the Court found a "more apt analogy" in a criminal defendant's right to a speedy trial after arrest, reasoning that the deprivation of a claimant's property after seizure "mirror[ed]" the deprivation of a criminal defendant's liberty following indictment or arrest.  *Id.* at 564.  The Court, therefore, applied a four-factor balancing test used in analyzing delays in the speedy trial context.  *Id.*  (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).  Although the

20

Supreme Court has not addressed the applicability of the speedy-trial balancing test in the context of a pre-seizure delay by the Government, the Sixth Circuit has applied the test in that context. *See United States v. Salti*, 579 F.3d 656, 672 (6th Cir. 2009) (applying *Barker*'s speedy trial test to claimants' argument that ten-year delay in initiating criminal forfeiture proceedings against a foreign bank account after the Government first became aware of the account violated due process).

However, because the Supreme Court's decision in *$8,850 in United States Currency* focused on the deprivation of property that resulted from seizure—an issue not present in pre-seizure delays—the standards for pre-indictment delay articulated in *Lovasco* and *Marion* likely provide a more appropriate analogy for analyzing pre-seizure delays by the Government in bringing a civil forfeiture action. Excessive delays between the conduct allegedly giving rise to forfeiture and the initiation of forfeiture proceedings implicate the same concern as pre-indictment delays in the criminal context—that excessive delay will impair the claimant's right to defend against the Government's claims.

Here, the more than 10-year delay between the Government's becoming aware of the conduct allegedly giving rise to forfeiture in this case—much of which dates back to the mid-1990s—is considerable and prejudicial. The excessive length of the delay, alone, should raise an inference that Claimants will be unavoidably prejudiced. Although courts have rejected arguments based upon "only a general dimming of memories and loss of evidence" as insufficient to demonstrate prejudice, *see, e.g.*, *Mahoney*, 698 F.Supp. at 346 (quoting *United States v. Bridgeman (Matthews)*, 523 F.2d 1099, 1112 (D.C. Cir. 1975)), no doubt few have confronted the effects of the passage of almost twenty years from the dates of the relevant events, far beyond any applicable statute of limitations. The ravages of time are clear to see in

this case.  General Sani Abacha died in 1998, and his administration is long gone.[8]  Witnesses

who could testify about their involvement in or knowledge of the alleged illegal conduct in

Nigeria will be difficult, if not impossible to track down.  Indeed, two of the named defendants *in*

*rem*—Mecosta Securities, Inc. and Ridley Group Ltd.—have been defunct for several years and

stuck off the register of companies in the British Virgin Islands.  Skeleton Argument of the

Proposed Claimant [United States] at ¶ 19, Doc. No. 50-5, p.5 n. 5.

        In addition, to contest the Government's claims regarding the movement of funds,

Claimants will have to rely on financial records, many of which are likely to have been

destroyed.  *See, e.g.*, 31 C.F.R. § 1010.430(d) (providing only five-year general retention

requirement for bank records under Bank Secrecy Act, including records relating to certain

international transactions of more than $10,000 (§ 1010.410(b)-(c)), issuance or sale of checks

and similar instruments (§ 1010.415), and certain reports relating to financial transactions

(§ 1010.306(2)).  Inland Bank—which is alleged to have received and transferred money in

connection with the Security Votes Transaction, Compl ¶¶ 34-35—no longer exists as a result of

several bank mergers likely impairing Claimants' ability to obtain records or locate witnesses to

authenticate any such records.  *See* Ayodele Aminu, *First Inland Bank Concludes Merger*,

ALLAFRICA.COM, Dec. 18, 2005, annexed to Campbell Decl. as Ex. N.  Even the Government has

admitted that certain relevant bank records are no longer available.  *See, e.g.,* Skeleton Argument

of the Proposed Claimant [United States] at ¶ 31, Doc. No. 50-5, p. 8 ("In some cases, complete

information is not available.  For example, there is not a complete record for Standard

---

[8] Indeed, Nigerian civil service rules prohibit permanent secretaries and directors from remaining in government office for more than eight (8) years.  *See* Circular from Nigerian Head of the Civil Service, annexed to Campbell Decl. as Ex. O.  Consequently, many of the principal actors referenced in the Complaint—high-ranking Nigerian government officials who would also be potentially relevant witnesses—are almost certainly no longer in their former positions and likely more difficult to locate.

Bank . . .").  This serious impediment to Claimants' defense is evident from the large gaps in the Government's tracing analysis, as discussed in Section III(C) below.

      Even more troubling, there appears to be no innocent or reasonable justification for the Government's excessive delay.  By May 2003, the Government was well aware of the allegations forming the basis of its Complaint.  Instead of instituting any action, they decided to allow Mr. Bagudu to return to Nigeria and to complete a global settlement related to the funds at issue in this case.  From the face of the Complaint, the Government did not use the intervening ten years to identify any additional forfeitable proceeds or specified unlawful activity.  The Complaint is almost devoid of any allegations concerning events after 2005.  Therefore, the Government's delay cannot be excused by "either a continuous active investigation of a complex situation, or ignorance on the part of the government prosecutors that a crime may have taken place some years before."  *United States v. Alderman*, 423 F. Supp. 847, 855 (D. Md. 1976) (dismissing an indictment that was returned 34 months after defendant was first notified that he was under investigation and would be indicted).

      "In the lack of any reason advanced by the government for the delay, [the court] may infer that there was an intent by the government to secure a tactical advantage over the defendant."  *United States v. Harmon*, 379 F.Supp. 1349, 1351 (D.N.J. 1974); *cf. United States v. Cooper*, Cr. No. 86-422, 1987 WL 9508, at *1 (D.D.C. Apr. 6, 1987) (dismissing indictment and finding that there was a violation of due process when "there was no good, or even known, reason for the forty-month delay between investigation and indictment.").  Notwithstanding that it is appropriate here for the Court to infer intent by the Government to secure tactical advantage, the Government's delay in this case appears to have provided it with several potential tactical advantages.  First, the Government, in effect, seeks a double recovery of assets notwithstanding

its at least tacit facilitation of the settlement between Mr. Bagudu and Nigeria to resolve all issues relating to funds transferred under General Abacha's rule.  Second, by secretly laying in wait to file this suit until more than ten years after the settlement with Nigeria was concluded, which settlement may have included the transfer of non-forfeitable assets, the Government also tactically disadvantaged the Claimants.  In addition, over the intervening years, the allegedly forfeitable property accrued millions of dollars in dividends, was ultimately liquidated, and deposited into various accounts.  Compl. ¶¶ 73, 83, 85.  Thus, through oppressive delay, the Government has increased the amount of funds it now believes is available for forfeiture.

The Government's unjustified delay in bringing this action has resulted in significant violations of Claimants' due process rights.  The Complaint should be dismissed on this basis alone.

## II.     THE COURT LACKS JURISDICTION TO ADJUDICATE CLAIMANTS' INTERESTS IN THE CLAIMED PROPERTY

Not only is the pursuit of Claimants' Property at this stage a clear violation of Claimants' due process rights because of the Government's oppressive delay in bringing this proceeding, exercising jurisdiction over the Claimed Property and Claimants—which are all located abroad and lack sufficient relevant contacts with the U.S.—would also violate basic constitutional limits on the Court's jurisdiction.

The Government claims jurisdiction is proper pursuant to 28 U.S.C. § 1355.  *See* Compl. ¶¶ 5-6.  While, under *Banco Español*, 28 U.S.C. § 1355 may confer jurisdiction over the Claimed Property as a *statutory* matter, the Court may only exercise that jurisdiction when it is consistent with constitutional principles.  *See, e.g., Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002).  The Court's jurisdiction is cabined by the Due Process Clause of the Fifth Amendment, which "'protects an individual's liberty interest in not being subject to the

binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations . . . .'" *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). "For the exercise of personal jurisdiction to be consistent with the Due Process Clause, a non-resident defendant must have certain minimum contacts with the forum such that 'traditional notions of fair play and substantial justice' are not offended." *Heller v. Nicholas Applegate Capital Mgmt., LLC*, 498 F. Supp. 2d 100, 109 (D.D.C. 2007) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "Minimum contacts" consist of those acts by which a defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State," a defendant cannot "be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Burger King*, 471 U.S. at 475 (citations and quotations omitted).

