**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-cv-1832 (JDB) |
| | ) | |
| ALL ASSETS HELD IN ACCOUNT NUMBER | ) | |
| 80020796, IN THE NAME OF | ) | |
| DORAVILLE PROPERTIES CORPORATION, | ) | |
| AT DEUTSCHE BANK INTERNATIONAL, | ) | |
| LIMITED IN JERSEY, CHANNEL ISLANDS, | ) | |
| AND ALL INTEREST, BENEFITS, OR ASSETS | ) | |
| TRACEABLE THERETO, *ET AL.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**UNITED STATES' OPPOSITION TO THE CLAIMANTS' MOTION TO DISMISS
GOVERNMENT'S VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Comes now the Plaintiff, United States of America, by and through its undersigned

counsel, and respectfully urges this Court to deny the Claimants' Motion to Dismiss

Government's Verified Complaint for Forfeiture *In Rem* (ECF No. 55). The United States'

Verified Complaint for Forfeiture *In Rem* ("Complaint") (ECF No. 1) alleges facts demonstrating

that former Nigerian Head of State Sani Abacha, his son Mohammed Sani Abacha, their

associate Abubakar Atiku Bagudu, and others embezzled, misappropriated, defrauded, and

extorted hundreds of millions of dollars from the government of Nigeria and laundered the

proceeds of those crimes through conduct in and affecting the United States in violation of U.S.

law. These facts, which must be accepted as true for consideration of a motion to dismiss, "state

the grounds for subject-matter jurisdiction, *in rem* jurisdiction over the defendant property, and

venue," "state a claim upon which relief can be granted," and "state sufficiently detailed facts to

support a reasonable belief that the government will be able to meet its burden of proof at trial," such that the Claimants may commence an investigation and frame a responsive pleading without moving for a more definite statement, as required by Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and Federal Rule of Civil Procedure 12(b)(6).  Further, principles of international comity and the act of state doctrine do not warrant dismissal of this forfeiture action because it was brought by the United States to forfeit property criminally laundered in the United States.  Thus, this Court should enter the attached order denying the Claimants' motion.

## I.    BACKGROUND

This is a civil forfeiture action against five corporate entities and more than $500 million in other assets involved in an international conspiracy to launder proceeds of corruption in Nigeria during and after the military regime of General Sani Abacha.  As alleged in Complaint, General Abacha, together with Nigerian National Security Advisor Ismaila Gwarzo, General Abacha's son Mohammed Sani Abacha, Abubakar Bagudu, and others, systematically embezzled public funds worth billions of dollars from the Central Bank of Nigeria on the false pretense that the funds were necessary for national security, and moved the embezzled funds overseas into and out of the United States (¶¶ 25-35) (referred to as the "Security Votes Fraud"). General Abacha and Nigerian Finance Minister Anthony Ani also caused the government of Nigeria to purchase non-performing government debt from a company controlled by Mr. Bagudu and Mohammed Abacha at vastly inflated prices, generating a windfall of over $282 million for Mohammed Abacha and Mr. Bagudu through U.S. financial transactions (¶¶ 36-44) (referred to as the "Debt Buy-Back Fraud").  The proceeds of these criminal schemes were transported into and out of the United States in violation of U.S. law and pooled into bank accounts in London,

held in the names of shell companies controlled by Mohammad Abacha and Mr. Bagudu (¶ 30). Mohammad Abacha and Mr. Bagudu used these monies to purchase hundreds of millions of dollars of U.S. dollar-denominated Nigerian bonds, through a purchase agreement that required payments to a financial institution in the United States (¶ 57).  The bonds also generated tens of millions of dollars in interest paid through transactions from Citibank in New York and guaranteed by the United States; in effect, the conspirators lent money stolen from Nigeria back to Nigeria with zero risk and at enormous profit (¶¶ 57, 60).  The bonds were liquidated, and the proceeds from the sale of the bonds were deposited into the defendant accounts that are the subject of this forfeiture action (¶¶ 52-93).

The Claimants are members of Mr. Bagudu's family.  They filed claims to the defendants identified in ¶¶ 4(h) – 4(k) of the Complaint (hereinafter the "defendant assets").  The defendant assets are four investment portfolios containing funds derived from Nigerian Par Bonds held in the name of the Ridley Group at Credit Agricole Indosuez, London, discussed in ¶¶ 79-86 of the Complaint.

On August 6, 2014, this Court entered a default forfeiture judgment  against seven other defendants in this case pursuant to 18 U.S.C. § 983,  Federal Rule of Civil Procedure 55, and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.  In doing so, the Court found that "[b]ased on the government's well-pleaded allegations in its verified complaint . . .  that [forfeited] defendant assets . . .  were involved in transactions in violation of 18 U.S.C. §§ 1956 and 1957, or are traceable to such property." (ECF No. 65).

Previously, the Court had issued arrest warrants *in rem* for the restraint and seizure of these seven defendants, as well as the defendant assets, finding probable cause that they were subject to forfeiture to the United States.

The defendant assets are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they were "involved in a transaction or attempted transaction" in violation of the U.S. money laundering laws,  or "are traceable to such property."  The relevant U.S money laundering law, 18 U.S.C. § 1957, criminalizes engaging or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000 that is derived from specified unlawful activity.  The Complaint contains allegations that the defendant assets were involved in money laundering transactions with the proceeds of two "specified unlawful activities," namely, "the misappropriation, theft or embezzlement of public funds by or for the benefit of a public official," as codified in 18 U.S.C. § 1956(c)(7), and the transfer and receipt of property stolen or taken by fraud, in violation of 18 U.S.C. §§ 2314 and 2315.

## II.     LEGAL STANDARDS

### A.     Legal Standards for a Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) and Supplemental Rule G(2)(f)

In deciding a motion under Fed. R. Civ. P. 12(b)(6), the Court must "take all of the factual allegations in the Complaint as true," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and "draw all inferences in favor of the nonmoving party.*" See City of Harper Woods Emps. Ret. Sys. v. Oliver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009); *United States v. $79,321*, 522 F. Supp. 2d 64, 68 (D.D.C. 2007) ("plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor").  Indeed, Rule 12(b)(6) mandates that the Court accept the Complaint's material factual allegations as true "even if doubtful in fact." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). The Complaint "may not be dismissed based on [the]

4

court's assessment that the plaintiff will fail to find evidentiary support . . . to the satisfaction of the factfinder." *Id.* at 563, n.8.  The Court must not "evaluate the probability of [plaintiff's] success." *Doe v. Rumsfeld*, 800 F. Supp. 2d 94, 114 (D.D.C. 2011).

The sufficiency of a forfeiture complaint is governed by Rule G(2)(f) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, which requires the United States to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. Rule G(2)(f). The United States' burden at trial is to establish forfeitability by a preponderance of the evidence; the Civil Asset Forfeiture Reform Act makes clear that "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property."  18 U.S.C. § 983(a)(3)(D). Thus, as set forth in *United States v. All Assets Held at Bank Julius Baer & Co.*, 571 F. Supp. 2d 1, 16 (D.D.C. 2008), "[t]he complaint must contain more than conclusory allegations; although it need not plead evidence, it must plead facts to support its allegations."  In pragmatic terms, as explained in *United States v. Mondragon*, the Complaint need only plead sufficient facts that "the claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." 313 F.3d 862, 864 (4th Cir. 2002); *see also* Advisory Comm. Note Supp. Rule G (Rule G(2)(f) should be read consistent with *Mondragon*).

**B.     The Statute of Limitations for Civil Forfeiture Actions**

The statute of limitations for civil forfeiture actions is set forth in 19 U.S.C. § 1621, which states that an action must be commenced "within five years after the time when the alleged offense was discovered, or . . . within 2 years after the time when the involvement of the property in the alleged offense was discovered."  The statute of limitations is tolled, however,

during the "time of the absence from the United States of the person subject to the penalty or forfeiture, or of any concealment or absence of the property."  19 U.S.C. § 1621(2).  The D.C. Circuit has concluded that property subject to forfeiture is "absent from the United States" when it is located in a foreign country.  *United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278 Banco Español de Credito, Spain*, 295 F.3d 23, 27 (D.C. Cir. 2002) (hereinafter "*Banco Español*").

C.    **Jurisdiction in Civil Forfeiture Actions Against Property Located Abroad**

Supplemental Rule G(2) requires a civil forfeiture complaint to state the grounds for subject matter jurisdiction, and for *in rem* jurisdiction over the defendant property.  Supp. R. G(2)(b).  Subject matter jurisdiction over forfeiture actions is governed by 28 U.S.C. § 1355(a) which states that "[d]istrict courts shall have original jurisdiction . . .  of any action or proceeding for the recovery or enforcement of any. . . forfeiture . . . incurred under any Act of Congress."

It is well settled that this Court has both *in rem* jurisdiction and venue for forfeiture actions brought to enforce the laws of the United States against property located abroad.  28 U.S.C. § 1335(b)(2) ("[w]henever property subject to forfeiture under the laws of the United States is located in a foreign country . . . an action or proceeding for forfeiture may be brought . . . in the United States District Court for the District of Columbia."); *see also Banco Español*, 295 F. 3d at 26-27 ("[i]t would make little sense for Congress to provide venue in a district court if there were no means for that court to exercise jurisdiction . . . Congress intended the District Court for the District of Columbia, among others, to have jurisdiction to order the forfeiture of property located in foreign countries.").

