**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 13-1832 (JDB)** |
| **ALL ASSETS HELD IN ACCOUNT NUMBER 80020796, IN THE NAME OF DORAVILLE PROPERTIES CORP., AT DEUTSCHE BANK INTERNATIONAL, LTD. IN JERSEY, CHANNEL ISLANDS, AND ALL INTEREST, BENEFITS OR ASSETS TRACEABLE THERETO, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

The United States brings this in rem action pursuant to 18 U.S.C. § 981(a)(1)(A), seeking forfeiture of sixteen defendant properties alleged to have been part of "an international conspiracy to launder proceeds of corruption in Nigeria during the military regime of General Sani Abacha." Compl. [ECF No. 1] ¶ 1. Claimants—all relatives of an individual alleged to have been involved in the conspiracy—have moved to dismiss the government's complaint with respect to four of the defendant properties, which are investment portfolios located in the United Kingdom that allegedly contain assets worth many millions of dollars. Having carefully considered the motion and related papers,[1] and for the reasons described below, the Court will deny claimants' motion.

---

[1] Claimants' Mot. to Dismiss [ECF No. 55] ("Mot. to Dismiss"); Gov't's Opp'n to Mot. to Dismiss [ECF No. 73] ("Opp'n"); Claimants' Reply to Opp'n [ECF No. 74] ("Reply").

## BACKGROUND

### I. PROCEDURAL HISTORY

The United States initiated this forfeiture action on November 18, 2013, by filing a verified complaint for forfeiture in rem against five corporations, seven bank accounts, and four investment portfolios. The government alleges that Nigeria's former de facto President General Sani Abacha, his sons Mohammed Sani Abacha and Ibrahim Sani Abacha, their associate Abubakar Atiku Bagudu, Nigeria's former National Security Advisor Ismaila Gwarzo, Nigeria's former Minister of Finance Chief Anthony Ani, and others "embezzled, misappropriated, defrauded, and extorted hundreds of millions of dollars from the government of Nigeria" and then "transported and laundered the proceeds . . . through conduct in and affecting the United States." Id. ¶¶ 1, 8–15. Defendant investment portfolios are alleged to contain proceeds from these illegal activities.

Eight claimants—all relatives of Abubakar Atiku Bagudu (hereinafter "Bagudu")—have filed verified claims of interest in the investment portfolios, asserting that they are beneficiaries of the portfolios.[2] Three claimants are adults: Ibrahim Bagudu (Bagudu's brother), Aisha Atiku Bagudu (one of Bagudu's wives), and Ibrahim Atiku Bagudu (Bagudu's adult child). The remaining five are minor children of Bagudu and Aisha Atiku Bagudu: M.A.B., I.A.B., F.A.B., M.A.B., and H.A.B. I.A.B. is a United States citizen; the other seven claimants are foreign citizens. All claimants reside in Nigeria and none are implicated in the government's allegations of wrongdoing. Claimants have moved to dismiss the complaint as to the four defendant investment portfolios, but they do not challenge the complaint as to the other twelve defendant properties, with respect to which a default judgment has been entered.

---

[2] Initially, there were ten claimants, but two (a wife and a minor child of Bagudu) withdrew their claims. See Unopposed Mot. to Withdraw Verified Claims of Zainab Shinkafi Bagudu and R.A.B. [ECF No. 66]; Aug. 19, 2014 Minute Order Granting Mot. to Withdraw Verified Claims of Zainab Shinkafi Bagudu and R.A.B.

## II.   VERIFIED COMPLAINT

The following facts are derived from the verified complaint and are assumed to be true for the purposes of deciding claimants' motion to dismiss.

The government alleges that the funds in defendant investment portfolios are traceable to two illegal schemes.[3]   The first scheme is referred to as the "Security Votes Fraud," which began when, between January 1994 and June 1998, General Abacha, National Security Advisor Gwarzo, and others "stole more than $2 billion from Nigeria by fraudulently and falsely representing that the funds were to be used for national security purposes." Id. ¶ 25.  The theft of funds was allegedly committed by General Abacha and Gwarzo when they "executed false national security letters [referred to as "security votes letters"] directing the withdrawal of funds from the [Central Bank of Nigeria]." Id.   Gwarzo, "at General Abacha's direction," prepared these security votes letters and addressed them to General Abacha "purporting to request millions of U.S. dollars, British pounds sterling, and Nigerian naira to address unidentified 'emergencies' that threatened Nigeria's national interests." Id. ¶ 26.  General Abacha "endorsed each letter with his signature" to approve the disbursements.  Id.   Over sixty such endorsed security votes letters were sent to the Central Bank of Nigeria in Abuja, Nigeria, where the bank disbursed the funds as requested in each letter, "in cash or traveler's checks, or through wire transfers." Id. ¶¶ 26, 28.  Instead of using the funds for national security purposes, "the stolen money was transported out of Nigeria and deposited into accounts controlled by General Abacha's associates, including [his son] Mohammed Abacha and Bagudu." Id. ¶ 25.  The complaint includes three examples of these security votes letters. Id. ¶ 28.

---

[3] There is a third scheme alleged in the complaint, see Compl. ¶¶ 94–100, but defendant properties are not alleged to be derived from it and claimants do not contest the sufficiency of the government's factual allegations related to it.

The process of using security votes letters "to take [funds] from the [Central Bank of Nigeria] violated what the [Central Bank of Nigeria] has described as 'accepted government procedures.'" Id. ¶ 27.   "The proper procedure required the Minister of Finance and the Accountant-General to each approve disbursements in accordance with Nigeria's budget." Id. The security votes letters at issue were not properly approved "and were also not included in Nigeria's budget for the relevant fiscal years." Id.   After General Abacha's death, Nigeria established a Special Investigation Panel, "which found that General Abacha and his co-conspirators had used the false security votes letters to steal and defraud more than $2 billion in public funds, including: (1) at least $1.1 billion and £413 million pounds sterling (GBP) in cash; (2) at least $50,456,450 and £3,500,000 GBP in traveler's checks; and (3) at least $386,290,169 through wire transfers." Id. ¶ 29.

