**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-cv-1832 (JDB) |
| | ) | |
| ALL ASSETS HELD IN ACCOUNT NUMBER | ) | **Redacted Version** |
| 80020796, IN THE NAME OF | ) | |
| DORAVILLE PROPERTIES CORPORATION, | ) | |
| AT DEUTSCHE BANK INTERNATIONAL, | ) | |
| LIMITED IN JERSEY, CHANNEL ISLANDS, | ) | |
| AND ALL INTEREST, BENEFITS, OR ASSETS | ) | |
| TRACEABLE THERETO, *ET AL.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**CLAIMANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
CLAIMANTS' MOTION TO COMPEL PRODUCTION OF RESPONSIVE
NON-PRIVILEGED DOCUMENTS**

---

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ....................................................................................................1

**STATEMENT OF FACTS** .........................................................................................................4

**ARGUMENT** .........................................................................................................................12

I.  The Non-Privileged Foreign Documents Are Relevant to THE GOVERNMENT'S
    CLAIMS AND Claimants' Defenses..................................................................................12

    A.  The Foreign Documents Are Relevant to the Government's Claims and
        Allegations in the Complaint ..................................................................................15

    B.  The Foreign Documents Are Relevant to Claimants' Defenses ...........................20

    C.  The Foreign Documents May Lead to Matters That Bear on the Claims and
        Defenses in this Litigation .....................................................................................25

    D.  The Government Has Conceded the Relevance of the Foreign Documents By
        Including Them on Its Privilege Logs ...................................................................25

    E.  The Discovery Sought is Proportionate to the Needs of This Case ......................26

II. The Relevant Foreign Documents Must Be Produced Because They Are Not
    Protected from Discovery By Treaty ................................................................................29

    A.  The Protective Order Entered In This Case Moots the Government's
        Confidentiality Concerns .......................................................................................29

    B.  The Government Has Not Carried Its Burden of Showing that the Foreign
        Documents Are Confidential and Protected From Disclosure Under
        International Treaties ..............................................................................................30

**CONCLUSION** .......................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

\* *Cienfuegos v. Office of the Architect of the Capitol*,
  34 F. Supp. 3d 1 (D.D.C. 2014) ....................................................................................29, 30

\* *Covad Commc'ns Co. v. Revonet, Inc.*,
  258 F.R.D. 5 (D.D.C. 2009) ................................................................................................30

\* *Dey, L.P. v. Sepracor, Inc.*,
  2010 WL 5094406 (S.D.N.Y. Dec. 8, 2010) ......................................................................26

*Feld v. Fireman's Fund Ins. Co.*,
  991 F. Supp. 2d 242 (D.D.C. 2013) ....................................................................................14

*Friedman v. Bache Halsey Stuart Shields, Inc.*,
  738 F.2d 1336 (D.C.Cir.1984) ............................................................................................34

*Haqq v. Standord Hosp. & Clinics*,
  No. C 06-05444 JW (RS), 2007 WL 902567 (N.D. Cal. Mar. 22, 2007) .......................13, 14

\* *U.S. ex rel. Landis v. Tailwind Sports Corp.*,
  303 F.R.D. 419 (D.D.C. 2014) ...........................................................................30, 31, 32, 34

\* *Laxalt v. McClatchy*,
  809 F.2d 885 (D.C. Cir. 1987) ............................................................................................30

\* *Nozinich v. Johnson & Johnson, Inc.*,
  2011 WL 13124088 (W.D. Tenn. Feb. 22, 2011) ................................................................26

*U.S. ex rel. Shamesh v. CA, Inc.*,
  314 F.R.D. 1 (D.D.C. 2016) ................................................................................................13

*St. John v. Napolitano*,
  274 F.R.D. 12 (D.D.C. 2011) ..............................................................................................13

\* *U.S. v. Painting Known as "Le Marche,"*
  No. 06 Civ. 12994(RJS)(KNF), 2008 WL 2600659 (S.D.N.Y. June 25, 2008) ..................35

\* *Woodruff v. Am. Fam. Mut. Ins. Co.*,
  291 F.R.D. 239 (S.D. Ind. 2013) .........................................................................................14

**Statutes**

18 U.S.C. § 981 .................................................................................................................7

18 U.S.C. § 1956(h) ..........................................................................................................6

18 U.S.C. § 1957(a) ..........................................................................................................6

**Treaties**

* Treaty on Mutual Legal Assistance in Criminal Matters, U.K.-N. Ir.-U.S., 1986
    U.S.T. LEXIS 157 (July 3, 1986). .........................................................................15

* Treaty with Nigeria on Mut. Legal Assistance in Criminal Matters, S. Treaty
    Doc. No. 102-26, 1989 WL 1686136 (Sept. 13, 1989)...........................................22

* Treaty with the United Kingdom on Mut. Legal Assistance on Criminal Matters,
    S. Treaty Doc. No. 104-2, 1994 WL 855115 (Jan. 6, 1994)..............................32, 33

**Rules**

Federal Rule of Civil Procedure 26(b)(1) ........................................................12, 13, 6

Federal Rule of Civil Procedure 37(a) ............................................................................1

## PRELIMINARY STATEMENT

Pursuant to Federal Rule of Civil Procedure 37(a), Claimants, by and through their undersigned counsel, submit this memorandum in support of an Order compelling the United States (the "U.S." or "Government") to produce over 1,600 non-privileged documents responsive to Claimants' document requests that indisputably concern allegations in the Complaint and defenses raised by Claimants. These documents consist primarily of communications between and among the U.S., foreign governments, and/or foreign third parties (the "Foreign Documents") concerning allegations in the Complaint. The Government withheld the Foreign Documents from production and identified them on five different privilege logs, not because they are legally privileged in any way, but rather because the Government claims that the Foreign Documents are confidential under unspecified provisions of various international treaties. However, as confidential documents are more than adequately protected by this Court's Litigation Protective Order and Agreement (the "Protective Order," ECF No. 85), any concern about preserving confidentiality cannot justify a refusal to produce the documents. Notably, after Claimants challenged the Government's purported basis for withholding the Foreign Documents, the Government, for the first time (despite affirmatively including the Foreign Documents on its privilege logs) argued without basis that *none* of the over 1,600 Foreign Documents are relevant to any of the claims or defenses in this action. The Court should reject this post-hoc justification and order the Government to produce the Foreign Documents.

Even a cursory review of the Government's privilege logs show that the Foreign Documents are highly relevant to the Government's allegations in its Verified Complaint for Forfeiture *In Rem* (the "Complaint," ECF No. 1) and Claimants' defenses to the Government's claims for forfeiture. Not only was the Government under no obligation to include non-

privileged non-relevant documents on its privilege logs, it had multiple opportunities to designate the Foreign Documents as not relevant, but failed to do so until Claimants' challenged the validity of the Government's baseless privilege claims. Tellingly, in a recent update to one of its privilege logs, the Government marked only six Foreign Documents as unrelated to this action. Under these circumstances, the Court should find that the Government has already conceded the relevance of these documents.

The Government has not, and cannot, show that *every one* of the Foreign Documents is irrelevant to the claims and defenses in this action. To the contrary, the Foreign Documents' privilege log descriptions indicate that they include: (1) requests under Mutual Legal Assistance Treaties ("MLAT(s)") exchanged between the U.S. and other countries, including Nigeria, the U.K., the Isle of Jersey, and France, which relate to allegations in the Complaint; (2) associated MLAT-related communications, dating as far back as 1999, which obviously relate to the investigation of the alleged conduct and defenses in this litigation; and (3) other relevant communications that do not appear to be connected to specific MLAT requests, but nonetheless relate to the allegations of the Complaint and Claimants' defenses, including: (i) the individuals, financial institutions, accounts, and financial instruments referenced in the Complaint; (ii) information from foreign proceedings and investigations concerning the alleged criminal activities that form the basis for the Complaint; (iii) the extradition proceeding commenced by the U.S. against Abubakar Atiku Bagudu; and (iv) the settlement agreement between Nigeria and Mr. Bagudu which resulted in Nigeria's release of all claims against the assets the Government alleges are traceable to the Claimed Property.[1]

---

[1] In this action, the U.S. seeks forfeiture of assets referred to in the Complaint as Assets (a) through (p). Claimants have filed verified claims and statements of interest with respect to Assets (h) through (k) (the "Claimed Property").

