UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

ALL ASSETS HELD IN ACCOUNT
NUMBER 80020796, IN THE NAME OF
DORAVILLE PROPERTIES CORP.,
AT DEUTSCHE BANK INTERNATIONAL,
LTD. IN JERSEY, CHANNEL ISLANDS,
AND ALL INTEREST, BENEFITS OR
ASSETS TRACEABLE THERETO, et al.,

    Defendants.

Civil Action No. 13-1832 (JDB)

## MEMORANDUM OPINION

This civil forfeiture proceeding involves sixteen foreign defendant properties collectively worth more than a half billion dollars, multiple litigants who have attempted to assert claims to these assets, and allegations by the United States government of criminal conduct by Nigeria's former de facto President and his associates. This Court has already determined the fate of most of the defendant assets and purported claims in prior opinions. The question now before the Court is whether to grant [226] the government's motion for entry of default and final judgment against two of the remaining defendant properties. For the reasons described below, the Court will enter default judgment against these two properties but will not certify this judgment as final.

## BACKGROUND

On November 18, 2013, the United States filed a verified complaint seeking civil forfeiture of assets totaling more than $500 million in value. Compl. [ECF No. 1] ¶ 1. As alleged and as described more fully in this Court's March 19, 2015 Memorandum Opinion, see United States v.

1

All Assets ("All Assets I"), 83 F. Supp. 3d 360, 364–366 (D.D.C. 2015), the defendant assets were "involved in an international conspiracy to launder proceeds of corruption in Nigeria during the military regime of General Sani Abacha," Compl. ¶ 1. General Abacha, his son Mohammed Sani Abacha, Abubakar Atiku Bagudu, and others allegedly embezzled billions of dollars of public funds from Nigeria by fraudulently representing that the funds would be used for national security purposes. Id. ¶¶ 2, 25–29. General Abacha and his associates also allegedly caused the Nigerian government to repurchase government debt at inflated prices from a company controlled by Abubakar Bagudu and Mohammed Abacha, yielding a profit of approximately $282 million. Id. ¶¶ 2, 36–44. The government asserts that the proceeds from these schemes were laundered through the purchase and subsequent liquidation of hundreds of millions of dollars of U.S.-backed Nigerian Par Bonds ("NPBs"), which entailed the transfer of funds into and out of U.S. domiciliary accounts and the disbursement of coupon interest payments from and liquidation of the NPBs by a U.S. bank. Id. ¶¶ 3, 34–35, 45, 52–53, 57, 85. Sixteen separate in rem defendants were alleged to contain proceeds from the illegal activities: seven bank accounts, identified at paragraphs 4(a)–(g) of the verified complaint; four investment portfolios, identified at paragraphs 4(h)–(k) of the verified complaint; and five corporate defendants. Compl. ¶ 4.

After filing the complaint, the United States sent direct notice of the action to known potential claimants and, on March 6, 2014, published notice of the forfeiture in accordance with the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure. See Mot. for Entry of Default J. and for Final and Appealable Order of Forfeiture Against Assets Identified in Paragraphs 4(h)[] and 4(j) of the Compl. ("Gov't's Mot.") [ECF No. 226] at 3. Potential claimants were required to file any verified claim to an asset within 60 days of publication of the notice. See Fed. R. Civ. P. Supp. R. G(5)(a).

Purported claims to various assets were subsequently filed by third parties. Godson Nnaka and his attorneys filed claims to all of the assets on behalf of himself and purportedly on behalf of the Republic of Nigeria, all of which have been struck for failure to meet certain filing requirements. See July 3, 2014 Mem. Op. & Order [ECF No. 54] at 14.

Eight relatives of Abubakar Bagudu also filed verified claims of interest in the four defendant investment portfolios.[1] See Verified Claims and Statements of Interest [ECF Nos. 17–19, 21–25]. These four defendant investment assets are described in paragraphs 4(h) through 4(k) of the Complaint as:

> (h) All assets held in the name of Blue Holding[s] (1) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, at J.O. Hambro Investment Management Limited in the United Kingdom, and all interest, benefits, or assets traceable thereto ["Asset 4(h)"] . . . .
>
> (i) All assets held in the name of Blue Holding[s] (2) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, at J.O. Hambro Investment Management Limited in the United Kingdom, and all interest, benefits, or assets traceable thereto ["Asset 4(i)"] . . . .
>
> (j) All assets held in the name of Blue Holding[s] (1) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, at James Hambro & Partners LLP, in the United Kingdom, and all interest, benefits, or assets traceable thereto ["Asset 4(j)"] . . . .
>
> (k) All assets held in of the name of Blue Holding[s] (2) Pte. Ltd., on behalf of or traceable to Ridley Group Limited and/or the Ridley Trust, at James Hambro & Partners LLP, in the United Kingdom and all interest, benefits, or assets traceable thereto ["Asset 4(k)"].

