# **Exhibit 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA, :

Plaintiff, :

v. : Case No.

ALL ASSETS HELD IN ACCOUNT NUMBER : 13-cv-1832(JDB)

80020796, IN THE NAME OF DORAVILLE:

PROPERTIES CORPORATION, AT DEUTSCH:

BANK INTERNATIONAL LIMITED, IN :

JERSEY, CHANNEL ISLANDS, AND ALL :

INTEREST, BENEFITS, OR ASSETS :

TRACEABLE THERETO, et al., :

Defendants. :

- - - - - - - - - - - - - - - - - X

Videotaped Deposition of

THE UNITED STATES OF AMERICA,

by and through its Designated Representative

PAMELA J. HICKS

Washington, DC

Tuesday, August 14, 2018, 9:35 a.m.

Job No.: 199496

Pages 1 - 508

Reported by: Debra A. Whitehead

Videotaped Deposition of PAMELA J. HICKS, held at the offices of:

BAKER HOSTETLER, LLP
Washington Square
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
(202) 861-1500

Pursuant to notice, before Debra A. Whitehead, an Approved Reporter of the United States District Court and Notary Public of the District of Columbia.

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF AND THE WITNESS:

JOSHUA L. SOHN, ESQUIRE
ELIZABETH A. ALOI, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
Criminal Division
Money Laundering and Asset Recovery Section
1400 New York Avenue, NW, 10th Floor
Washington, DC 20005
(202) 353-2223

ON BEHALF OF CLAIMANT:

PATRICK T. CAMPBELL, ESQUIRE
JONATHAN B. NEW, ESQUIRE
MATTHEW D. FEIL, ESQUIRE
BAKER HOSTETLER, LLP
45 Rockefeller Plaza
New York, New York 10111-0100
(212) 589-4200

ALSO PRESENT:

NACHE BUIE, Video Specialist

C O N T E N T S

| EXAMINATION OF PAMELA J. HICKS | PAGE |
|---|---|
| By Mr. Campbell | 10 |

E X H I B I T S

(Attached to the Transcript)

| HICKS DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 30 |
| Exhibit 2 | United States Department of Justice, Criminal Division, E-mail Retention Guide, November 8, 2002 | 141 |
| Exhibit 3 | Request for Records Disposition Authority, Department of Justice, 7/13/89 | 169 |
| Exhibit 4 | Abacha Points for DOJ | 169 |
| Exhibit 5 | 30(b)(6) Deposition, 13 August 2018, Outline | 189 |
| Exhibit 6 | FBI Information | 228 |
| Exhibit 7 | Claimants' First Set of Requests For Production to Plaintiff United States of America | 230 |

**file. And I'm like, Yes, that's what goes in an archived file.**
**Like, I didn't necessarily -- just by having worked there, like I already know. So some of this stuff was just stuff I already knew. And so I kind of read it and set it aside, and didn't think much more about it.**
Q Okay. We'll come back to those policies when we get to the specific areas --
**A Okay.**
Q -- of the topic.
What -- what was the policy for commencing in -- well, let me ask you this first: What is the -- the -- the purpose of AFMLS?
**A Currently, or in 1999?**
Q In 1999.
What does AFMLS do?
**A AFMLS --**
MR. SOHN: Objection. Outside the scope of the 30(b)(6) notice.
Q You can answer.
MS. ALOI: You can answer.

**A Well, I mean, if it's actually outside the scope of the notice, I don't know that I'm authorized to disclose it.**
Q It's an objection, that you can still ...
**A Okay. AFMLS was the Asset Forfeiture & Money Laundering Section, and provided guidance and sometimes litigation support.**
**I mean, in what time frame? Like now or then?**
Q In 1999.
**A In 1999 AFMLS would have been the -- the people that were providing primarily policy guidance on asset forfeiture and money laundering. They would have provided consultations on asset forfeiture and money laundering prosecutions and legal issues.**
**They would have been in charge of and overseeing the equitable sharing program, the remission of forfeited funds to victims. And they had a -- a litigation unit that would at times, usually at the request of a U.S. Attorney's Office, come help out on litigation that was large**

**and complicated related to either money laundering or asset forfeiture.**
Q So you said they provided consultations on asset forfeiture and money laundering prosecutions?
**A Uh-huh.**
Q Who would they provide consultations to?
MR. SOHN: Again, outside the scope of the 30(b)(6) notice.
**A Usually to the U.S. Attorney's Offices. Although, at the time we did have in '99 I think two individuals that also worked internationally to provide and work with foreign counterparts.**
Q And who were those individuals?
**A Daniel Claman and Linda Samuel.**
Q Okay. And what did they do?
MR. SOHN: Counsel, in the interest of a -- getting a clean record, are you okay with a standing objection to all questions about the scope and responsibilities of AFMLS?
MR. CAMPBELL: Yeah, you can make that standing objection.

MR. SOHN: Great. Standing objection. Standing objection to all questions about the scope and responsibility of AFMLS, given that this -- this subject is outside the scope of the 30(b)(6) notice.
Q And you can answer my last question.
**A This is in 1999?**
Q Yes.
**A Their primary responsibilities in 1999 was international advice to the chief.**
**This was around the time, it was either in 1999 or 2000, when the international unit was created. But at the time -- it's a little bit complicated in the sense of the time.**
**Because in 1999 Gerry McDowell, Gerald, G-E-R-A-L-D, left as chief of AFMLS, and John Roth became chief of AFMLS. And so AFMLS was a slightly reorganized, although what they basically did was the same.**
**But they would have been primarily going around and providing support -- I mean, all of the -- all of the systems that we talk about now,**

77

**that we take for granted now, like you send a mutual legal assistance treaty request to Switzerland, and they -- they will restrain funds for you, those were all being built in the 19 -- late 1990s, in the mid 1990s, up through the early 2000s, and even really today to some countries.**

**So they were providing a lot of assistance both to foreign counterparts, in terms of how you try to build this system where countries can cooperate together; and also at times -- I don't know if it was as early as 1999.**

**But at some point in the early 2000s they were assisting U.S. Attorney's Offices that had cases where assets were overseas, trying to work with the foreign counterparts to try to get the foreign counterparts to help the U.S. prosecutors do those assets.**

Q And those -- those cases would be -- would be brought to AFMLS by the U.S. Attorney's Offices?

**A I don't know what you mean by cases brought to AFMLS.**

78

**AFMLS wasn't typically on those cases in the international context. I think there was one later in the 2000s, like later, in a later time period, that AFMLS did so much work overseas, they joined the case as kind of a -- but typically these are prosecutions being done by U.S. Attorney's Offices. And AFMLS' role is to act as a liaison and to give assistance as they're dealing with their foreign counterparts.**

Q Okay. And in 19 -- staying in the time frame of 1999, would AFMLS conduct its own asset forfeiture investigations?

**A The only asset forfeiture investigations AFMLS would have conducted in 1999 would have been in conjunction with a money laundering investigation that it had joined. But, again, it probably didn't open the money laundering investigation. It would have joined one with the U.S. Attorney's Office.**

**Or similarly, my understanding is that we were asked to join occasionally domestic money laundering -- I mean, forfeiture cases that were,**

79

**you know, brought to us by the U.S. Attorney's Office, where we didn't -- we didn't personally open them. We joined them to help with expert assistance on the forfeiture part of the case.**

Q Okay. And putting aside any domestic efforts for the moment. What would be AFMLS' involvement in international asset forfeiture -- in asset forfeiture investigations in 1999?

**A In 1999 it would have been primarily as a liaison, working with foreign governments or working with U.S. Attorney's Offices, to either both -- working with foreign governments to both build the system that would do it; and at times working with U.S. Attorney's Offices, helping them with foreign governments to try to figure out how they might be able to restrain and return property, if that was even possible at the time under their laws.**

Q Okay. Were there any policies in place for the -- the conduct of AFMLS in 1999?

**A I mean, there is a -- I mean, there are -- the policies -- there's the policy guide to**

80

**asset forfeiture. We have a policy manual on asset forfeiture, which is a public document and I'm pretty sure existed in 1999.**

**There are delegations from the Attorney General through the CFR to the Assistant Attorney General. And then there are policies that just people set as supervisors.**

Q Did you --

**A And the U.S. -- U.S. Attorney's manual.**

Q Were there any policies specific to AFMLS' investigations?

**A I don't think so. Because I don't think there were any AFMLS investigations in 1999.**

**I interviewed a lot of people that were there in 1999. And our role in 1999 was to serve as experts that could be added to other people's cases and investigations. We didn't have our own investigations in 1999. What we did do, though, is work closely with people who did have them.**

**So, for example, we would work with U.S. Attorney's Offices, and would become part of the investigative team or try to get -- or give them**

**legal advice or other things to try to further their investigation.**

**So we had investigations, but they were in -- usually in conjunction with a U.S. Attorney's Office.**

Q And how would that process work?

**A The U.S. Attorney's Office would typically call and ask for assistance.**

Q Okay. And would the U.S. Attorney's Office be responding to any international request?

**A They could.**

**In this case, for example, the U.S. Attorney's Office in the Southern District of New York responded to requests from the Government of Nigeria for assistance via an MLAT.**

**And then AFMLS would have helped -- would have worked with the Southern District of New York and OIA, and those type of things, to give advice and guidance.**

Q Are you talking about this case in particular?

**A I know -- I know that there was some done**

**on this case in 1999 by AFMLS and -- but that SDNY was the lead on the MLAT response.**

Q Are you referring to the MLAT request that was received in or around November 4, 1999?

**A Yeah, I don't know that AFMLS was responsible for that. I think that AFMLS was at the meeting with the Government of Nigeria in 1999.**

Q Okay. Who was responsible for that MLAT request?

**A Well, the Government of Nigeria sent it.**

Q Right.

**A All MLAT requests, other than extradition, go to the Office of International Affairs, which is the Attorney General's delegate for handling mutual legal assistance requests.**

**And so it would have gone through the Office of International Affairs, and then been assigned to -- they -- they assign someone to do the commissioner subpoenas and those kinds of things to get records.**

**And my understanding is it went to the**

**Southern District of New York and the Northern District of Georgia. I don't know if 1999 was the Northern District of Georgia, too.**

**But they would have gone out to those offices. And then the FBI -- I believe it was the FBI that served the subpoenas. And then the -- there was a -- an AUSA in SDNY that was -- was looking at it.**

Q Okay. So who was -- who was responsible for the investigation and response to the November 4, 1999, MLAT request?