The Supreme Court has recognized that because *in rem* proceedings—like *in personam* proceedings—ultimately concern the rights of ***persons***, *in rem* actions are subject to the same due process considerations as *in personam* actions. *See Shaffer v. Heitner*, 433 U.S. 186, 207-08 (1977) ("[I]n order to justify an exercise of jurisdiction in rem, the basis for jurisdiction must be sufficient to justify exercising 'jurisdiction over the interests of persons in a thing.'") (citation omitted). "The standard for determining whether an exercise of jurisdiction over the interests of persons is consistent with the Due Process Clause is the minimum-contacts standard elucidated in International Shoe." *Id.* Thus, in this *in rem* action, there must be a sufficient nexus among the Claimed Property, Claimants, and the forum—judged on the "minimum contacts" standard—to satisfy due process. *Cf. Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 224-25 (4th Cir. 2002) (applying "minimum contacts" test to district court's exercise of *in rem* jurisdiction under Anticybersquatting Consumer Protection Act). As the *Shaffer* Court

recognized, "minimum contacts" are typically met when a dispute involves property that is physically located within the forum, as the property's presence can "bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation." *Shaffer*, 433 U.S. at 207.  Here, by contrast, ***none*** of the Claimed Property—indeed, none of the property claimed in the Government's civil forfeiture action at all—is within the borders of the United States.  As a consequence, the Government must rely on means other than the physical location of the property to attempt to establish minimum contacts between the Claimed Property and this forum.

The Complaint falls short of alleging the constitutionally required minimum contacts to exercise jurisdiction over the Claimed Property.  The Claimed Property's contacts with the U.S. hinge on the allegations that—years ago—certain wire transfers passed through U.S. correspondent banks on their way from one foreign financial account to another foreign account, that U.S. financial institutions played a role in facilitating certain transactions involving Nigerian Par Bonds, and that certain interest payments were made from U.S. financial institutions.  *See, e.g.*, Compl. ¶¶ 35, 57, 71, 85.  However, the mere payment or receipt of funds by way of a forum's banking facilities does not amount to "minimum contacts" for constitutional purposes. *See, e.g., Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1299 (10th Cir. 1999) (finding that defendant's contacts with forum state, which included "a few wire transfers of funds," were insufficient to satisfy minimum contacts); *T.J. Raney & Sons, Inc. v. Sec. Sav. & Loan Ass'n of Salina, Kansas*, 749 F.2d 523, 525 (8th Cir. 1984) ("[T]he use of interstate mail, telephone ***or banking facilities***, standing alone, [is] insufficient to satisfy the requirements of due process.") (emphasis added).  Moreover, whatever contacts certain, past transfers may have had with the United States, the ***specific assets*** comprising the Claimed Property—which, according

26

to the allegations of the Complaint, consist of Euro-denominated investment portfolios held in investment firms in London, England, Compl. ¶ 86—have even less connection with the U.S. The Government alleges that the investment portfolios were funded by transfers from accounts in the name of the Ridley Trust to accounts in the name of the Blue Holdings Companies, but the Complaint does not allege that any of these transfers had any nexus with the U.S. *See id.*

Additionally, all but two of the Claimants—I.A.B., who is a U.S. citizen, and Ibrahim Bagudu, who regularly travels to the U.S.—clearly lack sufficient contacts with the U.S. to justify this Court's adjudicating their interests in the Claimed Property. Claimants Aisha Atiku Bagudu and her other five children, for example, are all residents of Nigeria, who own no bank accounts or property in the U.S. Aisha Decl. at ¶¶ 3, 7. While Aisha and four of her children lived in the United States for about three years more than a decade ago, only I.A.B. has traveled to the U.S. since 2003—for a school-related trip. *Id.* at ¶¶ 4-5. Two of her children, minor Claimants F.A.B. and H.A.B., have never even been to the United States. *Id.* at ¶ 6. Claimant Zainab Shinkafi Bagudu also resides in Nigeria with her minor daughter, R.A.B. Zainab was last in the U.S. in 2002 on vacation, and R.A.B. has never been to the United States. Zainab Decl. at ¶ 3. Crucially, none of the Claimants are implicated in any of the Complaint's allegations of wrongful conduct, and whatever contacts Claimants, including I.A.B. and Ibrahim Bagudu, have had with the United States, these contacts are ***wholly unrelated to events at issue in this case***. Indeed, some of the minor Claimants—who range in age from 4 to 17—***were not yet alive*** when General Abacha was in power or at the time of the money laundering transactions alleged by the Government. Aisha Decl. at ¶¶ 2, 6; Zainab Decl. at ¶ 2. Under these circumstances, exercising jurisdiction to adjudicate Claimants' interests in the Claimed Property would be fundamentally unfair. *See* Courtney J. Linn, *International Asset Forfeiture and the Constitution: The Limits of*

27

*Forfeiture Jurisdiction over Foreign Assets Under 28 U.S.C. § 1355(b)(2)*, 31 AM. J. CRIM. L. 251, 289 (2004) ("The court must consider the fairness of requiring an interested party who had no role in the offense, and otherwise has insufficient general contacts with the United States, to defend his right to the property in an action brought in the United States.").

Lastly, even if the Claimed Property or all of the Claimants had "minimum contacts" with the U.S., which they do not, exercising jurisdiction over the Claimed Property and Claimants would be "unreasonable" and would not "comport with fair play and substantial justice." *Mwani*, 417 F.3d at 14 (quoting *Burger King*, 471 U.S. at 476-77). In making its reasonableness inquiry, the Court must balance the burden imposed on the party defending a claim against the interests of the forum, the plaintiff, the judicial system, as a whole, as well as the interests of other nations. *See Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano Cnty.*, 480 U.S. 102, 113 (1987). Forcing Claimants to litigate their claims in the U.S.—with its foreign legal system thousands of miles from their homes in Nigeria—would impose an extreme burden on Claimants. *See Asahi*, 480 U.S. at 114 (noting that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness" of exercising jurisdiction over a foreign party); *cf. Casualty Assur. Risk Ins. Brokerage Co. v. Dillon*, 976 F.2d 596, 600 (9th Cir. 1992) (finding that it would be "unreasonable to force the defendant[, a Washington, D.C. resident,] to travel over 7,000 miles to defend an action in Guam" and calling the burden on the defendant "extreme").[9]

---

[9] In *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 772 F. Supp. 2d 205, 210-211 (D.D.C. 2011), the D.C. District Court—in an opinion by Judge Friedman—declined to accept the claimant's argument that exercising jurisdiction over foreign assets raised "significant due process concerns" or the "conclusory" argument that litigating in the U.S. violated the claimant's due process rights, for which the claimant "fail[ed] to cite any legal authority." *Id.* at 211. Here, by contrast, Claimants make a specific jurisdictional challenge, based on the Supreme Court's decision in *Shaffer* (not considered by Judge Friedman), that the Court's exercise of *in rem* jurisdiction—its power to adjudicate "the interests *of persons* in a thing"—must be supported by "minimum contacts," and that

Other relevant considerations cannot overcome this substantial burden imposed on Claimants.  The Government's interest in adjudicating this case is greatly reduced because, as it has represented in litigation in the U.K., it is not litigating this case to obtain funds for its own behalf, but, rather, litigating for the benefit of the people of Nigeria.  Moreover, considerations of international comity also favor abstention out of respect for Nigeria's prior settlement with Mr. Bagudu, which fully and finally resolved claims surrounding the same underlying misconduct that undergirds the Government's Complaint.  Accordingly, the Complaint—which involves allegations of *foreign* wrongdoing, *foreign* property, *foreign* Claimants, and insufficient minimum contacts—should be dismissed for lack of jurisdiction.