**D.      Legal Standards Governing International Comity and the Act of State Doctrine**

International comity provides that a U.S. court should give full effect to a foreign judgment that has been rendered with impartiality and due process.  *See Hilton v. Guyot,* 159 U.S. 113, 163, 202-03 (1895); *Doe v. Exxon Mobil Corp.,* 654 F.3d 11, 64 (D.C. Cir. 2011). It is a "doctrine of deference based on respect for the decisions of foreign sovereigns." *L.G. Display Co. Ltd. v. Obayashi Seikou Co., Ltd.,* 919 F.Supp.2d 17, 28 (D.D.C. 2013); *United States v. One Gulfstream G-V Jet Aircraft,* 941 F. Supp. 2d 1, 8 (D.D.C. 2013) (hereinafter "*One Gulfstream*) (both quoting *United States v. Kashamu,* 656 F.3d 679, 683 (7th Cir. 2011)). International comity is not a doctrine of preemption that requires courts to decline jurisdiction merely because foreign laws might also apply. *One Gulfstream,* 941 F. Supp. 2d at 10.  Rather, U.S. courts should recognize a foreign judgment only if:

> there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment.

*Hilton,* 159 U.S. at 202.  Applying comity is inappropriate when doing so "would be contrary to the policies or prejudicial to the interests of the United States." *One Gulfstream,* 941 F. Supp. 2d at 10 (quoting *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru,* 109 F.3d 850, 854 (2d Cir.1997)); *see also Laker Airways Ltd. v. Sabena Belgian World Airlines,* 731 F.2d at 937 ("No nation is under unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum."); Restatement § 482(1) (a judgment may be denied comity if ". . . the cause of action on which the judgment was based, or the judgment itself, is repugnant to the public policy of the United States").

The act of state doctrine precludes domestic courts from inquiring into the validity of the public acts that a recognized foreign sovereign power committed within its own territory. *One Gulfstream,* 941 F. Supp. 2d at 11 (citing *McKesson Corp. v. Islamic Republic of Iran,* 539 F.3d 485, 491 (D.C. Cir. 2008)).   The doctrine applies when the relief sought would require a court in the United States to declare invalid the official act of a foreign sovereign performed within its boundaries. *Id.* (citing *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.,* 493 U.S. 400, 405 (1990)).  Much like international comity, the act of state doctrine is not a principle of abstention, that is, a claimant may not raise the act of state doctrine as a bar to suit simply because the case touches upon the realm of foreign affairs. *See W.S. Kirkpatrick,* 493 U.S. at 409 ("The act of state doctrine is not some vague doctrine of abstention[;]. . . [it] only arise[s] . . . when the outcome of the case turns upon the effect of official action by a foreign sovereign").  It serves as "a rule of decision for the courts of this country," and  requires that "the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *Id.* (internal quotations and citations omitted).

## III.   ARGUMENT

The Complaint's allegations, which must be accepted as true, establish a reasonable belief that the Government will be able to demonstrate forfeitability at trial.  First, the Complaint contains allegations sufficient to establish that the Abacha conspirators embezzled and stole money from Nigeria and transported such monies in and out of the United States in violation of 18 U.S.C. § 1956(c)(7)(B)(iv) and 18 U.S.C. §§ 2314 and 2315 (the "specified unlawful activities" of "misappropriation, theft or embezzlement of public funds by or for the benefit of a public official" and the interstate transportation of stolen property) (¶¶ 25 – 51).  The Complaint also contains allegations sufficient to establish that the embezzled and stolen monies were

laundered using the U.S. financial system (¶¶ 34, 35, 52-86).  Thus, the defendant assets were involved in money laundering in violation of U.S. law, and are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

Second, despite the Claimants' speculation about the timing of this action, the Claimants concede that this action was brought within the statute of limitations (ECF No. 55, p. 30). [1]  The Claimants have failed to present a basis for this Court to ignore clear statutory language, and binding D.C. Circuit precedent establishing that the statute of limitations is tolled while the defendant property is overseas. Indeed, it is undisputed that this case reflects the culmination of years of investigation spanning multiple jurisdictions.  The scope of the investigation speaks to the scale of the Abacha conspirators' criminal conduct and the Claimants do not (and cannot) establish the needed constitutional violation for a contrary finding.

Third, this Court has subject matter jurisdiction, *in rem* jurisdiction, and venue over the defendant assets as required by Supplemental Rule G(2).  There is subject matter jurisdiction because 28 U.S.C. §§ 1345 and 1355(a) give the district courts the jurisdiction to adjudicate any civil forfeiture action commenced by the United States under any provision of federal law. This Court has *in rem* jurisdiction and venue over the defendant assets pursuant to 28 U.S.C. § 1355(b), which expressly gives the United States District Court for the District of Columbia extraterritorial jurisdiction over forfeiture actions involving assets located overseas.  The exercise of this *in rem* jurisdiction is constitutional and does not offend traditional notions of fair play and substantial justice because of the defendant assets' sufficient minimum contacts to the United States through the conspirators' conduct in and abuse of the U.S. financial system.

---

[1] Citations to page numbers in the Claimants' Motion to Dismiss (ECF No. 55) refer to those assigned by the Court's ECF system.

Finally, the putative Claimants erroneously argue that in order to act consistently with the act of state doctrine and principles of international comity, this Court must drop this action to respect a 2003 settlement that Mr. Bagudu reached with Nigeria (ECF No. 55, p. 60).  However, neither the act of state doctrine, nor principles of international comity warrant dismissal of a civil forfeiture action where, as here, the Executive Branch of the United States seeks to forfeit defendant assets that were involved in violations of the U.S criminal laws. Thus, the defendant assets are properly subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

Unable effectively to challenge the sufficiency of the Complaint, the putative Claimants attach hundreds of pages of exhibits to their motion, none of which are properly considered by this Court in deciding a Motion to Dismiss.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) (In deciding a motion to dismiss, a court may consider "only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice.").  Because a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) is a facial challenge to the four corners of the Complaint, the Claimants' submissions are an inappropriate distraction.[2]

## A.    The Complaint States a Valid Claim Upon Which Relief Can be Granted

The Complaint alleges facts that, if accepted as true, demonstrate that the defendant assets were involved in money laundering.  According to the Complaint, General Abacha and his coconspirators stole more than $2 billion from Nigeria by fraudulently representing that the

---

[2] Moreover, without explanation, the putative Claimants seek dismissal of this case with prejudice.  As this Court recently reaffirmed, however, "even if the complaint were to be dismissed for failure to state a claim, dismissal with prejudice is inappropriate" where, as here, deficiencies in pleading could be cured by amendment. *United States v. Sum of $70,990,605*, --- F.Supp.2d ----, 2014 WL 824048, at *2, (D.D.C. March 4, 2014) (citing *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006) ("[D]ismissal with prejudice is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency. Therefore, a complaint that omits certain essential facts and thus fails to state a claim warrants dismissal pursuant to Rule 12(b)(6) but not dismissal with prejudice.") (emphasis in original; internal quotation marks and citation omitted)).

funds were to be used for national security purposes (¶ 25).  These funds were transported out of Nigeria, and into and out of the United States though the use of the U.S. financial system and deposited into accounts controlled by the coconspirators (¶¶ 25-33).  Thus, the conspirators embezzled public funds, as set forth in 18 U.S.C. § 1956(c)(7)(B)(iv), and illegally transported or received property that was stolen or obtained through fraud in violation of 18 U.S.C. §§ 2314 and 2315.  The allegations also show that the conspirators defrauded Nigeria of more than $282 million by causing Nigeria to repurchase its own government debt at a grossly inflated price (¶¶ 36-44).

Mohammed Abacha, Mr. Bagudu, and others invested the proceeds of these schemes in Nigerian Par Bonds, reaping more than $175 million in interest paid by the Nigerian government and guaranteed by the United States (¶¶ 52-86).  Specifically, the conspirators, through the use of their corporate entities, pooled their criminal proceeds in London to purchase Nigerian Par Bonds through monetary transactions in or affecting the United States (¶ 53).  Over the course of the conspiracy, Mr. Bagudu and Mohammed Abacha transferred approximately $190 million in proceeds of their criminal schemes into accounts they controlled at ANZ (London), which was used to purchase Nigerian Par Bonds worth $490 million (face value) at ANZ (London) (¶ 58).  Nigerian Par Bonds worth $90 million (face value) of the $490 million were transferred to an account in the name of the Ridley Group, from which the defendant assets are derived (¶¶ 80-86).  The transfers were conducted using the U.S. financial system, including transactions into and out of the United States used to pay down debt owed on the bonds (¶ 81, 83, 85).

The putative Claimants challenge the sufficiency of the Complaint with regard to (1) the elements of the alleged money laundering conspiracy, and in particular, the Debt Buy-Back Fraud allegations, and (2) the criminal derivation of the defendant assets and their involvement

in the money laundering scheme (ECF No. 55, p. 42-60).  Notably, the Claimants do not dispute the Security Votes Fraud allegations, which themselves establish the forfeitability of the defendant assets by showing that monies embezzled from Nigeria were transported out of Nigeria and into and out of the United States through the use of the U.S. financial system in violation of 18 U.S.C. §§ 1957, 2314 and 2315 before being pooled at ANZ London and used for the purchase of Nigerian Par Bonds in violation of 18  U.S.C. § 1957.