After the funds were disbursed from the Central Bank of Nigeria, bank staff and "other individuals known and unknown to the United States" would deliver the funds to National Security Advisor Gwarzo at his residence.   Id. ¶ 31.   "Gwarzo and others acting at his direction would [then] repackage the currency in secure bags and...deliver it to General Abacha at his residence." Id.   "General Abacha, or those acting at his direction, [then] delivered more than $700 million of these funds to [General Abacha's son] Mohammed Abacha in bags or boxes full of cash." Id. ¶ 32.   Mohammed Abacha, in turn, gave that cash to Bagudu, who "arranged for the money to be transferred to accounts controlled by Bagudu and Mohammed Abacha in foreign countries." Id. ¶ 33.   "In order to move the money overseas," Bagudu deposited the money, which he referred to as his "'cash swaps,'" in two local Nigerian banks, and then he "and/or Mohammed Abacha" instructed those banks to transfer the funds to accounts overseas owned by Mohammed Abacha and Bagudu.   Id. ¶ 34.   "Transfers included deposits into accounts in the

4

name of [defendant corporations]" under the control of Bagudu and Mohammed Abacha.  Id. ¶¶ 33–34.  "[A]t least $137 million" of these funds were "transported into and out of the United States."  Id. ¶ 35.  The complaint describes various specific transactions in support of these allegations.  Id. ¶ 35(a)–(f).  And as discussed below, the funds were later pooled with funds from the second scheme and then laundered and transferred to defendant investment portfolios.  See id. ¶¶ 52–93.

The second scheme, referred to as the "Debt Buy-Back Fraud," began in 1996, when Bagudu and others arranged for the Nigerian government, with General Abacha's approval, to repurchase its own debt from Mecosta—a company owned by Bagudu and Mohammed Abacha—at a price significantly higher than what Nigeria would have paid on the open market.  Id. ¶¶ 36–44.  The background of this scheme is as follows.  Nigeria had agreed to pay a Russian company (TPE) in debt instruments in exchange for the construction of a steel plant.  Id. ¶ 37.  A dispute arose, however, and Nigeria suspended payment and defaulted on the outstanding debt.  Id. ¶ 38.  Bagudu learned that another company (Parnar) "would be willing to sell the debt to one of Bagudu's companies (in this case, Mecosta)."  Id. ¶ 39.  Bagudu approached General Abacha's other son Ibrahim Abacha and Nigerian Finance Minister Anthony Ani, who assured Bagudu that if Mecosta bought the debt, Nigeria would buy it from Mecosta.  Id. ¶ 40.  "To guarantee that Nigeria would purchase the debt, Ani entered into an agreement on behalf of Nigeria to buy the debt from Mecosta on April 14, 1996, more than four months before either Parnar or Mecosta actually acquired the debt."  Id.  Bagudu then "orchestrated a series of transactions through which Mecosta received money in escrow from Nigeria, used that money to purchase the debt from Parnar, and sold the debt back to Nigeria at a significant markup."  Id. ¶ 41.

> Specifically, Bagudu arranged for TPE to sell approximately 1.6 billion [German Deutschemarks ("DM")] of its Nigerian debt instruments to Parnar on or about September 30, 1996, for 350 million DM.  That same day, Parnar resold the same debt to Mecosta, raising the price to 486 million DM.  Mecosta immediately marked up the price again and sold it back to Nigeria for 972 million DM, which the Nigerian government paid in two installments of 486 million DM.

Id. ¶ 42.  General Abacha "personally approved" Nigeria's purchase of the debt, "even though Nigeria would have saved hundreds of millions of dollars by buying the debt on the open market at the price TPE was willing to sell it, which was nearly two-thirds less than Nigeria ultimately paid for the debt."  Id. ¶ 44.  "Mohammed Abacha and Bagudu, as the owners of Mecosta, yielded a profit of approximately 481 million DM or $282,506,664."  Id. ¶ 43.

Proceeds from the Debt Buy-Back scheme were wired from Nigeria, through New York, to corporate accounts at Goldman Sachs in Zurich, Switzerland controlled by Mohammed Abacha and Bagudu.  Id. ¶ 45.  Shortly thereafter, "officials at Goldman Sachs informed Bagudu and Mohammed Abacha that the bank was ending their relationship over concerns about the source of the money."  Id. ¶ 46.  As a result, Bagudu and Mohammed Abacha moved the funds from the account at Goldman Sachs to an account for Mecosta at Banque Baring Brothers in Geneva, Switzerland.  Id.  Officials at Banque Baring Brothers then "informed Bagudu and Mohammed Abacha that the bank was terminating its relationship with Mecosta over false representations made by Bagudu and Mohammed Abacha about the source of their money."  Id. ¶ 47.  "Bagudu and Mohammed had falsely represented . . . that the funds came from the oil and gas industry."  Id.  Bagudu and Mohammed Abacha then moved the money from Banque Baring Brothers to an account for Mecosta at DBIL in Jersey, which "rel[ied] on false representations of Bagudu and Mohammed Abacha and false documents purportedly showing legitimate sources of the Mecosta money."  Id.  ¶ 48.  "For example, Bagudu and Mohammed Abacha represented to DBIL that the Mecosta funds were the proceeds of oil, construction, and energy trading."  Id.

Once the funds from the Security Votes scheme and the Debt Buy-Back scheme were transferred out of Nigeria, they were laundered through the purchase of money instruments—referred to as Nigerian Par Bonds—backed by the United States that were later liquidated. Id. ¶¶ 52–93. The investment portfolios contain funds derived from the liquidation of the Nigerian Par Bonds. See id.

## PLEADING STANDARDS

The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 981 et seq., established the procedural and substantive rules to govern forfeiture actions. The government brings this forfeiture action under one of CAFRA's substantive provisions: section 981(a)(1)(A). Hence, the pleading requirements for this action are governed by the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions; specifically, Rule G of the Supplemental Rules, which "governs a forfeiture action in rem arising from a federal statute." Fed. R. Civ. P. Supp. R. A(1); G(1). The Federal Rules of Civil Procedure also apply, except to the extent that they are inconsistent with the Supplemental Rules. Fed. R. Civ. P. Supp. R. A(2).

Supplemental Rule G(2) requires that the government's complaint for forfeiture in rem "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. R G(2)(f). The government's burden of proof at trial is "to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). In other words, at the pleading stage, the complaint is only required to "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." Fed. R. Civ. P. Supp. R. E(2)(a); Fed. R. Civ. P. Supp. R. G, Advisory Committee Notes (noting that the "reasonable

belief" standard in Rule G(2)(f) mirrors the sufficiency standard in Rule E(2)(a)); see also United States v. One Gulfstream, G-V Jet Aircraft, 941 F. Supp. 2d 1, 14 (D.D.C. 2013) ("At the pleading stage, it suffices for the government to simply allege enough facts so that the claimant may understand the theory of forfeiture, file a responsive pleading, and undertake an adequate investigation.").   Notably, a civil forfeiture complaint may not be dismissed because the government lacked sufficient evidence of forfeitability at the time of filing, see 18 U.S.C. § 983(a)(3)(D), and the government may use evidence gathered after filing to meet its burden of proof at trial, see id. § 983(c)(2).