The Foreign Documents not only bear on the Government's core allegations, but also help establish Claimants' defenses, particularly their due process defense, which highlights the Government's inexcusable, decade-plus delay in bringing this action. The Foreign Documents likely show, or will assist Claimants in identifying evidence of, the specific information the Government obtained about the allegations in its Complaint, how and when the U.S. obtained the information, and the reasons why the U.S. did not act promptly on the information. The Foreign Documents also include documents and communications concerning the Government's 2003 extradition proceeding against Mr. Bagudu and his resulting settlement with Nigeria, which declared the assets the Government alleges are traceable to the Claimed Property free from any claims by Nigeria, on behalf of Nigeria, or for Nigeria's benefit. Claimants believe that the Government should be bound by Mr. Bagudu's settlement agreement with Nigeria, since the U.S. is purportedly acting for the benefit of Nigeria in this action. The Foreign Documents also include communications between the U.S. and other countries concerning Mr. Bagudu before his extradition proceeding and settlement with Nigeria, the Government's facilitation of the settlement (including potential involvement in settlement discussions/decisions), and the Government's eventual dismissal of the extradition proceeding after the settlement was executed.

Instead of producing these relevant documents, the Government self-servingly claims that a broad new privilege purportedly precludes discovery of all documents exchanged between the U.S. and foreign countries or third parties during the investigation of the Complaint's allegations or the tracing of assets the Government seeks to forfeit. Notably, the Government has not cited any case law in support of its novel privilege claim, and disregards the Court's Protective Order, which was created to avoid unnecessary discovery disputes like this. The Government's position is also contrary to precedent in the District of Columbia where Judge Cooper has ruled that

international treaties do not bar production in a civil action absent express congressional intent to the contrary.

The Government is obligated to produce relevant documents in discovery results from the Government's voluntary decision to file this civil forfeiture action. The Court should not allow the Government to shield itself behind the penumbras of various international treaties to gain a tactical advantage over Claimants in an action that it chose to commence. For all of these reasons, and as set forth below, the Court should grant Claimants' Motion to Compel (the "Motion") and order the Government to produce the Foreign Documents.

## **STATEMENT OF FACTS**

The Government filed its Complaint on November 18, 2013, seeking forfeiture of assets allegedly derived from various money laundering offenses, including two allegedly unlawful schemes in Nigeria: one regarding so-called national security votes (the "Security Votes Transaction"), and another concerning a commercial deal involving Nigeria's repurchase of large amounts of its own debt (the "Debt Buy-Back Transaction"). (Compl. ¶¶ 1-2, 25-29, 36-44). The Government alleges that funds derived from these alleged unlawful activities were transferred out of Nigeria to bank accounts in Europe, in part through U.S. correspondent banks, by Mr. Bagudu "and/or" Mohammed Sani Abacha. (*Id*. at ¶¶ 30-35). The Government alleges that the proceeds from the alleged transactions were purportedly laundered through the purchase of Nigerian Par Bonds ("NPBs") and Payment Adjustment Warrants ("PAWs"). (*Id*. at ¶¶ 52-93). NPBs and PAWs with a face value of $490 million were allegedly purchased and held at Australia and New Zealand Bank ("ANZ") in London. (*Id*. at ¶ 58). The Government alleges that the Claimed Property is traceable to proceeds from the liquidation of $90 million (face value) of those NPBs and related PAWs. (*Id*. at ¶¶ 79-86).

On May 1, 2014, Claimants timely filed verified claims of interest in the Claimed Property. (*See* Claimants' Verified Claims and Statements of Interest, May 1, 2014, ECF Nos. 17-19, 21-25). On July 7, 2014, Claimants filed a motion to dismiss the Complaint with respect to the Claimed Property. (*See* Claimants' Mot. to Dismiss, July 7, 2014, ECF. No. 55). Claimants argued, among other things, that the Government has known of the allegations underlying its Complaint and the existence of the allegedly forfeitable funds and their origin since at least 2003. (*Id*. at 1, 9, 14). In that year, the Government detained Mr. Bagudu and initiated an extradition proceeding against him, upon the request of the Isle of Jersey, based on allegations similar to those raised in the Complaint. (*See id*.) In the course of the extradition proceedings, the Government allowed Mr. Bagudu to travel to Nigeria to resolve various charges and controversies related to the assets the Government alleges are traceable to the Claimed Property. Mr. Bagudu's settlement with Nigeria provided that: (1) Nigeria "shall renounce any interest whatsoever whether of a legal or beneficial nature" to the assets the Government alleges are traceable to the Claimed Property; (2) "[n]o claim of any kind at all will attach to" those assets; and (3) those assets "will be held . . . free from any claims existing or future, direct or indirect, contemplated or otherwise," by Nigeria, "or in whole or part at its behest or on its behalf or for its benefit."[2] Once the settlement was executed, Jersey withdrew its extradition request and the Government dismissed its extradition proceeding against Mr. Bagudu.

At no point prior to the instant proceeding did the Government initiate any action against Mr. Bagudu or the Claimed Property. Rather, through its conduct, the Government embraced, facilitated, and helped effectuate the terms of the settlement. For example, as recently as 2011, during Mr. Bagudu's campaign for elective office in Nigeria, the Government did not oppose

---

[2] *See* August 21, 2003 Settlement Agreement Between the Federal Republic of Nigeria and Abubakar Atiku Bagudu, as amended, annexed to the Declaration of Patrick T. Campbell in Support of Claimants' Motion to Dismiss, dated July 7, 2014 as Exhibits I, at 12, ¶ 7.10(b), ECF. No. 55-10 & K, ECF No. 55-12.

Mr. Bagudu's request for the U.S. District Court for the Southern District of Texas to expunge all records related to his 2003 extradition proceeding.  (*See* Decl. of Patrick T. Campbell in Support of Claimants' Mot. to Dismiss, July 7, 2014, Ex. E, Davidson Aff. at Ex. CAD 3, at 1, CAD 6, at 2, ECF No. 55-6).  Against this backdrop, Claimants' argued that the Government's delay in bringing this forfeiture action violates Claimants' Fifth Amendment due process rights.

Claimants also argued that, despite the volume of information the Government has possessed for more than a decade concerning its forfeiture allegations and the Claimed Property, the Government failed to sufficiently allege that any person knowingly engaged in money laundering transactions, and also failed to sufficiently trace the proceeds of alleged criminal activity to the Claimed Property sufficiently.[3]  On March 19, 2015, the Court denied Claimants' motion, finding the Complaint sufficiently pled for the purposes of surviving a motion to dismiss.  (Order, at 1, March 19, 2015, ECF. No. 79).  However, concerning Claimants' due process claims, the Court held that, "[a]t this point in the proceedings, it is premature for the Court to consider claimants' due process argument," because "Claimants' constitutional argument requires the Court to consider evidence outside of the pleadings, and hence cannot be resolved on the current motion to dismiss."  (*Id*. at 15).

On May 4, 2015, Claimants filed Answers to the Complaint and asserted Affirmative Defenses, including: (1) the forfeiture of the Claimed Property would violate Claimants' due process rights; (2) the Government cannot prove illegal conduct, including the elements of money laundering under 18 U.S.C. § 1957(a), and the elements of conspiracy to commit money laundering under 18 U.S.C. § 1956(h) necessary to forfeit the Claimed Property; (3) the

---

[3] Claimants further argued that the Court lacked jurisdiction to entertain this case, as there are virtually no contacts between the Claimed Property and the U.S., and that this litigation violated the doctrines of international comity and/or act of state, because the Federal Republic of Nigeria already dismissed its litigation against Mr. Bagudu and declared the assets that the Government alleges are traceable to the Claimed Property free from any claims by Nigeria or for its benefit.  (*See* Claimants' Mot. to Dismiss, at 24, 47, ECF No. 55).

Government's claims for forfeiture are barred due to its failure to trace seized funds under 18 U.S.C. § 981 or demonstrate that seized funds were involved in money laundering defenses; and (4) the Government's claims for forfeiture are barred because the assets the Government alleges are traceable to the Claimed Property were declared by Nigeria to be free and clear of all claims under its settlement agreement with Mr. Bagudu.