Compl. ¶ 4(h)–(k). These assets form the basis of two discretionary trusts. The two defendant assets held by Singaporean company Blue Holdings (1) Pte. Ltd.—Assets 4(h) and 4(j) (collectively, the "Blue Holdings (1) Assets")—comprise the Blue Family Trust I. See Ibrahim Bagudu Verified Claim [ECF No. 19] ¶ 2(a), (c). The two defendant assets held by Singaporean

---

[1] There were initially ten claimants, but two withdrew their claims. See Unopposed Mot. to Withdraw Verified Claims of Zainab Shinkafi Bagudu and R.A.B. [ECF No. 66]; Aug. 19, 2014 Min. Order Granting Mot. to Withdraw Verified Claims of Zainab Shinkafi Bagudu and R.A.B.

company Blue Holdings (2) Pte. Ltd. —Assets 4(i) and 4(k) (collectively, the "Blue Holdings (2) Assets")—comprise the Blue Family Trust II. See id. ¶ 2 (e), (g).

The Bagudu litigants primarily asserted claims to the defendant investment portfolio based on their status as beneficiaries of the Blue Family Trusts I and II. See United States v. All Assets ("All Assets III"), 299 F. Supp. 3d 121, 124–125 (D.D.C. 2018). One of the eight litigants, Ibrahim Bagudu, asserted an additional interest in the claimed assets based on an annuity he received from the Blue Family Trust II. Id. This Court struck the claims of seven of the Bagudu claimants, finding they had no vested beneficial interest in—and hence no colorable claim to—the Blue Holdings (1) and Blue Holdings (2) Assets, and no standing to contest their forfeiture. Id. at 135, 137. Ibrahim Bagudu's claim to the Blue Holdings (1) Assets was likewise struck, but the Court held that he had standing to challenge the forfeiture of the Blue Holdings (2) Assets due to his annuity. Id. at 131, 140. His claim to the Blue Holdings (2) Assets is now the sole remaining third-party claim to the assets in this litigation.

In the absence of any verified claims to certain defendant properties, the government sought default judgment. The government first requested, and the Court granted, default and final judgment against the seven bank accounts identified in paragraphs 4(a)–(g) of the verified complaint. See Aug. 6, 2014 Mem. Op. & Order [ECF No. 65] (granting default judgment); United States v. All Assets ("All Assets II"), Civil Action No. 13-1832, 2015 WL 13673819, at *3–4 (D.D.C. Dec. 17, 2015) (certifying judgment as final). Then, on March 13, 2018, the government filed an affidavit in support of default against the Blue Holdings (1) Assets. See Aff. for Default Against Defs. Assets H and J [ECF No. 216]. Two days later, the Clerk of Court entered default against these defendant assets. See Clerk's Entries of Default [ECF Nos. 217–18].

4

The government now moves for entry of default judgment against and forfeiture of the Blue Holdings (1) Assets. The government also asks the Court to certify as final any order of default judgment pursuant to Federal Rule of Civil Procedure 54(b). Ibrahim Bagudu, claimant to the Blue Holdings (2) Assets, opposes the motion. He contends that entry of default judgment is inappropriate because this Court's exercise of jurisdiction over the assets would violate due process, see Claimant Ibrahim Bagudu's Opp'n to Gov't's Mot. ("Opp'n to Gov't's Mot.") [ECF No. 231] at 8–14, and because under Frow v. De La Vega, 82 U.S. 552 (1872), it could result in "inconsistent judgments of liability" against the Blue Holdings (1) and Blue Holdings (2) Assets should he successfully defend against forfeiture of the Blue Holdings (2) Assets, see id. at 15–19. He also opposes entry of final judgment and forfeiture, which he asserts would require him to litigate in two fora simultaneously and the D.C. Circuit to hear duplicative appeals based on the same underlying facts and legal issues. Id. at 20–27.