MR. SOHN: Objection. Asked and answered.

**A It would have been SDNY, with any assistance from AFMLS that they had requested.**

Q And --

**A And the FBI.**

Q Can you identify any individuals from the SDNY who were handling that MLAT request?

**A I know there was an individual from SDNY that attended the 2001 meeting. I believe it's the same individual that handled the MLAT request,**

**but I'm not certain. I don't know for sure.**

Q And who was that individual?

**A It's on the document. It's, like, Richard somebody. I can't remember his last name.**

Q Strassberg?

**A Yeah.**

Q Okay. And what was his role?

**A He was investigating it from SDNY. He was investigating the Abacha matter.**

Q And who from the FBI was involved?

**A In 1999?**

Q Yes.

**A I don't know. It would have been someone probably in New York that served the subpoenas on the banks.**

Q Richard Strassberg, he was involved in 1999?

**A I'm not sure. By 2001 he was the representative from SDNY. SDNY was involved in 1999. I'm not sure -- a hundred percent sure it was Richard Strassberg, but I believe that it was.**

Q Do you know who was involved from the

SD -- SDNY in 1999?
**A Not for sure.**
Q Okay. And who was involved from the OIA in 1999?
**A It was the Nigeria desk.**
**I don't think Jason Carter remembered whether or not he had been the person, when I interviewed him. But he was involved in the Bagudu extradition. But it was definitely the Nigeria desk from OIA that it came through.**
Q Can you identify any individuals on the Nigeria desk who -- who was -- who were involved in --
**A I can't.**
Q Okay. And who from -- so -- so this MLAT request, AFMLS was asked for assistance?
**A I don't know if we were asked for assistance on the MLAT request itself.**
**I know we were aware of the Abacha matter and -- or became aware of the Abacha matter, as I think everyone was. I think we had discussions with -- at some point there was a meeting with the**

**Government of Nigeria representatives in Washington, and we attended that. And I think that was with regard to assistance, including the -- the outstanding MLA.**
Q Do you know when that -- when that meeting occurred?
**A Either '99 or 2000.**
Q And who was at that meeting?
**A I think Dan Claman was the representative from -- from AFMLS.**
Q And why was Dan Claman involved?
**A He was the -- one of the -- and -- in the AFMLS international unit at the time, if it had been created. If not, he would have been special counsel for International at AFMLS and would have been one of the subject matter experts OIA would have relied upon as trying to figure out what to respond to.**
**And, also, at the time the U.S. was looking -- well, I can't say that, I guess.**
THE WITNESS: Can we have five minutes? I want to make sure I'm not going to disclose

privileged information.
MR. CAMPBELL: Sure.
VIDEO SPECIALIST: Okay. Please stand by.
We are going off the record at 10:53 a.m.
(A recess was taken.)
VIDEO SPECIALIST: We're going back on the record at 11 a.m.
BY MR. CAMPBELL:
Q Ms. Hicks, you understand you're still under oath?
**A I do.**
Q Okay. Before the break you had referenced a meeting in Washington with Nigeria representatives.
**A Yes.**
Q And do you know when that meeting occurred?
**A It was either 1999 or 2000.**
Q It was after the U.S. received the November 1999 MLAT request?
**A It was.**

Q Okay. And who initiated that meeting?
**A I don't recall. I mean, I don't know.**
**Typically -- it's not uncommon to meet with a foreign government or have discussions after you get an MLAT request, to discuss -- to make sure that it's written in the way that we can respond and stuff under the treaty. But I don't know whether it was initiated by the Government of Nigeria or the U.S.**
[redacted]
Q Was it before the November 1999 MLAT came in?
**A I know I have the date somewhere, but I just don't remember off the top of my head. But**

**it was around that time.**

COURT REPORTER: You have to let him finish the question.

THE WITNESS: Oh, sorry. Sorry.

**A I have no idea.**

Q Okay. Moving back to the meeting in Washington.

Who -- who attended the meeting?

**A It would have been representatives from OIA, and I believe Dan Claman attended for AFMLS, and representatives from the Government of Nigeria.**

Q Do you know who from the OIA attended?

**A I think it was John Harris, but I'm not a hundred percent sure.**

Q What was John Harris' role at that point?

**A For a while he was the acting director of OIA. And I don't -- I can't remember when his acting ended and Molly Warlow took over. I -- I don't have -- off the top of my head, I don't have those dates. But at some point he was no longer acting and Molly Warlow became director of OIA.**

Q And why did Harris attend this meeting?

**A I'm not a hundred percent sure he did.**

Q Okay.

**A It's going to depend on the timing of the meeting and who is probably acting.**

**I think in 2000, though, he would have still been acting, because he ended up going in 2001 to the meeting.**

Q And anybody else from OIA was there?

**A I have no idea.**

Q Okay. And Mr. Claman was at the meeting?

**A I believe he was.**

Q And he was at AFMLS at the time?

**A He was.**

Q Anybody else at AFMLS attend the meeting?

**A I don't know.**

Q And what was the purpose of Mr. Claman's presence at that meeting?

**A I think the purpose of Mr. Claman's presence at these meetings is -- is that -- and one of the reasons -- things I wanted to talk about, was to make sure I can answer this in the nonprivileged way, was, at the time there was a**

**tremendous focus in the United States government of assisting Nigeria to recover funds. And as part of that, we were also looking for funds in the United States. This is part of the commitment that the government had made to help the Nigerians.**

**There had been a congressional inquiry about banking by General Abacha in the United States. As well, there is a congressional investigation. And so part of what AFMLS was doing, along with other parts of the U.S. government, was trying to figure out whether there were assets in the United States and whether there was anything we could do to investigate the claims about -- to investigate the missing assets, to try to locate them for the Government of Nigeria.**

Q So -- so the U.S. at that time was both assisting Nigeria in Nigeria's request. Right?

**A (No verbal response.)**

Q And also independently investigating for funds in the -- in the United States?

**A Yes.**

Q And who was -- who was -- and -- and which department was tasked with -- with the function of looking for funds in the United States?

**A Well, it would have been sort of a joint effort. Because a lot of times the way these work -- and I think the way it worked here is -- you get these incoming MLATs saying that someone in our country violated the law, in this case General Abacha, and sent money to, we believe, your country, and please tell us what it is.**

**Right?**

**So on the one hand you're collecting the evidence via the MLAT to send back to the foreign country to help them.**

Q Right.

**A At the same time you're reviewing the evidence that you get via the MLAT to see whether or not there are any U.S. persons or U.S. violations of law or other things that might warrant further investigation or further leads in the United States.**

**So I think when you -- I think it's very hard to talk about responding to an MLAT in a way that separates out what part of it's for the foreign government versus what part of it's for the United States investigation.**

**Because those tend to -- because MLATs tend to be executed by prosecutors and by special agents, that tends to be kind of one thing. Which is, Oh, we've got these bank records in. Let's look at them for our own purposes. In addition to, the primary purpose of going to get them was, of course, to response to the requests coming in. If that makes any sense.**

Q Okay. Who else was at the Washington meeting --

**A I don't know.**

Q -- from the United States?

**A I don't know.**

Q And who from Nigeria attended that meeting?

**A I don't know.**

Q Okay. And what was discussed at the meeting?

**A Responding to the Nigerian MLAT and -- and making -- and trying to figure out to make sure that we got them what they wanted and that -- and that the treaty was complied with.**

Q Any -- anything else discussed at that meeting?

**A I'm sure there was -- this is a bit of speculation. But I believe there was also a discussion generally about what the United States might be able to do to assist beyond the MLAT.**

Q Okay. At that point in the meeting, had the United States retrieved any documents in response to the MLAT?

**A I don't know.**

Q And at that point was the United States reviewing information to determine whether there was anything else the United States could do?

**A I believe it was.**

Q Okay. And who was -- and who was doing that review? Let -- let me rephrase that.

Who was involved in that review?

**A See, I think it's hard to say in the way that you phrased the question. Because I think it implies that kind of this person was assigned or that kind of person was assigned. And I think it's more of a, for lack of a better word, a team effort, where people are talking to each other about what the possibilities are. People are getting information from various sources. AFMLS was going at various times. Although I'm not sure before the 2000 one.**

**But would have -- you know, I know FBI, for example, had meetings in Nigeria, the FBI Legat in 1999, with the Government of Nigeria, to talk about the theft.**

**So there's all this kind of U.S. government activity going on, and various pockets that connect and then disperse and then connect again. So it's very hard to be, like, This is the person who is responsible for it. When what you really have is $2 billion missing from Nigeria, and a bunch of countries and a bunch of people trying to figure out what happened.**

101

**remember it off the top of my head.**
Q Okay. Do you know if he was involved with any of the various functions that -- that you just described?
**A Since I don't remember the name, I -- I can't say.**
Q Okay. Now, so, there -- was -- was there an asset forfeiture investigation going on at -- after the United States received the November -- November 1999 MLAT request?
MR. SOHN: Objection. Asked and answered.
**A I mean, it depends on what you mean by "an asset forfeiture investigation."**
**I would say yes, because we were looking for assets that belonged to the Government of Nigeria in the United States. So I would call that an investigation. So, yes.**
Q Well -- did that review include assets that were located in other countries?
**A In 1999?**
Q Yeah.

102

**A I think in 1999 our primary focus was still looking in the United States.**
Q Okay. Were there other focuses in 1999?
**A Not that anyone I spoke to recalled.**
Q Okay.
**A I mean, this is 20 years ago, so people's recollection of this is not great.**
**But the main focus when it was first asked was about the United States and assets in the United States in 1999.**
Q And who did you -- who provided you with information concerning the steps taken after the 1999 MLAT?
**A Well, I have a copy of the MLAT.**
Q Uh-huh.
**A I, as we talked about earlier, got documents related to -- well, I guess that was 2001, back and forth. I spoke to numerous people at AFMLS about how AFMLS worked. I spoke to Dan Claman.**
**I spoke to OIA, Jason Carter, who would have been on the Nigeria desk in 1999. Didn't**

103

**have a specific recollection of having been assigned to the Abacha matter in 1999. He was the only one from OIA that was still at OIA that was there in 1999 from the Nigeria desk. But we did talk about generally how it worked.**
**And -- and I saw documents related to the -- the -- like I said, the MLAT.**
Q Are you familiar with an individual named Abubakar Bagudu?
**A I am.**
Q And do you recall seeing Mr. Bagudu's name in the MLAT request that you reviewed?
**A I did.**
Q And what steps did the U.S. government take regarding Mr. Bagudu after it received the 1999 MLAT request?
**A I don't understand the question. I mean, like, everything from 1999 to 2018, what did they do with regard to Abubakar Bagudu?**
Q No. Let's -- let's cabin the time frame.
The government receives an MLAT request in November of 1999. Correct?