## III.   THE GOVERNMENT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

The Court should dismiss all forfeiture claims related to the Claimed Property—namely the Government's First, Second, and Third Claims for Forfeiture[10]—for failure to state claims upon which relief can be granted.  Even accepting the Government's allegations as true, the Government fails to plead facts sufficient to establish that any individuals knowingly engaged in, or conspired to engage in, money laundering transactions, a necessary component of the Government's Claims for Forfeiture.  In addition, the Government fails to meet its pleading burden to show it will be able to trace the alleged proceeds of the alleged crimes to the Claimed Property.

### A.   The Government's Heightened Pleading Burden

Under Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"), the Government faces "a heightened burden for

---

exercise of jurisdiction must otherwise satisfy traditional notions of "fair play and substantial justice" to pass constitutional muster.  *Shaffer*, 433 U.S. at 207-08.

[10] Claimants do not address the Fourth and Fifth Claims for Forfeiture as these Claims do not seek the forfeiture of any of the Claimed Property.

pleading" in civil forfeiture cases than in actions governed solely by the Federal Rules of Civil

Procedure. *United States v. All Assets Held at Bank Julius Baer & Co.,* 571 F.Supp.2d 1, 16

(D.D.C. 2008) (hereinafter "*All Assets*").  The Government must "allege enough facts so that the

claimant may understand the theory of forfeiture, file a responsive pleading, and undertake an

adequate investigation." *United States v. One Gulfstream G-V Jet Aircraft*, 941 F.Supp.2d 1, 14

(D.D.C. 2013) (citation omitted) (hereinafter "*Gulfstream Jet*").  The Government's pleadings

must at least "state sufficiently detailed facts to support a reasonable belief that the government

will be able to meet its burden of proof at trial," Supplemental Rule G(2)(f), and "allege enough

facts such that the court may infer that the property is subject to forfeiture." *Gulfstream Jet*, 941

F.Supp.2d at 14.  The "heightened particularity requirement is designed to guard against the

improper use of seizure proceedings and to protect property owners against the threat of seizure

upon conclusory allegations." *Id*. (citation omitted).  And, as typically is the case for any type of

civil pleading, the Government is obligated to furnish "more than labels and conclusions" or "a

formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 555 (2007); *Gulfstream Jet*, 941 F.Supp.2d at 13 ("Although the Supplemental Rules

govern, the normal set of rules may help to clarify any ambiguity").

### B.  The Allegations In The Complaint Fail to Establish All of the Elements of Money Laundering or Conspiracy

The Complaint predicates its first two Claims for Forfeiture on alleged money laundering

in violation of 18 U.S.C. § 1957, which imposes a criminal penalty on any person who

"knowingly engages . . . in a monetary transaction in . . . property . . . derived from specified

unlawful activity."  Thus, in order to establish a basis for forfeiture, the Government must meet

its heightened pleading burden in two separate steps.  First, the Government must sufficiently

allege the commission of a "specified unlawful activity," including the necessary *mens rea* of the

person who allegedly committed the criminal offense.  Second, the Government must sufficiently allege that someone engaged in a monetary transaction with the proceeds of the "specified unlawful activity" knowing that they were derived from criminal activity.

The Government fails to meet its pleading burden at both levels of the analysis.  In the first instance, the Complaint fails to sufficiently allege that the Debt Buy-Back Transaction was criminal, and therefore fails to allege that its proceeds were the fruits of "specified unlawful activity" for the purpose of any of the Government's Forfeiture Claims.  Next, the Complaint premises the "specified unlawful activity" of its First Claim for Forfeiture on alleged violations of 18 U.S.C. §§ 2314 or 2315, but fatally fails to sufficiently allege that anyone who transported funds in foreign commerce knew that the funds were stolen, converted, or taken by fraud. Moreover, with respect to both the First and Second Claims for Forfeiture, the allegations in the Complaint fail to establish that the alleged money laundering transactions were undertaken with knowledge that the money or instruments were derived from any specified unlawful activity. The Complaint's Third Claim for Forfeiture, based on a purported conspiracy to commit money laundering, fails for this reason as well.  Therefore, all three claims should be dismissed.

### 1. To the Extent that Counts One Through Three Are Premised Upon the Debt Buy-Back Transaction, the Complaint Wholly Fails to Establish the Requisite Specified Unlawful Activity

The allegations in the Complaint concerning the Debt Buy-Back Transaction do no more than outline an arms-length, transparent, commercially-reasonable, and ultimately profitable transaction between informed parties.  The Complaint provides no basis to conclude this Transaction was fraudulent and thus no basis for the forfeiture of any Debt Buy-Back-derived property as proceeds of crime.

For one, the Complaint does not sufficiently allege that the profits from the transaction were "stolen, converted, or taken by fraud" as would be required for a violation of either 18

U.S.C. § 2314 or 2315, the "specified unlawful activity" under the First Claim of Forfeiture.

Although the Complaint labels this transaction as a "fraud" and alleges in a conclusory fashion

that Mohammed Abacha, Mr. Bagudu, and others "defrauded" Nigeria, Compl. ¶ 36, there are

simply no factual allegations to back up the Complaint's naked assertions of wrongdoing. *See,*

*e.g.*, *McQueen v. Woodstream Corp.*, 248 F.R.D. 73, 78 (D.D.C. 2008) ("[I]n alleging fraud the

plaintiff must provide more than conclusory statements that the defendant's actions were

fraudulent and deceptive.") (citation omitted).  The Complaint instead alleges that Mr. Bagudu

arranged for Nigeria to buy back $1.6 billion DM of its own debt instruments at the substantial

discount of $972 million DM.  Compl. ¶ 42.  Thereafter, the Complaint alleges that Nigeria

should have paid even less to buy-back the debt through some other means.  *Id.* at ¶ 44.

Even read in a light most favorable to the Government, the Complaint simply details a

series of purchases of certain defaulted Nigerian debt instruments culminating in the transparent

negotiation of a contract for the sale of the debt to the Nigerian government in exchange for an

agreed-upon contract price.  The Complaint speculates, without any factual basis, that Nigeria

paid more than it would have otherwise paid to "repurchase the debt on the open market."

Compl. ¶ 36.  Yet, there are no allegations that Nigeria received any other offers for the debt or

that there was any market, let alone an "open market" for such defaulted Nigerian debt.  Indeed,

the only basis for the Government's allegation that Nigeria paid "more than necessary to cancel

its debt," Compl. ¶ 40, is an assumption that Nigeria could have repurchased it directly from the

original holder of the debt, TPE, at a lower price.  However, as the Complaint notes, there was a

"dispute" between the government of Nigeria and TPE that led Nigeria to default on the debt

instruments it had issued to TPE.  Compl. ¶ 38.  In this context, it is implausible that Nigeria

could have negotiated a deal directly with TPE at a significantly better price.  *Ashcroft v. Iqbal,*

556 U.S. 662, 678 (2009) (complaint must plead "sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'") (*quoting Twombly*, 550 U.S. at 570).  At

most, the Complaint alleges that the Debt Buy-Back Transaction was ***profitable*** for those

involved, which hardly amounts to pleading illegality or fraud.  *See R.S.M. Prod. Corp. v.*

*Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1051-52 (D.C. Cir. 2012)

("[A]llegations that a defendant acted in ways consistent with a conspiratorial agreement, but

also equally well explained by legitimate economic incentives, do 'not suffice . . . to show

illegality.'") (quoting *Twombly*, 550 U.S. at 556-57); *Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir.

2001)  ("A common definition of 'fraud' is 'an intentional misrepresentation, concealment, or

nondisclosure for the purpose of inducing another in reliance upon it to part with some valuable

thing belonging to him or to surrender a legal right.'") (citation omitted).