As set forth below, not only are the allegations sufficient but the Complaint also meets the heightened burden set forth in Supplemental Rule G(2)(f) because the Claimants have clearly been able to "commence an investigation of the facts and to frame a responsive pleading," as demonstrated by the breadth of the factual argument put forth in their motion to dismiss. *Mondragon*, 313 F. 3d at 864; *United States v. All Assets Held at Bank Julius Baer & Co.,* 571 F. Supp.2d 1, 16 (D.D.C. 2008) (Rule G(2)(f) supplants Rule E(2) but carries forward the *Mondragon* standard for determining the sufficiency of a complaint); *see also* Advisory Comm. Note Supp. Rule G (Rule G(2)(f) should be read consistent with *Mondragon).*

### 1. The Allegations in the Complaint Establish All the Elements of a Money Laundering Conspiracy

#### a. The "Debt Buy-Back Fraud" Transactions Establish the Requisite "Specified Unlawful Activities."

Contrary to the Claimants' assertions, the "Debt Buy-Back Fraud" involved criminal proceeds that were "stolen, converted or taken by fraud."  (ECF No. 55, p. 44) (discussed in detail in ¶¶ 36-44 of the Complaint).[3]  Specific allegations about the fraudulent nature of the "Debt Buy-Back Fraud" are found in ¶ 2 ("General Abacha and his finance minister, Anthony

---

[3] In challenging the fraudulent nature of the Debt Buy-Back Fraud, the Claimants appear to believe that each of the alleged schemes must contain each of the elements of the alleged "specified unlawful activities" that are the predicates for forfeiture.  However, to be sufficiently plead under Rule 12(b)(6) and Supplemental Rule G(2) it only is necessary that the Complaint contain allegations that show the defendant assets' involvement in money laundering and derivation from specified unlawful activity.

Ani, caused the government of Nigeria to purchase non-performing government debt from a company controlled by Bagudu and Mohammed Abacha at vastly inflated prices, generating a windfall of over $282 million for Mohammed Abacha and Bagudu through U.S. financial transactions"); ¶ 36 ("Mohammed Abacha, Bagudu, and others defrauded Nigeria of more than $282 million by causing the government of Nigeria to repurchase Nigeria's own debt from one of their companies for more than double what Nigeria would have paid to repurchase the debt on the open market"); and ¶ 41 ("Bagudu orchestrated a series of transactions through which Mecosta received money in escrow from Nigeria, used that money to purchase the debt from Parnar, and sold the debt back to Nigeria at a significant markup.").

As set forth in the Complaint, the majority of the criminal proceeds derived from the "Debt Buy-Back Fraud" were deposited into an account held in the name of Doraville Properties in the Bailiwick of Jersey (¶¶ 45-49).  However, $3.2 million of the "Debt Buy-Back Fraud" criminal proceeds were transferred to ANZ (London), intermingled with the proceeds of the Security Votes Fraud, and laundered in the United States through the purchase of Nigerian Par Bonds (¶ 52).  Another $2.4 million was transferred into and out of the United States to pay down debt owned on the Nigerian Par Bonds in order to facilitate the transfer of the bonds to the defendant assets (¶ 81).

Such allegations are sufficient to establish that the "Debt Buy-Back Fraud" involved criminal proceeds that were taken by fraud because they describe the contours of a fraudulent scheme.   *See, e.g., United States v. Sum of $70,990,605*, No. 12-1095, 2014 WL 824048, at * 7 (D.D.C. March 4, 2014) (finding that signals of fraud, when viewed in tandem with other details suggesting illegal behavior, suffice to describe the contours of an illegal scheme.)

The putative Claimants also argue, incorrectly, that the Complaint fails to allege that the "Debt Buy-Back Fraud" involved transactions conducted by or for the benefit of a public official as required by 18 U.S.C. § 1956(c)(7)(B)(iv) (ECF No. 55, p. 46).  The allegations state that the scheme was conducted, in-part, by General Abacha, a public official.  Specifically,  "Nigeria's purchase of the debt was personally approved by General Abacha, even though Nigeria would have saved hundreds of millions of dollars by buying the debt on the open market at the price TPE was willing to sell it, which was nearly two-thirds less than Nigeria ultimately paid for the debt." (¶ 44).  Finance Minister Anthony Ani, himself a public official, is also alleged to have participated in the scheme (¶ 40).  Thus the requirements of 18 U.S.C. § 1956(c)(7)(B)(iv) are met.

Finally, the putative Claimants also erroneously state that the United States has failed to properly allege specific violations of Nigerian law.  However, "no case law supports requiring the government to plead a specific violation of foreign law" when charging a case under 18 U.S.C. § 1956(c)(7).  *United States v. Lazarenko*, 564 F. 3d. 1026, 1033 (9th Cir. 2009). Nevertheless, the Complaint identifies several specific offenses enumerated in both the Nigerian Penal Code and the Nigerian Criminal Code that could serve as the foreign law violations for purposes of money laundering violations under 18 U.S.C. §§1956 and 1957 (¶ 101; Attachment A).[4]

### b. The Complaint Contains Allegations Sufficient to Establish Violations of 18 U.S.C. §§ 2314 and 2315

The Complaint contains allegations sufficient to establish that the defendant assets were "stolen, unlawfully converted, or taken" by fraud as required by 18 U.S.C. §§ 2314 and 2315, both with regard to the proceeds from the "Debt Buy-Back Fraud" and the "Security Votes

---

[4] As set forth in the Complaint, the Nigerian law violations identified in the Complaint are intended to be a non-exhaustive list of possible Nigerian predicate offenses for the money laundering alleged.

Fraud."  Examples of such allegations are found in ¶ 25 ("Between January 1994 and June 1998, General Sani Abacha, National Security Advisor Gwarzo, and others stole more than $2 billion from Nigeria by fraudulently and falsely representing that the funds were to be used for national security purposes"); ¶ 28 ('Over sixty false security votes letters were addressed to and endorsed by General Abacha, each of which resulted in the withdrawal of Nigeria's public funds from the CBN.") and ¶ 36 ("Mohammed Abacha, Bagudu, and others defrauded Nigeria of more than $282 million by causing the government of Nigeria to repurchase Nigeria's own debt from one of their companies for more than double what Nigeria would have paid to repurchase the debt on the open market").

The Claimants argue that such allegations are insufficient to establish the *mens rea* necessary to demonstrate that the assets were taken by fraud as required by 18 U.S.C. §§ 2314 and 2315 (ECF No. 55, p. 49).  However, in considering a motion to dismiss, this Court must draw all inferences in favor of the nonmoving party and *mens rea*, or scienter can be inferred from fraudulent conduct. *See City of Harper Woods Emps. Ret. Sys. v. Oliver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009); *United States v. Approximately $50,205.00 in U.S. Currency*, No. 12-cv-1183, 2013 WL 3729573, at *4-*5, (E.D. Wis. July 12, 2013) (finding allegations in the complaint sufficient where scienter could be inferred from conduct); *United States v. All Funds on Deposit at Citigroup Smith Barney Account No. 600-00338,* No. 06-cv-3730, 2008 WL 3049895 (E.D.N.Y. Aug. 1, 2008) (finding allegations sufficient where the facts and circumstances would support a reasonable belief that a party acted with the intent to defraud); and *United States. v. Portrait of Wally, A Painting By Egon Schiele*, No. 99-Civ. 9940, 2002 WL 553532 (S.D.N.Y. April 12, 2002) (allegations sufficient where knowledge can be inferred and proved by circumstantial evidence.).

It is reasonable to draw such inferences of fraud in the present case when, as here, Mr. Bagudu, a private citizen, moved hundreds of millions of dollars of Nigerian public funds overseas.  Furthermore, the Claimants' argument that Mr. Bagudu would have had no reason to believe that the transactions were illegitimate or illegal is irrelevant. (ECF No. 55, p. 49). The proper inquiry for the purposes of this motion to dismiss is not whether any of the conspirators are personally, criminally, liable, but whether the Complaint contains allegations demonstrating that violations of 18 U.S.C. §§ 2314 and 2315 occurred.  Mr. Bagudu's personal liability is not dispositive of whether the defendant assets are subject to forfeiture to the United States.  *See One Lot Emerald Cut Stones & One Ring v. United States,* 409 U.S. 232 (U.S. 1972) (1984) (holding that civil forfeiture following an acquittal is not barred "because it involves neither two criminal trials nor two criminal punishments").  *See also, United States v. Cherry,* 330 F.3d 658, 666 n.16 (4th Cir. 2003) (a claimant's personal culpability is irrelevant in deciding whether property should be forfeited.).

### c. The Complaint Alleges Conduct Sufficient to Establish the *Mens Rea* Necessary for Money Laundering

The Claimants also argue that the Complaint is deficient because it fails allege that the conspirators knew they were conducting financial transactions with criminal proceeds, and that therefore the requirements of 18 U.S.C. § 1957 are not met (ECF No. 55, pp. 49-50).  However, the Complaint contains allegations more than sufficient to demonstrate the requisite *mens rea* to establish the money laundering offenses.  They include: ¶ 57 ("Mohammed Abacha, Bagudu, and others invested the proceeds of the schemes described above in Nigerian Par Bonds (NPBs), reaping more than $175 million in interest paid by the Nigerian government and backed by the United States."), ¶ 58 ("Through the use of their corporate entities, including defendants Mecosta, Rayville, Standard Alliance, and Doraville, Bagudu and Mohammed Abacha pooled

16

proceeds of the Security Votes Fraud, the Debt Buy-Back Fraud, and other criminal activity into the purchase of NPBs and related Payment Adjustment Warrants (PAWs) through a complex series of monetary transactions in or affecting the United States.") and ¶ 80 ("Bagudu caused the transfer of NPBs worth $90 million (face value) of the original $490 million from ANZ (London) to an account in the name of the Ridley Group at Credit Agricole Indosuez, London").