A claimant in an in rem proceeding may move to dismiss under Rule 12(b).  Fed. R. Civ. P. Supp. R. G(8)(b)(i).  When considering a Rule 12(b)(6) motion to dismiss, the court construes the complaint in the light most favorable to the plaintiff and "must assume the truth of all well-pleaded allegations."   Warren v. District of Columbia, 353 F.3d 36, 39 (D.C. Cir. 2004).  "The plaintiff must be afforded every favorable inference that may be drawn from the allegations of fact set forth in the complaint."   United States v. Seventy-Nine Thousand Three Hundred Twenty-One Dollars, 522 F. Supp. 2d 64, 68 (D.D.C. 2007).  Moreover, factual challenges are not permitted under Rule 12(b)(6), and the court may "consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice."[4]   EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

---

[4] In support of their motion, claimants submit various attachments.  Certainly, "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint," as well as "documents upon which the plaintiff's complaint necessarily relies," may be considered by the Court in assessing a motion to dismiss.  Ward v. D.C. Dep't of Youth Rehab. Servs., 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (internal quotation marks omitted).  Anything else is extraneous and cannot be considered at this stage.

## DISCUSSION

Claimants put forth four main arguments in their motion to dismiss: (1) this Court lacks jurisdiction over this case; (2) the timing of the complaint exceeds the applicable statute of limitations and violates claimants' due process rights; (3) the doctrines of international comity and act of state necessitate dismissal; and (4) the complaint fails to allege that defendant investment portfolios are subject to forfeiture. None of these arguments are successful.

### I.   JURISDICTION

Congress has provided that, "[w]henever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government, an action or proceeding for forfeiture may be brought . . . in the United States District court for the District of Columbia." 28 U.S.C. § 1355(b)(2). Subsection (d) of the same statute refers to "[a]ny court with jurisdiction over a forfeiture action pursuant to subsection (b) . . . ." Id. § 1355(d). Upon consideration of these provisions, the D.C. Circuit has explained that "Congress intended the District Court for the District of Columbia, among others, to have jurisdiction to order the forfeiture of property located in foreign countries." United States v. All Funds in Account in Banco Español de Credito, Spain, 295 F.3d 23, 27 (D.C. Cir. 2002).

Here, the government has alleged that defendant properties are located abroad and are subject to forfeiture, and that hence, this Court has jurisdiction to hear the forfeiture action under section 1355(b)(2). Claimants disagree. First, they argue that, because "there are virtually no contacts between the Claimed Property and the U.S.," jurisdiction is not proper. Mot. to Dismiss at 2. Use of the United States banking system, however, provides sufficient contact between property and the United States for a civil forfeiture action in rem. See, e.g., United States v. All

<u>Assets Held at Bank Julius Baer & Co.</u>, 571 F. Supp. 2d 1, 10 n.8 (D.D.C. 2008).  And here, the government has alleged widespread use of the United States banking system in the storage and movement of funds and the liquidation of investment instruments.  <u>See, e.g.</u>, Compl. ¶ 35 (wire transfers of security vote proceeds passed through ANZ (New York)); ¶ 81 (a wire transfer of approximately $2.4 million of the Debt Buy-Back scheme proceeds passed from an account for Mecosta at Credit Agricole Indosuez (London) to Marine Midland Bank, N.A. (New York) to ANZ (New York), and then to ANZ (London)); ¶ 85 (the Nigerian Par Bonds were liquidated through Citibank  (New York)).

Claimants  also  argue  against  jurisdiction  because  they  allegedly  "have  less  than  the required minimum contacts with the United States."  Mot. to Dismiss at 2.  But whether a court has  personal  jurisdiction  over  claimants  is  not  a  valid  jurisdictional  consideration  in  an in rem civil forfeiture action.  Instead, once a court has determined that jurisdiction exists over an in rem civil  forfeiture  action,  the  court  has  jurisdiction  to  adjudicate  all  claims  to  the  defendant property. <u>See</u> <u>Tennessee Student Assistance Corp. v. Hood</u>, 541 U.S. 440, 453 (2004) ("[J]urisdiction over the  person  is  irrelevant  if  the  court  has  jurisdiction  over  the  property.")  (citing  4A  C.  Wright  & A.  Miller,  <u>Federal Practice & Procedure</u>  § 1070 (3d ed. 2002)).  Accordingly, the Court has jurisdiction  over  this  in rem civil  forfeiture  action,  regardless  of  claimants'  personal  contacts with the United States.[5]

## II.   TIMING OF THE COMPLAINT

The statute of limitations for bringing a civil forfeiture action is "five years after the time when the alleged offense was discovered" or "2 years after the time when the involvement of the property in the alleged offense was discovered," whichever is later.  19 U.S.C. § 1621; 18 U.S.C.

---

[5] If it were otherwise, then United States' forfeiture actions against property located outside of the United States would always be dismissed whenever a foreign national without minimum contacts entered a claim to the property and raised personal jurisdiction as an issue.  It is unlikely that this is what Congress intended.

§ 981(d) (adopting 19 U.S.C. § 1602 et seq.).  Pursuant to 19 U.S.C. § 1621(2), however, the clock is tolled during any "absence of the property" from the United States.  And the D.C. Circuit has held that, when property is located outside of the United States, there is an "absence of the property" because "when property is not here it is absent."  Banco Español, 295 F.3d at 27; see also id. ("There is no particular reason . . . for stretching the word 'absence' to mean something other than not present.").  In that case, the Circuit found the claimant's argument that "property cannot be absent unless it was first in this country and then removed" to be incorrect. Id.; see also id. ("If Congress had meant what the claimant suggests, we would expect some reference in the statute to the act of removal, but there is none.").  The Circuit further noted that

> We recognize that our reading tolls the running of the limitations period indefinitely for bringing actions against drug proceeds located in foreign countries.  But given the uncertainties of foreign cooperation, Congress may not have wanted to force the government to bring forfeiture proceedings within five years to recover such property.

Id.  The Circuit was well aware, then, that its reading of the tolling statute could lead to extended or even indefinite  tolling  in certain situations, but reached its decision nonetheless.

Here, because defendant properties are investment portfolios located in the United Kingdom that have been "absent" from the United States since their creation, the statute-of-limitations clock has been tolled pursuant to 19 U.S.C. § 1621(2).  And because the complaint was filed during the ongoing "absence of the property" from the United States, this forfeiture proceeding commenced within the applicable statute-of-limitations  period.