Claimants thereafter began to investigate the Government's allegations and develop their defenses through discovery.  On April 29, 2015, the Court entered a Scheduling Order managing discovery between the parties and the Protective Order governing the treatment of confidential information exchanged in discovery.  (Protective Order, at 12-18).  Promptly thereafter, on May 11, 2015, Claimants served their First Set of Requests for Production (the "Document Requests") on the Government.  (*See* Decl. of Patrick T. Campbell in Support of Motion, Nov. 4, 2016 ("Campbell Decl."), Ex. 1, Claimants' First Set of Requests for Production, May 11, 2015).  Claimants propounded 40 document requests narrowly tailored to seek discoverable information related to the claims and defenses of this litigation, including the following requests concerning the discovery of relevant documents and communications the Government exchanged with foreign governments and other foreign third parties:

- All documents and communications concerning Mr. Bagudu, including documents related to the Government's extradition proceeding against him (Request No. 3);

- All documents and communications concerning the settlement agreement between Nigeria and Mr. Bagudu (Request No. 19);

- All documents and communications concerning Nigeria's renouncement of any interest in the Claimed Property (Request No. 21);

- All documents and communications concerning the Government's interactions with any other country concerning the allegations of the Complaint (Request No. 22);

- All documents and communications concerning Enrico Monfrini, a representative of Nigeria during the relevant time period, or his law firm, Monfrini Crettol & Partners (Request No. 23);

- All subpoenas, letters rogatory, MLAT requests, or other requests the U.S. received from, or submitted to, other countries concerning the allegations of the Complaint, and materials produced in response to those requests (Request Nos. 24-27, 34-37);

- All documents and communications concerning court orders issued in U.K. proceedings involving the frauds alleged in the Complaint (Request No. 28); and

- All documents and communications concerning the Special Investigation Panel established by Nigeria referenced in the Complaint, and concerning Abdulsalam Abubakar and Peter Gana regarding their work on the panel (Request Nos. 29-30).

On May 12, 2015, the Government informed Claimants that it "expects to produce non-privileged, unclassified documents responsive to the Claimants' discovery requests on a rolling basis." (*See* Campbell Decl. Ex. 2, Letter from Aloi, at 1 (June 10, 2015)). On June 10, 2015, the Government served its responses to Claimants' Document Requests. (*See id*.) The Government responded to a majority of the Document Requests, including Request No. 22, by agreeing to produce non-privileged, unclassified documents responsive to the requests. (*See, e.g.,* Campbell Decl. Ex. 3, Pl.'s Response to Claimants' Document Requests, ¶¶ 20, 22, and 24-25).

Between June 10 and July 13, 2015, the Government produced documents in response to Claimants' requests. On September 11, 2015, the Government produced three privilege logs, "identifying privileged documents withheld from production." (*See* Campbell Decl. Ex. 4, Letter from Aloi, at 1 (Sept. 11, 2015)). The portions of these logs that identify the Foreign Documents at issue in Claimants' Motion are attached to the Campbell Decl. as Exhibits 5-7. The Government noted that its first privilege log ("Initial Privilege Log 1") "includes material under the custody or control of the Asset Forfeiture & Money Laundering Section of the United States

Department of Justice, including material gathered from the Federal Bureau of Investigation (FBI)," and that the second and third logs ("Privilege Log 2" and "Privilege Log 3," respectively) identify "privileged ESI materials and privileged paper documents under the custody or control of the FBI." (*See* Campbell Decl. Exs. 5, 6, and 7). The Government made *no* mention of "relevance," or the lack thereof, in its September 11, 2015 letter serving the three privilege logs. (*See* Campbell Decl. Ex. 4.) The Government's privilege logs themselves, particularly Initial Privilege Log 1, did not identify "relevance" as an objection. (*See* Campbell Decl. Exs. 5, 6, and 7). Indeed, Initial Privilege Log 1 included a column titled "Relevance Comment" which the Government used to provide details concerning certain relevant and responsive documents. (*See* Campbell Decl. Ex. 5). In March 2016, the Government produced another two privilege logs (*see* Campbell Decl. Exs. 8 and 9), attaching excerpts of Privilege Logs 4 and 5 that identify Foreign Documents.

In all, the Government withheld from production over 7,700 documents, of which over 1,600 Foreign Documents were withheld on the purported basis that they are confidential intergovernmental communications that are protected from disclosure by agreements, understandings, or treaties."[4] Notably, the Government's privilege logs made no references to the specific treaties, which purportedly provided the basis for withholding the Foreign Documents. Therefore, on November 12, 2015, Claimants challenged in writing the Government's withholding of the Foreign Documents and requested the Government's "basis for asserting these documents are confidential," and the citations "to the applicable treaty" for each document. (*See* Campbell Decl. Ex. 10, Letter from Campbell, at 3-4 (Nov. 12, 2015)). On

---

[4] For the vast majority of the Foreign Documents, the Government merely asserted, "Confidential Intergovernmental Communications; Protected from Disclosure by Treaty." The Government also asserted the attorney-client privilege, work product doctrine, deliberative process privilege, and law enforcement privilege for a small number of Foreign Documents.

November 24, 2015, the parties met, conferred, and the Government agreed to "identify the applicable treaty or agreement" that applied to the documents on its privilege log.  (*See* Campbell Decl. Ex. 11, Letter from Campbell, at 2 (Dec. 3, 2015)).  During the November 24, 2015 meet-and-confer, the Government made no mention of logging documents on its privilege logs that were not relevant to this action.   (*See* Campbell Decl. ¶ 2).

On February 26, 2016, the U.S. provided Claimants with a "non-exhaustive list of treaties or agreements with foreign nations implicated on the government's privilege logs," but failed to identify which treaties, or treaty provisions, applied to its privilege log entries, as requested by Claimants.  (*See* Campbell Decl. Ex. 12, Letter from Aloi, at 1 (Feb. 26, 2016)).  No relevance objection was noted in the Government's February 26 response.  (*See id*.)  After analyzing the treaties and agreements cited by the Government, on May 9, 2016, Claimants served the Government with a deficiency letter challenging its "non-exhaustive list of treaties or agreements" as an insufficient basis for withholding the Foreign Documents.  (*See* Campbell Decl. Ex. 13, Letter from Campbell, at 2 (May 9, 2016)).  Claimants' deficiency letter challenged approximately "1,386 entries appearing to identify documents and communications exchanged between the United States and foreign nations which the United States is withholding from production to Claimants solely on the basis of confidentiality under treaties or agreements with foreign nations."  (*Id*. at 2).  The letter emphasized that the U.S. had failed to carry "its burden for withholding the Foreign Documents from production."  (*Id*.)  The letter also stressed that "even assuming the United States can carry its burden of showing the Foreign Documents are confidential under one or more Treaties, which it cannot, the United States may not withhold documents from production on confidentiality grounds alone in a case that has a protective order

in place." (*Id*.)  Thereafter, Claimants immediately called for a meet-and-confer to discuss their challenges to the Government's privilege logs.

During a May 26, 2016 telephonic meet-and-confer, the Government argued for the first time that the Foreign Documents were *not relevant* to this action, and refused to discuss the propriety of the Government's withholding of the Foreign Documents on the bases identified in its privilege logs.  (*See* Campbell Decl. Ex. 14, Letter from Campbell, at 1 (May 27, 2016)).  On June 2, 2016, in a follow-up letter to the meet-and-confer, the Government claimed—also for the first time—that it provided "a log of materials responsive to [Claimants'] request . . . in a good faith effort to have [a] meaningful conversation about the materials [Claimants] seek." (Campbell Decl. Ex. 15, Letter from Khoo, at 1 (June 2, 2016)).  With this cursory pivot, the Government, presumably realizing that its treaty confidentiality arguments could not prevail, refused Claimants' multiple attempts to engage in a meaningful discussion about its withholding of the Foreign Documents on the basis of international treaties and agreements, and instead, conveniently focused solely on "relevance" as its basis for withholding the Foreign Documents. (*See* Campbell Decl. Ex. 16, Letter from Campbell (July 8, 2016)).