In reply, the government avers that Ibrahim Bagudu lacks standing to contest the forfeiture of the Blue Holdings (1) Assets and disputes the assertion that entry of default judgment is prohibited by either the Due Process Clause or Frow. United States' Reply Br. in Supp. of Gov't's Mot. ("Gov't's Reply") [ECF No. 236] at 3–9. The government also asserts that certification of the default judgment as final would permit third parties whose claims had been struck to rejoin the litigation, should the default judgment be overturned on appeal, and would promote the prompt execution of forfeiture. Gov't's Mot. at 7–9. The government's motion is now fully briefed and ripe for decision.

## ANALYSIS

### I. IBRAHIM BAGUDU'S STANDING TO CHALLENGE FORFEITURE

Before addressing the merits of the government's motion for entry of default and final judgment, this Court first must consider the threshold issue of whether Ibrahim Bagudu has

standing to contest the forfeiture of the Blue Holdings (1) Assets. To have standing to participate in an in rem proceeding, an individual must at least demonstrate a colorable interest in the property. See United States v. Emor, 785 F.3d 671, 676 (D.C. Cir. 2015). "A claimant who lacks such an interest has no standing to challenge the forfeiture." United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 959 F. Supp. 2d 81, 95 (D.D.C. 2013).

This Court has already held that Ibrahim Bagudu does not have standing to contest the forfeiture of the Blue Holdings (1) Assets. See All Assets III, 299 F. Supp. 3d at 131, 137. Although he is a claimant in this proceeding, his participation in the litigation does not allow him to challenge the forfeiture of defendant assets to which he has no claim. Rather, he has "standing only to contest the forfeiture of the claimed assets held in the investment accounts associated with Blue Family Trust II (Assets 4(i) and 4(k))." Id. at 131 (emphasis added). He therefore may not contest the entry of default judgment against the separate Blue Holdings (1) Assets.

Nevertheless, Ibrahim Bagudu has raised issues that the Court itself must consider. As the D.C. Circuit has said, "entry of a default judgment is not automatic." Mwani v. bin Laden, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted). Before entering judgment against an absent defendant, a court must "satisfy itself that it has personal jurisdiction" over that defendant. Id. When there are multiple defendants in a proceeding, the Court must also determine whether entry of default judgment against one absent defendant could result in conflicting orders of relief. See Frow v. De La Vega, 82 U.S. 552 (1872). Therefore, while Ibrahim Bagudu may not challenge the forfeiture of the Blue Holdings (1) Assets, the Court will consider the arguments set forth in his opposition brief to the extent they aid this Court's analysis of whether entry of default and final judgment is appropriate.

## II. DEFAULT JUDGMENT AGAINST THE BLUE HOLDINGS (1) ASSETS

Federal Rule of Civil Procedure 55(a) provides for entry of default by the Clerk of Court "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." In most cases, after the Clerk's entry of default, the Court has discretion to enter default judgment pursuant to Rule 55(b)(2). Although "[d]efault judgments are not favored by modern courts," they may be appropriate "when the adversary process has been halted because of an essentially unresponsive party." Jackson v. Beech, 636 F.2d 831, 835–36 (D.C. Cir. 1980) (citation omitted). Such relief protects the plaintiff and prevents "interminable delay and continued uncertainty as to his rights." Id. at 836 (citation omitted).

This form of relief is no less appropriate when the defendant in question is property. Through the "legal fiction" of in rem proceedings, it is the alleged criminal conduct of the res— here, the Blue Holdings (1) Assets—that is at issue. See United States v. Usery, 518 U.S. 267, 275 (1996) (citation omitted). Because a res typically cannot respond on its own behalf, unless a claimant properly intervenes to raise defenses to its forfeiture, the defendant property is deemed to have "failed to plead or otherwise defend" against the allegations, and the Clerk of Court must enter default. Fed. R. Civ. P. 55(a). Default constitutes an admission of all allegations in the well-pleaded complaint and establishes the liability of the defaulting party. See Thomson v. Wooster, 114 U.S. 104, 111 (1885) (plaintiff's claims taken as true after entry of default); Adkins v. Teseo, 180 F. Supp. 2d 15, 17 (D.D.C. 2001) ("A defaulting defendant is deemed to admit every well-pleaded allegation in the complaint."). As already noted, however, "a court should satisfy itself that it has personal jurisdiction" before entering a default judgment. Mwani, 417 F.3d at 6. When a case involves multiple defendants, the need to guard against the entry of incompatible judgments

7

providing conflicting relief may also counsel against entry of default judgment. See Frow, 82 U.S. at 554.