104

**A Yes.**
Q And Mr. Bagudu is referenced in that -- in that MLAT request?
**A Yes.**
Q And you've just discussed the various things that the U.S. government was doing in response to that MLAT request.
Did any of those activities concern an investigation into Mr. Bagudu?
**A I think to the extent that Mr. Bagudu was involved in moving assets from -- that were stolen from the Government of Nigeria, and we were trying to locate assets, yes.**
**That -- that would involve Mr. Bagudu, in the sense that he helped move the assets out of Nigeria. But I don't know whether or not there was any -- there was no discussion of Mr. Bagudu that came up in any of my interviews or the documents I reviewed that separated him out from the general hunt for Mr. -- for General Abacha's assets.**
Q Okay. What about any assets that were

alleged to belong to Mr. -- Mr. Bagudu; were -- were those discussed?

**A Only to the extent that they are also considered -- I mean, I don't think -- nobody -- nobody that was involved in those discussions or that I talked to thinks of it that way. And so it becomes very difficult to answer these questions.**

**Because what people think about it is, we're trying to find assets stolen by General Abacha and his co-conspirators. To the extent that Mr. Bagudu is identified as one of the co-conspirators who helped steal assets out of Nigeria, yes, that would have been -- that would have been part of the overall hunt for assets belonging to the Government of Nigeria that he either entered or moved through the United States.**

**I don't know, and I don't -- no one mentioned it, and as they talk about this to me, that there was a -- this kind of very lawyerly division among people.**

**I think it was, More than $2 billion were stolen from Nigeria. Let's go see if any of it**

**ended up in the United States, so we can help the Government of Nigeria recover its assets.**

**And in the process of that, maybe we might uncover liabilities or criminal actors in the United States; for example, the congressional hearings and report issued about the banking system and private banking.**

Q Okay. Going back to the -- to the meeting in Washington that was attended by OIA, AFMLS, and --

**A The meeting 20 years ago?**

Q The meeting 20 years ago. Correct.

What -- what documents did you review concerning that meeting?

**A I don't think there were very many documents about the meeting itself. I think people knew that there was a meeting, and I was told there was a meeting, and there was the incoming MLAT. I don't remember seeing any specific documents to that meeting.**

Q Do you know if anyone took notes at that meeting?

**A I don't.**

Q Would it have been typical for someone to take notes at that meeting?

MR. SOHN: Objection. Calls for speculation.

Q Would it have been the plaintiff's practice to take notes at that meeting?

**A It would be now. I don't know what the practice would have been in 1999.**

Q Did you review any documents -- let me -- let me take that back.

Do you know if there were any documents handed out at that meeting?

**A I don't know.**

Q What's plaintiff's understanding of the -- the take-away from that meeting?

MR. SOHN: Objection. Vague.

**A I mean, I think we were still just trying to comply and respond to the 1999 MLAT request.**

**I think that was the primary purpose of the meeting, was to figure out what the Nigerians really wanted and needed from us, and to make sure**

**we were going to get it for them.**

Q Were any additional promises made by the U.S. government to a Nigerian representative at that meeting?

**A Not that I know of.**

Q Any additional investigative steps that were discussed that the U.S. would take after that meeting?

**A I don't know.**

Q Any -- any targets, individuals that the U.S. would look into after that meeting?

**A I don't know.**

Q Who would know?

**A I'm not sure anyone at this point knows. Because I think people's memories of each meeting are very vague at this point.**

**So I think if there's not a document from it, that no one's probably going to remember perfectly a meeting that happened 20 years ago, and it was one of a series of meetings that occurred on a topic.**

Q And why is that?

**got to go through, you know, numerous layers before it's actually filed.**

Q And that applies to 2005 onward?

**A Yeah. I mean, I think from 2005 onward, you would need, at the very least, the approval of the chief of the section to file a complaint.**

**To draft a complaint, I mean, I don't think you need anyone's approval to draft something. I think you need approval to file it.**

Q Do you understand when -- when a complaint -- when a draft complaint -- when a complaint was being drafted in connection with -- with this forfeiture litigation?

**A I know there was a complaint drafted, because I reviewed it, in 2013. I don't know when the exact date that the drafting process would have started.**

Q Did you discuss that with anybody in preparation for this deposition?

MR. SOHN: Caution the witness not to reveal the specifics of any attorney-client -- or I'm sorry, any work-product communications.

**A I know the complaint as drafted, I believe -- well, I really focused on when the pros memo was being drafted, because that's the -- the mechanism through which you get approval. And that I believe started in or about February of 2013.**

Q And was there a complaint drafted before that date?

MR. SOHN: Objection. Asked and answered.

**A I don't know if -- drafted implies it was done. I don't know when they actually started drafting the complaint.**

**The complaint wasn't done until around the time that it was filed. I mean, there were various drafts of it, inevitably. But it wouldn't have been -- you know, so whether there was a draft in process or not, as of the time they were doing the pros memo, I don't know whether they chose to do the pros memo first and then the complaint, or the complaint and then the pros memo, or to do them simultaneously. I can't say.**

Q Do you know who was drafting the complaint?

**A I believe Elizabeth Aloi.**

Q Do you know if the FBI was involved?

**A The FBI would have involved. It would have been Debra LaPrevotte, at the very least, and -- would have, very least, been involved. Because the FBI has to verify in a forfeiture action. Unlike other types of civil complaints, they have to be sworn to by an agent, typically an agent. And so, inevitably they become involved in the process, because they have to verify it.**

Q And who -- who -- who was responsible for making the decision whether to file the complaint in this action?

**A Well, the initial recommendation would come from the trial team, which would have been Elizabeth Aloi and Dan Claman. That would have gone up through their supervisor, who was Linda Samuel.**

**And I think Linda was still involved in this case. Eventually her health declined to the**

**point that she wasn't really doing much work. But I'm -- there was parts of this case that I know she was involved in.**

**Then it would have gone to the chief of the section, which would have been Jai Ramaswamy. At the time I don't think we had -- for the early part of it, I don't think we had a principal deputy chief.**

**And then when the principal deputy chief joined, which would have been Tyndall Dey, he would have been involved, but at a lower level, obviously.**

**The chief of the section had numerous discussions with the AAG's office. At the very least, that would have been the Principal Deputy Assistant Attorney General Mythili Raman. And I believe probably also Lanny Breuer, who was the AAG at the time. It kind of depends on the timing of those discussions. But --**

Q Was that the structure in 2008?

**A That was the structure starting in 2009 when Lanny came. In 2008 the chief would have**

137

been Richard Weber. The DAAG would have been Ken Blanco. And I believe we had an acting AAG, I think it was Matthew Friedrich.
Q And the person making the recommendation would have still been Dan Claman?
A That's the way it works. Is that the trial team makes a recommendation, in consultation with their supervisors. In 2008 it would have been Dan, and not Liz, because Liz hadn't joined the section.
The initial -- the final one I think was recommended by Liz, because she would have been the trial attorney and Dan would have been in a supervisory position at that point.
Oops. Excuse me.
Q Well, we're going to move on to -- to document filing, storage, and retention.
A Sure.
Q What did you do to prepare for this portion of Topic Number 1 of the deposition notice?
A Document retention, filing, this is 1G.

138

I interviewed the CIO for the criminal division of the Department of Justice. I obtained -- I spoke to FBI. I spoke to OIA. I got written input from OIA. And I think I -- I can't -- I don't think I got it as to 1 from FBI, but I might have. I'll have to go back. I have to look at what they sent me. But I got -- that's what I got.
And -- and I reviewed the archiving policies for the Department of Justice --
Q Okay.
A -- criminal division.
Q Starting in 1999, how were electronic documents maintained in -- in AFMLS?
A They were retained in a variety of ways.
So from '99 to 2009, the department, criminal division, our IT services, used a series -- when you say "electronic documents," do you mean electronic case documents, or do you mean electronic e-mails? What do you mean by electronic documents?
Q Let's start -- let's start with e-mails.

139

A Okay. From 2009 -- from 1999 to 2009, they were retained in one of two ways.
They could be printed out, if they were particularly important, and added to the case file. The other way they were retained is, attorneys could keep them on their computers.
We went through a series of mail -- electronic mail applications. So every time they would roll out kind of a new IT system, attorneys would -- could request, and IT generally tried to do it, although sometimes there were systems failures, roll the e-mails from one computer to the next computer or to the next system, because they were stored on the individual attorney's computer.
Q So are you describing the print and file system?
A There's both. It's -- it's stored both ways.
It is a print and file system. But in addition to that, they also provided -- you could store them electronically on your computer. Some

140

attorneys did that.
That's where they were physically stored in terms of it -- important e-mails, e-mails important to your case, should have been printed and filed. But there also was a way to keep them electronically, which was not as secure. Because as they changed systems, they had to reimport them from system to system up through 2009.
In 2009, the entire system changed. But that's the way it went --
Q We'll stay 2009 prior.
A Okay.
Q The process you're describing, that applies to AFMLS?
A It applies to the entire criminal division.
Q So that would -- that would include OIA?
A It does.
Now, OIA had a separate system. Which is, OIA had an Oracle database that they could upload information into. I don't know if they -- what they did with e-mails. But they could upload

**specific information into the Oracle database, in addition to whatever IT -- other IT systems they provided.**
Q Okay.
MR. CAMPBELL: Mark this as Exhibit 2.
(Hicks Deposition Exhibit 2 marked for identification and is attached to the transcript.)
Q Ms. Hicks, the court reporter has just handed you what's been marked as Exhibit 2.
**A Yes.**
Q Do you recognize this document?
**A I don't. But it looks like the retention guide.**
Q Did you review this document in preparation for this -- this deposition?
**A I did not.**
Q Did you review any retention guides?
**A I did. I -- I reviewed the national archives, about what happens with -- with cases that are sent off.**
Q Okay. Does this guide apply to the criminal division?