Nor do the allegations concerning the Debt Buy-Back Transaction make out a claim

under 18 U.S.C. § 1956(c)(7)(B)(iv) for "the misappropriation, theft or embezzlement of public

funds by or for the benefit of a public official" in violation of Nigerian law necessary to plead the

unlawful specified activity of the Second Claim for Forfeiture.[11]  With the exception of funds

returned to the Nigerian government following General Abacha's death, Compl. ¶ 50, the

Complaint does not trace any funds from the Debt Buy-Back Transaction to any Nigerian public

---

[11] To support its allegations of violations of Nigerian law, the Government includes a threadbare appendix containing excerpts from Nigerian criminal laws, many of which do not contain the full text of the cited sections and provisions.  *See, e.g.*, Compl. Attachment A at 1 (excerpting only subsection 1 of section 98 of the Nigerian Criminal Code, Act 1990, CAP 77).  To make matters worse, the Government includes excerpts of offenses under the Nigerian Criminal Code, which do not apply to activities in Northern Nigeria–including the Nigerian capital of Abuja.  Criminal offenses in Northern Nigeria and Abuja are governed by separate criminal statutes independent of the Nigerian Criminal Code.  *See* excerpts from the Penal Code Law, 1963, CAP 89 of the Laws of Northern Nigeria ("Nigerian Penal Code") and the Penal Code Act, 1990, CAP 532 of the Laws of the Federation of Nigeria, annexed to Campbell Decl. as Ex. P; *see also* Peter A. Anyebe, *Sentencing in Criminal Cases in Nigeria and the Case for Paradigmatic Shifts*, 1 NIALS JOURNAL ON CRIMINAL LAW AND JUSTICE 151, 151-52 (2011), *available at* http://www.nials-nigeria.org/journals/Peter%20A.%20Anyebe.pdf.  Claimants request that this Court consider the above sources in reference to applicable foreign law pursuant to Federal Rule of Civil Procedure 44.1 and find that to the extent the Government's allegations rely upon violations of the Nigerian Criminal Code, they must be dismissed.

official or public servant or to any other person on a public official or public servant's behalf, or allege that any such transfers were attempted or expected. Compl. ¶¶ 45-51. Notably, the Complaint does not allege that Mr. Bagudu, Mohammed Abacha, or Mecosta are public officials or "public servants," *see* Nigerian Penal Code §§ 115, 117. The only two public officials and/or public servants named in the Complaint with respect to the Debt Buy-Back Transaction are General Abacha and Finance Minister Ani, neither of whom is alleged to have solicited or agreed to receive any property, benefit, consideration, or other remuneration from any other person based on their participation in or approval of the Debt Buy-Back Transaction, or to have made arrangements for any other person to receive such a benefit in exchange for their official acts. Compl. ¶¶ 36-44; Nigerian Penal Code §§ 115-17. Accordingly, the allegations concerning the Debt Buy-Back Transaction also fail to establish the commission of any foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official. 18 U.S.C. § 1956(c)(7)(B)(iv).

Just as in *Gulfstream Jet*, with regard to the alleged Debt Buy-Back Transaction, "the Complaint does not provide enough detail for the Court to infer the contours of the illicit scheme." 941 F. Supp.2d at 1. Accordingly, the Government cannot rely on this alleged conduct as the "specified unlawful activity" necessary to survive a motion to dismiss.

> **2.  The First Claim for Forfeiture Should Be Dismissed Because the Allegations are Insufficient to Establish Any Violation of 18 U.S.C. §§ 2314 or 2315**

The Government's First Claim for Forfeiture alleges that the "specified unlawful activity" underlying the purported money laundering transactions consisted of a violation of either 18 U.S.C. § 2314, which criminalizes the "transport[ation], transmi[ssion], or transfer[] in . . . foreign commerce" of property that has been "stolen, converted, or taken by fraud," or § 2315, which criminalizes the receipt, possession, concealment, storage, sale or disposal of

34

property which has crossed a state line or United States boundary "after being stolen, unlawfully converted, or taken."  Both of these statutory provisions require that the alleged perpetrator act with knowledge that money or property transported in interstate or foreign commerce is stolen, converted, or taken by fraud.  *See, e.g.*, *Dowling v. United States*, 473 U.S. 207, 214 (1985) ("Section 2314 requires . . . that the defendant kno[w] the [goods, wares, or merchandise] to have been stolen, converted or taken by fraud."); *United States v. Rosa*, 17 F.3d 1531, 1546 (2d Cir. 1994) ("Since § 2315 does include a mens rea element with respect to the status of the goods as having been stolen . . . the government is required to prove defendants' mental state with respect to that status") (citation omitted).  The Complaint, however, is devoid of any allegations establishing that anyone who may have transported the proceeds of the Security Votes or Debt Buy-Back Transactions in foreign commerce, or received, possessed or disposed of such proceeds after they crossed a United States boundary, knew that these funds were criminally-derived.

With respect to the Security Votes Transaction proceeds, the Complaint refers to an alleged scheme executed by General Abacha, Ismaila Gwarzo, "and others."  Compl. ¶¶ 25-29. However, for all the Government's efforts to chart the movement of these funds, the Complaint does not plead that the person involved in transferring these funds out of Nigeria was aware of the alleged Security Votes Transaction or had any reason to suspect that the funds might be criminal proceeds.  Compl. ¶¶ 30-35.  The most that the Complaint alleges is that Mr. Bagudu at one point referred to the transferred funds as "cash swaps," *Id.* at ¶ 34, which is insufficient to establish that he was aware that the funds were the proceeds of the Security Votes Transaction or were otherwise stolen.

As discussed above, the Complaint fails to allege that the profits of the Debt Buy-Back Transaction were obtained through fraud, and therefore there can be no violation of 18 U.S.C. §§ 2314 or 2315.  In addition, the Complaint lacks any factual allegations from which it can be inferred that the person who received and transferred the proceeds from the Debt Buy-Back transaction believed that he was handling money that had been stolen, converted, or taken unlawfully.  To the contrary, the Complaint alleges that Mr. Bagudu negotiated with the Finance Minister of Nigeria who entered into an agreement "on behalf of Nigeria."  Compl. ¶ 40.  The Complaint further alleges that the transaction was approved by the President of Nigeria, General Sani Abacha.  Compl. ¶ 44.  Thus, Mr. Bagudu would have had no reason to believe that the transaction was illegitimate or illegal.

"While the complaint is to be construed liberally in plaintiff's favor, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint; nor must the Court accept plaintiff's legal conclusions."  *All Assets*, 571 F.Supp.2d at 15 (citations omitted).  As the Complaint does not allege a reasonable basis to conclude anyone participating in the movement of the Security Votes and Debt Buy-Back Transactions proceeds out of Nigeria was aware that these funds may have been criminally-derived, the Complaint fails to establish that these funds are the result of "specified unlawful activity" in support of its money laundering allegations related to 18 U.S.C. §§ 2314 or 2315.

**3.     The First And Second Claims Should Be Dismissed Because The Allegations Fail to Establish the Required Scienter for Money Laundering**

The Government's first two Claims for Forfeiture similarly fail because the Complaint's allegations are insufficient to establish that any person participated in alleged laundering transactions knowing that the funds used were criminally-derived.  Liability for money laundering under 18 U.S.C. § 1957 requires that the perpetrator "**<u>knowingly</u>** engag[e] in or

36

attempt[] to engage in a monetary transaction in criminally derived property."  (emphasis added). Thus, to set out a claim for forfeiture, the Government must establish that the person involved in the alleged monetary transaction knew that the funds were illegal proceeds.  *United States v. Alaniz*, 726 F.3d 586, 602 (5th Cir. 2013) ("The elements of money laundering, in violation of 18 U.S.C. § 1957(a)" include "'the defendant's knowledge that the property was derived from unlawful activity.'") (citation omitted); *United States v. Huff,* 641 F.3d 1228, 1230 (10th Cir. 2011) (same).  Just as the Complaint fails to allege the requisite knowledge to establish the specified unlawful activity identified in the First Claim for Forfeiture, the allegations in the Complaint fail to establish the knowledge required for criminal money laundering.