Such allegations are sufficient to establish the intent of Mohammad Abacha and Mr. Bagudu to conduct monetary transactions with criminal proceeds.  The allegations need not be more specific because the requisite state of mind may be inferred.  *See, e.g.*, *United States v. Woodruff*, 296 F.3d 1041, 1046 (11th Cir.2002) (discussing the sufficiency of an indictment and stating that "the requisite state of mind may be inferred from other allegations."). As discussed above, drawing inferences of money laundering is reasonable when, as here, a private citizen collaborated with a public official to move millions of dollars into accounts held in the name of shell companies under their control.

The Claimants cite to two criminal cases, *United States v. Alaniz*, 726, F. 3d. 586 (5th Cir. 2013) and *United States v. Huff,* 641 F. 3d. 1228 (10th Cir. 2011), to show that the elements of money laundering include a defendant's knowledge that the property was derived from unlawful activity. (ECF No. 55, p. 50).  Both *Alaniz* and *Huff* involved the criminal prosecution of an individual for money laundering offenses.  In both cases, the courts' analysis focused on whether the evidence was sufficient, and not the sufficiency of the allegations. Neither case supports the claim that the United States' allegations are deficient in this civil forfeiture action.[5]

---

[5] And, in any event, the Complaint may not need to contain the same type of specific allegations as may be necessary in an indictment. Rather, the allegations must demonstrate that a crime occurred and that the defendant assets are derived from that criminal activity. *See e.g., United States v. Bajakajian*, 524 U.S. 321, 355 (1998) (minority opinion distinguishing mens rea requirements between *in personam* and *in rem* actions); *United States v. Ursery*, 518 U.S. 267, 291 (1996) ("there is no requirement in the statutes at issue that the Government demonstrate scienter in order to establish that the property is subject to forfeiture; indeed, the property may be subject to forfeiture even if no party files a claim to it and the Government never shows any connection between the property

### d. The Conspiracy Allegations are Sufficient

To show the existence of a money laundering conspiracy under 18 U.S.C. § 1956(h), the Complaint's allegations must demonstrate that there was an agreement to commit a money laundering offense. *Whitfield v. United States*, 543 U.S. 209, 211 (2005).   "The government does not need to allege facts that demonstrate an explicit agreement; rather '[p]roof of a tacit, as opposed to explicit, understanding is sufficient to show agreement.'" *United States v. Sum of $70,990,605*, No. 12-1905, 2014 WL 824048, at *5 (D.D.C. March 4, 2014) (*citing Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir.1983)); *see also United States v. Mellen*, 393 F.3d 175, 191 (D.C. Cir. 2004) (Henderson, J., dissenting in part) ("[A] conspiracy can be inferred from a combination of close relationships or knowing presence and other supporting circumstantial evidence.") (internal citations omitted).

Here, the Complaint alleges conduct sufficient to demonstrate such an agreement. For example, the Complaint contains multiple allegations describing Mr. Bagudu and Mohammad Abacha's joint investment of the Nigerian Par Bonds (¶¶ 52, 53, 65, 70); their use of shell companies (¶ 58); and Mr. Bagudu and Mohammad Abacha's collaboration moving the criminal proceeds from the "Security Votes Fraud" overseas, through transactions in the United States (¶ 33).

### e. The Defendant Assets Were Involved in Monetary Transactions

The allegations in the Complaint are sufficient to meet the jurisdictional requirements of money laundering, the U.S. substantive law that is the predicate for forfeiture. The specific money laundering violations include engaging in or attempting to engage in monetary transactions "in criminally derived property of a value greater than $10,000, and is derived from

---

and a particular person."); *see also United States v. 8 Gilcrease Lane, Quincy, Fla.* 32351, 656 F. Supp. 2d 87 (D.D.C. 2009) ("To the extent Mr. Bowdoin's argument is one of mens rea—that is, that he had no intent to defraud—he is free to make that argument to the factfinder in a criminal proceeding…").

specified unlawful activity," in violation of 18 U.S.C. § 1957; and conspiracy to engage in money laundering in violation of 18 U.S.C. § 1956(h). 18 U.S.C. § 1957(a).

The term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in 18 U.S.C. § 1956(c)(5)) by, through, or to a financial institution (as defined in 18 U.S.C. § 1956), including any transaction that would be a financial transaction under 18 U.S.C. § 1956(c)(4)(B)). Thus, the term "monetary transaction" includes a "financial transaction" as defined under § 1956(c)(4)(B).

A "financial transaction," as defined in 18 U.S.C. § 1956(c)(4), includes "a transaction which in any way or degree affects interstate or foreign commerce . . . involving the movement of funds by wire or other means or . . . a transaction involving a financial institution, which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree."  Thus, to meet the jurisdictional requirements of the money laundering statutes, the defendant assets must have been involved in financial transactions which "affect interstate or foreign commerce."

The transfer of money through U.S. correspondent bank accounts is a financial transaction which affects interstate or foreign commerce.  *See United States v. All Assets Held at Bank Julius Baer & Company, Ltd.,* 571 F.Supp.2d 1, 12-14 (D.D.C. 2008) (only minimal conduct within the United States is required to show violation of section 1956(a)(1); transfer of money through U.S. correspondent bank accounts sufficient to establish nexus).  "To require more would be to suppose that Congress did not intend to criminalize the use of United States financial institutions as clearinghouses for criminal money laundering and conversion into United States currency."  *Id.* at 12*; United States v. Real Prop. Known as 2291 Ferndown Lane,*

No. 3:10-CV-0037, 2011 WL 2441254, at *5 (W.D. Va. June 14, 2011) (a court may exercise

jurisdiction over a money laundering offense – and over a civil forfeiture action based on it – as

long as the money laundering transaction occurred in part in the U.S.; it makes no difference that

the foreign specified unlawful activity occurred wholly in the foreign country). "In a complex

routing transaction, each transfer of funds, if it affects interstate or foreign commerce, can be a

separate § 1956(a)(1) violation."   *BCCI Holdings (Luxembourg) Societe Anon. v. Khalil*, 56

F.Supp.2d 14, 54 (D.D.C. 1999), aff'd in part, rev'd in part and remanded on different grounds,

214 F.3d 168 (D.C.Cir. 2000).

Money laundering transactions alleged in the Complaint include, but are not limited to,

the following:

- Wire transfers of security vote proceeds (public funds misappropriated, stolen or embezzled by or for the benefit of a public official as set forth in 18 U.S.C. § 1956(c)(7)(B)(iv)) through Barclay's Bank PLc and ANZ (New York) for credit to the Eagle Alliance account at ANZ (London) ( ¶ 35);

- The wire transfer of approximately $2.4 million of "Debt Buy-Back Fraud" proceeds on or about November 24, 1998, from an investment account in the name of Mecosta at Credit Agricole Indosuez, London, to Marine Midland Bank N.A., New York, to ANZ (New York), and then to the account of Mecosta at ANZ (London), to pay down debt owed on the NPBs in order to transfer NPBs from ANZ London to the defendant investment portfolios (¶ 81); and

- The liquidation of the NPBs through Citibank in New York (¶ 85).

### 2.   The Defendant Assets Were Involved in the Alleged Money Laundering Schemes

### a. The Complaint Traces the Criminal Proceeds out of Nigeria

The Claimants contend that the United States does not attempt to trace the "Security

Votes Fraud" proceeds from Nigeria to ANZ London (ECF No. 55, p. 54).  This is simply untrue.

For example, as stated in the Complaint:

- The conspirators transported the proceeds of the Security Votes Fraud out of Nigeria to accounts in Europe that were under the conspirators' private control, including…the Eagle Alliance and Mecosta accounts at ANZ (London) (¶ 30);

- In order to move the money overseas, Bagudu deposited the cash proceeds of the Security Votes Fraud into at least one of two Nigerian commercial banks, Union Bank of Nigeria and/or Inland Bank of Nigeria…Bagudu and/or Mohammed Abacha then instructed Union Bank or Inland Bank to transfer the stolen funds to other accounts under Bagudu or Mohammed control, such as accounts in the name of Mecosta, Rayville, and Eagle Alliance…The funds were transferred from Union Bank or Inland Bank back to the CBN, to an account held by Union Bank or Inland Bank at the CBN. The CBN then transferred the funds from the account of Union Bank or Inland Bank to their respective overseas domiciliary accounts held at banks in either London or New York….(¶ 34)

- At least $137 million was transported in and out of the United States (¶ 35)

- Over the course of the conspiracy, Bagudu and Mohammed Abacha transferred approximately $190 million in proceeds of their criminal schemes into accounts in the name of Eagle Alliance and Mecosta at ANZ (London), of which approximately $126.2 million originated with the Security Vote Fraud. (¶¶ 58-59)

Such allegations are sufficient to demonstrate tracing for the purposes of a civil forfeiture

complaint. *See, e.g*., *United States v. Contents of J.P. Morgan Chase Bank, N.A., Account No.*

*xxxxxx9951*, No. 10-551, 2011 WL 6217123, at *4 (S.D. Ala. Dec. 13, 2011) (describing money

laundering transactions but omitting the names of the participants was sufficient to support a

reasonable belief that the property was involved in a violation of § 1957);  *United States v.*

*$40960.00 in U.S. Currency*, 831 F. Supp. 2d 968, 971 (N.D. Tex. 2011) ("the insufficiency of

any tracing of funds to the offense cannot be a basis for dismissal of a forfeiture"); *United States*

*v. All Funds on Deposit at Dime Savings Bank*, 255 F. Supp. 2d 56, 68 (E.D.N.Y. 2003)

(complaint that alleged facts showing money moving in and out of bank account sufficient to

plead forfeiture under the money laundering statute; it is not necessary for the complaint to set

forth any tracing analysis).