Claimants acknowledge that binding precedent provides that the statute-of-limitations clock is tolled in circumstances like those here.  Nevertheless, they argue that the Court should decline to toll the time for this particular action.  They contend that the government has been "well aware of the allegations that form the basis of the Complaint in this action as early as May

2003," yet "inexcusably decided to wait nearly ten years to file these forfeiture proceedings." Mot. to Dismiss at 14–15. But nothing indicates that the government maliciously waited to bring this action. To the contrary, the government asserts that it knew about defendant investment portfolios' involvement in the alleged offenses for less than two years before it filed this action. See Opp'n at 27 n.8 ("[T]he United States only identified the specific defendant assets' involvement in the crime on February 2, 2012, less than two years before filing the civil forfeiture complaint [filed on November 18, 2013] and well within the statute of limitations without resorting to the tolling provision."). If this is correct, then the government filed its complaint within the statutory limit without tolling. But in any event, tolling does apply to the government's claims based on the ongoing absence of defendant properties from the United States, and hence the complaint was timely filed.

Claimants also argue that tolling in this action violates their due process rights. Specifically, they contend that "[t]he excessiveness of the Government's delay in pursuing claims against the Claimed Property runs far afoul of the protections afforded Claimants by the Fifth Amendment's Due Process Clause" because the delay "has severely prejudiced Claimants and puts them in the absurd position of having to defend against allegations of events that occurred almost 20 years ago." Mot. to Dismiss at 18–19.

There are several problems with this argument. First, as noted above, there is a fundamental dispute between claimants and the government regarding whether tolling is necessary for the complaint to be timely filed. The government represents that it knew of the portfolios' involvement in the criminal conspiracy for less than two years prior to filing the complaint, which claimants challenge. At this point in the proceedings, however, the Court is not in a position to resolve this dispute.

Second, as claimants acknowledge, to succeed on their due process claim, claimants must "show that the Government's delay in bringing the action: a) prejudiced [claimants'] ability to defend [themselves], and b) 'was a purposeful device to gain a tactical advantage over the accused.'"   Mot. to Dismiss at 20 (quoting United States v. Mahoney, 698 F. Supp. 344, 346 (D.D.C. 1988)).   Claimants must produce evidence to support these assertions.   See, e.g., United States v. Bridgeman, 523 F.2d 1099, 1112 (D.C. Cir. 1975) (explaining that allegation of "a general dimming of memories and loss of evidence" was insufficient to show prejudice or tactical advantage); Mahoney, 698 F. Supp. at 346 (explaining that defendant's mere assertion that it is difficult to recall events that occurred eight or more years ago is insufficient to show prejudice or tactical advantage).   Hence, claimants' assertion that "[t]he excessive length of the delay [in the filing of the complaint], alone, should raise an inference that Claimants will be unavoidably prejudiced," Mot. to Dismiss at 21, is clearly insufficient.   More is needed to show prejudice, and this motion to dismiss is not the appropriate vehicle for the argument.   See, e.g., Seventy-Nine Thousand Three Hundred Twenty-One Dollars, 522 F. Supp. 2d at 72 n.5 (declining to address claimants' constitutional arguments on a motion to dismiss because the only question before a court at that stage is whether the complaint sufficiently describes "the circumstances that form the basis for the claims so as to enable the Claimant . . . 'to commence an investigation of the facts and to frame a responsive pleading'").

Third, all claimants may not all be entitled to due process protections.   It is possible that I.A.B., the minor child who is a U.S. citizen, is protected by the due process clause.   See, e.g., Rasul v. Myers, 563 F.3d 527, 529 (D.C. Cir. 2009) ("American citizens abroad can invoke some constitutional protections.") (citing Reid v. Covert, 354 U.S. 1, 5 (1957) (plurality)).   The other seven claimants, however, are foreign nationals who are located outside of the United States.   Six

of them assert that they lack minimum contacts with the United States (one claimant—Ibrahim Bagudu—asserts that he travels to the U.S. regularly and does not argue that he lacks minimum contacts).

The D.C. Circuit has not opined on whether foreign nationals may assert a due process claim in United States courts in the context of an in rem civil forfeiture action.  See Banco Español, 295 F.3d at 27 n.* (explaining that, under the circumstances, the court "need not consider whether [claimant's] status as a foreign national outside the United States precludes any constitutional claims").   The Circuit has decided, however, that foreign entities or nationals without minimum contacts with the United States lack due process or other constitutional rights. People's Mojahedin Org. of Iran v. Dep't of State, 182 F.3d 17, 22 (D.C. Cir. 1999) ("A foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise."); Arbelaez v. Newcomb, 1 F. App'x 1, 1 (D.C. Cir. 2001) (holding that plaintiffs, who were foreign nationals without a substantial connection to the United States, could not raise claims under constitutional provision barring bills of attainder and ex post facto laws).   And in other situations, the Supreme Court has indicated that foreign nationals can assert constitutional claims only if they have minimum contacts with the United States.   See, e.g., United States v. Verdugo-Urquidez, 494 U.S. 259, 271 (1990) (stating, in the context of the Fourth Amendment, that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country"); Johnson v. Eisentrager, 339 U.S. 763, 770–71 (1950) (holding that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment habeas protections).

At this point in the proceedings, it is premature for the Court to consider claimants' due process argument. Claimants' constitutional argument requires the Court to consider evidence outside of the pleadings, and hence cannot be resolved on the current motion to dismiss.

### III.   DOCTRINES OF INTERNATIONAL COMITY AND ACT OF STATE

Claimants argue that principles of comity and act of state support dismissal because, they allege, a "2003 Settlement Agreement between Mr. Bagudu and Nigeria constitutes a formal decision and act by Nigeria to fully and finally resolve the disputes regarding Mr. Bagudu's alleged participation in misappropriating funds from Nigeria." Mot. to Dismiss at 49. The government responds that "[n]either principles of international comity, nor the act of state doctrine, warrant dismissal of a civil forfeiture action when, as here, the Executive Branch has brought a forfeiture action against defendant assets involved in violations of U.S. criminal laws." Opp'n at 36.

International comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." Hilton v. Guyot, 159 U.S. 113, 164 (1895); see also Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 937 (D.C. Cir. 1984) (explaining that "the central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts"). "[C]ourts in this country have long recognized the principles of international comity . . . in order to promote cooperation and reciprocity with foreign lands." Pravin Banker Assocs. v. Banco Popular Del Peru, 109 F.3d 850, 854 (2d Cir. 1997). Nevertheless, dismissing a case because of international comity concerns is inappropriate when doing so "'would be contrary to the policies or prejudicial to the interests of the United States.'" One Gulfstream, 941 F. Supp. 2d at 10 (quoting Pravin Banker, 109 F.3d at 854); see also United States v. Portrait of Wally, A Painting By Egon

Schiele, No. 99-cv-9940, 2002 WL 553532, at *10 (S.D.N.Y. Apr. 12, 2002) ("Even when there is true conflict with the laws of a foreign nation, United States courts will not yield in the name of comity if doing so conflicts with the law or policy of the United States.").