On August 26, 2016, Claimants sent another letter to the Government challenging additional privilege log entries, which brought the total number of Foreign Documents challenged to over 1,600.  (Campbell Decl. Ex. 17, Letter from Campbell, at 1 (Aug. 26, 2016)). Among other things, Claimants challenged "approximately 222 attachments that were not accounted for in the document list attached to [Claimants' May 9, 2016] letter." (*Id*. at 11.)  "Of the 222 attachments, 143 of them provide[d] no basis to assess their privilege designations, i.e.,

no e-mail or author information was provided, and in some cases, privilege designations were omitted entirely."[5]  (*Id.*)

Thereafter, Claimants met and conferred with the Government on several occasions, which resolved a few matters unrelated to the Foreign Documents and ultimately led to the Government's production of an updated Privilege Log 1 on September 23, 2016 (the "Updated Privilege Log 1").  (*See* Campbell Decl. Ex. 18).[6]  Nonetheless, the Government continued to refuse to discuss its rationale for withholding the Foreign Documents on the basis of confidentiality under international treaties.  On September 19, 2016, Claimants' requested a conference with the Court to resolve the issue.  The Court set the matter for discussion at a previously scheduled October 5, 2016 status conference and, at the conference, ordered Claimants to file an appropriate motion and accompanying memorandum addressing the relevance and privilege issues in connection with the Government's improper withholding of the Foreign Documents.

## ARGUMENT

### I.    THE NON-PRIVILEGED FOREIGN DOCUMENTS ARE RELEVANT TO THE GOVERNMENT'S CLAIMS AND CLAIMANTS' DEFENSES

The Foreign Documents bear directly on Claimants' defenses, the Government's claims and allegations in the Complaint, and may also lead to matters that bear on the claims and defenses in this case.  The Foreign Documents are therefore relevant to the claims and defenses in this action and are within the scope of permissible discovery under Federal Rule of Civil Procedure 26(b)(1).

---

[5] In preparation for Claimants' Motion, Claimants re-analyzed the attachments that were not identified in its May 9, 2016 letter, and found an additional five attachments that the Government is inappropriately withholding.  These additional log entries are included in the Initial and Updated Privilege Logs 1, attached to the Campbell Decl. at Exs. 5 and 18.

[6] For the sake of clarity, Claimants are challenging the Foreign Documents the Government withheld and identified on Updated Privilege Log 1 and Privilege Log Nos. 2-5 (Campbell Decl. Exs. 6-9, 18).

Parties to a litigation "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).   Relevance is interpreted broadly for the purposes of discovery to "'encompass any matter that bears on, or that reasonably could lead to other matters that bear on,' any party's claim or defense." *U.S. ex rel. Shamesh v. CA, Inc.*, 314 F.R.D. 1, 8 (D.D.C. 2016) (citation omitted); *St. John v. Napolitano*, 274 F.R.D. 12, 15-16 (D.D.C. 2011). This Court has noted that, "even if there's a relevance claim . . . often documents that are marginally relevant are produced nonetheless, if it's not burdensome to do so and there isn't really a legal privilege claim." (*See* Campbell Decl. Ex. 19, Tr. of Status Hr'g, 13:8-16, Oct. 5, 2016).

Ordinarily, when a relevancy objection is made to a party's discovery requests, the party seeking discovery must demonstrate that the materials sought in its requests are relevant. *See Shamesh*, 314 F.R.D. at 8. Thereafter, once the moving party has established that the sought materials are relevant, the objecting party bears the burden of showing why the material should not be produced. In this case, however, the Government has logged over 1,600 documents responsive to Claimants' documents requests that it now purports are not relevant to the claims and defenses of this action. While, as set forth more fully below, Claimants can identify general categories and specific illustrative examples of relevant Foreign Documents, the Government's privilege logs in many cases do not contain sufficient information for Claimants to establish that each document is relevant, nor is it feasible for Claimants to do so in this motion. *See, e.g.,*

*Haqq v. Standord Hosp. & Clinics*, No. C 06-05444 JW (RS), 2007 WL 902567, at *2 (N.D. Cal. Mar. 22, 2007) (finding that relevance is "not a matter that can easily be evaluated based on entries on a [privilege log].").

The issue presently before this Court is whether the specific documents identified on the Government's privilege logs should be withheld, rather than whether the Claimants' document requests seek the production of relevant documents (which they do).  Thus, the Government should be considered to be in the same position as if it were defending against challenges to documents that it withheld on the basis of privilege.  *See Feld v. Fireman's Fund Ins. Co.*, 991 F. Supp. 2d 242, 248 (D.D.C. 2013) ("[T]he proponent of a privilege bears the burden of demonstrating facts sufficient to establish the privilege's applicability.") (citation omitted).  Indeed, at least one other district court has required a party who claimed that its privilege log contained irrelevant documents to explain, on a document by document basis, why the documents were not relevant.  *See Woodruff v. Am. Fam. Mut. Ins. Co.*, 291 F.R.D. 239, 242 (S.D. Ind. 2013) (finding that when a party makes a "blanket assertion that . . . documents identified on its privilege log [are] irrelevant," but fails to explain "on a document-by-document basis" why "it claims these documents are not relevant," the party has "waived its relevancy objections.").

The Government cannot support its objection to the relevance of any of the Foreign Documents, let alone to every single one of the more than 1,600 documents they logged.  As demonstrated below, the Foreign Documents bear on the very heart of the claims and defenses in this case: (1) the Government's proof, or lack thereof, of the unlawful conduct and money laundering allegations in the Complaint; (2) evidence, conflicting evidence, or lack of evidence concerning the tracing of assets; (3) the identification of potential witnesses related to the

allegations of the complaint or the tracing of assets; (4) the identification of evidence or witnesses that are no longer available due to the Government's unnecessary and unjustifiable delay in bringing its action; (5) the identification of statements by the Government or facts that can be used in cross examination or to identify facts that can be use in cross examination; and (6) the identification of facts, witnesses, and evidence related to Claimants' affirmative defenses based on the settlement agreement between Nigeria and Mr. Bagudu and the Government's violation of Claimants' due process rights.

### A.   The Foreign Documents Are Relevant to the Government's Claims and Allegations in the Complaint

Even a cursory review of the Government's broad descriptions on its privilege logs confirms that the Foreign Documents bear on the allegations in the Complaint.  First, several of the over 1,600 Foreign Documents appear to be MLAT requests the Government received from or submitted to Nigeria, the U.K., or Jersey, among others.  These MLAT requests likely contain, among other things: (1) a description of "the subject matter and nature of the investigation or proceeding for the purposes of which the request is made and in particular the criminal offense or offenses for the investigation, prosecution or suppression of which the assistance is requested"; (2) "information concerning the persons involved including, where available, their full names, dates of birth, and addresses"; and (3) "the information relied upon in support of the request." *See, e.g.,* Treaty on Mutual Legal Assistance in Criminal Matters, U.K.-N. Ir.-U.S., July 3, 1986, 1986 U.S.T. LEXIS 157, Form and Contents of Requests, Article 4, 2(b).  There is no doubt that this type of information generally contained in MLAT requests will assist in the identification and location of witnesses, evidence, facts, and potential impeachment material that is directly related to the allegations of the Complaint, Claimants' defenses, or asset tracing issues.  In some cases, the MLAT requests likely include statements of fact by the Government on the results of

its investigation and tracing efforts, critical cross examination evidence not available from any other source.

For example, Updated Privilege Log 1 shows that on or around November 4, 1999, the U.S. Department of Justice (the "DOJ") received a MLAT request from Nigeria, entitled "Request for Mutual Assistance in the Fight Against Corruption and to Recover Looted Public Funds from Mohammed Sani Abacha, Abubakar Atiku Bagudu, Ismaila Gwarzo and Other Family Friends of the Abachas." (Campbell Decl. Ex. 5, USDOJ Updated Priv. Log 1, P-DOJ-00007196-7200). From the Government's description, it is evident that this MLAT request contains information directly related to Mr. Bagudu and the tracing of allegedly looted public funds from Nigeria, and thus is relevant to the allegations in the Government's Complaint.