**A. Jurisdiction**

The Court begins by examining the threshold question whether it has jurisdiction over the Blue Holdings (1) Assets. Traditionally, when exercising in rem jurisdiction, the defendant property is physically present within the court's territorial jurisdiction.[2] See United States v. All Funds in Account in Banco Español de Credito, Spain, 295 F.3d 23, 25 (D.C. Cir. 2002). However, in this case—and increasingly in the modern era—the defendant assets are located outside the United States. Therefore, this Court's jurisdiction rests on 28 U.S.C. § 1355(b)(2), which provides that "[w]henever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government, an action or proceeding for forfeiture may be brought . . . in the United States District [C]ourt for the District of Columbia." As the D.C. Circuit has noted, "th[is] statute must be enforced" "[u]nless the Constitution commands otherwise." Banco Español, 295 F.3d at 27.

At this juncture, the defendant's status as property may cause the applicable legal standards to diverge. If the defendant were a person, the standard for determining whether the Court had personal jurisdiction would be clear: "the constitutional touchtone" is "whether the defendant purposefully established 'minimum contacts' in the forum." Mwani, 417 F.3d at 12 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985)). This test focuses on "the relationship among the defendant, the forum, and the litigation," Walden v. Fiore, 571 U.S. 277, 284 (2014)

---

[2] There are two types of in rem jurisdiction. A true "judgment in rem affects the interests of all persons in designated property." Hanson v. Denckla, 357 U.S. 235, 246 n.12 (1958) (citation omitted). "A judgment quasi in rem affects the interests of particular persons in designated property." Id. This litigation is a true in rem proceeding.

8

(citation omitted), and is satisfied when the defendant has "purposefully directed" its activities at the United States and the plaintiff's claims "'arise out of or relate to' those activities," Burger King Corp., 471 U.S. at 472–73 (citations omitted). The defendants in this case, however, are property, and it less obvious what standard should guide the Court's analysis of whether it has personal jurisdiction.[3]

Assuming application of the traditional minimum contacts test is appropriate in this case, this Court again finds that there are sufficient contacts between the Blue Holdings (1) Assets and the United States such that the requirements of due process are satisfied. See All Assets I, 83 F. Supp. 3d at 368. Here, the government has alleged—and the defaulting defendants have been deemed to admit—widespread use of the United States banking system through the storage and movement of funds into and out of the United States. See, e.g., Compl. ¶¶ 35, 81. More notably, the proceeds of the criminal schemes were laundered through the United States financial system. Because Citibank in New York served as the fiscal agent, registrar, and calculation agent for the NPBs that were the vehicle for the laundering scheme, the United States became the epicenter of the money laundering activities. See id. ¶¶ 54–60, 85–86. Coupon interest and dividend payments from the NPBs, which were paid either directly to the trust that held the Blue Holdings (1) Assets or were used to finance the purchase of the NPBs, were made from the United States in U.S. dollars. See Compl. ¶¶ 57, 60, 67, 83. The NPBs also were eventually liquidated, in part, in the

---

[3] As the government notes, it is unclear whether the Due Process Clause—which protects "any person" from being "deprived of life, liberty, or property, without due process of law," U.S. Const. amend. V (emphasis added)—applies to defendant property. Cf. Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 95, 96 (D.C. Cir. 2002) (holding "that foreign states are not 'persons' protected by the Fifth Amendment"). In Shaffer v. Heitner, the Supreme Court held that "all assertions of state-court jurisdiction must be evaluated according to the standards set forth in International Shoe [Co. v. Washington, 326 U.S. 310 (1945)] and its progeny." 433 U.S. 186, 212 (1977). Shaffer concerned the assertion of quasi in rem jurisdiction, and the Court's conclusion was "premised on [the] recognition that 'the phrase, "judicial jurisdiction over a thing," is a customary elliptical way of referring to jurisdiction over the interests of persons in a thing.'" Id. at 207 (citation omitted). Other courts have assumed without deciding that the traditional minimum contacts test applies in true in rem proceedings. See, e.g., United States v. Batato, 833 F.3d 413, 423 (4th Cir. 2016). This Court will do the same.