**A It would have in 2002.**
Q Do you know if it applied to the criminal division at points after 2002?
**A No. I don't know that it's ever -- it was interesting talking to the CIO. Because technically we still apparently are in a print e-mail message system, but nobody actually does that. So it's -- it's an interesting system that we've set up here.**
Q Okay. Well, we'll talk about that.
That -- that reference is to post 2009?
**A Yes.**
Q Okay. So staying prior to 2009.
If you go to -- to the first page, or right after the table of contents of this document, this policy applies to archiving, saving, and printing messages. Is that right?
**A Let me read.**
**Yes.**
Q Now, do you have an understanding of the -- the automatic deletion function prior to 2009?

**A Prior to 2009?**
Q Yeah. Let me ask -- let me rephrase.
**A You mean when the mailbox became overfull?**
Q No. Was there -- was there a purge function prior to 2009 for e-mails?
**A A purge function being by the user or by IT?**
Q By IT.
**A There was -- there wasn't a way prior to 2009, and actually even -- I think even after 2009, in the sense that users' mailboxes could become full, and they would have to deal with it.**
Q And -- and what would happen if a user's e-mail box became full? The IT would deal with it?
**A Yeah.**
Q Now, was there -- was there an automatic deletion or an automatic purge function --
**A Yeah, I think they did, if you didn't take steps to save them.**
**Although, in talking to the CIO, a lot of**

**people did take the steps to save them at the time.**
Q And if someone didn't take steps to save them, when would that -- to save an e-mail --
**A Uh-huh.**
Q -- when would that e-mail be deleted?
**A I don't know the exact number of days. I don't know how long they kept them.**
Q If you -- look at the first page. And you see that first paragraph under Background?
**A Uh-huh.**
Q That last sentence says, "In order to maintain at optimum performance levels, the automatic mail purge feature for deleting messages 90 days or older will be used."
Is it your understanding that messages that were 90 days or older would be -- would be purged from the -- from the e-mail system, unless someone took a step to save it?
**A That's what this says. But that is -- it's not necessarily my understanding that that was always true.**

Q Well, what's your understanding about an automatic -- the automatic purge or the automatic deletion system?

**A My understanding is that they're talking about purging it from the network, because it talks about network deg -- degradation. When, in fact, at very -- some of the mail services, depending on what time you're talking about, they were -- they could be -- you could set it up to save them locally.**

**So they were purged from the network. But some of -- my understanding is prior to 2009 there were systems set up, depending on what software they were using at the time, to maintain e-mails locally on user's hard drives, as opposed to keeping them on the network.**

**They didn't have the server vaults that they have since put in since 2009.**

Q But the user -- the user would have had to designate a certain e-mail for -- for that process to kick in. Right?

**A I don't know.**

Q So --

**A It's not the impression I got from talking to the CIO. But -- but I'm not sure.**

Q So prior to 2009, if a user received an e-mail and did nothing to save that e-mail, would that e-mail have been automatically deleted at some point?

**A I don't believe so.**

Q What's the basis of that belief?

**A My interview with the -- the CIO for the criminal division.**

**My understanding is, is that, prior to 2009, when the Enterprise Vault system was set up, that -- as a practical matter, that the -- that users could save -- that -- that e-mails at times, depending on the system they were using, could -- could be maintained on the user's hard drive, as opposed to in the network.**

**And that as they switched to the next e-mail system, they would attempt to -- and sometimes successfully did -- move those e-mails over to the next system to be accessed by the next set of e-mail software. That is what I was told.**

Q And which e-mails were -- were -- let me rephrase the question.

It -- not all e-mails were moved over to that separate system. Is that right?

**A I think it depends on what -- what I was told, it depends -- they -- they went through a series of software of e-mail delivery devices. And -- and depending on what -- which one they used, they stored them according to how that system worked.**

**So I don't know particularly more than that. But I was told that users could at times save them electronically on their hard drive. And whenever they changed systems, they would try -- they would do their best to try to technically move them over to the next system.**

**I was also told, for what it's worth, that the goals and stuff of policy do not always match the practice, because of just as a practical matter.**

Q Now, if you look at the -- the third paragraph of the -- of the policy I handed you.

**A Uh-huh.**

Q The paragraph refers to a automatic daily purge process?

**A It does.**

Q What is that?

**A Let me see.**

**Do you know which system this is under? Because they went through a series of e-mail systems.**

Q This is part of a policy that you see in front of you --

**A Right. For 2002.**

Q Yeah.

**A I don't know. I was told they went through a bunch of different systems, so I don't know.**

**And apparently they don't even have a record of all the systems they used for electronic mail.**

Q So users could designate e-mails to move onto a different system. Is that --

**A Right. Or archived in folders, as it says here.**

Q Or archived in folders.

**A Which I think is what -- I think is the process they were talking to me about.**

Q But they weren't required to do that?

**A Like, all e-mail?**

Q Yes.

**A I'm sure they were not required to do all e-mail.**

**I mean, in general, there's an understanding that you'll maintain e-mails that are of substance, that you need to maintain for your cases. But what files you maintain for your cases has always been left up to the trial attorney discretion.**

Q And -- and what -- what factors would go into what e-mails to maintain?

**A Ones with significant information on them about the case.**

Q And who made that decision?

**A The trial attorney.**

Q And would the trial attorney communicate that decision to -- to others involved in the matter?

**A Not particular -- not necessarily. They would, once there was litigation, where you need a litigation hold. But you wouldn't before that.**

**I mean, there -- it's also going to be -- it's also going to depend on, when you say "case," what you mean by a case. Right?**

**If you're just taking advice and guidance to people, you might not retain those. If it's just like, Oh, I have this case that does this, what do you think?**

**On the other hand, if you're investigating something and you think you're going to file something on it, you would maintain a lot broader number of e-mails about it, because you know you may be engaged in litigation.**

Q Okay. Now, if a user did not decide to retain an e-mail and move it onto a different system, what happened to that e-mail?

**A Even if they decided to retain it and move it onto a different system, the e-mail could have been deleted through technical problems. That was made very clear to me. That they had a number of times where they tried to move e-mails over, and they just failed to move. Otherwise, as they changed systems, they would also have been deleted.**

**But it's impossible at this point to go back and -- and tell whether it was deleted purposefully or whether it was just a failure of the system to move it over.**

Q Now, you -- you mentioned technical problems of -- of moving e-mails over to a different system.

What are you referencing in particular -- in specific -- in particular?

**A The way computers work.**

**I mean, you're talking about art -- taking stuff created in one e-mail system, moving it over to another e-mail system. And some of this stuff is 20 years ago, so you're talking about the technology at the time. Sometimes it moved over, sometimes it didn't.**

**I've got files even now that systems totally corrupt, for no apparent reason other than they just corrupted them.**

**So it was made clear to me that when you're talking to -- about electronic data, there -- the best is done to move it over, as they could. But any significant e-mails were to be printed and stored at this time frame. And -- and that would have been at the trial attorney's discretion, as to what was significant.**

Q Or any other user's discretion?

**A Or any other user's discretion.**

Q Right.

**A And then the other issue that comes up is when you have cases that start and stop. You think may it's over, and then it restarts again. Right? And then you're like, Oh, I didn't know I was going to get back into this, and those kind of things.**

**So -- but it's at the user's discretion.**

Q What -- so there was a e-mail -- a system

157

point prior to 2009 where e-mails were lost?
A No. They -- they don't have that kind of institutional knowledge anymore in our IT.
But what we were -- what I was told is, is that any time you transitioned prior to that from one e-mail system to another, there was a risk that e-mails would be lost.
Whether any e-mails actually were lost would depend on individual users remembering that that had happened.
Q Now, this -- this system that you're describing, it applied to -- to AFMLS?
A It applied to the entire criminal division.
Q Okay. And what about the FBI?
A No. The FBI has its own system.
Q What's the FBI's system? Prior to 2009.
A Well, it's interesting that you said that.
Because the FBI system I think was very similar to the criminal division's prior to 2009, in the sense that they didn't have a system to

158

maintain it.
I believe it was in or about 2009 in which on the high side, which is the classified side, which is really where they do most of their e-mailing, even in unclassified matters, they installed a similar system to the criminal division. They installed a vault system at the FBI, as well.
Q And I'm sorry, that was in -- around the same time?
A Uh-huh.
Q Okay.
A Yes.
Q So before that at the FBI, like in -- like what you just testified to regarding the criminal division, retention of e-mails would be at the discretion of the user?
A I think FBI, because they're agents and they have cases, they had -- they had rules specifically requiring them to retain e-mails that were case-specific.
Q Do you know those rules?

159

A Not off the top of my head, but I know they have them -- had them.
Q And those rules would govern which -- which e-mails they would print and save?
A I don't think they were that specific. But they were general guide -- they were guidelines to agents about needing to -- to save and -- and preserve e-mails that were related to cases, that would include factual statements and those kind of stuff related to cases.
Q Did the criminal division have any rules like that?
A I don't think so, in part because of just our role is different.
Q Now, this -- this document references retention of official records. Is that right?
A Right. Yes.
Q So what -- what was an official record?
A Well, if I could look at the -- I think it's in the archives thing.
So official records tend to be --
Q Well, before -- there's also --

160

MR. SOHN: Counsel, she was --
Q Go ahead. Finish your answer.
A Yeah. I think there may be a definition in the archiving policy. I'll have to look. I can't remember.
But an official record generally is the stuff under archiving things. So that's often decision memos, things like that.
Because remember, the criminal division, while we think of it and talk about line-level litigation, there's also larger policy decisions and things like that being made by the Assistant Attorney General, which there are statutory requirements to keep.
And so when I think of official records, I'm thinking of the national archiving responsibility of what you have to keep. And so most -- almost all of these kind of policies will have something in it, basically saying, Just because we tell you you can delete it doesn't get you out of the archiving rules. Right? And so that's to me what that is a reference to.



161

Q What did Ms. Aloi just put in front of you?