In outlining the transactions allegedly linking only a portion of the Nigerian funds to the Claimed Property, the Government again fails to show that any participants in those transactions had any reason to know that that the funds underlying the transactions were "criminally derived." With respect to the Security Votes Transaction proceeds, the Complaint fails to allege that any person or entity responsible for any monetary transaction involving those proceeds occurring after the funds left Nigeria was aware of any alleged Security Votes fraud or any other potential criminal activity related to the Security Votes.  Compl. ¶¶ 52-93.  In fact, for many transfers of such purported proceeds, the Government fails to identify who ordered or executed the transaction at all, much less plead any aspect of that person's understanding of the origins of funds underlying the transaction.  *See, e.g.*, Compl. ¶¶ 35(b)-(f).  Similarly, the Complaint completely fails to allege that Mr. Bagudu knew of any alleged Security Votes fraud or that any other potential criminal activity was the source of the funds.  Regarding the Debt Buy-Back Transaction proceeds, the Complaint has failed to provide a basis to believe these funds were "criminally derived," and therefore has failed to show that anyone involved in any monetary

transactions with respect to those proceeds knew of their supposed criminal character. Absent allegations of such knowledge, the Complaint fails to establish liability for money laundering under 18 U.S.C. § 1957 and the Government's first two Claims for Forfeiture must be dismissed on this basis alone.

> **4.    The Complaint Fails to Establish a Conspiracy for the Purposes of the Third Claim for Forfeiture**

As the Government fails to sufficiently allege that anyone knowingly committed money laundering, the Third Claim for Forfeiture, which is based on a purported conspiracy to commit money laundering claim, must be dismissed as well.

To plead conspiracy to commit money laundering under 18 U.S.C. § 1956(h), the Government must show: "(1) agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the [accused]."  *United States v. Broughton*, 689 F.3d 1260, 1280 (11th Cir. 2012); *United States v. Greenidge*, 495 F.3d 85, 100 (3d Cir. 2007) (same).

As explained above, the Government has failed to establish that the participants in the transactions now alleged to be money laundering knew that the proceeds from the Security Votes or Debt Buy-Back Transactions transferred out of Nigeria were criminally derived.  Therefore, there is no basis to allege that they knew of any unlawful purpose for their alleged conduct. Furthermore, the Complaint does not allege sufficient facts to show a common plan or agreement between Mr. Bagudu, Mohammed Abacha, or any other person regarding the funds at issue. Rather, the Complaint merely recites a litany of financial transactions occasionally involving the same individuals and entities.  Without more, the Complaint's allegations fail make a plausible showing that these parties acted with a common unlawful purpose, and therefore fail to state a claim for conspiracy to violate 18 U.S.C. § 1957.  *See Iqbal*, 556 U.S. at 678 ("The plausibility

standard" for pleading "asks for more than a sheer possibility that a defendant has acted

unlawfully.").

> C.     **The Government Fails to Allege Facts Sufficient to Show the Claimed Property is Derived From or Traceable to Illicit Activity**

To succeed on its forfeiture claims for the Claimed Property, the Government must plead

more than money laundering activity (which it failed to do).  The Government must also show "it

will be able to trace the proceeds of [the] alleged criminal activity to [the] purchase of the

Property."  *United States v. One Partially Assembled Drag Racer*, 899 F. Supp. 1334, 1341

(D.N.J. 1995); 18 U.S.C. § 981(a)(1)(A) (forfeiture of property "involved in" or "traceable to"

money laundering violations).  The Government attempts to do so by following certain funds

from Nigeria to accounts at ANZ in London, and from there to the purchase of NPBs which were

eventually liquidated and the proceeds deposited into account held in the name of the Blue

Holdings Companies.  However, even in the wake of its more than a decade-long delay in

bringing these proceedings, during which the government of Nigeria released the Claimed

Property from all claims concerning any alleged fraud, the Government now fails to meet its

tracing burden.

While the D.C. Circuit has held that the Government is not required to demonstrate full

tracing of all account activity to prove money laundering under 18 U.S.C. §1956, *see, e.g.*,

*United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1354 (D.C. Cir. 2002), the Government is

not excused from the tracing requirement of the forfeiture statute.  *United States v. Contents in

Account No. 059-644190-69*, 253 F.Supp.2d 789, 799-800 (D.Vt. 2003) (hereinafter "*Contents in

Account*") ("If the tracing requirement in § 981 is to be given any effect—as, indeed, it must—

then the government is required to demonstrate something more than the fact of commingling,

even across a series of complicated transactions, to establish that legitimate money is forfeitable

by virtue of its commingling with tainted funds."); *see also United States v. BCCI Holdings (Luxembourg), S.A.,* 961 F.Supp. 287, 304 (D.D.C. 1997) (in RICO forfeiture action, applying tracing rules and noting that "[w]hen tainted and untainted funds are commingled in a specific account, accounting principles have been applied to trace the funds").  The Government specifically took on this tracing burden when it elected to proceed under 18 U.S.C. § 981 rather than § 984.  *See Contents in Account*, 253 F.Supp.2d at 794 ("[Under § 981] the government must demonstrate the property it has seized is traceable to conduct proscribed by 18 U.S.C. §§ 1956 or 1957," and "[w]here the government cannot prove the traceability of fungible property, as required by § 981, the government is free to proceed under § 984.").[12]

Here, the Government attempts no actual tracing analysis using accounting principles or approaches explored by other courts.  *See Braxtonbrown-Smith*, 278 F.3d. at 1352 n.1 (comparing tracing approaches but noting that Section 1956 money laundering conviction for transactions that involve illegal proceeds did not require tracing all account activity); *Contents in Account*, 253 F.Supp.2d at 799 (applying specific tracing rule and noting the "nearly limitless contagion" that would occur "if the government is able to seize legitimate, commingled funds" without limitation).  Rather, the Complaint simply links a series of accounts through selected transaction activity and then attempts to declare ***all*** accounts and ***all*** assets linked by that selected activity to be forfeitable proceeds of crime.  Where funds transfer through numerous commingled accounts, "innocent funds are not forfeitable simply because they have been commingled with tainted funds."  *Contents in Account, 253* F.Supp.2d at 799; *United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997) ("[M]erely pooling tainted and untainted funds in an account does not, without more, render that account subject to forfeiture").

---

[12] If the Government had chosen to proceed under § 984, it would have been subject to a one-year statute of limitations.  18 U.S.C. § 984(b).

Allowing the Government to proceed under its current pleadings, which permit the Government to "contaminate any account that had dealings with" Nigeria "[l]ike a contagious disease," would provide the Government with a windfall and render meaningless the forfeiture statute's tracing requirement. *United States v. Certain Accounts, Together With all Monies on Deposit Therein*, 795 F.Supp. 391, 398 (S.D. Fla. 1992); *Contents in Account*, 253 F.Supp.2d at 799 ("[I]f the government is able to seize legitimate, commingled funds, it would eviscerate the § 981 tracing requirement."). Such a windfall in the context of a Section 981 forfeiture action would be particularly inappropriate here, where the Government delayed filing its claims more than ten years after a global settlement of all claims with Nigeria relating to the funds at issue here. The Government's tracing allegations in this case are inadequate and fail to provide the Court with a sufficient basis to infer the Claimed Property is traceable to money laundering transactions. Hence, the Government fails to state a claim for forfeiture of the Claimed Property.