### b. The Full Balances of Funds on Deposit at ANZ Are Tainted and the Allegations Trace the Criminal Proceeds to the Purchase of Nigerian Par Bonds

Title 18, United States Code, Section 981(a)(1)(A) states that "any property. . . involved

in a transaction or attempted transaction  in violation of the [money laundering statutes]" is

subject to forfeiture to the United States.  Courts have held consistently that the term "property

involved" in money laundering should be read broadly to include the money or other property

being laundered (the "corpus" or "subject matter" of the money laundering offense); and any

property used to facilitate the money laundering offense.  *See e.g., United States v. Puche*, 350

F.3d 1137, 1154 (11th Cir. 2003) (affirming money judgment equal to value of untainted funds

used to facilitate the offense); *United States v. McGauley*, 279 F.3d 62, 76 n.14 (1st Cir. 2002)

(citing legislative history); *United States v. Baker*, 227 F.3d 955, 967 (7th Cir. 2000) (all real and

personal property used to commit the money laundering offense is subject to forfeiture as

property "involved" in the offense); *In re 650 Fifth Avenue and Related Props.*, 777 F. Supp. 2d

529, 563 (S.D.N.Y. 2011) (collecting cases holding that property used to facilitate the money

laundering offense is "involved in" the offense); *United States v. Nicolo*, 597 F. Supp. 2d 342,

347-48 (W.D.N.Y. 2009) ("The term 'involved in' has consistently been interpreted broadly by

courts to include any property involved in, used to commit, or used to facilitate the money

laundering offense"); *United States v. All Monies in Account No. 90-3617-3*, 754 F. Supp. 1467,

1473 (D. Haw. 1991) (seminal case applying the facilitation theory to money laundering forfeitures).

The full balance of the funds on deposit at ANZ in London were involved in money laundering, and therefore tainted, because the Complaint contains allegations sufficient to show that the entire Mecosta account at ANZ was used to commit money laundering offenses.  The allegations describe the criminal proceeds being pooled at ANZ (London) after being transferred in and out of the United States through money laundering transactions.  Then, the allegations describe how the pooled funds were involved in further money laundering transactions through the purchase of Nigerian Par Bonds.  For example:

- General Abacha, or those acting at his direction, delivered more than $700 million of [the proceeds of the Security Votes Fraud] to Mohammed Abacha in bags or boxes full of cash. (¶ 30)
- Mohammed Abacha gave the cash he received to Bagudu, who later arranged for the money to be transferred to accounts controlled by Bagudu and Mohammed Abacha in foreign countries. Transfers included deposits into accounts in the name of defendants Mecosta, Doraville, Standard Alliance, and Rayville, as well as Eagle Alliance and Harbour Engineering. (¶ 33)
- In order to move the money overseas, Bagudu deposited the cash proceeds of the Security Votes Fraud into at least one of two Nigerian commercial banks, Union Bank of Nigeria and/or Inland Bank of Nigeria.  Bagudu referred to the money deposited into Union Bank and Inland Bank as his "cash swaps."  Bagudu and/or Mohammed Abacha then instructed Union Bank or Inland Bank to transfer the stolen funds to other accounts under Bagudu or Mohammed Abacha's control, such as accounts in the name of Mecosta, Rayville, and Eagle Alliance. Inland Bank or Union Bank made the necessary arrangements to transfer the money overseas. The funds were transferred from Union Bank or Inland Bank back to the CBN, to an account held by Union Bank or Inland Bank at the CBN. The CBN then transferred the funds from the account of Union Bank or Inland Bank to their respective overseas domiciliary accounts held at banks in either London or New York.  The specific

London or New York account varied depending on which Nigerian commercial bank had been used in the first instance. (¶ 34)

- Through these "cash swaps," at least $137 million was transported into and out of the United States, and into accounts held in the name of the defendant corporations, including through transactions showing the deposit of funds at ANZ London. (¶ 35)

- Over the course of the conspiracy, Bagudu and Mohammed Abacha transferred approximately $190 million in proceeds of their criminal schemes into accounts in the name of Eagle Alliance and Mecosta at ANZ (London), of which approximately $126.5 million originated from the Security Votes Fraud. These funds were used to purchase Nigerian Par Bonds worth $490 million (face value) at ANZ (London), with financing provided by ANZ London, including through transactions in and out of the United States (¶¶ 61- 68).[6]

As previously discussed, such allegations are sufficient to demonstrate tracing for the purposes of a civil forfeiture complaint; a more detailed analysis at this stage in the litigation is unnecessary. Indeed, the allegations tracing the criminal proceeds through ANZ to the purchase of Nigerian Par Bonds and the defendant assets were undoubtedly sufficient to meet the requirements of Rule G because, as demonstrated by the Claimants' argument that the defendant assets are derived from those identified in the 2003 settlement agreement, the Claimants were able to "commence an investigation of the facts and to frame a responsive pleading." *Mondragon*, 313 F. 3d at 864.

The Claimants appear to concede that the defendant properties that are the subject of their motion – the assets held in the Blue Holdings accounts – are traceable to criminal conduct alleged in the Complaint. In their motion, the Claimants contend that the Blue Holdings defendants are subject to the purported settlement between the Government of Nigeria and Mr.

---

[6] The Claimants erroneously imply that the difference between the price paid for NPBs and their face value, was the ratio of legitimate to illegitimate money that went into the purchase (ECF No. 55, p. 57). However, as clearly stated in the Complaint, Eagle Alliance and Mecosta financed the purchase of the NPBs, using the NPBs themselves as collateral for the loans (ECF No. 1, ¶¶ 61 and 64).

Bagudu (ECF No. 55, p. 36 of 67; ECF No. 55-10, p. 25 (schedule 6); ECF No. 55, p. 24) (settlement agreement)). The subjects of the settlement agreement included "[a]ny and all accounts in the name of the Ridley Group Limited at Credit Agricole Indosuez, London." (ECF No. 55, p. 25).  Thus, the Claimants must concede that the tracing allegations are sufficient to show that the defendant assets are derived from "accounts in the name of Ridley Group Limited at Credit Agricole Indosuez, London," as alleged in the Complaint (¶ 82). If the allegations in the Complaint are accepted as true, as they must be for the purposes of a Motion to Dismiss, these Ridley Group funds at Credit Agricole were derived from Nigerian Par Bonds worth $90 million (face value) that had been purchased with the proceeds from the Security Votes Fraud and Debt Buy-Back Fraud pooled at ANZ London. (¶¶ 58, 79-86).

### c. The Full Value of the Defendant Assets Are Subject to Forfeiture

The defendant assets are forfeitable in their entirety because the defendant assets are derived from assets that were purchased, at least in part, by money laundering transactions. *See e.g, United States v. Coffman*, 859 F. Supp.2d 871 (E.D. Ky. Apr. 16, 2012) (where half of the $900,000 down payment on a yacht was fraud proceeds, the yacht was forfeitable in its entirety as the subject of a money laundering offense); *United States v. Real Property. Known as 1700 Duncanville Rd.*, 90 F. Supp. 2d 737, 741 (N.D. Tex. 2000), aff'd, 250 F.3d 738 (5th Cir. 2001) (where less than half of money used to buy real property was proceeds of food stamp fraud, property was forfeitable in its entirety because the purchase was a violation of section 1957); *United States v. One 1987 Mercedes Benz 300E*, 820 F. Supp. 248, 252 (E.D. Va. 1993) (where Section 1956 and 1957 financial transaction is a car payment, car is involved in the money laundering offense and is forfeitable in its entirety even if legitimate funds are used to make other payments).

The Complaint also states that Nigerian Par Bonds worth $90 million (face value) were transferred to the Ridley Group (¶ 80), and later liquidated and moved into the accounts holding the defendant assets (¶ 79-82; 85-86). [7]  Even if the entirety of the funds used to purchase the par bonds was not tainted, when money laundering transactions involve the movement of commingled money from one place to another, all of the money involved in the transaction is subject to forfeiture. *See*, *e.g, United States v. Jamieson*, 427 F.3d 394, 404 (6th Cir.2005) ("[N]ot all of the money involved in the transactions must be derived from the unlawful activity. When money from illegal sources is co-mingled with money from unspecified other sources, all such funds are attributable to the money laundering scheme."). Here, as alleged in the Complaint, the $90 million in Nigerian Par Bonds was transferred to the Ridley Group through transactions into and out of the United States that were  used to pay off of the remaining debt owed on the bonds.  Thus the bonds themselves constitute property involved in a money laundering transaction, and when they were subsequently liquidated and transferred they continued to constitute property involved in or derived from those criminal money laundering transactions. Thus, all of the defendant assets are forfeitable.