Along similar lines, "[t]he act of state doctrine precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." McKesson Corp. v. Islamic Rep. of Iran, 539 F.3d 485, 491 (D.C. Cir. 2008) (internal quotation marks omitted). Hence, the act of state doctrine "is applicable when 'the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within' its boundaries." World Wide Minerals, Ltd. v. Rep. of Kazakhstan, 296 F.3d 1154, 1164–65 (D.C. Cir. 2002) (quoting W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., 493 U.S. 400, 405 (1990)). "One of the major concerns underlying the act of state doctrine is 'the strong sense of the judicial branch that its engagement in the task of passing on the validity of foreign acts of a state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere.'" One Gulfstream, 941 F. Supp. 2d at 11–12 (quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 423 (1964)).

Here, the Executive Branch, through the Department of Justice, has brought this forfeiture action against defendant properties involved in alleged violations of United States criminal laws. And as in One Gulfstream, "[b]ecause the Executive has already done the balancing in deciding to bring the case in the first place, the doctrine of international comity does not bar this lawsuit." 941 F. Supp. 2d at 10–11 (internal quotation marks and citation omitted); see also United States v. All Assets Held at Bank Julius Baer & Co., 772 F. Supp. 2d 205, 210 n.3 (D.D.C. 2011) ("[A] case in which the United States is the plaintiff would seem a particularly unsuitable candidate for

abstention on international comity grounds.   Where, as here, the executive branch has decided that a forfeiture action is in the interests of the United States, declining jurisdiction out of deference to the interests of a foreign nation would be inappropriate.").   Likewise, the act of state doctrine does not weigh against this Court's exercise of jurisdiction.   Because this action is brought on behalf of the United States to enforce United States laws, there is little concern that the Court's decision "may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole." Banco Nacional de Cuba, 367 U.S. at 423; see also United States v. Giffen, 326 F. Supp. 2d 497, 502 (S.D.N.Y. 2004) ("The major underpinning of the act of state doctrine is the policy of foreclosing court adjudications involving the legality of acts of foreign states on their own soil that might embarrass the Executive Branch . . . in the conduct of our foreign relations . . . . Where the Executive Branch files an action, however, courts are reluctant to invoke the act of state doctrine on this rationale." (internal quotation marks omitted)).   Hence, neither the principles of act of state nor those of international comity support dismissal of this forfeiture action.

## IV.   FACTUAL ALLEGATIONS IN THE COMPLAINT

As previously mentioned, this forfeiture action is brought under 18 U.S.C. § 981(a)(1)(A), which provides that "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section [1956 or 1957] of this title, or any property traceable to such property," is subject to forfeiture to the United States.   Section 1956 provides a criminal penalty for money laundering.   Section 1957 provides a criminal penalty for the knowing engagement or attempted engagement in a monetary transaction derived from "specified unlawful activity," which includes violations of sections 2314 and 2315 (the transportation of stolen property in interstate or foreign commerce) and section 1956(c)(7)(B)(iv) (the

misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official).   See 18 U.S.C. §§ 1957(f)(3), 1956(c)(7)(A)–(B), 1961(1).   Claimants challenge the sufficiency of the government's factual allegations in support of its first three claims for forfeiture, which rely on the provisions recounted above.[6]   Each of these claims provides an independent basis for the forfeiture of defendant investment portfolios.

A. *The government's first claim for forfeiture*

The government's first claim for forfeiture alleges that defendant properties were involved in or traceable to money laundering or attempted money laundering in violation of section 1957, as a result of "specified unlawful activity" penalized by sections 2314 and 2315. These sections define "specified unlawful activity" as when someone "transports, transmits, or transfers in interstate or foreign commerce any . . . securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud," 18 U.S.C. § 2314, or "receives, possesses, conceals, stores, . . . sells, or disposes of any . . . securities, or money of the value of $5,000 or more . . . which have crossed a State or United States boundary . . . knowing the same to have been stolen, unlawfully converted, or taken," 18 U.S.C. § 2315.   In other words, to make out a claim under sections 2314 and 2315, the government must allege that the property was stolen, converted, or taken by fraud[7]; that the property was transported in interstate or foreign commerce; and that someone who moved the property into interstate or foreign commerce knew the property was stolen, converted, or taken by fraud.

---

[6] Claimants do not challenge the sufficiency of the government's fourth and fifth claims, which do not apply to defendant investment portfolios.

[7] Sections 2314 and 2315, when examined together, have been interpreted to apply to property transported, sold, or received in interstate or foreign commerce known to have been "stolen, converted or taken by fraud." See, e.g., United States v. Mask of Ka-Nefer-Nefer, 752 F.3d 737, 741 (8th Cir. 2014); United States v. Lazarenko, 564 F.3d 1026, 1032 (9th Cir. 2009); United States v. Cotoia, 785 F.2d 497, 502 (4th Cir. 1986).

Claimants argue that the government's first claim should be dismissed because (1) the complaint fails to show that the Debt Buy-Back scheme was fraudulent and thus the government has failed to show that proceeds from the scheme were stolen, converted, or taken by fraud; and (2) the complaint fails to allege facts showing that, in the course of both the Security Votes scheme and the Debt Buy-Back scheme, someone who transported the funds in foreign commerce knew that the funds were stolen, converted, or taken by fraud.

1.  Whether the complaint sufficiently alleges facts showing that the Debt Buy-Back scheme constituted fraudulent activity

According to the complaint, in the Debt Buy-Back scheme, General Abacha, his two sons, their associate Bagudu, the Nigerian Minister of Finance, and others caused the government of Nigeria to purchase non-performing government debt at an inflated price from a company controlled by Bagudu and Mohammed Abacha.  Once the proceeds from the Debt Buy-Back scheme were transferred out of Nigeria, they were laundered through the purchase of Nigerian Par Bonds and deposited into the defendant investment portfolios.  See Compl. ¶ 53.