Moreover, although the Government claims to have produced all documents sent or received in response to MLAT requests, emails and other correspondence among law enforcement investigating the same alleged crimes and assets are also likely to contain substantive information concerning the allegations in the Complaint, the tracing of assets, the existence and location of evidence or witnesses, or impeachment material. For example, the U.S. appears to have exchanged correspondence with Peter Gana concerning MLAT requests from Nigeria. (Campbell Decl. Ex. 18, USDOJ Updated Priv. Log 1, P-DOJ-00007167-68, P-DOJ-00007213-7217). Peter Gana was not only Nigeria's Assistant Commissioner of Police, he was also the Chairman of a Special Investigation Panel (the "SIP") established by Nigeria shortly after General Abacha's death. The Complaint alleges that the SIP "found that General Abacha and his co-conspirators had used the false security votes letters to steal and defraud more than $2 billion in public funds." (Compl. ¶ 29). Among the withheld Foreign Documents is a six-page, February 11, 2002 letter from Mr. Gana "to J. Joseph Brent, ALAT Lagos, regarding [a] forensic

analysis report for U.S. account, forwarding correspondence between Mr. Gana and Enrico Monfrini regarding mutual assistance efforts." (*See* Campbell Decl. Ex. 9, USDOJ Priv. Log 5, 163-LG-46, at 17, ¶ 59). Clearly, all documents to, from, and regarding the SIP and Mr. Gana are directly related to the allegations in the Complaint, in particular those documents related to the assistance Nigeria requested from the U.S. concerning its own investigation of the facts alleged in the Complaint.

The MLAT requests and related correspondence comprise only a portion of the over 1,600 Foreign Documents the Government is withholding from production. The Foreign Documents also include numerous communications that do not appear to be related to MLAT requests, but nonetheless concern the allegations in the Complaint. ██████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

Other examples of relevant Foreign Documents not apparently related to any MLAT requests include documents concerning the banks and accounts allegedly used to commit the crimes alleged in the Complaint or launder criminal proceeds. For example, Updated Privilege Log 1 identifies a number of e-mail communications between the U.S. and foreign countries or third parties dating from June, October, and November 2007, relating to "ANZ" or "ANZ Documents." (*See* Campbell Decl. Ex. 18, USDOJ Updated Priv. Log 1, P-DOJ-00003497, P-DOJ-00004472-4473,     P-DOJ-00004596,     P-DOJ-00005017,     P-DOJ-00005020-5022).

Documents relating to ANZ may concern the alleged money laundering at the heart of this case and/or the Government's ability, or inability, to trace allegedly tainted funds to the Claimed Property.  The Government has alleged that the NPBs and PAWs, purportedly purchased with funds derived from the alleged Security Votes Transaction, were pooled at ANZ London and then transferred to assets purportedly traceable to the Claimed Property.  (*See* Compl. ¶¶ 30-35). In addition, the Government has specifically alleged that Mr. Bagudu "was an authorized signatory" on ANZ London accounts.  (*Id*. at ¶¶ 17, 30).  ANZ's importance to the Government's claims is reflected further in its August 16, 2016 Supplemental Interrogatory Response, which identified several current and former ANZ Bank employees, which the Government "formally or informally interviewed."  (*See* Campbell Decl. Ex. 21, Pl.'s Second Supplemental Response to Interrogatory 2, at 2, Aug. 16, 2016).  Likewise, Privilege Log 2 includes a seven-page report from Credit Agricole Indosuez "re UK related transactions."  (*See* Campbell Decl. Ex. 6, USDOJ Priv. Log 2, at 37, ¶ 233).  The Complaint alleges that the Claimed Property is traceable to NPBs and PAWs that Mr. Bagudu transferred to accounts at Credit Agricole Indosuez.  (Compl. ¶¶ 79-86).  As a result, documents relating to ANZ and Credit Agricole, and similar types of documents and communications identified in the Government's privilege logs are, at the very least, relevant to the Government's efforts to trace funds and gather facts.

The Foreign Documents also include various French Financial Intelligence Unit ("FIU") letters, including a seven-page, 2008 French FIU letter concerning the exchange of information regarding "the framework of an investigation concerning money laundering and/or terrorism financing – Sani Abacha," which bears on the money laundering and asset tracing allegations of the Complaint.  (USDOJ Updated Priv. Log 1, P-DOJ-00007584-7591).  The Government also

received notes concerning "NPBs" and the "security votes scheme" from attorneys instructed by Jersey.  (Campbell Decl. Ex. 5, USDOJ Priv. Log 1, P-DOJ-00004628).

The Government's privilege logs further identify documents related to foreign litigations concerning the same alleged frauds and monetary transfers at issue in this action, which the Government utilized to build its case.  For example, the Government received: (1) a six-page letter from "Norton Rose to James & Sarch re Compagnie Noga v Australia and New Zealand Banking Group Limited" dated April 21, 1999; (2) a three-page letter from "James & Sarch to Credit Agricole Indosuez re 'Compagnie Noga v. ANZ and Others,' with fax cover sheets from Margaret Garner to Clive Moore" dated April 12, 1999; (3) a 15-page letter from "Credit Agricole Indosuez to James & Sarch re 'Campagnie Noga v. ANZ Banking group Limited and Others" dated April 1, 1999; and (4) a 15-page letter from Credit Agricole Indosuez to James & Sarch "re 'Compagnie Noga v. ANZ banking Group Limited and Others,' attaching Account Position Inquiries and memorandum from Peter Aves to Edmund Charles dated 11/11/1998." (*See* Campbell Decl. Ex. 6, USDOJ Priv. Log 2, at 38-39, ¶ 234-36; 39, ¶ 244).  Even the limited information provided in the privilege logs related to these documents demonstrates that the documents are relevant and discoverable.

The Government has argued that some of the Foreign Documents are not relevant to the claims and defenses in this case because "much of the withheld material relates to assets already forfeited in this litigation."  (*See* U.S. Mem. Describing Disc. Dispute ("U.S. Mem."), at 2, Oct. 3, 2016, ECF No. 128).  The Government's argument inappropriately narrows the scope of permissible discovery in this action, which concerns wide-ranging tracing and asset comingling allegations.  This is particularly inappropriate where the Government argued at the motion to

dismiss stage that actions and knowledge related to the already forfeited assets supported its case against the Claimed Property.

Documents concerning forfeited assets that are not the Claimed Property may still be relevant to the parties' claims and defenses, because the Complaint alleges that both the Claimed Property and the assets that were already forfeited were all derived from the proceeds of alleged crimes dating back to the mid-1990s. (*See* Compl. ¶¶ 1-3). The alleged proceeds of these crimes were purportedly transferred through various accounts and pooled and comingled at ANZ London as of November 20, 1998, the date the Government alleges that certain NPBs and PAWs were transferred from ANZ London to the alleged predecessor accounts of the Claimed Property. (Compl. ¶ 69). Therefore, any documents concerning the forfeited assets that bear on the Government's tracing allegations may also bear on the traceability of the Claimed Property and contain or lead to the discovery of valuable cross examination material. Similarly, any documents that relate to the financial transactions that allegedly constituted money laundering (i.e. the purchase, transfer, and liquidation of NPBs and PAWs), and the intent or knowledge of people involved in the transactions, bear on the claims and defenses at issue in this case regardless of the specific assets involved.

**B.     The Foreign Documents Are Relevant to Claimants' Defenses**

The Foreign Documents also bear on Claimants' defenses, which include the defense that the Government has violated Claimants' due process rights through its excessive, inexcusable, and prejudicial delay in bringing this forfeiture action; and that the settlement agreement between Nigeria and Mr. Bagudu bars the Government's claims for forfeiture against the Claimed Property. In order to succeed on their due process claims, Claimants seek to show that the Government's more than decade long delay in bringing this action: (1) prejudiced Claimants'

ability to defend themselves; and (2) was a purposeful device to gain a tactical advantage over Claimants.  (Order, at 13, ECF. No. 79).  The Court in deciding Claimants' motion to dismiss, held that it was premature to rule on their due process claims at the pleading stage, thus opening the door for Claimants' to take discovery on this defense.  (*Id*. at 15).  The Government should not be allowed to deny Claimants the discovery they are entitled to on one of their most important defenses.  Failure to provide such discovery would merely compound its violation of Claimant's due process rights.

Generally, the Foreign Documents may be relevant to: (1) the information the U.S. obtained about the allegations underlying the Complaint over the course of its more than a decade long investigation; (2) whether other relevant information may no longer be available to Claimants; (3) how and when the U.S. obtained that information or learned that relevant information was no longer available; and (4) the reasons why the U.S. chose not to act in a timely manner.  For example, certain privilege log entries indicate that DOJ and the Asset Forfeiture and Money Laundering Division of the DOJ ("AFMLS") reviewed Nigeria's MLAT requests, which involved Mr. Bagudu, as far back as 1999 (Campbell Decl. Ex. 18, USDOJ Updated Priv. Log 1, P-DOJ-00007196-7200), and the U.S. received charts with account information from Nigeria in 2001 (Campbell Decl. Ex. 9, USDOJ Priv. Log 5, 163-LG-46, at 16, ¶ 58).  The more than 10-year delay between the Government's becoming aware of the conduct allegedly giving rise to forfeiture in this case—much of which dates back to the mid-1990s—is considerable and prejudicial.  Claimants therefore need the Foreign Documents the Government is withholding to support their due process defense and to discover additional documents, facts, and evidence relevant to the defense.