United States, and the proceeds were placed in the defendant investment portfolios. See Compl. ¶¶ 85–86. Such activities were purposefully directed toward the United States by use of its domestic financial institutions for purposes of criminal money laundering. Hence, it is the movement of the funds themselves—rather than any conduct by owners, purported claimants, or other third parties—that provides the requisite contacts with the United States.[4] This civil forfeiture proceeding is predicated on these money laundering transactions. See, e.g., Compl. ¶¶ 108, 111, 114.[5] Therefore, to the extent the minimum contacts test applies in in rem proceedings, this Court finds that its requirements have been met.

### B. Application of Frow v. De La Vega

This Court also finds—as it has previously—that Frow does not prohibit entry of default judgment against the defendant assets in this case. See All Assets II, 2015 WL 13673819, at *3. In Frow, the plaintiff alleged that multiple defendants had conspired to defraud him of a single tract of land. See Frow, 82 U.S. at 552–53. The district court entered default judgment against one unresponsive defendant, which vested title to the land in the plaintiff; later, however, it found for the remaining defendants on the merits, which vested title to the land in the defendants.

---

[4] Ibrahim Bagudu argues that the Court also must consider the connection between the forum and "persons with interests in the assets," and avers that non-claimant Blue Holdings (1) Company did not purposefully avail itself of the benefits of doing business in the United States. See Opp'n to Gov't's Mot. at 9–11. This misstates the relevant due process inquiry, which focuses on "the relationship among the defendant, the forum, and the litigation." Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775 (1984) (emphasis added and citation omitted). This "relationship must arise out of contacts that the 'defendant himself' creates with the forum." Fiore, 571 U.S. at 284 (citation omitted). Here, the defendants are the properties themselves, not the property holders; hence, it is the contacts between the properties and the forum that are relevant.

[5] Ibrahim Bagudu cites a September 2010 wire transfer to the Blue Holdings accounts as "the sole source of funds" for the Blue Holdings portfolios. Opp'n to Gov't's Mot. at 11. Because this transfer occurred after the conclusion of the alleged money laundering activity in the United States and is not alleged to be connected to the U.S. banking system, Bagudu suggests that the nexus between the United States and the defendant assets is insufficient to support personal jurisdiction. See id. at 11, 14. But the government's claims do not "arise out of" this 2010 transfer of funds; rather, they arise out of distinct money laundering activities alleged to have occurred in the United States and that precede the 2010 transfer. It is those activities that are relevant to the Court's personal jurisdiction inquiry, not the final transfer of the criminally-derived funds to the Blue Holdings accounts. See Burger King Corp., 471 U.S. at 472–73 (finding the Due Process Clause "is satisfied if the defendant 'purposefully directed' his activities at residents of the forum, and the litigation resulted from alleged injuries that 'arise out of or relate to' those activities" (emphasis added and citations omitted)).

Because the two judgments provided irreconcilable relief, the Supreme Court vacated the default judgment. Id. at 554. Ibrahim Bagudu suggests that the principles underlying Frow bar entry of default judgment against the Blue Holdings (1) Assets. Because the government's claims against the Blue Holdings (1) and (2) Assets are predicated on the same factual allegations, Ibrahim Bagudu asserts that entry of default judgment against the Blue Holdings (1) Assets could result in logically inconsistent findings of liability should he successfully defend against forfeiture of the Blue Holdings (2) Assets. See Opp'n to Gov't's Mot. at 15–19.

But Frow does not protect against the mere possibility of logical inconsistencies; it forbids only "irreconcilable conflict[s]" between judgments that preclude effective relief. Carter v. District of Columbia, 795 F.2d 116, 137 (D.C. Cir. 1986). Frow applies "only when liability is truly joint—that is, when the theory of recovery requires that all defendants be found liable if any one of them is liable—and when the relief sought can only be effective if judgment is granted against all." Whelan v. Abell, 953 F.2d 663, 674–75 (D.C. Cir. 1992). Its application is limited to cases in which there are "inconsistent adjudications as to joint liability or as to a single res in controversy." Carter, 795 F.2d at 137 (citation omitted). Here, there are sixteen separate in rem defendants, joint liability has not been alleged, and there is no risk of conflicting orders concerning relief. Should Ibrahim Bagudu prevail on the merits, he will retain his interest in the Blue Holdings (2) Assets, regardless of whether the Blue Holdings (1) Assets have been forfeited. Frow is therefore inapposite.