162

Q Let me -- let me direct you back to the Exhibit 2 that we've been discussing?
**A Uh-huh. Yeah.**
Q If you look at Page A-1?
**A Yes.**
Q You see the -- there's reference to official records there?
**A Uh-huh.**
Q Why don't you just take a couple of seconds and read that.
**A Right.**
Q So would a -- would a -- so would an official record include a -- a communication related to -- to an MLAT request?
**A Maybe. It depends on what the**

163

**communication was.**
Q What does it depend on?
**A Well, you'll see is -- and preserved or appropriate for preservation by that agency, as evidence of the organization, functions, policies, decisions, procedures, operation or other activities of the government, or because of the informational value of the data in them.**
**You could have information going back about an MLAT request that -- that I don't think would necessarily meet that definition.**
Q Like what?
**A You could have e-mails like, have you responded yet, here's a copy of it, here's -- I mean, some of it is not really -- there's no substance to them. They're just -- they're just, you know, internal discussions that don't lead anywhere.**
Q So -- so if a -- if a communication had any amount of substance in it concerning an MLAT request, it would fall under the definition of a --

164

**A I don't think any amount of substance --**
MR. SOHN: Objection. Misstates testimony.
**A -- would be sufficient.**
**I think that it needs to be what it says here, which is evidence of the organization, function, policies, decisions, procedures.**
**I mean, if you did that, the government would just be nothing. I mean, there's no way to archive all that stuff. So it's supposed to be stuff that reflects major decision points, major parts of cases.**
**So, for example, in a case file, you would typically include the grand jury transcript in it and the grand jury exhibits. You wouldn't keep -- you wouldn't keep in perpetuity every bank record you got, even though that's a substantive statement, after the case -- you know, ten years after the case is closed.**
**So I don't think any substantive thing would be covered by this. I think, you know, things of serious substance, where decisions were**

165

**made or pivot points in a case, or things that -- like that.**

**Also, I think, to the extent that it's only repeating information that's contained in other documents, I'm not sure you have a requirement to keep the e-mail, as opposed to the underlying documents that it refers to.**

Q Okay. What's your understanding about -- let me rephrase that.

**A Oops. Sorry.**

Q The -- the various -- the criminal division also includes the U.S. Attorney's Offices?

**A It does not.**

Q Okay. So what are -- what's the document-retention policies for the U.S. Attorney's Office for the Southern District of New York?

**A That's going to be set by EOUSA. And my understanding, my belief is, is it would be at least what the criminal division policies would be, which would be ten years.**

166

Q And --

**A For money laundering and forfeiture matters. But I don't know that for sure.**

Q The -- the -- the way of maintaining e-mails prior to 2009 that you discussed for AFMLS, where it was at the user's discretion to retain or not, did that apply to the Southern District of New York's e-mail retention?

**A I have no idea. Because your -- your thing focuses on MLARS, OIA, and FBI. So those are the -- those -- that was -- that was my focus in determining this, was your focus in asking about it.**

Q Did you review any policies related to the Southern District of New York's document-retention policies?

**A I did not.**

Q Did you discuss that with anybody?

**A I didn't. Nor the other 92 U.S. Attorney's Offices.**

Q So that would also include the Southern District of Texas; you didn't ask anybody about

167

that?

**A No. Or the Northern District of Georgia.**

Q Now -- okay.

What about the Department of State; what's your understanding of the Department of State's document-retention policies starting prior to 2009?

168

189

Q Okay. Well, let me just ask a couple more questions, then we can break -- break for lunch.
**A Sure.**

190

Q Is that okay?
So the -- the plaintiff from 1999 to 2017 received correspondence from foreign officials --
**A It did.**
Q Right?
-- and what were the retention practices for those foreign correspondence?
**A They should have been retained by the office that received the foreign correspondence.**
Q And by who?
**A Well, if it's the correspondence to the President, the Office of the President should have maintained them. If it's a correspondence to OIA, Office of International Affairs should have retained it. If you're talking about official correspondence, as opposed to informal e-mails and those kinds of things.**
Q So if it's a correspondence to OIA, then the person who received it at the OIA should have retained it?
**A Yes; if it's an official correspondence from the foreign government.**

191

Q And it's at the -- it's at the person's discretion whether to retain it or not?
**A I don't think OIA would say, official correspondence. It's an official correspondence into it, as it's -- as the Attorney General's designee under these treaties, I don't think they have discretion about whether to retain that. I think they retain that.**
Q And what would -- what's your -- what's plaintiff's view of what an official correspondence is?
**A Okay. To me, that is like, here via MLAT, we're sending it from our -- our office to yours, to make a treaty request.**
**I don't know if someone said, Hey, do you want to talk about the treaty request by phone tomorrow at 3:00, I don't think that's an official thing. That's an informal discussion among people, among governments. Those happen all the time. I don't think there is any requirement to save that.**
**I think the formal request from**

192

**government to government, there would be a requirement by OIA to retain that.**
Q And what about the --
**A And I think they did retain that.**
Q Okay. And what about -- so the other communications that -- that aren't just the transmission of the foreign request, what were the retention policies for those transmissions, those communications?
**A Well, my understanding from talking to OIA is if it was a substantive matter that made a difference, they would upload those into -- they would retain them in their file or they would upload them into their Oracle database.**
**If it was not substantive, then they -- they -- you know, or important, then they wouldn't retain it. And -- and that that was -- you know, they kind of decided what -- what it was, just as trial attorneys decide what needs to be preserved.**
Q And who told you that information?
**A That was my discussion with Jason Carter and Colette Ford, both of whom have been at OIA**

**since the '90s.**
Q Okay. And what about AFMLS; if a -- if a communication from a -- from a foreign representative was received by someone at AFMLS, what was the retention policy?
**A It would be the same. It would be like any other correspondence. Which is, if it's an official correspondence, there's a whole set of records related to the chief and official correspondence that come in through the chief, and how that gets retained.**
**But if it's -- you're just talking about trial attorney to trial attorney, so you have a -- an informal or correspondence just at the trial-attorney level, it's going to depend on what's in it. And it's going to be up to the trial attorney's discretion for their case or investigation file about what goes in it.**
Q Do you have an understanding of -- of the criteria for issuing a litigation hold?
**A Yes.**
Q And starting with AFMLS, what's the

criteria for issuing a litigation hold?
**A Usually we -- the thing is, it's hard to say. Because in a lot of litigation holds, where there's ongoing litigation, you're really only worried about offices not involved in the ongoing litigation.**
**So because everybody that's the attorneys or your case agents or people associated with the case agent, that knows about the ongoing litigation, would know to hold the documents. So what you're really worried about reaching is offices that may not know that there's ongoing litigation.**
**And so usually then you would do a litigation hold to the -- to any -- to any people involved in your case, to ask that anybody -- part of the prosecution team, to ask that they preserve documents for discovery.**
Q So it would be more of an -- you said that people would know to retain documents if --
**A Well, they -- you can ask for an official litigation hold --**

Q Right.
**A -- through the FBI or through other things.**
**And then what they do is, at AFMLS we all get an e-mail saying there is a litigation hold in this matter, please do not destroy any documents related to that matter.**
Q And what would be the -- the -- the -- the trigger for a litigation hold?
**A It depends on -- on -- at the very least, discovery requests would be a trigger. Sometimes the filing of litigation.**
**Sometimes it's -- I've triggered them before in my own cases where I wasn't worried about anybody destroying anything, because there was an ongoing criminal case, but the criminal case closes and the civil case continues. And you're worried that the people that were only involved in the criminal part are, like, Woo-hoo, case is closed, we can move on with our lives. And you're like, No, don't move on with your life.**
**So I think -- I think the criteria is,**

**essentially, litigation, and a need to preserve documents for the litigation.**
Q What about if there's an investigation that precedes a litigation; would that trigger a litigation hold?
**A No; because it's a litigation hold.**
Q So you're saying -- so it's your testimony that -- that a litigation hold is -- cannot be triggered by an investigation?
**A A litigation hold cannot be triggered by an investigation.**
**I think, as we talked earlier, typically in an investigation there will be the need to maintain documents by the investigative agency, particularly by the investigative agency. And I've declined and dismissed cases where they failed to do that. So -- because you can't meet your discovery obligations.**
**So I think to the extent that you're planning on filing a case, you're going to have to be able to get approval for that case, to assure people up the chain you can meet your discovery**

209

A Not to my knowledge.
Q Do you know for sure that there wasn't?
A I don't. But, again, we keep e-mails in perpetuity way beyond what the Justice Management Division requires. So I know there's always been a -- I can't imagine why you would purge a shared drive.
Q What about the other -- the H drive; was there a purge process for documents stored on the H drive, an automatic purge process?
A An automatic purge process? Not that I know of.
Q Any other drives; were there any automatic purge processes?
A Well, when -- if someone leaves, anything on their laptop, they would, you know -- they would either destroy the hard drive or destroy the laptop or reformat it for the next user.
So that would probably have a -- but I don't think -- but it's not designed to get rid of that. It's designed to repurpose the laptop, unless they're -- they're getting rid of the

210

laptop. In which case, obviously they don't want criminal division stuff left on the laptop.
Q Did employees pre-2009 --
A Oh, let me correct that.
Q Sure.
A In 2009 we would not have had laptops; we would have had desktops.
Q Okay. But, now, would that same statement that you just made about cleaning the laptop hard drive, did that apply to -- to desktops when an employee --
A Yeah.
Q -- left?
A I'm sure it would have, yeah.
Q Okay. And what was the process for collecting data off of that desktop before it was wiped?
A I don't know. If it's like the current thing, I don't believe there is a process. I believe the employee is supposed to move everything off as they go.
They're supposed to farm out whatever

211

documents are still needed, and get permission if they're taking any documents with them from the department, just take them with them. And then IT comes in and does it.
I don't think IT has any other requirements other than that. And I'm assuming that it hasn't gotten less restrictive since 2009.
Q Now, we -- we mentioned John Harris before --
A Uh-huh.
Q -- before lunch.
Now, are you familiar when he left the -- the government's employment?
MR. SOHN: Objection. Outside the scope of the 30(b)(6).
A I don't know the date he actually left government, no.
Q In 2004 at some point?
A Maybe. Molly Warlow -- or I think her given name is Margaret Warlow -- became head of OIA around that time. But I don't know if John Harris left government or just wasn't the acting

212

director of OIA anymore.
Q Okay. Do you know the process for collecting any hard-copy files John -- John Harris maintained before he left?
A My understanding is, at OIA most documents would have been uploaded into the Oracle database system, and then the hard files would have stayed with whoever took over cases.
So, for example, if you're talking about Nigeria, and the Nigeria desk, hard copies of documents related to that and open cases are stored in storage related to the Nigeria desk.
For the OIA director, or the acting director, it would have just been made available -- it should have been made available to Molly Warlow. Because they're not his files; they're the agency's files.
Q Do you know if that happened with respect to John Harris' hard-copy files?
A I don't know specifically that that happened, but I don't have any reason to think that it didn't.