## 1. The Government Overstates the Amounts Traced from Nigeria

In order to give the impression of successful tracing, the Government frequently claims to have traced larger amounts out of Nigeria than it appears capable of actually following from the specific allegations of the Complaint.[13] While the Complaint states that more than $190 million in proceeds of alleged fraudulent schemes were deposited into accounts at ANZ, *see* Compl. ¶ 58, $126.5 million of which allegedly "originated from the Security Votes Fraud," *id*. at ¶ 59,[14] it does not even **attempt** to trace such an amount from Nigeria to ANZ. *Id*. at ¶¶ 35, 51, 80-81.

---

[13] For example, the Complaint alleges that "General Sani Abacha, National Security Advisor Gwarzo, and others stole more than $2 billion from Nigeria" but in attempting to follow even a fraction of this sum (the "more than $700 million" allegedly delivered in cash to Mohammed Abacha), the Government is able to chart the path of less than $108 million through the United States. Compl. ¶¶ 25, 32, 35.

[14] The Government attempts to bolster its incomplete tracing by introducing the idea of the un-pleaded fourth criminal scheme resulting in $15 million in additional fraud proceeds deposited to ANZ. Compl. ¶ 59 ("The $15 million was a portion of the more than $110 million received by Morgan Procurement for these [vaccine] contracts, of which only approximately $48 million was used to purchase vaccines."). This attempt to introduce extraneous evidence of other alleged money laundering offenses not only fails due to the complete lack of any pleadings to

In fact, even viewing the Government's allegations most favorably, the Complaint traces less than $24 million in "proceeds" from the Security Votes or Debt Buy-Back Transactions to ANZ[15]—less than 13% of the amount claimed, a more than ***$165 million*** discrepancy from the $190 million of proceeds "traced" to ANZ—and even these funds are not necessarily traced to the same accounts.  *Id.* ¶¶ 33-34, 35(a)-(b), 51, 80-81.  Even fully-crediting the specific tracing allegations, the Complaint does not foreclose the fact that the accounts contained much more than just $165 million in untraced funds at ANZ because the Complaint is silent as to the existence of other deposits to ANZ and many other accounts referred to in the Complaint and as to the opening dates and balances of various accounts.  Incredibly, though the Government has not sourced approximately $165 million deposited to ANZ, it baselessly declares these funds to be traceable "proceeds."  This Court should reject such "legal conclusions cast in the form of factual allegations."  *United States v. Seventy-Nine Thousand Three-Hundred Twenty-One Dollars*, 522 F.Supp.2d 64, 68 (D.D.C. 2007) (citation and quotation omitted); *see also Iqbal*, 556 U.S. at 679 (pleadings that "are no more than conclusions . . . are not entitled to the assumption of truth.").

> ## 2.   The Government Improperly Attempts to Taint the Full Balances of Funds on Deposit at ANZ

The Government next attempts to use the minimal amounts traced to ANZ to contaminate all further transactions the ANZ accounts, and thus the purchase of $490 million in NPBs.

---

support the existence of (and any person's potential liability for) such a scheme but actually undercuts the Government's tracing attempts by introducing millions of dollars in additional income and deposits for which the Government has not even attempted to account.

[15] The Complaint alleges that an additional $7.2 million was transferred from Nigeria to ANZ.  Compl. ¶ 35(b).  However, unlike the other transfers pleaded, the Complaint fails to allege that these specific funds passed through or otherwise impacted the U.S. and therefore fails to establish that these funds are proceeds of "specified unlawful activity" for the purposes of its later money laundering claims.  *See* 18 U.S.C. § 1956(c)(7)(B) (requiring a violation "occurring in whole or in part in the United States"); *Colony at Holbrook, Inc. v. Strata C.G., Inc.*, No. 95 CV 913(NG); 1999 WL 172350, at *5 (E.D.N.Y. March 25, 1999) ("The language of 18 U.S.C. § 2314 expressly requires that the stolen goods at issue cross state lines or United States borders"); *Rosa*, 17 F.3d at 1544 (Under 18 U.S.C. § 2315, the Government "must prove that the goods had traveled interstate or across a United States border").

Compl. ¶¶ 79-86.  The Government cannot be allowed to declare *all* funds on deposit in the ANZ

accounts to be tainted simply by following *some* amount of the proceeds from the Security Vote

and Debt Buy-Back Transactions to ANZ.  *Braxtonbrown-Smith*, 278 F.3d at 1354 (reviewing

various tracing methods but not requiring use of a particular method for a money laundering

conviction); *United States v. Davis*, 226 F.3d 346, 356-57 (5th Cir. 2000) (government may

presume tainted funds used only if aggregate withdrawals from account exceed clean deposits);

*but see United States v. Moore,* 27 F.3d. 969, 976-77 (4th Cir. 1994) (government may presume

transfers from commingled account tainted up to amount of tainted funds on deposit); *United*

*States v. Ward*, 197 F.3d 1076, 1083 (11th Cir.1999) (innocent funds acquire taint of illegally-

derived funds).

Here, the Government has not alleged that the ANZ accounts were used to disguise or

conceal the Security Votes or Debt Buy-Back Transactions proceeds.  In addition, by failing to

plead basic information regarding the balances and other sources of deposits for these accounts,

the Government has essentially provided no basis to understand the operation of Mecosta and

Eagle Alliance's ANZ accounts, and no reasonable means to follow particular funds on deposit

in these accounts to any further destination.  *See Certain Accounts*, 795 F.Supp. at 398 ("As the

account in question becomes more distant from the initial illegal transaction, so too does

probable cause become more attenuated"); *Gulfstream Jet*, 941 F.Supp.2d at 14.  Therefore, any

attempt by the Government to taint the purchase of the NPBs simply because they were

purchased from purportedly commingled accounts should fail.

> **3.**      **The Government Fails to Sufficiently Trace Nigerian Proceeds to the**
> **Purchase of NPBs**

For all of the Government's attempts to make it appear as though the NPBs were tainted

because they were purchased from pooled funds necessarily including proceeds from the

Security Votes and Debt Buy-Back Transactions, even the Complaint concedes that Eagle Alliance and Mecosta purchased the NPBs under their respective Master Deferred Purchase Agreements in separate, smaller tranches over time.  Compl. ¶¶ 61-64, 68.  According to the Government's own allegations, some of these NPB tranches were at least as small as $10 million.  *Id*. at ¶ 63.  Given the minimal amount actually traced by the Government, and the lack of information regarding the timing of the purchases, it is eminently probable, and indeed likely, that individual tranches of NPBs were purchased with untraced clean funds.  *See Certain Accounts*, 795 F.Supp. at 398 (to forfeit entire balance of account, the government must "allege facts other than a mere tracing of checks written against a suspect account.").

The Complaint describes the existence of approximately $165 million of untraced funds (nearly seven times the amount "traced" from Nigeria) available to purchase NPBs over time. As early as 1996, Eagle Alliance purchased over $200 million of NPBs for only $29.8 million, Compl. ¶¶ 62, 65.  Crediting the Complaint's allegations, enough unsourced funds may have been available in the ANZ accounts to make this purchase more than ***five times over*** without resorting to the use of "traced" proceeds.  It is not only possible, but probable, that the $90 million of NPBs held at ANZ, which the Government purports to trace to the Claimed Property, were purchased with clean funds.  As they stand, the Government's pleadings are too insufficient to even infer that NPB purchase transactions involved the requisite $10,000 in fraud proceeds necessary to sustain a claim under 18 U.S.C. § 1957.  Because the Complaint fails to plead sufficient facts to infer that the $90 million in NPBs transferred in 1998 to Ridley Group were purchased with the proceeds of fraud, the Government also fails to allege that coupon interest payments stemming from these NPBs are traceable to Nigeria.  Compl. ¶ 67.