The Claimants cite to *United States v. Bornfield*, 145 F. 3d 1123 (10th Cir. 1998), for the proposition that in order to forfeit comingled funds, the funds must have been used to facilitate the laundering.  Unlike the comingled funds in *Bornfield*, the Abacha conspirators' criminal proceeds were used to purchase assets – Nigerian Par Bonds – and not simply deposited in a tainted account.  In any event, as the Claimants themselves acknowledge, the law allows for the

---

[7] The Claimants also seem to misunderstand the nature of the government's allegations by arguing that Mr. Bagudu may have facilitated the purchase of Nigerian Par Bonds with legitimate monies.  For example, they state that Mr. Bagudu "had access to large sums of money (at least $63.4 million)[originating in an account at Inland Bank in Nigeria] to pay Mecosta's debts that the government does not attempt to argue was the proceeds of fraud." (ECF No. 55, p. 58).  However, the allegations in the Complaint explain Mr. Bagudu's use of his account at Inland Bank to transfer the proceeds of embezzlement out of the country (¶ 35).  To the extent the Claimants are asserting that there are other monies in the accounts, that goes to the weight of the evidence, which is an issue for trial, not a motion to dismiss.

forfeiture of an entire comingled balance as property "attributable to money laundering." (ECF No. 55, p. 60) (citing *United States v. Contents of Nationwide Life Insurance Annuity Account No. 0961 In the Name of Warshak*, No. 1:05-cv-00196, 2009 WL 961223 (S.D. Ohio Apr. 8, 2009).

Accordingly, for the reasons set forth above, the allegations in the Complaint are sufficient to demonstrate the forfeitablity of the defendant assets, and the Claimants' motion should be denied.

### B.      The Statute of Limitations Does Not Bar this Forfeiture Action

As the Claimants rightly observe, this case was the culmination of years of investigation spanning multiple jurisdictions.  Indeed, what may have transpired in other jurisdictions, or have been the subject of foreign investigations, only highlights the scale and scope of the Abacha conspirators' criminal conduct. The action was brought, nonetheless, within the statute of limitations.

The statute of limitations for civil forfeiture actions is set forth in 19 U.S.C. § 1621, which states that an action must be commenced "within five years after the time when the alleged offense was discovered, or . . . within 2 years after the time when the involvement of the property in the alleged offense was discovered."  The statute of limitations is tolled, however, during the "time of the absence from the United States of the person subject to the penalty or forfeiture, or of any concealment or absence of the property."  19 U.S.C. § 1621(2).  The D.C. Circuit has concluded that property subject to forfeiture is "absent from the United States" when, as is the case here, it is located in a foreign country.  *Banco Español*  295 F.3d at 27.[8]  The Claimants recognize that *Banco Español* is "binding precedent" (ECF No. 55, pp. 29, 30)

---

[8] And, in any event, the United States only identified the specific defendant assets' involvement in the crime on February 2, 2012, less than two years before filing the civil forfeiture complaint and well within the statute of limitations without resorting to the tolling provision.

("Although Claimants' disagree with the D.C. Circuit's interpretation of the statutory language 'absent' to be satisfied where the property is within the Court's jurisdiction but outside of U.S. territorial boundaries, *Banco Español* is binding precedent.").[9]

The Claimants seek to have this Court ignore the clear precedent established by *Banco Español* because they have purportedly "raised constitutional objections" to the forfeiture of the defendant assets." Specifically, they argue that their due process rights have been violated (ECF No. 55, pp. 29-30).  Such an approach is both unwarranted and unnecessary because the Claimants fail to raise a valid due process objection to this forfeiture action.[10]

As a threshold matter, in order to raise a due process claim, the Claimants must first establish that they are entitled to due process protection.  As the Claimants rightly recognize, this Court has not held that foreign nationals can assert constitutional claims in a civil forfeiture proceeding. (ECF No 55, p. 32, n. 7).  The Claimants also correctly identify that foreign nationals lack due process rights unless they have sufficient ties to the United States. *Id*. The Claimants concede that all but two of them – I.A.B. and Ibrahim Bagudu – lack such ties. They further concede that I.A.B. and Ibrahim Bagudu's ties to the United States are insufficient to establish the "minimum contacts" necessary for a Court to exercise personal jurisdiction over them as would be necessary in an *in personam* civil action (ECF No. 55, p. 41).  It is therefore

---

[9] *Banco Español* was correctly decided and is the only logical result. If the statute of limitations were not tolled while property was located overseas, money launderers would be rewarded with immunity from forfeiture by hiding their illicit proceeds in uncooperative jurisdictions, or jurisdictions slow to respond to U.S. requests for mutual legal assistance.

[10] Moreover, a party may only raise the affirmative defense of the statute of limitations via a Rule 12(b)(6) motion when the facts that give rise to the defense are clear from the face of the Complaint. *Potts v. Howard University Hosp.*, 598 F. Supp. 2d 36 (D.D.C. 2009).  Here, however, the Complaint alleges that the defendant property is located overseas (¶ 4), and therefore, the Claimants' attempt to raise this affirmative defense at this stage of the proceeding is barred by the reasoning in *Potts*.

far from clear that either I.A.B. or Ibrahim Bagudu may raise a due process challenge in the United States (ECF No. 55, p. 32, n. 7; p. 40). [11]

Without first establishing that they are entitled to due process protection, the Claimants ask this Court to analogize their purported due process rights to those of a criminal defendant bringing a Sixth Amendment claim where the criminal defendant's right to a speedy trial has been violated.  In doing so, the Claimants ignore precedent holding that the Sixth Amendment is inapplicable in civil forfeiture cases. *See, e.g., Austin v. United States,* 509 U.S. 602, 608 (1993) ("the protections provided by the Sixth Amendment are explicitly confined to 'criminal prosecutions'").

Moreover, in order to establish a due process violation, Claimants would have to establish prejudice.  In *United v. Lovasco* – a case on which the Claimants rely – the Court held that defendants' due process claims were speculative and premature because the defendant had not claimed or proved actual prejudice resulting from the delay.  404 U.S. 307 (1971). The Court emphasized that investigative delay alone does not deprive a defendant of his due process. *Id.* Like the defendants in *Lovasco*, the Claimants do not identify actual prejudice, but speculate on the potential loss of witnesses and documents resulting from the passage of time (ECF No. 55, p. 35).   Similarly, in *United States v. Marion,* 404 U.S. 307 (1971) – another case on which the Claimants rely – the Supreme Court held that the Sixth Amendment's guarantee of a speedy trial is applicable only after a person has been accused of a crime, and where there is actual prejudice.

Importantly, unlike the criminal defendants in *Lovasco* and *Marion*, the putative Claimants here will have the benefit of the civil discovery process to explore the U.S. forfeiture allegations.  "The federal discovery rules are designed to enable a defendant to elicit the basis for

---

[11] The Claimants  present contradictory arguments – that they lack sufficient minimum contacts for this Court to adjudicate their claims to the defendant properties, but at the same time they have sufficient contacts to give rise to constitutional due process protections (ECF No. 55, pp. 19, 27).

a plaintiff's allegations and to prepare his defenses to the charges made." *Equal Employment Opportunity Commission v. Carter Carburetor*, 76 F.R.D. 143, 144 (D.C. Mo. 1977). *See, also, United States ex rel. Schwartz v. TRW, Inc.* 211 F.R.D. 388, 392 (C.D. Cal. 2002) ("Generally, the purpose of discovery in civil actions is to remove surprise from trial preparation so the parties can obtain evidence necessary to evaluate and resolve their dispute"). Thus, because the availability of evidence to the Claimants is the same as that available to the United States there is less risk of actual prejudice caused by the timing of this action.[12]

Accordingly, not only do the Claimants concede that this case was brought within the statute of limitations, but they have offered no reason for this Court to ignore its duty to follow precedent established by *Banco Español*, or otherwise distinguish this case from it. Thus, their argument that the statute of limitations bars this forfeiture action is without merit.

## C.     This Court Has Jurisdiction to Adjudicate this Forfeiture Action

### i.      This Court has Subject Matter and *In Rem* Jurisdiction Over the Defendant Assets

The Complaint unequivocally sets forth this Court's subject matter and *in rem* jurisdiction to hear the forfeiture allegations. First, there is subject matter jurisdiction because 28 U.S.C. §§ 1345 and 1355(a) give the district courts the jurisdiction to adjudicate any civil forfeiture action, such as this one, commenced by the United States under any provision of federal law (¶ 5). This is uncontested by the Claimants.

---

[12] The Claimants also conflate the issues properly before this Court when they argue that the Supreme Court's reasoning in *United States v. Eight Thousand Eight Hundred and Fifty Dollars in United States Currency*, 461 U.S. 555 (1983) applies to this action (ECF No. 55, p. 33). In *Eight Thousand Eight Hundred and Fifty Dollars in United States Currency*, the Supreme Court found that principles of due process could be violated if there is an unreasonable delay between the seizure of property and the commencement of forfeiture proceedings. In the present action there was no such delay; the funds were seized only after the action was initiated. Thus the Claimants, to the extent they had control the defendant assets, were free to spend the defendant assets before the case was commenced, further demonstrating that they have suffered no prejudice.