Claimants argue that the complaint "provides no basis to conclude [the Debt Buy-Back] [t]ransaction was fraudulent and thus [provides] no basis for the forfeiture of any Debt Buy-Back-derived property as proceeds of crime."  Mot. to Dismiss at 31.  Specifically, claimants contend that the complaint "does not sufficiently allege that the profits from the transaction were 'stolen, converted, or taken by fraud' as would be required for a violation of either 18 U.S.C. § 2314 or 2315."  Id. at 31–32.

In response, the government asserts that specific allegations about the fraudulent nature of the Debt Buy-Back scheme are included in the complaint.  Opp'n at 12–13 (citing Compl. ¶¶ 2, 36, 41).  Indeed, the government's allegation that "Mohammed Abacha, Bagudu, and others defrauded Nigeria of more than $282 million by causing the government of Nigeria to repurchase

Nigeria's own debt from one of their companies for more than double what Nigeria would have paid to repurchase the debt on the open market," Compl. ¶ 36, provides a basis to conclude that the funds were proceeds of fraud, see, e.g., United States v. A 10th Century Cambodian Sandstone Sculpture, No. 12 Civ. 2600(GBD), 2013 WL 1290515, at *6 n.5 (S.D.N.Y. Mar. 28, 2013) (explaining that the government's allegations that defendant property was "stolen" via an organized "looting network" and ultimately delivered to a dealer in Bangkok were sufficient to support a reasonable belief that the government would be able to meet its burden of proof at trial to demonstrate that the property was stolen).

Claimants argue, however, that "[a]lthough the Complaint labels this transaction as a 'fraud' . . . there are simply no factual allegations to back up the Complaint's naked assertions of wrongdoing." Mot. to Dismiss at 32. Claimants direct the Court's attention to One Gulfstream, where a forfeiture complaint was dismissed for failing to link the defendant jet to any specific illicit acts despite a "disconcerting pattern of corruption." 941 F. Supp. 2d at 4. There, the government had alleged that the defendant jet was subject to forfeiture because it was either derived from or traceable to extortion, misappropriation, theft, or embezzlement of public funds by a public official. See id. at 5. The complaint alleged that the jet was purchased by Equatorial Guinea's Minister of Forestry and Agriculture, who was a member of "a coterie of powerful individuals . . . [who] demand[ed] extortionate payments from oil companies seeking to do business in the country . . . [and] misappropriate[d] government funds into a slush fund created for their personal use." Id. The government's only alleged connection between the jet and the illegal activity was its allegation that, because the Minister of Forestry and Agriculture's level of spending was inconsistent with his government salary, the defendant jet must have been derived from or traceable to extortion, misappropriation, theft, or embezzlement of public funds by a

public official.  Id. at 5, 14–15.  The court explained, however, that, "[w]hen viewed in tandem with other details suggesting illegal behavior, [the Minister of Forestry and Agriculture's] wealth might allow an inference of illegal activity—but standing alone, it does not."  Id. at 16; see also id. at 15 ("[T]he government does not provide enough detail for the court to infer the contours of the illicit scheme.").  "Faced with this complaint," the court concluded, "the claimants would find it difficult to know where to begin their investigation, what individuals to interview, or what documents to review. . . . The government cannot proceed by casting general allegations of lawlessness in the country in which the relevant transactions took place."  Id. at 16.

In contrast, the court in United States v. Sum of $70,990,605, denied a motion to dismiss a forfeiture action in which the complaint named an individual subcontractor engaged in a "scheme to defraud," involving the payment of bribes and kickbacks to officials who, in turn, fraudulently inflated the price of contracts.  4 F. Supp. 3d 189, 199 (D.D.C. 2014).  The complaint there included specific examples of bribery that did more than "'describe[] a disconcerting pattern of corruption,'" because it identified the victim of the scheme, members of the conspiracy, the goal of the conspiracy, the means of effectuating the conspiracy, and which members of the conspiracy were responsible for which acts.  Id. at 200 (quoting One Gulfstream, 941 F. Supp. 2d at 4).  Additionally, the court noted that the individual subcontractor received most of the contracts, even when his company did not bid, and concluded that "[t]hese signals of fraud [i.e., being awarded contracts without bidding], [w]hen viewed in tandem with other details suggesting illegal behavior, such as the money paid . . . as bribes, suffice to describe the contours of the illegal scheme."  Id. at 201 (internal quotation marks omitted); see also United States v. $22,173.00 in U.S. Currency, No. 09 Civ. 7386(SAS), 2010 WL 1328953, at *3 (S.D.N.Y. Apr. 5, 2010) (explaining that a large amount of cash kept in a safe-deposit box, rather than an

interest-bearing account, "[i]n tandem with the factual allegations suggesting a pattern of drug trafficking—e.g., the allegations indicating [that the owner of the safe-deposit box] was in possession of a half ounce of cocaine on the night the NYPD executed the first search warrant and the multiple prior arrests for possession with intent to sell"—was sufficient to support the government's claim that the safe-deposit money is subject to forfeiture).

The complaint here, like that in Sum of $70,990,605, "does not suffer from mere conclusory and broad-brushed allegations."  4 F. Supp. 3d at 199.  Instead, the government has specified the victim of the alleged fraud (Nigeria); the perpetrators of the alleged fraud (Bagudu, Abacha, Abacha's sons, and the Minister of Finance); the goal of the fraud (to defraud Nigeria by orchestrating its purchase of debt at a vastly inflated price); the means of effectuating the fraud (the agreement between Bagudu, Ani, and Ibrahim Abacha, Mecosta's purchase of the debt with money loaned by Nigeria, the sale of the debt from Mecosta to Nigeria, and the various transactions afterward moving the proceeds of the sale overseas and depositing them into accounts controlled by Bagudu and Mohammed Abacha); and which members of the fraud were responsible for which acts.  This information is certainly sufficient for claimants to commence an investigation of the facts and frame a responsive pleading.  See One Gulfstream, 941 F. Supp. 2d at 14.

The allegations are also sufficient to support an inference of illegal activity well beyond "general allegations of lawlessness in the country in which the relevant transactions took place." One Gulfstream, 941 F. Supp. 2d at 16.  For example, the complaint includes allegations that a deal was struck between Bagudu and General Abacha's son and Nigeria's Minister of Finance to cause Nigeria to buy its own non-performing debt from a company owned by Bagudu and another son of General Abacha at more than double what Nigeria would have paid on the open

market[8]; that General Abacha personally approved this deal at the inflated price; and that the proceeds from the deal were moved overseas to accounts controlled by Bagudu and one of General Abacha's sons.  These facts support an inference that the Debt Buy-Back scheme was fraudulent and therefore that the proceeds of the scheme were stolen, converted, or taken by fraud.