The Government has erroneously argued that "the requested MLAT requests and the

related correspondence are not relevant to any claim or defense in this forfeiture action." (*See* U.S. Mem., at 2.)   However, as noted above, the Government's position is contradicted by the very documents it seeks to withhold.   Indeed, by November 1999, the Government was well aware that Nigeria's asset recovery request to the U.S. involved Mr. Bagudu.   (Campbell Decl. Ex. 5, USDOJ Priv. Log 1, P-DOJ-00007196-7200).   The 1999 Nigerian MLAT request undoubtedly also contained information about the ███████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Treaty with Nigeria on Mut. Legal Assistance in Criminal Matters, S. Treaty Doc. No. 102-26, 1989 WL 1686136, Article IV, at *7-8 (Sept. 13, 1989) (requiring the request to include, among other things, "a description of the subject matter and nature of the investigation, prosecution, or proceeding, including the specific crimes which relate to the matter . . .")).   Similarly, the other withheld MLAT requests and related correspondence will likely provide critical information about what exactly the Government knew at various points in time prior to the filing of the Complaint or enable Claimants to identify and request documents that do illuminate these issues.

Many of the Foreign Documents also concern Mr. Bagudu's 2003 extradition proceeding, which is discussed in the Government's Complaint.   (Compl. ¶ 77).   These communications appear to range from: (1) the location of Mr. Bagudu, *see* Updated Priv. Log 1, P-DOJ-00008242 (February 2003 document concerning "Whereabouts of Bagudu"); (2) to his arrest, *see* Updated Priv. Log 1, P-DOJ-00007312-7315 (May 2003 correspondence between DOJ attorneys and Jersey officials concerning "US/Jersey communications re Bagudu arrest"); (3) to the extradition request, *see* Updated Priv. Log 1, P-DOJ-00009599-9601 (April 2003 "Supplemental Letter of Request re Extradition of Bagudu" exchanged between DOJ attorneys and Jersey officials); and

(4) the materials the U.S. received as part of the extradition request, *see* Updated Priv. Log 1, P-DOJ-00007293-7301 (July 2003 communications concerning "Bagudu: Case Overview"). Claimants have repeatedly argued that the Government "was well aware of the allegations that form the basis of the Complaint in this action as early as May 2003," due to the active role it played in the extradition proceeding. (*See* Claimants' Mot. to Dismiss, at 9, 14, July 7, 2014, ECF. No. 55). The Government detained Mr. Bagudu in connection with a 2003 extradition proceeding, which was at the request of the U.K. on behalf of Jersey, and based on allegations similar to those raised in the Complaint. (*See id*; Compl. ¶ 77). Yet, rather than file any charges against Mr. Bagudu for money laundering or seek the forfeiture of any assets traceable to the alleged unlawful conduct, the Government facilitated Mr. Bagudu's 2003 settlement with Nigeria, released him, and ultimately dismissed the extradition proceedings. (Compl. ¶ 77). Thus, the information learned by the Government in the course of the 2003 extradition proceeding, the nature of the investigation that it undertook, and the reasons for the actions it took (or did not take) at that time are directly relevant to the Claimants' due process defense, as well as to specific allegations made by the Government in the Complaint.

Foreign Documents related to other litigations dating from the early 2000s concerning assets that the Government alleges are traceable to the Claimed Property also bear on Claimants' due process defense. For example, in October and July 2001, the Government received a "Letter from Margaret Garner to B. O'Sullivan re Mecosta" and "Letters between Norton Rose and DJ Freeman re 'Federal Republic of Nigeria v. Union Bank of Nigeria,'" respectively. (*See* Campbell Decl. Ex. 6, USDOJ Priv. Log 2, at 38, ¶ 240-41). These documents may show when Government became aware of the location of property allegedly traceable to the Claimed

Property, the extent to which that property was already frozen by a U.K. Court, and whether the Government could have sought to forfeit the property at that time.

Finally, some of the Foreign Documents specifically relate to the Government's role in the discussions that led to the settlement agreement between Mr. Bagudu and Nigeria that was executed in 2003. That settlement agreement effectively resolved all outstanding actions against Mr. Bagudu by various nations and allowed him to retain and use, without restriction, the assets allegedly traceable to the funds the Government now seeks to forfeit. The Government has brushed aside the settlement agreement as irrelevant to this forfeiture action because, among other things, Nigeria's decision to settle with Mr. Bagudu should not bind the Government. (Pl.'s Opp'n to Claimants' Mot. to Dismiss, at 40, Oct. 17, 2014, ECF No. 73.) However, the Foreign Documents may demonstrate that the U.S. was not only aware of Mr. Bagudu's 2003 Settlement Agreement, but was also involved in negotiating and facilitating it, even before Jersey requested Mr. Bagudu's extradition from the U.S. For example, on March 15, 2002, officials from Jersey, the U.K., and the U.S., discussed "Negotiations between the Abachas and Nigeria." (*See* Campbell Decl. Ex. 18, USDOJ Updated Priv. Log 1, P-DOJ-00008010). On March 22, 2002, a DOJ attorney from AFMLS participated in a communication concerning "No Compromise of the Jersey Investigation." (Campbell Decl. Ex. 5, USDOJ Priv. Log 1, P-DOJ-00008315-8317). Indeed, the U.S. played a key role in securing and effectuating the settlement agreement, by releasing Mr. Bagudu from custody to travel to Nigeria to execute the agreement and thereafter dismissing its extradition proceeding against Mr. Bagudu. The withheld Foreign Documents will shed light on the specific nature of the U.S. involvement in the settlement, whether any agreements between the U.S. and other parties were discussed or reached as part of the settlement, and whether the U.S. acted as an agent of Nigeria in carrying out the terms of the

agreement such that it should also be bound by its terms.  Alternatively, the documents may assist Claimants in locating relevant witnesses, evidence, facts or cross examination material regarding these issues.

**C.      The Foreign Documents May Lead to Matters That Bear
on the Claims and Defenses in this Litigation**

The Government's privilege log entries show that the Foreign Documents are relevant because they may lead to matters that bear on the claims and defenses in this case.  For example, the Government's privilege logs reference several draft MLATs, which presumably indicate information that was initially sought but subsequently omitted from the final MLATs that were exchanged between the U.S. and other countries.  (*See, e.g.,* Campbell Decl. Ex. 18, USDOJ Updated Priv. Log 1, P-DOJ-00008241, P-DOJ-00008853-8861).  Also the Foreign Documents include several reports and analyses concerning the accounts at issue in the Government's Complaint.  (*See, e.g.,* Campbell Decl. Ex. 6, USDOJ Priv. Log 2, at 37, ¶ 233).  These documents, at the very least, contain information that may lead to matters bearing on such issues.  As noted above, many of the Foreign Documents such as the MLAT requests, correspondence related to MLAT requests, documents related to Mr. Bagudu's extradition proceedings and settlement, and documents related to other litigations may assist Claimants in locating relevant witnesses, evidence, facts or cross examination material regarding these issues.

**D.      The Government Has Conceded the Relevance of the
Foreign Documents By Including Them on Its Privilege
Logs**

Despite the Government's current objections, it has already acknowledged that the Foreign Documents are relevant by including them on its privilege logs and failing to raise any relevance objection until confronted by Claimants with the lack of any privileged basis for withholding the documents.  As described in more detail above in the Statement of Facts, neither

25

the Government's Responses to Claimants' Document Requests, nor the cover letters to its privilege logs, nor its initial correspondence and communications concerning the Foreign Documents notified Claimants that the Government would be withholding and logging Foreign Documents on the basis of relevance. The Government's Initial Privilege Log 1 and Privilege Logs 2-5 contain no indications that the Foreign Documents are being withheld on relevance grounds, let alone provide a basis as to why such documents are irrelevant to the claims and defenses in this case. Even the Government's Updated Privilege Log 1, submitted months after the Government took the position that each of the Foreign Documents are not relevant, only identifies six withheld Foreign Documents as not relevant to this matter in some way. (*See* Campbell Decl. Ex. 18, USDOJ Priv. Log 1, P-DOJ-00000153, P-DOJ-00000155, P-DOJ-00000156, P-DOJ-00000160, P-DOJ-00003471, and P-DOJ-00010448).