**C. Liability**

Having resolved any potential impediments to entry of default judgment, this Court now concludes that entry of default judgment against the Blue Holdings (1) Assets is warranted. The government has asserted three claims of forfeiture against the defendant assets under 18 U.S.C.

§ 981(a)(1)(A), which provides that "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 [or] 1957 . . . of this title, or any property traceable to such property" "is subject to forfeiture to the United States." See Compl. ¶¶ 103–114. Section 1957 in turn prohibits "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in . . . property of a value greater than $10,000" that "is derived from specified unlawful activity." 18 U.S.C. § 1957(a). Such "specified unlawful activities" include (1) the transfer, receipt, sale, or disposition of stolen securities or money having a value of $5,000 or more that have crossed into the United States, 18 U.S.C. §§ 2314, 2315 (2) foreign offenses involving the "misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official," 18 U.S.C. § 1956(c)(7)(B)(iv); and (3) conspiracy to commit these offenses, 18 U.S.C. § 1956(h).

The government has alleged sufficient facts to establish its forfeiture claims. As alleged, the defendant assets were involved in an international conspiracy to launder the proceeds of crimes committed by General Abacha and his associates. Compl. ¶ 1. These crimes constituted theft, conversion, fraud, extortion, and the misappropriation, theft and embezzlement of public funds by or for the benefit of a public official under Nigerian law. See Compl. ¶¶ 2, 25, 36, 41, 101. Knowing these funds were stolen and obtained through fraudulent means, Abubakar Bagudu transferred the money into foreign commerce, including into U.S. banks. Id. ¶¶ 33, 35, 39–40, 43, 45–48. The proceeds were then laundered through the purchase of NPBs and deposited in the defendant investment portfolios. Id. ¶¶ 53, 85–86. Because these allegations are sufficient to satisfy § 981(A)(1)(A), and defendants are deemed to have admitted liability for these well-pleaded allegations, see Adkins, 180 F. Supp. 2d at 17, this Court will enter default judgment against the Blue Holdings (1) Assets.

## III. CERTIFICATION OF THE DEFAULT JUDGMENT AS FINAL

Even when entry of default judgment is warranted, however, it does not necessarily follow that the order is final and appealable. Generally, an order in a case involving multiple claims or defendants is not final until the district court has "disposed of all claims against all parties." Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc., 630 F.3d 217, 221 (D.C. Cir. 2011). Under Federal Rule of Civil Procedure 54(b), however, a court may "direct entry of a final judgment as to one or more, but fewer than all, claims or parties" if the court expressly finds "that there is no just reason for delay." This exception permits courts to balance "the demonstrated need for flexibility in providing for appellate review in complex cases" with the goal of avoiding "piecemeal appellate review." Blue v. D.C. Pub. Schs., 764 F.3d 11, 15 (D.C. Cir. 2014) (citation and internal quotation marks omitted). "Not all final judgments on individual claims should be immediately appealable, even if they are in some sense separable from the remaining unresolved claims." Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 8 (1980). "It is left to the sound judicial discretion of the district court to determine the 'appropriate time' when each final decision in a multiple claims action is ready for appeal." Id. (citation omitted).

Application of Rule 54(b) requires a two-step analysis. First, the Court must ensure that the order under consideration is final, meaning it represents the "ultimate disposition of an individual claim entered in the course of a multiple claims action." Id. at 7 (citation omitted). If the Court determines that the order is final as to a claim or party, then it must satisfy itself that there is "no just reason" to delay certifying the order. Fed. R. Civ. P. 54(b). "This determination weighs both 'justice to the litigants' and 'the interest of sound judicial administration.'" Brooks v. Dist. Hosp. Partners, 606 F.3d 800, 806 (D.C. Cir. 2010) (citation omitted). The factors pertaining to "justice to the litigants" are case-specific, id., while the factors pertaining to judicial administration include "whether the claims under review were separable from the others remaining

to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals," Curtiss-Wright Corp., 446 U.S. at 8.