249

issued to the FBI prior to March 24, 2015, with respect to any Abacha matter?

**A No. Not that I know of.**

Q Okay.

**A Oh, I -- let me rephrase that. The MLARS litigation hold would have gone to the FBI in March or May of 2014, because that's when the litigation hold went out in the case. It got issued by the FBI in 2015.**

Q What do you mean," it got issued by the FBI in 2015"?

**A That's when their discovery person sent it out.**

MR. SOHN: Can we take a break for a privilege issue?

Is it for privilege?

MS. ALOI: Yes.

MR. SOHN: Okay.

THE WITNESS: Okay.

VIDEO SPECIALIST: All right. This is Disk Number 2. We are going to go off the record at 2:20 p.m.

250

(A recess was taken.)

VIDEO SPECIALIST: Here begins Disk Number 3. We're going back on the record at 2:25 p.m.

BY MR. CAMPBELL:

Q Ms. Hicks, your -- your counsel requested that we take a break. Correct?

**A Yes.**

Q Do you wish to clarify anything?

**A Let me see if I can thread the needle here on privileged versus nonprivileged stuff.**

**In 2014, when the case was unsealed, a hold went out to the team, meaning all the case agents and everything on it, to maintain litigation. That later was processed as a more formal litigation hold by the FBI in 2015.**

**I should note, kind of separate from that, that, as we discussed earlier, everything should have been being maintained at the FBI regardless of whether there's a hold, because it was an open case.**

Q And that hold was issued by -- initially

251

issued in 2014 by AFMLS?

**A Yes. It was a request from the prosecution team, to the FBI agents and accountants and stuff that were part of the case.**

Q And what were the factual circumstances that led to that lit hold being issued?

**A The case was public and unsealed.**

Q And where -- where was that lit hold -- so it was issued to the FBI?

**A I don't know that it was issued. Again, this was a -- I don't know whether it was verbal or written.**

**But they were asked to maintain everything that they had in their case file in kind of -- but that was just kind of reiterating what they were supposed to be doing anyway. Because FBI isn't supposed to be getting rid of any documents in an open investigation, regardless of any litigation hold.**

Q Were any lit holds issued to the FBI prior to the one that you're talking about now?

**A A litigation hold?**

252

Q Yes.

**A No.**

Q Okay. Were any lit holds issued in AFMLS prior to the one that was issued in 2014?

**A A litigation hold?**

Q Yes.

**A No. But, again, the expectation is that all files in any open case will be maintained until the case is closed.**

Q And were any litigation holds issued in the -- the Southern District of Texas at any point related to an Abacha matter?

**A I would defer to Ed Gallagher on that, and his testimony, because that's going to be the basis of the government's knowledge.**

Q Were any litigation holds issued in the District of Columbia?

**A No. But I don't think there was a reason to think, other than the stuff related to the original arrest of Bagudu, that there was anything in the District of Columbia.**

**It was -- instead of a litigation hold,**

253

**it was a request to go get documents that they -- that we knew that they had. It's not like they had ongoing litigation or ongoing cases that they needed to maintain. It's going back and get your closed case.**

Q And you previously -- I think you testified -- and correct me if I'm wrong -- before the break that there were no litigation holds issued in the Southern District of New York with respect to an Abacha matter.

**A You'll have to read that back. Because I think there was a time -- there was a time piece on that that's missing from your question.**

Q Were any litigation holds issued in the Southern District of New York, the U.S. Attorney's Office for the Southern District of New York, related to an Abacha matter?

**A Not by MLARS. And --**

Q By --

**A The only -- the only files that I know of, again much like the Southern District of Texas -- like DDC, is that they would have been**

254

**asked to go back and pull stuff that was old. I don't know that there was ever a hold issued by the Southern District of New York.**

**Because you're talking about retrieving documents that are going to be archived, not ongoing kind of case files that people are dealing with in the Southern District of New York.**

**So I think it depends on what it -- what you mean by -- again, this gets into very, like, technical, like, what is a hold, versus just what's policy of retention.**

**Versus, like, is a retention the fact that you're not allowed to destroy anything for ten years after a case closes, is that a lit hold? No. But it has the same effect, which is that none of the documents are being destroyed.**

Q Let me ...

MR. CAMPBELL: Are we up to Exhibit 8?

(Hicks Deposition Exhibit 8 marked for identification and is attached to the transcript.)

Q The court reporter has just handed you what's been marked as Exhibit 8.

255

Do you recognize this document?

**A Yes. It's an excerpt of the Asset Forfeiture Policy Manual.**

Q Did you review this document in -- in preparation for this deposition?

**A No. I'm very familiar with the document, however.**

Q Okay. If you --

MR. SOHN: Counsel, has this document been produced? I don't see a Bates number.

MR. CAMPBELL: No, it hasn't. It's publicly available.

THE WITNESS: It's on our website. And he's going to ask about the preservation policy, which is fine.

Q And if you turn to Page 155.

**A Yep.**

Q And if you look at the paragraph that started with the preservation -- the section that says, Preservation Policy for Civil Forfeiture.

Do you see that?

**A Yes.**

256

Q Now, this -- this section is talking about litigation holds. Is that correct?

**A It is. It's not followed in practice. But it is talking about that, yes.**

Q Okay. Now, when I reference a litigation hold, I'm talking about a litigation hold that's described on the Preservation Policy For Civil Forfeiture.

**A Okay.**

Q Is --

**A I'm -- but let me just be clear. This is the policy in the policy manual. We are in the process -- I helped write this policy.**

**We're in the policy -- we're in the process of rewriting it because, as a practical matter, it's not followed by anyone.**

Q Okay. Now, the -- the litigation hold that's covered in this policy manual, was one ever issued in the -- putting aside the -- the litigation hold that we discussed, the one from March 2014, was a litigation hold, as contemplated in this policy manual, ever issued in -- in AFMLS?

**A Probably not. Because the reason the policy is being rewritten is that after it came out it became apparent it is not practicable to issue it this way, given the way the various bureaus work.**

**This policy was written at a time when they were -- we were still trying to figure out how to do a litigation hold policy, years ago. And, as a practical matter, it was written kind of in a way that turned out to be completely not usable by any of the bureaus or by practitioners. Just because -- in part because of the way that the bureaus and the department institute holds. And so, as a practical matter, I don't think anyone in the country actually follows this.**

Q So if no litigation holds as -- you know, as described in this -- in this manual were issued in AFMLS prior to March -- prior to 2014, what was done to preserve documents?

**A Again --**

MR. SOHN: Objection. Asked and answered.

**A Yeah, I mean, we've gone through this a million time, but I'll go through it again.**

**Documents are preserved when they're part of a case file. They are to be preserved as part of a case file. In seeking the authority to file a case, you have to explain up the chain your ability to respond to discovery.**

**We have looked high and low. And I've talked to people about this, and I know a lot was done to respond to this. We cannot find any documents or have not discovered any cache of documents, any subject of documents, that were ever destroyed or not done with in this case. Other than the FBI exhibits that we mentioned.**

**People are expected to maintain their case files. Bureaus are expected to maintain their evidence files. That's -- that's just part of doing the job.**

**So I don't know -- I mean, you can talk about whether a litigation hold went out or a litigation hold didn't go out. As a practical matter, there's no reason to think any documents**

**were destroyed in this case.**

**Or, frankly, you know, I don't know of another case that AFMLS has had a document destruction case that went forward.**

**I've had problems with bureaus where they failed to maintain documents, and we just killed the case.**

Q So what's your basis for your statement that -- that -- that documents were not destroyed in this case?

MR. SOHN: Objection. Asked and answered.

**A Everybody I've asked, Did you produce all your documents to the people? Yes, we did.**

**If you look through all of this, of everywhere they looked, searched, is it possible that someone at some point threw out some notes that they took in 1998? Yeah, of course that's always possible.**

**But I don't have any -- I have not come across anything, in talking to everybody, about any documents that have been -- that people knew**

**about having existed that we don't have. With the exception of the FBI documents that reference exhibits that the FBI cannot find the exhibits to.**

**Although we're not as sure whether some of those ever existed. They might have existed and don't exist anymore, or are filed someplace else.**

**So my basis for that is based on the discussions I've had with everybody of, This is where we searched, these are the documents we found. And no one has identified any document that they know existed that we haven't found.**

**Like I said, in one specific case a document was particularly mentioned to me. And I immediately went back to the team and said, Have we had -- do we have this document, and did we produce it? Because it's an old document. It's from, like, 2002. And the answer is, it's on the privilege log.**

**So I don't -- I -- I don't have any reason to doubt what people are telling me. Which is that everyone found the documents they had, and**

**they have no recollection of any cache or documents that don't exist.**

**Again, is it possible someone wrote down, like, a title of a meeting and decided it wasn't important enough to keep? Of course. But I don't know of any documents that the government had in its possession that it doesn't still have.**

Q And -- and the basis is -- and -- and let me rephrase that.

Whether or not a document was -- was retained was up to the person who had that document.

**A Yes.**

Q Is that correct?

**A That's correct.**

Q Now, this policy that -- that --

**A Well, let me correct that one thing.**

**Whether a document retained was up to a person. Once they got archived, then that followed the archiving policy.**

Q Right.

Now, the -- the policy that -- that we're

discussing that's been marked as Exhibit 8, this applies more than to just case files. Right?

**A I'd have to -- I'd have to review it again and refresh my recollection.**

**Like I said, to my knowledge, we're in the process -- this is a way outdated policy. It never really took effect, even though it went into the manual. It almost immediately received statements that -- that it was not practicable.**

**So I would have to review it and see what -- what's required of it. Because we're in the process of completely rewriting it, because it just doesn't -- it just doesn't work.**

Q Why don't -- don't you look at Page 158.

**A Okay.**

Q And look at the top of 158, where it says, "The starting point for information that should be captured by the litigation hold is no later than: The date the investigation began."

Do you see that?

**A Uh-huh.**

Q So this policy contemplates that -- that

materials generated in the course of an investigation would be preserved with a litigation hold, doesn't it?