To the extent that the Complaint relies on a 1998 transfer of alleged Debt Buy-Back Transaction proceeds to ANZ to contaminate ANZ's later transfer of NPBs to the Ridley Group, Compl. ¶ 81, any assumptions in favor of the Government's tracing become patently unreasonable.  First, as described above, the Complaint fails to establish that the Debt Buy-Back Transaction proceeds are criminally-derived.  Secondly, where, as here, the Government's own "procrastination" in bringing these forfeiture counts has resulted in gaps in information necessary to trace funds to the Ridley Group, the Government may not take advantage of its own delay to demand assumptions in its favor.  *In re Moffitt, Zwerling & Kemler, P.C.*, 875 F.Supp. 1152, 1160-61 (E.D.Va. 1995) (the Government's procrastination is an equitable factor that "may be weighed against the government's request to extend the tracing trail. . ."), *rev'd in part on other grounds,* 83 F.3d 660 (4th Cir. 1996).[16]

Even if the Court credits the Government's allegations that Debt Buy-Back Transaction proceeds were deposited into a Mecosta account, Compl. ¶ 46, and that a later transfer to ANZ originated from the same account, *id*. ¶ 81, the totality of what is alleged (and what is absent) from the Complaint precludes a reasonable inference that the latter transfer must have consisted of proceeds of fraud.  The Complaint tacitly admits that Mr. Bagudu had access to large sums of money (at least $64.3 million) to pay Mecosta's debts that the Government does not attempt to argue was the proceeds of fraud.  *Id*. ¶ 66.  Likewise, the Complaint is utterly devoid of any allegations that Mr. Bagudu has no other sources of wealth than the alleged criminal schemes or that these sums did not travel through the pertinent accounts at ANZ or elsewhere.  *See Gulfstream Jet*, 941 F.Supp.2d at 16 (where no information regarding forfeiture target's other

---

[16] In any event, the Government has already implicitly conceded in the U.K. Proceedings that it is not seeking forfeiture of assets allegedly stolen through the Debt Buy-Back Transaction.  *See* Skeleton Argument of the Proposed Claimant [United States]at ¶¶ 12, 28, Doc. No. 50-5 (representing that the assets held in the name of the Blue Holdings Companies are allegedly traceable to the Security Votes Transaction, with no reference to the Debt Buy-Back Transaction).

sources of income were alleged, allegations regarding his "outlandish wealth" were insufficient to give rise to inference that his property was traceable to alleged fraud). The Government labels the $2.4 million paid to ANZ in 1998 as fraud proceeds but does not plead sufficient facts to accept such a conclusion. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief") (quotations omitted); *see also* 12 Charles A. Wright, et al., Federal Practice and Procedure § 3242 (West. Supp. 2014) (civil forfeiture's "drastic nature" requires "added specifics" to state a claim). Hence, the Government's label of these funds should be disregarded and its deficient tracing attempt rejected.

In the absence of its desired assumption that all funds at ANZ used to purchase the NPBs are necessarily tainted, the Government fails to plead sufficient facts to support an inference that the NPBs purchased at ANZ were purchased using traceable proceeds of fraud.

> **4.    The Complaint Lacks Any Basis to Forfeit the Full Value of the Claimed Property**

The Government's allegations admit that the Claimed Property is derived from commingled proceeds of the liquidation of $90 million in NPBs. As described above, the Government has failed to plead sufficient facts to infer that all (or, indeed, any) of the NPBs transferred to the Ridley Group were traceable to or involved in money laundering offenses. Thus, as alleged, Claimed Property necessarily consists in whole or in part of innocent funds.

To forfeit property which consists in whole or in part of innocent funds, the Government must allege that "the innocent funds" were "used in some way to hide the nature of the tainted funds." *Contents in Account*, 253 F.Supp.2d at 799; *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998) (forfeiture of commingled funds in laundering scheme "proper as long as the government demonstrates that the defendant pooled the funds to facilitate, i.e., disguise the

nature and source of, his scheme."); *but see United States v. Contents of Nationwide Life Insurance Annuity Account No. 0961 In the Name of Warshak,* No. 1:05-cv-00196, 2009 WL 961223, at *3 (S.D. Ohio Apr. 8, 2009) (entire commingled balance forfeitable as "attributable to a money laundering scheme").

Here, the Complaint is fatally devoid of allegations that the funds were routed to ANZ or elsewhere in order to disguise or conceal their source or the alleged schemes.  Compl. ¶¶ 58-78. In fact, the Complaint indicates that funds were routed to ANZ for the profitable opportunity to purchase NPBs rather than to disguise their source, and from there travelled to the Ridley Group and ultimately to the accounts held in the name of the Blue Holdings Companies as part of legitimate financial activity.  *Id.* at ¶¶ 54-56.

While the Government may not be required to trace every transaction in every account at issue, the Government may not make unreasonable and unsupportable leaps to try to reach innocent property.  Because the Complaint fails to allege sufficient facts connecting the Claimed Property to the alleged criminal activity, fails to support an inference that the NPBs are traceable proceeds of money laundering, and fails to allege that any commingling occurred in order to conceal the source of the funds at issue, the Complaint fails to state a claim for forfeiture.

## IV.   THIS COURT SHOULD DISMISS THE COMPLAINT ON GROUNDS OF INTERNATIONAL COMITY AND THE ACT OF STATE DOCTRINE

Courts are empowered under the international comity and act of state doctrines to decline to exercise jurisdiction that is otherwise properly asserted and dismiss an action.  *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 422 (2d Cir. 2005) (comity); *Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1257 (11th Cir. 2006) (act of state).  The principle of comity "summarizes in a brief word a complex and elusive concept—the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise

binding on the forum," *De Csepel v. Republic of Hungary*, 714 F.3d 591, 606 (D.C. Cir. 2013)

(citation and quotations omitted), and it is applicable to foreign acts whether executive,

legislative, or judicial in nature.  *See Hilton v. Guyot*, 159 U.S. 113, 164 (1895) (describing

comity as "the recognition which one nation allows within its territory to the legislative,

executive or judicial acts of another nation, having due regard both to international duty and

convenience, and to the rights of its own citizens, or of other persons who are under the

protection of its laws").  Ultimately, comity calls for U.S. courts to defer to determinations made

by other nations out of "respect for the decisions of foreign sovereigns."  *Gulfstream Jet*, 941 F.

Supp. 2d at 8.  The act of state doctrine is similarly based on "notions of sovereign respect and

intergovernmental comity," as well separation of powers principles, and it "reflects the

judiciary's reluctance to complicate foreign affairs by validating or invalidating the actions of

foreign sovereigns."  *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 113 (D.D.C. 2005).  The act of

state doctrine precludes domestic courts from "inquiring into the validity of public acts that a

recognized foreign sovereign power committed within its own territory."  *McKesson Corp. v.

Islamic Republic of Iran*, 539 F.3d 485, 491 (D.C. Cir. 2008) (citation and quotations omitted).

However, both comity and act of state doctrines are weakened in the circumstance where the

Executive Branch exercises discretion to bring a suit.  *Gulfstream Jet*, 941 F. Supp.2d at 10-12

(refusing to dismiss on comity or act of state grounds).  In addition, dismissal is not appropriate

on comity grounds when doing so "would be contrary to the policies or prejudicial to the

interests of the United States.  *Id.* at 10 (citation and quotation omitted).[17]

---

[17] Although international comity and the act of state doctrine are generally regarded as affirmative defenses that are more appropriately considered at the summary judgment stage, this Court has recognized that they could be invoked on a motion to dismiss if the applicability of the defenses is evident from the complaint itself.  *See United States v. Sum of $70,990,605*, Civil Action No. CV 12-1905 (RWR), 2014 WL 824048, at *10 (D.D.C. Mar. 4, 2014).  Here, the bare allegations of the Complaint and other documents properly considered on this motion set forth the facts necessary to establish the applicability of comity and the act of state doctrine, even at this stage in the proceedings.  *See* Compl. ¶ 77; Settlement Agreement, Campbell Decl. at Ex. I.