Second, this Court has *in rem* jurisdiction over the defendant assets pursuant to 28 U.S.C. § 1355(b), which expressly gives the United States District Court for the District of Columbia extraterritorial jurisdiction over forfeiture actions involving assets located overseas (¶¶ 6 -7).  *See also, United States v. All Funds in Account Nos. 747.034/278*, 295 F.3d 23, 27 (D.C. Cir. 2002) (finding that Congress intended the District Court for the District of Columbia . . . to have jurisdiction to order the forfeiture of property located in foreign countries).  Nevertheless, the Claimants contest this Court's jurisdiction to adjudicate the pending forfeiture action on the grounds that the exercise of *in rem* jurisdiction would violate their constitutional due process rights because the Complaint alleges insufficient contacts between the United States and the property (ECF No. 55 p. 39).

This Court's exercise of *in rem* jurisdiction is constitutional and does not offend principles of due process because the allegations demonstrate that the defendant assets had sufficient minimum contacts to the United States through the conspirators' abuse of the U.S. financial system, and involvement in money laundering transactions.  Indeed, the fact that the defendant assets are alleged to have been involved in U.S. money laundering transactions itself qualifies as sufficient minimum contacts.  *See United States v. All Assets Held at Bank Julius Baer & Co.*, 571 F. Supp. 2d 1, n.8 (D.D.C. 2008) ("As the government properly explains, jurisdiction for forfeiture is provided by the specific predicate statutes underlying [the claims] . . . Wire transfer into and out of the United States and bank checks drawn on United States accounts and clearing through the United States financial system . . . are sufficient to satisfy both.").

Most notably, the abuse of the U.S financial system occurred through the purchase and sale of the U.S. backed Nigerian Par Bonds (NPBs) through Citibank in New York. (¶ 54- 60)

("Citibank NA, New York . . . served as the Fiscal Agent, Registrar, and Calculation Agent for the Nigerian government in connection with the purchase and sale of NPBs and PAWs . . . Citibank (New York) was responsible for disbursement of coupon interest payments on the NPBs . . . The Nigerian government periodically transferred money to Citibank (New York) to fund these payments. Coupon interest payments and dividend payments were then made from the United States by Citibank (New York) in U.S. dollars to the financial institution designated by each bond holder"); ¶ 85 ("the NPBs were liquidated and the proceeds from each sale were deposited into J.O. Hambro Investment Accounts. Because Citibank (New York) served as the Fiscal Agent, Registrar, and Calculation Agent for Nigeria in connection with the issuance and sale of NPBs and PAWs, the transactions that liquidated the bonds occurred, in part, in the United States.").  Such contacts are sufficient to meet the constitutional requirements of civil forfeiture actions. *See, e.g.*, *Licci ex rel. Licci v. Lebanese Canadian Bank*, *SAL,* 732 F.3d 161 (2nd. Cir. 2013) (finding that repeated use of New York's banking system is sufficient to meet due process requirements).[13]

The Claimants cite to *Soma Medical Intern. v. Standard Chartered Bank*, 196 F.3d 1292 (10th Cir. 1999), and *T.J. Rainey & Son, Inc. v. Sec. Sav. & Loan Ass'n of Salina*, Kansas, 749 F. 2d 523, 525 (8th Cir. 1984), two *in personam* matters, for the proposition that payments by way of a forum's banking facilities do not amount to "minimum contacts" for constitutional purposes. In *Soma Medical Intern*, the Tenth Circuit found that a Utah court could not exert personal jurisdiction over a British bank if the bank itself had no contacts with Utah beyond mailing correspondence into the state. 196 F.3d 1292 (10th Cir. 1999). In *T.J. Rainey*, the Eighth Circuit found that a Kansas court could not exert jurisdiction over an Arkansas company based on the

---

[13] As set forth herein, the Complaint also alleges numerous other transactions into and out of the United States to pool the criminal proceeds into the ANZ account in London, to transfer the Nigerian Par Bonds between financial institutions, and to pay down debt.

use of interstate mail, or telephone or bank facilities, standing alone.  749 F. 2d 523, 525 (8th Cir. 1984).   The present action *in rem* is easily distinguished from these cases.  The defendant assets were involved in more than simply the use of the United States' banking facilities.  Here, in addition to their involvement in numerous transactions to illegally transport and transfer funds into and then out of the United States, the criminal proceeds were invested in bonds administered by financial institutions in the United States, that paid interest backed by the United States.  But for the United States, the Nigerian Par Bonds would not have existed as an investment vehicle for the Abacha conspirators and the defendant assets could not have been laundered through the purchase of Nigerian Par Bonds.

 Once it is established that the subject of an action, in this case the defendant assets, has minimum contacts with the United States, these contacts,  "may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, (1985) (internal quotation marks omitted).  "Relevant factors at this second step of the analysis may include: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief...." *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 568 (2d Cir.1996).

The United States has a significant interest in the enforcement of its money laundering laws, including in connection with foreign corruption offenses, as well as obtaining the relief sought by the forfeiture. *See, e.g., United States v. All Assets Held At Julius Baer & Co.*, 571 F.Supp.2d 1, 12 (D.D.C.2008) ("The legislative history of 18 U.S.C. § 1956(c)(7)(B) makes clear that Congress added this offense as a specified unlawful activity in the 2001 Patriot Act in order

to send a strong signal that the United States will not tolerate the use of its financial institutions for the purpose of laundering the proceeds of such activities.") (internal citations omitted). Indeed, "there is authority for the proposition that because the United States is exercising its judicial power, it need not demonstrate the minimum contacts with the forum state required by *International Shoe*." *United States. v. Premises Known as Lots 50 & 51, 2050 Brickell Ave.,* 681 F. Supp. 309 (E.D.N.C. 1988) (*citing United States v. Irvine & Associates, Inc.*, 645 F. Supp. 845, 848 (E.D. Va. 1986) (*citing Gilbert v. Bagley*, 492 F. Supp. 714, 746-47 (M.D.N.C. 1980))); *see also Hogue v. Milodon Engineering, Inc.*, 736 F.2d 989, 991 (4th Cir. 1984) ("The propriety of process issuing from federal courts sitting in cases arising under federal law is not tested by the same yardstick as is the constitutional limitation upon service of process issuing from state courts because the issues involved necessarily are often national in character.").  Thus, this Court's exercise of *in rem* jurisdiction over the defendant assets comports with notions of "fair play and substantial justice," and is constitutional.  *Int'l Shoe*, 326 U.S. at 316, 66.

### ii. Personal Jurisdiction Over the Claimants is Not Required in Civil Forfeiture

The Claimants contest this Court's jurisdiction to adjudicate the pending forfeiture action on the grounds that the exercise of *in rem* jurisdiction would violate their purported constitutional due process rights because there are insufficient contacts between the United States and the Claimants (ECF No. 55, pp. 37,40).  However, in a civil forfeiture action*, once in rem* jurisdiction exists over the contested property, the district court has jurisdiction to adjudicate the interest of a claimant in the property; no personal jurisdiction over the Claimants is necessary.  *See Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 453 (2004) (noting "jurisdiction over the person is irrelevant if the court has jurisdiction over the property" (quoting 4A WRIGHT & MILLER § 1070, at 280-81)).  The "exercise of *in rem* jurisdiction in a civil

forfeiture case permits the court to adjudicate the rights of the government to the property as against the whole world." *United States v. 51 Pieces of Real Property Roswell, N.M.*, 17 F.3d 1306, 1309 (10th Cir. 1994); *see also State Engineer of State of Nevada v. South Fork Bank of the Te-Moak Tribe of Western Shoshone Indians*, 339 F.3d 804, 811 (9th Cir. 2003) (same); *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 957 (4th Cir. 1999) (same); 4A WRIGHT & MILLER § 1070 ("Conceptually, *in rem* jurisdiction operates directly on the property and the court's judgment is effective against all persons who have an interest in the property.").

In support of their incorrect assertion that sufficient contacts between the United States and the Claimants are a jurisdictional requirement, the Claimants erroneously cite to *Shaffer v. Heitner*, 433 U.S. 186, 207-12 (1977) for the proposition that such minimum contacts are necessary (ECF No. 55, p. 38).  However, the *Shaffer* Court found only that assertions of state court jurisdiction over the subject of an action must be evaluated according to the standard set forth in *International Shoe*.  *Shaffer*, 433 U.S. at 207-12 (discussing *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and noting that same test of minimum contacts, fair play, and substantial justice that governs *in personam* jurisdiction also applies to the subject of an *in rem* action.).

Specifically, in *Shaffer*, the Supreme Court held that a Delaware Court's exercise of jurisdiction based solely on the statutory presence of an appellant's property in Delaware was not constitutional.  *Id.; See also Porsche Cars North America v. Porshe.net*, 302 F. 3d 248, 259 (4th Cir. 2004) ("*Shaffer* only holds that "[p]roperty alone is not sufficient 'contact' to support personal jurisdiction over a non-resident as to matters unrelated to the property.")  In this forfeiture action, the defendant assets — the subjects of this action — have sufficient minimum contacts to the United States.  Thus, *Shaffer's* requirements are met, and jurisdiction is proper.