> 2. <u>Whether the complaint sufficiently alleges facts showing that whoever transported the subject funds into foreign commerce knew that the funds were stolen, converted, or taken by fraud</u>

Sections 2314 and 2315 have a criminal-knowledge element: one involved in the transportation of property in interstate or foreign commerce must have known that the property was stolen, converted, or taken by fraud.  For the purposes of the sufficiency of a complaint, such knowledge can be inferred from the factual allegations.  <u>See, e.g.</u>, <u>United States v. One Tyrannosaurus Bataar Skeleton</u>, No. 12 Civ. 4760(PKC), 2012 WL 5834899, at *10 (S.D.N.Y. Nov. 14, 2012) (finding that government alleged sufficient facts to show that paleontologist who moved defendant skeleton in interstate commerce knew that the skeleton was stolen where complaint alleged that paleontologist attempted to obscure its country of origin on importation paperwork); <u>Seventy-Nine Thousand Three Hundred Twenty-One Dollars</u>, 522 F. Supp. 2d at 72 (finding that government had sufficiently alleged scienter for the illegal transport of money in interstate commerce where complaint alleged that individual had misrepresented the amount of money he was carrying over the border by filling out a customs form for only a portion of the funds in his possession).

---

[8] Claimants argue that, because there was a dispute between Nigeria and the Russian company that originally owned the debt, "it is implausible that Nigeria could have negotiated a deal directly with TPE [to buy the debt] at a significantly better price."  Mot. to Dismiss at 32.  This is a factual challenge, not a legal one; it is therefore not an argument for the Court's consideration at this stage of the proceedings.

Claimants argue that, for both schemes, the complaint fails to adequately allege that Bagudu knew the funds were stolen at the time he moved them into foreign commerce. Instead, claimants contend, "[a]t most, the Complaint alleges that Mr. Bagudu, a private citizen, transferred large sums of money he received from Mohammed Abacha, who is not alleged to be a public official, to accounts in foreign countries." Reply at 9. The government responds that Bagudu's knowledge can be inferred from the fraudulent conduct alleged in the complaint and that "[i]t is reasonable to draw such inferences" where "Bagudu, a private citizen, moved hundreds of millions of dollars of Nigerian public funds overseas." Opp'n at 16.

Recall that the complaint alleges that, after the funds from the Security Votes scheme were fraudulently disbursed from the Central Bank of Nigeria, bank staff and others delivered the funds to National Security Advisor Gwarzo at his residence; Gwarzo and others then repackaged the currency in secure bags and delivered it to General Abacha at his residence; and Abacha and others then delivered these funds to Abacha's son Mohammed Abacha "in bags or boxes full of cash." Compl. ¶ 32. Mohamed Abacha subsequently gave the cash he received to Bagudu, who arranged to move the money—approximately $700 million—out of Nigeria and into overseas accounts controlled by Bagudu and Mohammed Abacha. Id. ¶ 33. Moreover, it is also alleged that, in the Debt Buy-Back scheme, Bagudu struck a deal with General Abacha's other son Ibrahim Abacha and Nigeria's Finance Minister so that Nigeria would buy non-performing debt at a significant markup from Mecosta (a foreign company owned by Bagudu and Mohammed Abacha). Id. ¶¶ 39–40. This markup was quite significant—from 350 million DM to 972 million DM. Id. ¶ 42. General Abacha "personally approved" Nigeria's purchase of the debt, id. ¶ 44, and Mohammed Abacha and Bagudu "yielded a profit of approximately 481 million DM or $282,506,664." Id. ¶ 43. Afterward, two banks where Bagudu and Mohammed

Abacha moved the proceeds cancelled their services "over concerns about the source of the money," and "over false representations made by Bagudu and Mohammed Abacha about the source of their money." Id. ¶¶ 46–47. Finally, a third bank accepted the money, but that acceptance was based on the "false representations of Bagudu and Mohammed Abacha and false documents purportedly showing legitimate sources of the Mecosta money." Id. ¶ 48.

According to the complaint, then, Bagudu, with Mohammed Abacha's involvement, repeatedly moved millions of dollars of suspiciously packaged funds (boxes and bags of millions of dollars from the Security Votes scheme) and millions of dollars of money he knew was from Nigeria's public funds (from the Debt Buy-Back scheme) overseas to bank accounts controlled by him and one of General Abacha's sons. Bagudu and Mohammed Abacha subsequently lied about the source of some of the funds to several sets of bank officials. Accepting all of these facts as true for the purpose of resolving claimants' motion, as the Court must, gives rise to a reasonable inference that Bagudu and Mohammed Abacha knew that the funds were "stolen, converted or taken by fraud" when the funds were transported into foreign commerce. And certainly, there are sufficient facts alleged for the claimants to "understand the theory of forfeiture, file a responsive pleading, and undertake an adequate investigation." One Gulfstream, 941 F. Supp. 2d at 14.

B. *The government's second claim for forfeiture*

The government's second claim for forfeiture alleges that defendant properties were involved in or traceable to money laundering or attempted money laundering in violation of section 1957, as a result of "specified unlawful activity" penalized by section 1956(c)(7)(B)(iv). "Specified unlawful activity," in this statutory provision, is defined as "an offense against a foreign nation involving . . . bribery of a public official, or the misappropriation, theft, or

embezzlement of public funds by or for the benefit of a public official."   18 U.S.C. § 1956(c)(7)(B)(iv).   Claimants argue that the government's claim should be dismissed because the complaint does not allege that the Debt-Buy Back scheme was a specific "offense against a foreign nation" involving misconduct "by or for the benefit of a public official."

Regarding the involvement of a public official, the government's allegations state that the Debt Buy-Back scheme was conducted with the assistance of Finance Minister Ani and the approval of General Abacha.   See Compl. ¶ 40 ("Ani entered into an agreement on behalf of Nigeria to buy the debt from Mecosta . . . ."); ¶ 44 ("Nigeria's purchase of the debt was personally approved by General Abacha . . . .").   These allegations are more than "conclusory and unadorned allegation[s] that the [foreign public official at issue] was involved" in the alleged misconduct.   United States v. 2291 Ferndowne Lane, Keswick VA 22947-9195, No. 3:10-CV-0037, 2011 WL 2441254, at *4 (W.D. Va. June 14, 2011) (dismissing claim where complaint failed to allege any specific acts of a former public official in furtherance of money laundering). Hence, the complaint sufficiently alleges actions taken by a public official involved in the Debt Buy-Back scheme.