Under these circumstances the Government has acknowledged that the Foreign Documents are relevant to the claims and defenses in this action. District courts have not hesitated in finding that parties conceded the relevance of documents included on their privilege logs. *See Nozinich v. Johnson & Johnson, Inc.*, 2011 WL 13124088, at *2 (W.D. Tenn. Feb. 22, 2011) (finding that a party by implication concedes relevance, by including documents on a privilege log); *see also Dey, L.P. v. Sepracor, Inc.,* 2010 WL 5094406, at *3 (S.D.N.Y. Dec. 8, 2010) (noting that a party "implicitly recognized . . . documents were relevant when it included them in its . . . privilege log"). Accordingly, the Government's belated and self-serving assertion that the Foreign Documents are not relevant should be rejected.

### E.     The Discovery Sought is Proportionate to the Needs of This Case

Finally, the discovery Claimants seek is proportional to the needs of this case and within the proper scope of discovery under Federal Rule of Civil Procedure 26(b)(1). As discussed

above, the Foreign Documents are highly relevant to the claims and defenses of this litigation and may bear on the location of additional relevant documents, witnesses, and accounts, and whether these avenues of discovery are still available to Claimants. The Foreign Documents are unlikely to be obtained through other means of discovery because they are communications between representatives of the U.S. and of other nations or third parties located outside the U.S., who are likely beyond the process of this Court. In addition, many of the documents date may no longer be retained by other custodians due to the length of time that has passed. With regard to the Claimants' due process defense, production of the Foreign Documents is simply the most efficient and effective method of discovery. Furthermore, the issues at stake in this litigation are substantial as the Government is seeking to forfeit "about $100 million" from Claimants. (*See* Campbell Decl. Ex. 19, Tr. of Status Hr'g, at 20:22-21:1.)

The U.S. erroneously suggests that "[p]roducing all MLAT requests and all related correspondence sent to or from any foreign jurisdiction from 1994 to present would shed no additional light on the limited question underlying the due process argument and would be disproportionate to the needs of this case." (U.S. Mem., at 2.) According to the Government's flawed rational, to establish Claimants' fact intensive due process defense, Claimants are only entitled to a vague and misleading interrogatory response from the Government, which states that the Government: (1) became aware of the alleged Security Votes Transaction *at least as early* as November 22, 1999, (2) was aware of the alleged Debt Buy-Back Transaction *at least as early* as July 2003, (3) ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

(Campbell Decl. Ex. 22, Pl.'s Responses to Claimants' Interrogatory No. 5).  The Government appears to argue, in conflict with well-established discovery practice, that one interrogatory answer forecloses any discovery relating to the questions purportedly answered.

As an initial matter, even if this interrogatory response clearly and unequivocally established the date on which the Government first had sufficient information to seek forfeiture of the Claimed Property, or of the accounts in which the Claimed Property were previously located, *which it does not*, it would not foreclose Claimants from seeking further discovery into the facts and circumstances concerning the Government's investigation and whether it violated Claimants' due process rights.  Indeed, the Government's use of the terms "at least as early" and "no later than" to qualify the dates provided in its response raise more questions than they answer.  Similarly, the response does not indicate whether or not the Government had sought or received any information about the Ridley Group Limited prior to 2009.  Most egregiously, the Government parses its words and relies on technicalities when it states that "it became aware" of "the Claimed Property's involvement in the criminal conduct" only in 2012.   While the Government may have identified the precise accounts that hold the Claimed Property in 2012, according to the Government's own allegations, the assets allegedly comprising the Claimed Property had previously been held in accounts in the name of the Ridley Group Limited since 1998 and prior to the Government's extensive involvement in the extradition of Mr. Bagudu. (Compl. ¶ 80).  Thus, the Government's interrogatory response begs the question as to when it first identified the assets that it now seeks to forfeit as the Claimed Property and why it chose to delay its action until after the assets had been transferred into the trusts of which the Claimants are beneficiaries.

Finally, the Government would not be burdened by producing the Foreign Documents,

because it has already searched for and gathered them, and its confidentiality concerns, while unfounded, are fully mitigated by the Protective Order.  By contrast, the burden placed on the Claimants from withholding production is substantial because they will be severely hamstrung in mounting their defense while their property rights continue to be impaired and may ultimately be deprived.  Accordingly, Claimants' discovery of the Foreign Documents is not disproportionate to the needs of this case.

## II.    THE RELEVANT FOREIGN DOCUMENTS MUST BE PRODUCED BECAUSE THEY ARE NOT PROTECTED FROM DISCOVERY BY TREATY

The Government has logged the relevant Foreign Documents on privilege logs, but asserts no legally cognizable privilege over them.  Rather, the Government withholds these documents on the purported basis that they must remain confidential pursuant to unidentified terms of certain international treaties.  Even if the Foreign Documents are confidential, they have no place on a privilege log and cannot be withheld on that basis alone.  The parties consented to the entry of the Protective Order precisely to allow for the exchange of confidential information between the parties and, as necessary, with the Court.  In any event, the Government has not shown that the Foreign Documents are confidential and protected from disclosure under international treaties.  The relevant Foreign Documents should therefore be produced.

### A.    The Protective Order Entered In This Case Moots the Government's Confidentiality Concerns

First and foremost, even assuming the Government can carry its burden of showing that all of the Foreign Documents are confidential and protected from disclosure under international treaties, which it cannot, the Government may not withhold documents from production on confidentiality grounds alone in a case where a Protective Order is in place.  *See, e.g., Cienfuegos v. Office of the Architect of the Capitol*, 34 F. Supp. 3d 1, 3 (D.D.C. 2014) (ordering

production of confidential hearing records in case with protective order that addressed confidentiality concerns); *Covad Commc'ns Co. v. Revonet, Inc.*, 258 F.R.D. 5, 12 (D.D.C. 2009) (holding concerns that forensically searching defendant's client database will yield confidential data of other clients "can easily be alleviated through a protective order.")   Even statutory restrictions such as the Privacy Act do not bar disclosure in judicial proceedings where courts may fashion appropriate protective orders to restrict access to the information.  *See Laxalt v. McClatchy*, 809 F.2d 885, 889 (D.C. Cir. 1987).

The Protective Order maintains the confidentiality of designated materials exchanged in the course of discovery, including information that "is protected from disclosure under international law, the laws of the U.S. or the laws of the country from which the discovery is sought."  (Protective Order at ¶ 2.)  The Protective Order also provides that this information "shall not be given, shown, made available or communicated in any way to any person or entity," other than, among others: (1) the Court and Court personnel; (2) the producing or receiving parties and their employees and agents; and (3) such other persons or entities as the Court may order, as may be agreed to by the producing or receiving parties.  (*Id.* at ¶ 10).  Therefore, the Government has no legitimate basis for withholding the Foreign Documents, and the Foreign Documents should be produced, because they are safeguarded by the Court's Protective Order.

### B. The Government Has Not Carried Its Burden of Showing that the Foreign Documents Are Confidential and Protected From Disclosure Under International Treaties

As a court in this district has already found, at least one of the Government's purported treaties *does not* bar production in civil actions, "[a]bsent an express congressional intent to the contrary."  *See U.S. ex rel. Landis v. Tailwind Sports Corp.*, 303 F.R.D. 419, 423 (D.D.C. 2014) (citing *Laxalt,* 809 F.2d at 889).  At issue in *Landis* was the United States' MLAT with the European Union, which is among the "non-exhaustive list of treaties or agreements" the

Government relies on here (*see* Campbell Decl. Ex. 12), and whose provisions are either identical or similar to the provisions found in the other treaties on that list. The *Landis* court rightly concluded that the standards set forth in the Federal Rules "must be followed with respect to discovery requests in District Court," regardless of whether responsive documents were obtained pursuant to an MLAT. *See id.* This Court should reach the same conclusion.