Here, there is no dispute that the entry of default judgment is final. The default judgment vests ownership of the defaulted assets in the United States and, as such, is the "ultimate disposition" of the government's claims against those properties. It "ends the litigation on the merits" as to the Blue Holdings (1) Assets and "leaves nothing for the court to do but execute the judgment." Blue, 764 F.3d at 15 (citation omitted). The remaining question then is whether there is "no just reason" to delay certifying the order.

The Court first considers whether the prompt, final resolution of the claims against the defendant assets would advance the interests of the litigants. The government clearly has a substantial interest in the timely enforcement of any forfeiture judgment against the defaulted assets. More than two decades have passed since the alleged corrupt conduct began in Nigeria. See Compl. ¶ 25. Although the government now has title to Blue Holdings (1) Assets—which are worth approximately $15 million—it is unable to ask the United Kingdom to enforce the judgment until after the judgment is final and no longer subject to appeal. See Gov't's Mot. at 8–9. However, no concrete harm to the United States from that delay has been identified. For Ibrahim Bagudu, on the other hand, certification would pose real additional burdens, requiring him to litigate in two fora as he appeals forfeiture of the Blue Holdings (1) Assets in the D.C. Circuit and asserts his claim to the Blue Holdings (2) Assets in this Court. That outcome "would effectively invert the purpose of Rule 54(b) from one of enhancing the appellate rights of a losing party in circumstances when delay of an appeal would cause undue hardship or possible injustice, to one in which a prevailing party could prematurely force an appeal of part of a case by a losing party, who must

comply with timeliness requirements for exercising appellate rights." Stewart v. Gates, 277 F.R.D. 33, 36 (D.D.C. 2011).

Moreover, even assuming the asserted interests of the government outweigh the interests of Ibrahim Bagudu, the risk of piecemeal appellate review tips the scale against entry of final judgment. As the government rightly notes, see Gov't's Reply at 2–3, Ibrahim Bagudu and the other litigants whose claims were struck do not have standing to contest or appeal the forfeiture of assets to which they have no claim. See United States v. All Assets Held, 712 Fed. Appx. 13, 15 (D.C. Cir. 2018) (per curiam). Hence, any challenge to the default judgment would necessarily require the litigants first to challenge this Court's March 5, 2018 Order striking their claims to the Blue Holdings (1) Assets.[6]

But the Court's decision to strike the Bagudu litigants' claims is inextricably bound up in the ongoing litigation concerning the Blue Holdings (2) Assets. The litigants' theory of standing, which this Court rejected, was based on their status as beneficiaries of the discretionary trusts and applied equally to both the Blue Holdings (1) and Blue Holdings (2) Assets. Accordingly, while the claims to Blue Holdings (1) Assets may be separable from the remaining claim to the Blue Holdings (2) Assets, the predicate issue of whether the litigants have standing to assert claims to each of these defendants is not. If the Bagudu litigants were to challenge on appeal this Court's order striking their claims to the Blue Holdings (1) Assets, the D.C. Circuit necessarily would need to evaluate the validity of the litigants' standing theory as to <u>both</u> the Blue Holdings (1) and Blue Holdings (2) Assets. Even if the D.C. Circuit were able to partition its review of the March 5 decision such that it only considered this Court's conclusion to strike the litigants' claims to the Blue Holdings (1) Assets, the D.C. Circuit would then have to determine the validity of the

---

[6] The order striking the purported claims to the Blue Holdings (1) Assets by Nnaka and Nigeria has already been certified as final and affirmed on appeal. See id.

litigants' standing theory twice: once as to the Blue Holdings (1) Assets on appeal now from the default judgment and then again later as to the Blue Holdings (2) Assets after all litigation has concluded. This is precisely the type of "piecemeal" appellate review that district courts have been instructed to avoid. Hence, this Court finds there is good reason to delay certification of the default judgment against the Blue Holdings (1) Assets as final.

## **CONCLUSION**

The Court is satisfied that it has the power to enter default judgment against the Blue Holdings (1) Assets and that the entry of a default judgment and order of forfeiture is warranted. However, because this Court's predicate determination that the Bagudu litigants do not have standing is not separable from ongoing proceedings, the Court finds that certification of the default judgment as final is not appropriate. The government's motion therefore will be granted in part and denied in part. A separate order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: <u>September 4, 2018</u>