**A It -- it contemplates that when you issue a litigation hold, that when you ask for the period of documents that they held, it would begin at no later than the date of the investigation. But that's different from -- I -- I think I'm confused.**

**Because -- but the litigation hold would go out way later than the beginning of the investigation. It just would be, please maintain any documents beginning on this date forward. It's not about when the litigation hold itself goes out.**

**So I don't know if I'm understanding your question.**

Q How do you -- how do you know documents generated in the course of -- of an Abacha -- of the Abacha investigation, how do you know those documents have been preserved?

**A I -- I know they've been preserved**

**because -- I'll give you an example.**

**We get 57 boxes of documents in from the United Kingdom in -- I'll have to check the date, but it's, like, 2010, I think, 2009. Fifty-seven boxes.**

**They are -- they are gone through by -- I think Ed Bishop went through them. They go through them. And he -- he at the time made sure that when the boxes -- how -- which boxes tracked to which binders.**

**And then which binders, eventually they would be scanned into Relativity, because they take up a lot of space. And then tracking the binders into Relativity to make sure that they remained in Relativity.**

**And then when they get produced out the back end, people are going through to make sure that their Relativity production is complete.**

**So, otherwise -- so I know that people took steps to ensure -- such as that to ensure that evidence was maintained.**

Q Mr. Bishop told you that?

**A Yes, he did.**
Q And the only -- and that -- that entire process was up to Mr. Bishop's discretion as to how to handle. Right?
**A I don't understand the question.**
Q There was no -- there was no notice that directed Mr. Bishop to handle those boxes like that?
**A You mean like a formal notice on how to do your job? No.**
Q Yes.
Now, how do you know that other investigatory materials were preserved?
**A Because, first of all, when they went back and got them, they were there.**
**But, again, every -- at -- all of the bank records, we even have copies of the MLAT records that were produced. There are requirements that things be kept in an open investigation file.**
**And as people identify documents and -- documents that existed, no one has been able so**

**far, that I can find, identified types of documents or sources of documents or caches of documents that then people went back, either through the search that was done as it says on 12, or on my interviews with people.**
**I would -- I would say, like, Did you search the FBI offices in Nigeria for documents? Yes, we did. What do you keep? They keep files in Nigeria. And these are the files that -- you know, they keep case files in Nigeria, and -- and discussions in Nigeria. And they went back and searched them all.**
**Is it possible that the FBI in Nigeria may have had case notes from 2000 that they didn't keep? I guess. But I don't know that those would be very important, given that these assets were moved in 2010 and 2012.**
**But, yeah, I mean, every place I asked, they -- they had checked and they had found -- they either found or didn't find documents. But the FBI was, for example, very clear that their agents are expected to maintain their case files**

**and all of their relevant evidence in those files in an open investigation, regardless of litigation hold.**
Q Now, there was -- there was e-mails exchanged between AFMLS individuals regarding the Abacha investigation. Correct?
**A I'm sure there were, yes.**
Q And there was e-mails exchanged between AFMLS employees and third parties regarding Abacha investigation. Right?
**A I have seen some, yes.**
Q How do you know those were preserved?
**A Well, I've seen them.**
**But you mean every e-mail?**
Q Yes.
**A I don't know that every single e-mail about anything, like, Call me on Thursday, was preserved.**
Q How do you know substantive e-mails were preserved?
**A Again, we talked about technical problems that could have occurred in the IT problem --**

**department. So they could have been lost that way. But everything that was supposed -- was in the case file I think has been preserved.**
**Again, if one e-mail didn't get preserved, that's possible, or two. But -- but the -- but the main case file, from my understanding, everything is there.**
Q Can you state for certain that all substantive e-mails regarding the Abacha investigation exchanged by AFMLS employees were preserved?
**A No.**
MR. SOHN: Objection. Asked and answered.
Q Now, going back to the actions that -- that the plaintiff took with respect to claimants' document requests?
**A Yes.**
Q And -- and talking about the FBI.
If you -- if you look at Page 20 again in Exhibit -- Exhibit 5. And -- and you see the -- the fourth -- the fourth bullet down where it

285

**possible.**
Q And without telling me what information was provided, but was ATM -- ITM provided with -- with search terms for that exercise?
**A Yes.**
Q And who -- who provided those search terms?
**A It would have been someone on the trial team.**
Q Was the files of Andrew Lewczyk reviewed?
**A There's a name I haven't heard in a while.**
**I don't know if he worked on Abacha, so I don't know. But, again, he wouldn't have had cases. He was a contract attorney. He wouldn't have had files separate from the case files.**
Q Now, the e-mail review that -- that we're discussing are of e-mails that are post mid-2009.
Is that correct?
**A Not necessarily. There are e-mails that they can find that go back before 2009. It's just not -- the archiving system was not complete**

286

**before then, and so it's a more hit-or-miss system.**
Q Right. And so for e-mails that predate mid-2009, they only exist if the user decided to keep them?
**A Not -- not necessarily true. Because the user -- it might not be an e-mail by e-mail basis. ITM could have rolled them over as part of all the user systems when they changed from things, when they changed from one system to the next.**
**But it is true, I guess, that users could have gone in and deleted a bunch of stuff if they wanted to.**

287

288





293

294

Q Are you -- are you testifying that -- how would -- how would they know if one of the other person uploaded --

**A They all had access to the Oracle database.**

Q So are you saying that the process would be that they would consult with each other before uploading a document?

**A I don't know that for sure. I know that there were consultations made at OIA about uploading documents. I don't know whether it included this document or not.**

295

296

297

Q Were -- were Dan Claman's files, hard-copy files, searched in response to plaintiff's document request by --
**A I believe they were.**
Q And why would -- was this file missed?
**A I don't know.**
Q Do you know who searched?
**A I don't't.**

298

THE WITNESS: While you guys do that, can we take a quick two-minute break so I can go to the bathroom?
MR. CAMPBELL: Oh, absolutely.
THE WITNESS: And get more water.
MR. CAMPBELL: Sure.
VIDEO SPECIALIST: Please stand by.
We're going off the record at 3:08 p.m.
(A recess was taken.)
VIDEO SPECIALIST: We're going back on the record at 3:17 p.m.
BY MR. CAMPBELL:
Q Ms. Hicks, can you turn to Exhibit 1, the deposition notice?
**A Sure.**
**I would like to clarify two things first, if I may.**

299

Q Okay.
**A First off, Jack de Kluiver's name was not on the list given to ITM, because he had no basis to -- reason to think that he had any documents in this case.**

300

Q Okay. Now, what's -- what's the government's basis for not including Jack de Kluiver on --
**A de Kluiver?**
Q -- de Kluiver on the ITM list?
**A He was never assigned to the case. There was no reason to think that he was -- had any involvement in the case.**
**Jack wasn't on the kleptocracy side. The international unit at the time was divided into international assistance and the kleptocracy team. And Jack was on the international assistance side.**



Q Did he have communications with foreign third parties -- foreign third parties concerning the Abacha matter, other than the one that you just referenced?

**A Not that I know of. I don't know.**

Q Okay. Now, you -- you testified that there was at least one occasion where someone raised something with Jack, and he forwarded it to Dan?

**A I can't remember if they raised it with Jack and forwarded it to Dan, or they e-mailed Jack and Dan simultaneously and Dan responded.**

Q Okay. So Dan -- so Jack was in possession of material related to the Abacha matter?

**A He would have been copied on material. I don't know that he ever actually got any material just to himself. And Jack would have looped in Dan, because Dan was the person assigned to the**

305

**Abacha matter.**
Q Have you confirmed whether Jack de Kluiver possessed any material relevant to the Abacha matter?
**A No. Other than it should have gone into the Abacha file and been referred to Dan or left in Jack's files when he left.**
Q And when you say "it should have," you don't know for sure. Correct?
**A I don't know for sure.** [redacted]
**So I -- and I don't have any reason to believe, based on my discussions with people, that Jack played any meaningful role in the Abacha litigation.**
Q Have you ever consulted with Jack on his role?
**A I have not.**
Q Okay.
**A With regard to this case. When Jack was at AFMLS, I consulted with him on other cases.**

306

[redacted]
Q But you don't know for sure whether True Rowan's documents have been searched?
**A I don't know.**

307

Q Are you familiar with a person called Patricia Rowan?
**A Who?**
Q Patricia Rowan.
**A No.**
Q Okay. Now, this --
**A If it's one of the 49 people on the country desk, though, there -- at least their e-mails were searched.**
Q [redacted]

308

[redacted]



325

**memo on the privilege log.**

[redacted]

326

[redacted]

Q Okay. Now, did you do anything else to prepare for Topic 9?

**A Let me go back to Topic 9. I'm back on -- sorry. I'm back on Topic 3.**

**If they are in the interrogatories, I can't remember. Then I would have -- I've got my -- my notes here prepared by those, by the -- by the trial team that I looked at. And just the general discussions about how OIA works with OIA.**

Q Okay. And for Topic 10, are you prepared to testify as to Topic 10?

**A Yes. Although, again, Mr. Gallagher would be the government's -- the main knowledge for the government would be with Mr. Gallagher, who's already been deposed.**

**But, yes, I did talk to people as well about Number 10.**

327

Q Who did you talk to about Number 10?

**A Mr. Carter. And I'm trying to think if I talked to anybody else.**

**I think -- I know I talked to Mr. Carter about it. I think I talked to Liz Aloi and Dan Claman about it. But I know I talked to Mr. Carter about it.**

Q Okay.

MR. SOHN: Would this be an okay time for a three-minute bathroom break?

MR. CAMPBELL: Sure. It's okay if we take ten minutes?

MR. SOHN: Yeah.

VIDEO SPECIALIST: Please stand by.

We're going off the record at 3:44 p.m.

(A recess was taken.)

VIDEO SPECIALIST: We're going back on the record at 3:57 p.m.

BY MR. CAMPBELL:

Q Ms. Hicks, you understand you're still under oath?

**A I do.**

328

Q Okay.