A party seeking to invoke comity or act of state principles generally must show an adjudication of rights or an official decision by a foreign government to which the court should defer.  *See id.* at 8-10 (dismissal inappropriate because of no foreign adjudication of rights); *United States v. Portrait of Wally*, No. 99 Civ. 9940 (MBM), 2002 WL 553532, at *10 (S.D.N.Y. Apr. 12, 2002) (dismissal on comity grounds inappropriate due to lack of formal, purposeful act of judiciary, legislative, or executive authority).  The 2003 Settlement Agreement between Mr. Bagudu and Nigeria constitutes a formal decision and act by Nigeria to fully and finally resolve the disputes regarding Mr. Bagudu's alleged participation in misappropriating funds from Nigeria—the very same conduct undergirding the Government's allegations in this action with respect to the Claimed Property.  Moreover, the Settlement Agreement included the specific declaration concerning the funds at issue in this case that: "[n]o claim of any kind at all will attach to the AB Assets and they will be held by AB free from any claims existing or future, direct or indirect, contemplated or otherwise by the FRN *or in whole or part at its behest or on its behalf or for its benefit*."  Settlement Agreement at § 7.10(b) (emphasis added).  This declaration in the agreement by the settling parties, including Nigeria, similarly constituted a decision by the government of Nigeria.  Any fair reading of this declaration must recognize that as an inducement to gain the settlement and transfer of funds from Mr. Bagudu, Nigeria determined and promised that the funds at issue were no longer proceeds of crime related to the transfer of funds out of Nigeria under General Abacha's regime that were subject to suit or forfeiture by Nigeria or anyone acting *"at its behest or on its behalf or for its benefit."*  In effect, Nigeria recaptured funds that it believed were wrongfully taken from Nigeria while determining that the remaining funds would be free from any future claims as if Nigeria had proceeded through the formal process of first obtaining the funds and then transferring the released funds

49

back to the Ridley Trust.  Accordingly, the settlement with Nigeria is a separate basis on which

to dismiss the Government's suit, and at the time the funds at issue were transferred from the

Ridley Trust, Mr. Bagudu and Claimants were entitled to rely upon the sovereign decision of

Nigeria—the alleged victim of the purported activities referenced in the Complaint—that the

funds were not subject to suit or forfeiture for Nigeria's benefit.

Out of respect for Nigerian sovereignty, this Court should decline the Government's

invitation to re-litigate rights to property that were already concluded by Nigeria, and to examine

and pass judgment on Nigeria's determination that the funds at issue could be held by Mr.

Bagudu and his heirs (Claimants) free from any future claims for the benefit or at the behest of

Nigeria.  Entertaining this action in light of the Settlement Agreement, and Nigeria's

determination that the funds are free from any future claims, would eviscerate Nigeria's formal

and final decision more than a decade ago to conclude all disputes over Claimants' funds, risk

nullifying Nigeria's sovereign acts, and would likely subject Nigeria to a lawsuit by Claimants to

recover funds promised by Nigeria to be free and clear of claims. This Court should apply

principles of comity and act of state and avoid second-guessing the Nigerian government's

determination as to the best way to resolve a dispute arising from events occurring within its own

borders more than fifteen years ago.  *Cf. Bi v. Union Carbide Chem. and Plastics, Inc.*, 984 F.2d

582, 586 (2d Cir. 1993) (affirming dismissal of claims brought by individual plaintiffs arising

from industrial accident in India in light of Indian Government's decision to exclusively

represent all victims, recognizing that India had determined this to be the "most effective

method" of resolving claims).

Although the doctrines of comity and act of state are weakened where suit is brought by

the executive branch and are not appropriately relied upon where their application would be

"prejudicial to the interests of the United States," *Gulfstream Jet*, 941 F. Supp.2d at 8-10, in this case the U.S. government's attenuated interests pale in comparison to the considerable interests of Nigeria.  As a result, the Court should apply both doctrines to dismiss the case.  First, this forfeiture action is predicated upon alleged misappropriation of public funds ***in Nigeria*** and subsequent transfers of those funds to various ***foreign accounts and entities***, which—at most— passed through U.S.-affiliated financial institutions on their way to other countries.  This is not a situation where the Government seeks to target assets located within the United States or where the underlying unlawful conduct had a direct impact inside the United States—circumstances in which the Government's interest might be stronger.  *See Portrait of Wally*, 2002 WL 553532, at *10 (recognizing—in forfeiture action involving allegedly stolen painting imported into, and seized in, the United States—that the Government "has a strong interest in enforcing its own laws as applied to conduct ***on its own soil***") (emphasis added); *Sum of $70,990,605*, 2014 WL 824048, at *1-2 (unlawful activity forming the basis for forfeiture was alleged fraud perpetrated by foreign contractors against the U.S. Government).  Here, by contrast, the alleged unlawful conduct that serves as a foundation for the Complaint consists of purported violations of Nigerian law occurring on Nigerian soil by Nigerians against the nation of Nigeria, and the assets that the Government seeks to forfeit originated—and currently reside—wholly outside of the United States.

Second, while the Government is the nominal plaintiff in this action, it has made clear that its real purpose in bringing this case is not to recover property for the Government's own sake, but, rather, ***to recover property for the benefit of Nigeria***.  In the U.K. Proceedings, in order to rebut arguments that its action was penal in nature, the Government specifically assured the Commercial Court that in the event the Government prevails in this forfeiture action, "the

assets which it is able to forfeit and recover *__will be used for the benefit of the people of Nigeria__* (less any direct costs of the asset recovery process)." *See* United States Skeleton Argument, Doc. No. 39-7, p. 8 (emphasis added).  Thus, by the Government's own admission, this case is not the typical forfeiture action being brought to penalize money laundering activity and to compensate the United States for the misuse of the U.S. banking system.  Of course, if the Government truly is bringing this action in order to recover the Claimed Property for the benefit of Nigeria, then the Government is attempting to circumvent and violate the clear terms of the Settlement Agreement Nigeria determined appropriate and in its sovereign interest to execute.

This Court should rely upon the doctrines of comity and act of state to dismiss this case in deference to the decisions of the sovereign, Nigeria, which clearly has the strongest interests related to the property, disputes, and allegations that underlie the government's Complaint.

<u>CONCLUSION</u>

For all of the foregoing reasons, Claimants respectfully submit that the Government's Complaint must be dismissed as to the Claimed Property.  Claimants also request an oral hearing on this motion.

Dated:   July 7, 2014                                    Respectfully submitted,


                                                         /s/ Jonathan R. Barr
                                                         Jonathan R. Barr (D.C. Bar No. 437334)
                                                         BAKER & HOSTETLER LLP
                                                         1050 Connecticut Ave. NW, Suite 1100
                                                         Washington, DC 20036
                                                         Tel:  202-861-1500
                                                         Fax:  202-861-1783
                                                         jbarr@bakerlaw.com

                                                         Jonathan B. New
                                                         jnew@bakerlaw.com
                                                         Patrick T. Campbell
                                                         pcampbell@bakerlaw.com
                                                         BAKER & HOSTETLER LLP
                                                         45 Rockefeller Plaza
                                                         New York, NY 10111-0100
                                                         Tel: (212) 589-4650

## CERTIFICATE OF SERVICE

I certify that on July 7, 2014, I caused to be filed and served the foregoing via the Court's CM/ECF system, which will serve the following attorneys of record:

Elizabeth A. Aloi                                           Jude C. Ezeala
Trial Attorney                                              CAVA LEGAL GROUP PLLC
Asset Forfeiture and Money Laundering Section               1325 G Street, NW
Criminal Division                                           Suite 500
U.S. Department of Justice                                  Washington, DC 20005
1400 New York Avenue, NW
Suite 10100
Washington, DC 20005

Kenneth A. Nnaka
Law Offices of Nnaka & Associates, PLLC
2650 Fountain View Drive, Suite 332
Houston, TX 77057


                                                            /s/ Jonathan R. Barr