Moreover, the putative Claimants voluntarily submitted themselves to the jurisdiction of this Court when they filed claims against the defendant property.  For the same reasons that an intervenor in a typical civil action may not contest the court's personal jurisdiction, it is not proper for a civil forfeiture claimant that comes to the litigation seeking to participate in the forum to raise such a defense.  *See* 7C C. WRIGHT & A.MILLER, FEDERAL PRACTICE AND PROCEDURE § 1920 (3d ed. 2002) ("[T]he intervenor has submitted to the personal jurisdiction of the court by seeking to intervene in the action and cannot move to dismiss on that ground."); *United States v. 8 Gilcrease Lane*, 641 F. Supp. 2d. 1, 4 (D.D.C. 2009) (discussing the status of claimants as intervenors); *see also County Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 483 (6th Cir. 2002) ("[A] motion to intervene is fundamentally incompatible with an objection to personal jurisdiction."); *United States v. Oregon*, 657 F.2d 1009, 1017 n. 18 (9th Cir. 1981) (holding that "[t]he court below gained personal jurisdiction over [the defendant] when it intervened as of right");  *see also Disner v. United States*, 888 F. Supp. 2d. 83, 85 (D.D.C. 2012) (analyzing a motion to intervene under the standards required for filing a claim).

### D.    Principles of International Comity and the Act of State Doctrine Do Not Warrant Dismissal of the Complaint

The Justice Department made the decision to bring this civil forfeiture action to enforce the United States' money laundering laws, and in support of the United States' policy goals. Neither principles of international comity, nor the act of state doctrine, warrant dismissal of a civil forfeiture action when, as here, the Executive Branch has brought a forfeiture action against defendant assets involved in violations of U.S. criminal laws.[14]

---

[14] Moreover, it is premature for this Court to consider the Claimants' international comity, and act of state doctrine arguments because they are substantive rather than jurisdictional defenses.  *United States v. Sum of $70,990,605*, No. 12-1905, 2014 WL 824048, at *9 (D.D.C. March 4, 2014). Thus, they are not properly raised in the Claimants' motion to dismiss. Indeed, resolution of the Claimants' act of state and international comity arguments would require the adjudication of disputed facts.  For example, this Court would likely have to decide which, if any, of the

International comity is rarely, if ever, applied when the United States is a party to a lawsuit because the Executive Branch's decision to bring a case is viewed as evidence of its judgment that the delicate balance of foreign affairs would not be disturbed by the lawsuit. *One Gulfstream,* 941 F. Supp. 2d at 10 (declining to apply the doctrine of comity because the executive "has already done the balancing in deciding to bring the case in the first place"); *United States v. Baker Hughes Inc.,* 731 F.Supp. 3, 6 n.5 (D.D.C. 1990) (noting that it is "not the Court's role to second-guess the executive branch's judgment as to the proper role of comity concerns" when "the United States has decided to go ahead with the case").  Similarly, the act of state doctrine's rationale no longer applies, "[w]hen the Executive Branch brings suit." *One Gulfstream*, 941 F. Supp. 2d at 12 (*citing Banco Nacional De Cuba v. Sabbatino,* 376 U.S. 398, 423 (U.S. 1964) (superseded by statute)); *see also United States v. Giffen,* 326 F.Supp.2d 497, 502 (S.D.N.Y.2004) ("The major underpinning of the act of state doctrine is the policy of foreclosing court adjudications involving the legality of acts of foreign states on their own soil that might embarrass the Executive Branch of our Government in the conduct of our foreign relations . . . Where the Executive Branch files an action, however, courts are reluctant to invoke the act of state doctrine on this rationale.").

As the Claimants acknowledge, dismissal is inappropriate on international comity grounds when it "would be contrary to the policies or prejudicial to the interest of the United States" (ECF No. 55, p. 61 of 67) (*citing One Gulfstream,* 941 F. Supp. 2d at 10); *see also Laker Airways Ltd. v. Sabena Belgian World Airlines,* 731 F.2d 909, 937 (D.C. Cir. 1984) ("No nation is under unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum.").  The policy of the United States is to forfeit assets involved in

---

several different settlement agreements put forth by the Claimants is applicable.  *See, e.g.,* ECF No. 55-12, containing multiple drafts of the purported settlement agreement.

money laundering, and to enforce its own money laundering laws.  Indeed, the United States has advanced a policy of using its anti-money laundering laws to forfeit the proceeds of foreign corruption. *One Gulfstream*, 941 F. Supp. 2d at 10.  Doing so furthers U.S. interests in multiple ways, including precluding use of the U.S. financial system as a haven for the proceeds of illegal activity committed abroad.  *Id.* (*citing United States v. All Assets Held At Julius Baer & Co.*, 571 F.Supp.2d 1, 12 (D.D.C.2008)).

As the Claimants further acknowledge, in order for principles of international comity to apply, there must be "an adjudication of rights or an official decision by a foreign government to which the court should defer." (ECF No. 55, p. 62) (*citing United States v. Portrait of Wally*, No. 99-cv- 9940, 2002 WL 553532, at *10 (S.D.N.Y Apr. 12, 2002).  Similarly, the act of state doctrine precludes domestic courts from inquiring into the validity of the public acts that a recognized foreign sovereign power committed within its own territory.  *McKesson Corp. v. Islamic Republic of Iran,* 539 F.3d 485, 491 (D.C. Cir. 2008); *One Gulfstream*, 941 F. Supp. 2d at 10 (the act of state doctrine applies when the relief sought or the defense interposed would require a court in the United States to declare invalid the official act of a foreign sovereign).

The Claimants identify a 2003 settlement agreement between Mr. Bagudu and Nigeria as an official decision and an official act declaring that the defendant assets were not "proceeds of crime," and argue that the United States should defer to Nigeria with regard to this decision (ECF No. 55, p. 62).  However, the settlement agreement between Mr. Bagudu and Nigeria does not address whether the defendant assets are proceeds of crime under U.S. law, and it would be an improper abdication of responsibility for the United States to defer to Nigeria's actions when there is evidence that the U.S. laws have been violated, as alleged in the Complaint.

First, the settlement explicitly states that it applies only to "all claims and liabilities of any kind which exist or might exist against AB [Abubakar Bagudu] in favour of or at the suit of the FRN [Federal Republic of Nigeria]." (ECF No. 55, p. 24; ECF No. 55-10, p. 9).  The forfeiture of the defendant assets to the United States does not disturb the settlement vis-a-vis Nigeria because this forfeiture action is not a claim or liability "that might exist against Mr. Bagudu in favour of or at the suit of the Federal Republic of Nigeria."  To the contrary, this forfeiture action reflects a claim by the United States to the defendant assets to enforce U.S. anti-money laundering and forfeiture laws, due to the defendant assets' involvement in violations of the U.S. criminal laws.[15]

Second, under principles of international comity, the foreign decision to which the United States defers must have been rendered consistent with due process protections for the United States.  Specifically, U.S. courts should only recognize a foreign decision if "there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction." *Hilton,* 159 U.S. at 202.  The Claimants offer no evidence to suggest that the Nigerian authorities considered whether the defendant assets were involved in violations of U.S. law before entering into the settlement agreement.  Indeed, there could be no "full and fair trial" because the United States did not have the opportunity to put forward evidence of violations of U.S. law in conjunction with the settlement.  *United States v. Sum of $70,990, 605*, 991 F. Supp. 2d 154, 169(D.D.C. 2013) ("foreign court's judgment should be conclusive under the principles of international comity when, among other things, the relevant parties had an opportunity to be heard") (internal citations and quotation marks omitted).

[15] In contrast, in order to forfeit assets "in favour of, or at the suit of" another country, U.S. authorities must bring an action pursuant to 18 U.S.C. § 2467, which provides for the enforcement of foreign forfeiture judgments and restraining orders.  If the United States is successful in this civil forfeiture action, all rights and title to the defendant assets will vest in the United States, and the United States will dispose of the assets in a manner authorized by U.S. domestic law.  This may include, as appropriate, spending the forfeited assets for the benefit of the people of Nigeria.

Contrary to the Claimants' assertions, the United States did not embrace the 2003 settlement agreement.  In support of the flawed argument that the United States "facilitated" the settlement (ECF No. 55, p. 24), the Claimants spill much ink on the fact that the United States executed a request from the Bailiwick of Jersey seeking Mr. Bagudu's provisional arrest and extradition. (ECF No. 55, p. 22).  The United States did so consistent with its treaty obligations; the decision to initiate, and later to withdraw the extradition proceedings occurred at the request of Jersey.  The Claimants also erroneously read intention into the United States' decision to take no position on Mr. Bagudu's subsequent request to have his extradition file expunged (ECF No. 55, p. 15).  The United States took no position on the expungement simply because Jersey took no position on the expungement. Thus, Nigeria's decision to enter into the settlement agreement should not bind the United States.

**IV.     CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court enter the attached order denying the Claimants' Motion to Dismiss.

Respectfully submitted,

JAIKUMAR RAMASWAMY, CHIEF
ASSET FORFEITURE AND
    MONEY LAUNDERING SECTION


/s/ Elizabeth A. Aloi_____
DANIEL H. CLAMAN
Assistant Deputy Chief
ELIZABETH A. ALOI
Trial Attorney
Asset Forfeiture and Money
    Laundering Section
Criminal Division
United States Department of Justice
1400 New York Avenue, N.W., Suite 10100
Washington, D.C. 20530

Telephone:  (202) 514-1263

Attorneys for Plaintiff
UNITED STATES OF AMERICA