Likewise, regarding "an offense against a foreign nation," the complaint presents sufficient factual support.   Specifically, the complaint alleges that

> At all times relevant to this complaint, conduct constituting theft; conversion; fraud; extortion; and the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official were criminal offenses under Nigerian law, as enumerated in the Nigerian Criminal and Penal Codes, including but not limited to Nigerian Criminal Code Act . . . and the Nigerian Penal Code Law. . . . Copies of relevant provisions are set forth in Attachment A.

Compl. ¶ 101.   Attachment A contains various provisions of law from the Nigerian Criminal Code and the Nigerian Penal Code, including prohibitions on the corruption and abuse of

political office, theft, the corruption of public servants, misappropriation, breach of trust, and the receipt of stolen property.  See Att. A [ECF No. 7-1].

Claimants argue that the government's allegations are insufficient to show a foreign offense because the Nigerian Criminal Code does not apply to the region of Nigeria where the alleged corruption took place.  Even supposing that this is true, the complaint still alleges offenses of the Nigerian Penal Code, which appears to apply to the whole country.  Assuming the government's facts to be true, and drawing all reasonable inferences in the government's favor, then, the government has sufficiently alleged that a foreign offense occurred in the course of the Debt Buy-Back scheme.

C. *The government's third claim for forfeiture*

The government's third claim for forfeiture alleges that defendant properties are subject to forfeiture because they were involved in or traceable to a conspiracy to commit money laundering in violation of sections 1956(h) and 1957.  Section 1957 describes money laundering as when a person "knowingly engages or attempts to engage in a monetary transaction in criminally derived property." 18 U.S.C. § 1957(a).  And section 1956(h) criminalizes any conspiracy to commit an offense defined in section 1956 or section 1957.  Claimants argue that the complaint fails sufficiently to allege both that someone who laundered the funds knew they were proceeds of a crime, and that there was a conspiracy to launder money.

The Court has already concluded that the complaint alleged sufficient facts to infer that Bagudu and Mohammed Abacha knew that the funds from the Debt Buy-Back scheme and the Security Vote scheme were stolen when they moved the funds into foreign commerce.  These same funds were subsequently laundered through the purchase of Nigerian Par Bonds.  It stands to reason that if Bagudu and Mohammed Abacha were aware that the funds were derived from

illegal activity when they moved them into foreign commerce, then they also knew that those same funds were derived from illegal activity when they subsequently laundered them through the purchase of Nigerian Par Bonds.

As for whether the complaint alleges a conspiracy to launder money, "[t]he government does not need to allege facts that demonstrate an explicit agreement; rather '[p]roof of a tacit, as opposed to explicit, understanding is sufficient to show agreement.'" Sum of $70,990,605, 4 F. Supp. 3d at 198 (quoting Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983)).  Here, the government cites multiple allegations in the complaint that, it argues, demonstrate a tacit agreement to launder the funds, such as allegations "describing Bagudu and Mohammed Abacha's joint investment of the Nigerian Par Bonds; their use of shell companies; and [their] collaboration moving the criminal proceeds from the 'Security Votes Fraud' overseas."  Opp'n at 18 (citing Compl. ¶¶ 52–53, 58, 65, 70).

Indeed, the facts alleged, if true, would confirm that both men played key roles in the two schemes and were in control of the bank accounts where the proceeds from these schemes were deposited.   The complaint also alleges that both men were responsible for the laundering of the proceeds through Nigerian Par Bonds.  See, e.g., Compl. ¶ 53 ("Bagudu and Mohammed Abacha pooled proceeds of the Security Votes Fraud [and] the Debt Buy-Back Fraud . . . into the purchase of [Nigerian Par Bonds] . . . through a complex series of transactions in or affecting the United States.").   The complaint describes the Nigerian Par Bond transactions—and Bagudu's and Mohammed Abacha's involvement—at length and in detail.  See id. ¶¶ 54–93. Accepting all the allegations as true and drawing all inferences in the light most favorable to the government, these concerted actions support the existence of a tacit agreement to launder funds.

D. *Traceability*

Lastly, claimants argue that all three claims at issue must be dismissed because the complaint "fails to allege sufficient facts connecting the Claimed Property [i.e., the four defendant investment portfolios] to the alleged criminal activity, fails to support an inference that the [Nigerian Par Bonds] are traceable proceeds of money laundering, and fails to allege that any co[-]mingling occurred in order to conceal the source of the funds at issue."  Mot. to Dismiss at 47.

The pleading standard for tracing funds in a civil forfeiture complaint is not exacting—even claimants concede that "the D.C. Circuit has held that the Government is not required to demonstrate full tracing of all account activity to prove money laundering under 18 U.S.C. § 1956."  Mot. to Dismiss at 39 (citing United States v. Braxtonbrown-Smith, 278 F.3d 1348, 1354 (D.C. Cir. 2002)).  Moreover, "since the issue on this motion is one of pleading, not proof at trial, it is not necessary to pass on the government's ultimate burden of proof regarding traceability of the defendants-in-rem."  United States v. All Funds, No. CV-05-3971(SJF), 2007 WL 2114670, at *7 (E.D.N.Y. July 16, 2007) (internal quotation marks omitted).  Here, the government has sufficiently alleged that the two schemes constituted unlawful activity under sections 1956 and 1957, a predicate to establishing that defendant properties are subject to forfeiture.  The government has also alleged that the proceeds from the two schemes were laundered through the purchase of Nigerian Par Bonds, and that defendant properties contain proceeds obtained from the liquidation of the Nigerian Par Bonds.  Accordingly, the government has alleged sufficiently detailed facts in the complaint to demonstrate that defendant properties contain assets traceable to specified unlawful activity.  See United States v. Approximately $25,829,681.80 in Funds, No. 98 Civ. 2682(LMM), 1999 WL 1080370, at *7 (S.D.N.Y. Nov. 30,

1999) (holding that, as long as the government alleges specific facts supporting an inference that the funds are traceable to wire fraud and mail fraud, it has met its burden at the pleadings stage). To the extent claimants argue that there are innocent funds in defendant properties, that is an issue of fact for later resolution; for purposes of this motion to dismiss, the Court must accept the government's factual allegations as true.

In sum, the government has alleged sufficiently detailed facts to support a reasonable belief that it will be able to establish by a preponderance of the evidence that defendant investment portfolios are subject to forfeiture. Fed. R. Civ. P. Supp. R. G(2)(f). And the government has pled the circumstances from which the claims arise with such particularity that the claimants should be able to commence an investigation of the facts and frame a responsive pleading. No more is needed at this stage.

## CONCLUSION

For the foregoing reasons, claimants' motion to dismiss will be denied. A separate Order accompanies this Memorandum Opinion.


_____/s/_____
JOHN D. BATES
United States District Judge

Dated: March 19, 2015

30