In *Landis*, a defendant professional cyclist moved to compel production of documents in response to his request for production to the U.S. *See Landis*, 303 F.R.D. at 421. The defendant's former teammate had filed a *qui tam* action against him; and after the close of a criminal investigation, the U.S. intervened in the case. *Id.* The defendant sought "investigation records that the U.S. Attorney's Office . . . obtained from France and Italy in the United States' criminal investigation of [the defendant]," but the Government refused to produce the requested records, because according to the Government, "the terms of the Mutual Legal Assistant Treaties . . . to which these records were produced [did] not authorize their use in [the] litigation." *Id.* at 423. Specifically, the Government took the position that "Article 9 of the United States' MLAT with the European Union . . . implicitly prohibits these documents from being produced in civil discovery because the criminal investigation is now closed." *Id.*

However, the court in *Landis* saw "nothing in Article 9 to bar the production of the requested records." *Landis*, 303 F.R.D. at 423. Article 9 provides that a "requesting State may use any evidence or information obtained from the requested State . . . in its non-criminal judicial or administrative proceedings directly related to [its criminal] investigations or proceedings." *Id.* *Landis* ultimately granted the defendant's motion to compel discovery "[b]ecause the records acquired from France and Italy [were] in the 'possession, custody, or control' of the U.S. Government and the MLAT [did] not explicitly bar their production in civil actions." *Id.*

31

The other treaties and agreements cited by the Government to Claimants generally contain the same provisions as the MLAT in *Landis*.  It is, therefore, unsurprising that the Government has yet to point to any terms of its non-exhaustive list of treaties that *explicitly* bar production of the Foreign Documents.  *See Landis*, 303 F.R.D. at 423.

The Government seeks to distinguish "the MLAT requests themselves, and related intergovernmental correspondence," from "underlying evidence . . . obtained as a result of an MLAT request to or from the United States."  (U.S. Mem., at 2.)  However, the Government has failed to identify any express provision of a purportedly applicable treaty or agreement that would prevent disclosure of the MLAT requests themselves, and related communications in this action, while, at the same time, allowing disclosure of evidence produced in response to such an MLAT request.  Indeed, for those Foreign Documents that appear to be MLAT requests and related communications exchanged between the U.S. and foreign governments, the treaties generally require the "requested" party to keep the information confidential, but only if asked to do so by the "requesting" party.  The treaties are thus inapplicable to the MLAT requests and related information sent by the U.S. to foreign governments, because Claimants are asking the "requesting party," the U.S., for the information.[7]  As the plaintiff in this civil case, the Government cannot shield itself from discovery by asserting a claim of confidentiality over documents that it generated in connection with its own investigation and prosecution of this forfeiture action.

For MLATs and related communications where the U.S. was the "requested party," the Government has not presented any evidence that it was asked by a foreign sovereign to keep the

---

[7] *See e.g. Treaty* Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland On Mutual Legal Assistance in Criminal Matters, U.S.-U.K.-N. Ir., 1994 WL 855115, at *9-10 (Jan. 6, 1994) (the "January 1994 U.S.-U.K. MLAT") (providing that the U.S., as a "Requesting Party," may "use or disclose any information . . . obtained under [the] Treaty for . . . the proceeding stated . . . without prior consent.").

information it received confidential.   Moreover, Claimants have been unable to discern the specific treaty provision that the U.S. relies upon for each document it is withholding, because the U.S. has refused to engage in any meaningful discussions on this issue until its relevancy objection is overruled.   For example, to the extent that the Government relies upon Article 7 of the January 1994 U.S.-U.K. MLAT, it does not have a basis to withhold production of responsive documents.

The January 1994 U.S.-U.K. MLAT is representative of many of the MLATs cited in the Government's "non-exhaustive" list.   Article 7 of that MLAT states that a "Requested Party shall, <u>upon request</u>, keep confidential any information which might indicate that a request has been made or responded to."   *See* Treaty with the United Kingdom on Mut. Legal Assistance on Criminal Matters, S. Treaty Doc. No. 104-2, 1994 WL 855115, at *9-10 (Jan. 6, 1994) (emphasis added).   Article 7 also provides that a "Requesting Party shall not use or disclose any information or evidence obtained under this Treaty for any purposes other than for the proceedings stated in the request without the prior consent of the Requested Party."   *Id*. at *10. According to the Treaty's Letter of Submittal, "Article 7 establishes procedures both for ensuring the confidentiality of requests and their contents."   *Id*. at *3.   The Letter of Submittal provides that:

> In the interpretative notes, the Parties recognize that these prohibitions <u>will not prohibit a Requesting Party from disclosing such information to the extent there is an obligation to do so under that Party's Constitution or law</u>. This last clarification was provided to ensure that the United States and the United Kingdom authorities would be in a position to make available exculpatory information to criminal defendants.

*Id*. (emphasis added).

33

It is clear from its terms and the Letter of Submittal, that the January 1994 U.S.-U.K. MLAT does not preclude disclosure of requests and information obtained under the Treaty in connection with a legal proceeding or to the extent such disclosure is required by law.  As noted above, this view is consistent with D.C. Circuit jurisprudence, which provides that, "[a]bsent an express congressional intent to the contrary, the standards set forth in the [Federal Rules of Civil Procedure] must be followed with respect to discovery requests in District Court."  *See Landis*, 303 F.R.D. at 423 (citation omitted).  Indeed, "Congress must clearly and strongly indicate its intent to contradict th[e] broad objective favoring disclosure in judicial proceedings."  *See Landis*, 303 F.R.D. at 423 (citing *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1343 (D.C.Cir.1984)).

Rather than pointing to specific provisions of specific treaties to support its withholding of the Foreign Documents, the Government has made a general argument that the U.S. and its law enforcement partners "share a common interest in the non-disclosure of sensitive law enforcement information contained in the requests and in the candor and manner of communications between the parties."  (*See* U.S. Mem., at 3.)  According to the Government, communications between governments regarding mutual legal assistance are generally conducted with the expectation of non-disclosure and such "communications and correspondence between . . . two sovereign countries necessarily implicates foreign affairs and, on occasion, national security issues . . . ."  (*Id.*)  The Government also argues that, "[i]n addition, mutual legal assistance requests also include work product, and set forth the mental impressions of the attorneys preparing such requests."  (*Id.*)

These generalizations are inapplicable here.  Claimants have not sought any classified information and the Government has not claimed that any Foreign Documents are classified.

Nor has the Government designated any Foreign Documents as being subject to a common interest privilege.  Moreover, the Government represented to Claimants during the parties' September 9, 2016 meet-and-confer that it does not believe that Foreign Documents consisting of communications between the United States and foreign governments or their representatives are covered by the attorney client privilege or work product doctrine.  (Campbell Decl. Ex. 23.)  The Government's concession is well founded as at least one district court has held that MLAT-related communications between the U.S. and a foreign country are not entitled to protection under the attorney-client privilege or work product doctrine.  *U.S. v. Painting Known as "Le Marche,"* No. 06 Civ. 12994(RJS)(KNF), 2008 WL 2600659, at *4-6 (S.D.N.Y. June 25, 2008).

It bears noting that only a portion of the Foreign Documents are identified on the Government's privilege logs as MLAT requests or U.S. government-to-foreign government communications related to MLAT requests.  The balance of the Foreign Documents, according to the Government's own descriptions, do not appear to be related to MLAT requests between the U.S. and a foreign government.  The Government also identified several draft MLAT requests in its privilege logs that, by their very nature, cannot be covered  by international treaties concerning requests pursuant to those treaties.  Despite the Government's gratuitous assertion of confidentiality over numerous documents that do not even appear to relate to MLAT requests, there is no blanket "confidentiality" shielding all international communications of the United States from discovery.  This Court should therefore grant Claimant's Motion in its entirety.

## CONCLUSION

For the reasons set forth above, Claimants respectfully request that their Motion be granted in its entirety.

Dated: November 4, 2016

Respectfully submitted,

/s/ Jonathan R. Barr
Jonathan R. Barr (D.C. Bar No. 437334)
BAKER & HOSTETLER LLP
1050 Connecticut Ave. NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
jbarr@bakerlaw.com

Jonathan B. New
jnew@bakerlaw.com
Patrick T. Campbell
pcampbell@bakerlaw.com
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111-0100
Tel: (212) 589-4200
Fax: (212) 589-4201