[redacted]



329

[redacted]
Q So in AFMLS' role that you just described, is -- would there be any -- any official -- was there an opening of an investigation or an opening of a case?
**A Well, it wouldn't have been a case, because they hadn't filed any litigation.**
**An investigation? It could have been considered an investigation. I don't know what you mean by "opening."**
**I mean, we often investigate things informally and kind of try to figure out what's going on, and those kind of things. I -- I don't know about an opening. I guess I'm not -- I'm not clear what you mean by "opening."**
Q Well, is there a log that -- that would -- that would maintain when AFMLS assists in an MLAT request like this?
**A There can be. We have a system. I don't know if -- it existed as of -- of at least 2002.**

330

**I don't know if it existed -- I couldn't find out whether it existed -- how much before 2002 it existed.**
**We do have a system called ACTS. That's mostly a case-tracking system, although you can open consultations, advice, and matters, which are investigations, in it.**
**Whether or not people do so is -- people are inconsistent about whether or not they do the matters and investigations and advice and consultations, and when they log them in. But cases, when they open, are logged in ACTS.**
Q [redacted]
**A I don't know if it was put -- put in the system. I know that the case filing, when they filed the case, was put into the system.**
Q Case filing meaning in 2014?
**A 2013.**
Q 2013.
[redacted]

331

[redacted]
**A I don't know if they would have called it a case. But they definitely opened some sort of Mutual Legal Assistance matter.**
**And as I talked about earlier, those often are in conjunction with what we would consider an investigation on the U.S. side, even though we may not open it separately.**
Q And just to -- to sum up. The -- the role of -- of AFMLS at that point was to take investigatory steps to assist the Southern District of New York?
**A I think -- I don't know exactly when. But sometime in the two -- 1999 to 2001 period, AFMLS was part of a larger U.S. government effort that I talked about earlier --**
Q Yes.
**A -- to try to find General Abacha's assets, particularly with respect to any assets that might be located in the United States.**
**As part of that effort, documents related to the MLAT request that were provided to Nigeria**

332

**would have been part of that effort in -- in things that they looked at.**
**My understanding is that eventually the -- the -- the conclusion reached was that we were unable to find any assets of General Abacha's that remained in the United States.**
**Although at one point, I believe it was CitiBank, there was a bank in New York in which General Abacha had -- had had some accounts and assets.**
Q And during that time period from 1999 to 2001, Mr. Claman was involved from the AFMLS side?
**A Yes.**
Q And what was Mr. Claman's role?
**A He would have been advising the folks on the forfeiture & money laundering side. He would have been working with counterparts overseas. And they would have been trying to figure out whether or not there was a more active litigation role to be played by the United States.**
Q Okay.
MR. CAMPBELL: Can you mark this, please.

333

334

335

A It should have -- to the extent that we've talked about the e-mail problem, that the -- the -- whether or not e-mails would have been preserved.

But when I talked to Jason Carter, he said that he would routinely upload stuff into -- and substantive information into Oracle.

Q Did he tell you that he would upload his

336

notes from meetings into Oracle?

A I don't know that they uploaded the notes from meeting into Oracle. As to whether -- as opposed to just typing in notes of meetings into Oracle. I'm not sure which.

Q So the only basis you have as to that notes were preserved is your conversation with Jason Carter?

A Related to this.

Q Yes.

A Yes.

Q And how do you know that e-mails were preserved? Did Jason Carter tell you that, as well?

A Jason Carter said that they -- that he tried to preserve e-mails that were relevant, and any data that were relevant should have been in the files.

Q So it's possible that -- that -- what did he mean by "tried"?

A I don't know that he used the word "tried." He said that he did.

Q So he said for sure that he did?
**A That any case information that was relevant and -- and needed to be preserved would have been uploaded into the Oracle system or kept in the hard-copy case file.**
Q Did he tell you that he actually did that?
**A He did tell me that he actually did that.**
Q And -- and did he tell you that -- that he did that based on his memory, or based on something else?
**A I believe he was basing it on his practice. Because I don't think he has a lot of specific memories about pre -- he has a lot of specific memories about the Bagudu extradition.**
**He did not have any particular memories about Abacha, outside of the Bagudu extradition request.**
**And so it was his general -- he -- we were talking about his general practice, about how he handles his notes and e-mails and other documents, and not any specific set of notes or**

**e-mails.**

Q Okay. Did you -- did you have a criminal investigation open at this time?
**A By "you" do you mean the United States government or do you mean AFMLS? What do you mean by "you"?**

Q Plaintiff. So that would be the -- including the -- you know, the United States government.
**A I don't think it would have been -- well, I don't know if you would have considered it a criminal investigation or not. I don't know that a formal one was open.**
**Again, I think people were looking for ways that they could help the Nigerians, and whether or not there were potential targets to be targeted. I don't know whether I would call it a formal criminal investigation or not. Part of that depended I think on what they found.**
**And at that point they had not found, I don't think, any assets in the United States. And most of the assets and -- and including some of the -- some of the conspirators were being prosecuted in other countries.**
**So I -- I think we were looking for ways to do more to help the Nigerians, including potential criminal investigations. But I don't know whether or not -- I mean, it was kind of in**

**the nascent stages.**

Q What --

**A It's hard to say when -- you know, when it actually becomes a criminal investigation, as opposed to should we -- you know, poking around trying to figure that out.**

Q Was plaintiff considering whether it could bring its own claim on these assets at this point?

MR. SOHN: Caution the witness not to disclose any work product, internal thought processes.

**A I wasn't shared any privileged information.**

**I know in August of 2002 John Harris and Colette Ford met with -- I think his first name is Enrico Monfrini, who represented Nigeria and Switzerland, at which point he again reiterated assistance.**

**And we -- we, I believe, informed him we were doing what we could, but all the assets had been tied up by other countries.**

Q Now, who was Enrico Monfrini?

**A Enrico Monfrini was a private lawyer in Switzerland who represented the Government of Nigeria, and later would become their point of contact for MLAT requests.**

Q At the time in the 2002 time period, did plaintiff understand Monfrini to have the ability to bind the Nigeria -- the Nigerian government?

MR. SOHN: Objection. Calls for a legal conclusion.

**A I don't know.**

Q But plaintiff understood that Monfrini represented the Nigerian government?

**A Yes. And there was ongoing litigation in Switzerland, in which Nigeria was a partie civile.**

Q And plaintiff understood Monfrini to represent the Nigerian government before 2002, as well?

**A I don't know when it became known that he**

**was representing -- I can't remember when it became known he was representing the Nigerian government.**

**But I know as of 2002, he was representing the Nigerian government with regard to this -- at least the Swiss litigation.**

Q Is it fair to say that the first time plaintiff met Mr. Monfrini in the context of the Abacha matters, that plaintiff understood that Monfrini represented the Nigerian government?

**A Yes.**

Q Okay.



345

347

346

348

Q If there were e-mails concerning this meeting involving Dan Claman, John Harris, or Mr. Strassberg, what is plaintiff's -- how do you know that they would have been preserved?

**A Well, we talked about e-mails in this time period. I can't say for sure that they would have been preserved.**

Q And who -- and who is Mr. Strassberg?

**A He was an AUSA in the Southern District of New York, I believe from its fraud section.**



349

was --

A As I said throughout this whole thing, there were -- there were contemplated criminal investigations through the whole thing, as well as civil forfeiture, as well as forfeiture proceedings through the -- through the entire time.

People were looking for ways to help the Nigerians and also protect the U.S. financial system.

350

351

A I mean, assuming that there aren't objections that are -- I mean, arguably, once you object, you shouldn't answer at all. But I see we objected and answered it anyway.

So I think it depends on whether the objection was -- whether it was objectionable, as to whether or not we were required to provide a response.

352

Transcript of Pamela J. Hicks, Designated Representative
Conducted on August 14, 2018

89 (353 to 356)

353

355

354

356

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM



Transcript of Pamela J. Hicks, Designated Representative
Conducted on August 14, 2018
100 (397 to 400)

397
398
399
400

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM



Transcript of Pamela J. Hicks, Designated Representative
Conducted on August 14, 2018
102 (405 to 408)

405
407
406
408

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM



409

411

410

412

Q

Once it was determined -- you know, Bagudu goes back to Nigeria, so he's not in the United States anymore. The assets are still being litigated in Europe. And so other than responding to any requests from the Europeans and asking them I believe at various -- I know at various meetings even that weren't on this, checking in with our allies to see how things were going with their Bagudu litigation, there wasn't a lot for us to do while other countries were litigating it. And so we were waiting to kind of see what happened.

Q But you referenced before that the United States had -- was also taking its own look.

A Yes.

413

Q So why would activities in other countries have any impact on the United States taking its own look?
**A Well, once they've seized and started their own criminal processes and -- and asset forfeiture cases, we would not -- we would not -- oftentimes -- there are exceptions, but oftentimes the United States does not like to get cross-ways with -- with friendly nations and people that we're working with.**
**And to try to tie up the same assets they are, or to try to go after the same targets they are, becomes very -- it's just not a good way to do business.**
Q So if there's a resolution in another country concerning assets, then it's the United States' practice to -- to respect that resolution?
**A Not necessarily.**
MR. SOHN: Objection. Incomplete hypothetical.
**A It's the United States' practice to not get into competing litigation most of the time.**

414

**There are exceptions to that. And we don't necessarily, once that litigation is over, take the position that that resolves our potential claims.**
**It's more of a question of when, as opposed to -- and -- and what those -- what the results were, and whether or not we think that there is more that should be done.**
Q Okay. Does this document have any -- anything to do with the restart of the investigation?
**A Not to my knowledge.**

Q Would Ed Gallagher and Dan Claman have been communicating about the extradition proceeding at this time?
**A I have no idea.**
Q Did this case need to be closed for Dan Claman to begin investigating -- to be -- to take the investigative steps he took in June 2007?

415

**A Did the extradition case need to be closed?**
Q Yeah.
**A I don't see why.**
Q Okay. Now, when you -- just going back to the terminology you used that the investigation lost steam.
Is that what you said?
**A Yes.**
Q And precisely when, or -- or your best recollection as to when that happened?
**A I think it was -- it was an investigation in fits and starts.**
**Because we discovered, looking for assets here of General Abacha and his co-conspirators, that there were none in the United States. And then other countries had started not only forfeiture proceedings but criminal proceedings against various Abacha-related people, that, you know, you kind of look around and see what there is for you to do and try to get something going.**

416

**My understanding is that other countries were not particularly interested in having us have competing ongoing litigation. And by "other countries" in particular I mean the European countries that were assisting Nigeria. And so we deferred to those countries.**
**And then a time came where it became apparent that the countries were not going to be able to complete some of the forfeitures and other matters. And so given that we have an interest in the case as well, we decided to step in and -- and do it ourselves.**
Q Did you have a concern about having a competing action with Nigeria?
**A Nigeria was asking us to do something. I think the concern was a competing action with the European countries. Because Nigeria had been asking us to essentially compete with the other countries. And I think our decision was not to do that.**