# Exhibit 15

Transcript of Debra LaPrevotte Griffith
Conducted on June 25, 2018

1 (1 to 4)

---

**Page 1**

```
         IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,       )
               Plaintiff        )
     v.                         ) Case No.
ALL ASSETS HELD IN ACCOUNT NUMBER ) 13-cv-1832 (JDB)
80020796, IN THE NAME OF        )
DORAVILLE PROPERTIES CORPORATION, )
AT DEUTSCHE BANK INTERNATIONAL, )
LIMITED IN JERSEY, CHANNEL ISLANDS,)
AND ALL INTEREST, BENEFITS OR   )
ASSETS TRACEABLE THERETO, et al., )
               Defendants.      )
          -----------
   Videotaped Deposition of DEBRA LaPREVOTTE GRIFFITH
               Washington, DC
              Monday, June 25, 2018
                 9:39 a.m.

Job No.: 194049
Pages: 1 - 446
Reported By: Dawn M. Hart, RPR/RMR/CRR
```

**Page 2**

```
   Videotaped Deposition of Debra LaPrevotte
Griffith, held at the law offices of:

     BAKER HOSTETLER, LLP
     Washington Square
     1050 Connecticut Avenue, Northwest
     Suite 1100
     Washington, DC 20036
     (202) 861-1500













     Pursuant to Notice, before Dawn M. Hart,
RPR/RMR/CRR and Notary Public in and for the District
of Columbia.
```

**Page 3**

```
            A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF UNITED STATES:
     JOSHUA L. SOHN, ESQUIRE
     DANIEL H. CLAMAN, ESQUIRE
     UNITED STATES DEPARTMENT OF JUSTICE
     1400 New York Avenue, Northwest
     10th Floor
     Washington, DC 20005
     (202) 353-2223

ON BEHALF OF THE FEDERAL BUREAU OF INVESTIGATION:
     MARISA C. RIDI, ESQUIRE
     FEDERAL BUREAU OF INVESTIGATION
     935 Pennsylvania Avenue, Northwest
     Room 10140
     Washington, DC 20535
     (202) 324-2569
```

**Page 4**

```
        A P P E A R A N C E S (Continued)

ON BEHALF OF THE CLAIMANT IBRAHIM BAGUDU:
     PATRICK T. CAMPBELL, ESQUIRE
     MATTHEW D. FEIL, ESQUIRE
     BAKER HOSTETLER, LLP
     45 Rockefeller Plaza
     New York, New York 10111
     (212) 589-4643
  and
     JONATHAN R. BARR, ESQUIRE
     BAKER HOSTETLER, LLP
     Washington Square
     1050 Connecticut Avenue, Northwest
     Suite 1100
     Washington, DC 20036
     (202) 861-1500

     ALSO PRESENT:  Alexandra Zimmer, Law Clerk
                    Fred Walker, Videographer
```

**397**

the Virgin Islands, Rayville International in the BVI, Mecosta, so on, so forth, and that money from The Ridley Group changed location.

As I said in the past, bad money is always bad money, whether it's a horse -- you sell a horse and you buy a boat, you sell the boat and you buy a car, so in this affidavit, or this Complaint in rem, it shows that the money from The Ridley Group moved.

And so additional time was taken to see where the assets were held now and how they had changed shape. That investigation just takes time.

Q But you knew the location of the accounts at that point, right? They moved after you --

A This time.

Q -- found them out.

A I knew by this time.

Q No, you knew by the time that your file note that referenced The Ridley Group where those accounts were at that time, correct?

A No, my -- this only talks about The Ridley Group, it doesn't even begin to notice how they changed --

**398**

Q I'm asking you about --

A -- shape.

Q Ms. Griffith, I'm asking you about The Ridley Group. The Ridley Group accounts, not the other accounts that you're talking about in your Complaint.

A But during the course of my investigation --

Q Can you just please --

A -- I found out The Ridley Group money moved.

Q Ms. Griffith, answer my question.

In the file note that you refer to The Ridley Group accounts --

A Uh-huh.

Q -- did you know where those accounts were at the time?

MR. SOHN: Objection. Ms. Griffith was interrupted about three times in the last 30 seconds.

MR. CAMPBELL: Please instruct your witness to answer my question and then I wouldn't have to interrupt her.

Q So my specific question is, at the time that you referenced The Ridley Group --

**399**

A Uh-huh.

Q -- in your file note, did you know where those accounts were?

A I believed that they were at this bank in London at that time.

Q Okay. Now, if you refer back to -- to 360, which is February of 2008 file note, February 27th.

A Yes.

Q Now, we've already established, I think, that you had a Complaint prepared for that $480 million, correct?

A I had a draft Complaint prepared, yes.

Q And it was with the Department of Justice, correct?

A Uh-huh.

Q The Department of Justice decided not to approve it at that time, correct?

MR. SOHN: Objection. Foundation.

A You're mischaracterizing. They could have --

Q Was the Complaint approved at that time?

A It wasn't approved because it wasn't ready

**400**

to go.

Q Who made the decision not to approve it?

MR. SOHN: Objection. Foundation. Speculation.

Q Who made the decision not to approve that 480 million-dollar Complaint at that time?

A Wait. It's not that it wasn't approved; we were still conducting investigation.

Q But you said that you had probable cause for the funds, including The Ridley Group funds, at that point, didn't you?

A Yes, I did, but I -- during the course of my investigation I became aware of other bank accounts.

Q You also testified previously that had the DOJ approved that Complaint it would have been filed, correct?

A If they had approved it, but --

Q So at this point isn't it true that the Department of Justice chose not to file the 480 million-dollar Complaint?

A No, that's not true.

MR. SOHN: Objection. Foundation. Calls

---

401

1  for speculation.
2  Q  Did they file it? Was the Complaint filed
3  at that point?
4  A  No, it wasn't ready to go.
5  Q  But you had probable cause?
6  A  I felt I had probable cause. Doesn't mean
7  my DOJ attorney agrees with me.
8      MR. CAMPBELL: Take a short 10-minute break.
9      THE VIDEOGRAPHER: We are going off the
10 record and the time is 5:30 p.m.
11     (A recess was taken.)
12     THE VIDEOGRAPHER: We're back on the record
13 and the time is 5:41 p.m. You may begin.
14 BY MR. CAMPBELL:
15 Q  Ms. Griffith, you testified before our break
16 that in February 2008 you had provided the DOJ with a
17 draft Complaint that included The Ridley Group funds;
18 is that correct?
19 A  That provided the what?
20 Q  The DOJ would have drafted a Complaint that
21 included The Ridley Group funds, correct?
22 A  That's correct.

---

402

1  Q  And at that point you believed you had
2  probable cause, correct?
3  A  I believed I did.
4  Q  And you were just waiting for the DOJ
5  approval, correct?
6  A  Yes, on that particular affidavit --
7  Q  Yes.
8  A  -- but I -- I didn't get it.
9  Q  And do you know why -- what reasons
10 Mr. Claman -- well, let me back up.
11     Who -- who was -- were you -- who would have
12 approved the -- the Complaint at that point?
13 A  It was probably Dan Claman, but I would have
14 to go back and check.
15 Q  Would it have been anybody else that would
16 have approved the Complaint at that point?
17 A  I can't tell you what year Elizabeth Aloi
18 came on as the primary prosecutor on that
19 investigation.
20 Q  And did you know the reasons why Mr. Claman
21 didn't approve the Complaint at that point?
22 A  Well, as I recall, it's because we were

---

403

1  continually getting new evidence in in this
2  investigation.
3      For example, in 2002, if you look at my
4  affidavit, Exhibit 3, page 29, that in 2009 and in
5  2005 and 2010 and 2011 we continued to receive
6  information that money related to The Ridley Group was
7  being moved or that Ridley Group was receiving
8  additional funds.
9      And so during all of that time, if we got
10 information or allegations, we had to wait for records
11 or records were coming in that we had requested
12 previously.
13 Q  So the information that you received would
14 have been that Ridley Group funds were being moved.
15 A  Or addition- -- in one case, additional
16 funds -- page 28. Coupon interest payments were
17 transferred to Ridley Group at Crédit Agricole in
18 connection with the Nigerian par bond.
19     For example, on November 22nd, 2000, a
20 payment of 2.8 million was transferred into the
21 account at Citibank New York to Ridley Group at
22 Crédit Agricole.

---

404

1      So I mean this is only a year and a half
2  after I wrote my original draft Complaint, and so
3  additional records that we were requesting throughout
4  our investigation continued to come in from multiple
5  sources.
6  Q  So you were waiting for the --
7      MR. SOHN: Objection.
8  Q  -- funds to freeze?
9      MR. SOHN: I think you interrupted the
10 witness yet again, counsel.
11 Q  Would you like to finish your -- your --
12 your question [sic]?
13 A  I would just say that, as I stated, all of
14 these bank accounts in London required me asking for
15 additional records to identify the source of the
16 funds, where they came from, what they were traceable
17 to, and where they are now.
18     I'm giving you an example that I learned
19 that in November 2000 -- this is only 18 to 20 months
20 after I wrote my original draft -- I was in possession
21 of -- or obtaining evidence related to additional bank
22 accounts, and I see that credit interest was going

**409**

1  A  Yes.
2  Q  You identified probable cause in the
3  Lazarenko case and then you filed the Complaint,
4  correct?
5  A  Yes, but it wasn't done in a day, no.
6  Q  Let me -- let me pose the question.
7  A  My probable --
8     MR. SOHN:  Counsel --
9  A  No, I'm going to finish your question.
10    MR. SOHN:  -- (inaudible) objection.
11 A  Because I could have written a draft
12 Complaint or a draft and it could have taken a year
13 and a half before it got approved and filed.  I didn't
14 write it and it got approved and it got filed --
15 Q  How long --
16 A  -- the next day.
17 Q  -- did it take for it to get approved -- how
18 long did it take between your identification of
19 probable cause and the filing of the Complaint in the
20 Lazarenko case?
21 A  A year and a half, maybe two years.
22 Q  Okay.  And in any other circumstances did

**410**

1  you wait -- in your other experience, in your other
2  cases, did you ever wait five years after identifying
3  probable cause to file a Complaint?
4  A  Not that I can think of.
5  Q  Okay.  Now, you don't -- you don't know all
6  the reasons why Mr. Claman didn't approve the
7  Complaint, correct?
8  A  No, I don't know all the reasons.
9  Q  Okay.  Now, you mentioned that -- from 2008
10 that there were a different -- additional
11 investigative steps?
12 A  Well, I -- I obtained thousands of documents
13 and they weren't obtained in a day, they were obtained
14 over years --
15 Q  And from --
16 A  -- but --
17 Q  Specifically what steps did you take in the
18 investigation after February of 2008?
19 A  You'd have to look at the file.  I mean,
20 seriously.  Whether it was MLATs to obtain foreign
21 records, sending requests to Nigeria, Switzerland, the
22 Isle of Jersey, to either ask who were experts in the

**411**

1  field, if I could get additional documents, who we
2  would talk to at banks, what was the process for
3  obtaining certified copies from that location.
4     Every single thing I did investigatively
5  would be in my file.
6  Q  All -- okay.  All of those steps would be in
7  your file?
8  A  Uh-huh.
9  Q  Ms. LaPrevotte, are you aware of any
10 settlement agreements between Mr. Bagudu and Nigeria
11 concerning the -- the funds that the Government is
12 seeking to forfeit in this case?
13 A  I heard once there was a settlement
14 negotiation, but beyond that, I don't know.
15 Q  Did anybody ever tell you that there was a
16 settlement agreement between Mr. Bagudu and -- and
17 Nigeria that -- that covered the -- the Blue assets in
18 this case?
19 A  No.  I -- as I said, I heard once they were
20 in some type of -- that Bagudu was in some type of
21 negotiation, but specifically related to the Blue
22 assets or specifically even related to Ridley Group,

**412**

1  no.
2  Q  Who told you that there was negotiations?
3  Who did you hear that from?
4  A  Could have been Legat Nigeria or it could
5  have been DOJ; I don't recall.
6  Q  Do you recall when you heard that
7  information?
8  A  It would have been four or five years ago
9  when I worked this case.
10 Q  And do you recall -- recall specifically
11 what you heard?
12 A  No, just that he was in negotiations.
13 Q  Now, you submitted a second affidavit in the
14 United Kingdom action in March 26, 2014, correct?
15 A  Uh-huh.
16 Q  Do you recall discussing a settlement
17 agreement in that affidavit?
18 A  I don't recall.  I'd have to read it again.
19 Q  Okay.  Let's first -- let's go to your --
20 your February affidavit, and that has been marked as
21 Exhibit 4, so if you could turn to Exhibit 4.
22 A  My Exhibit 4 ...

---

421

1  Q  But it includes the security votes
2  allegations, correct?
3  A  Well, it doesn't specifically list them, but
4  I would assume that it -- it -- it doesn't include
5  them.
6  Q  Go to page 522.
7  A  Uh-huh.
8  Q  And then if you look at the -- the second
9  paragraph from the bottom.
10  A  "The crimes at origin of the properties
11  notably correspond to embezzlement, misappropriating,
12  other diversions of property by public officials."
13      Paragraph 2?
14  Q  I think you read -- so, is it your view that
15  this -- this MLAT request from Nigeria is not related
16  to your security votes investigation?
17  A  Well, in that this came in five to seven
18  years after I initiated my investigation, yeah, I
19  would say that this had no impact on my investigation.
20  Q  So this came in -- so -- no, my question
21  was, does this -- does this MLAT request, does it
22  have -- is this MLAT request related to the subject

422

1  matter of your investigation?
2  A  Well, it doesn't specifically say, so it
3  just talks about Nigerian assets.  This -- and related
4  to Abacha.  So it would pertain to any assets related
5  to the 5 billion that allegedly were stolen by
6  Sani Abacha while he was President.
7  Q  Which includes in your -- as you allege the
8  security votes, correct?
9  A  I think so.
10  Q  Okay.  Now, is it possible that the
11  United States was waiting to file its Complaint before
12  it received permission from Nigeria to file?
13      MR. SOHN:  Objection.
14  A  No.
15      MR. SOHN:  Calls for speculation.
16  Q  How do you know that's not a possibility?
17  A  Because I seize assets all the time without
18  a request from another country to do so.
19      And I certainly initiated my investigation
20  based off of request from DOJ that wasn't related to
21  this request, so no, I would say --
22  Q  You previously could not identify another

423

1  case where you waited five years between probable
2  cause and filing the Complaint, correct?
3  A  I said I couldn't think of any, but I
4  also -- but that had nothing to do with a MLAT
5  request.
6      Nobody in civil cases asked the
7  United States for assistance.  We became aware of
8  criminal proceeds being from either a news article,
9  from a Suspicious Activity Report, from an alert from
10  a bank, and initiated a case that had nothing to do
11  with the -- that all had to do with kleptocracy, none
12  of which had to do with the -- starting an MLAT
13  request.
14  Q  Isn't it possible that Mr. Claman was
15  waiting for permission from Nigeria to file the civil
16  asset forfeiture case?
17      MR. SOHN:  Objection.  Calls for
18  speculation.
19  A  I would say no.
20  Q  You mentioned before that you don't know all
21  the possibilities that Mr. Claman was considering,
22  correct?

424

1  A  I can't guess what was in Mr. -- I can't say
2  to what Mr. Claman was thinking at the time.
3  Q  Now, going back to your affidavit, if you
4  look at -- if you look at the bottom of page 610,
5  paragraph 14 --
6  A  Uh-huh.
7  Q  -- you note a Swiss lawyer -- the Government
8  of Nigeria has engaged a Swiss lawyer?
9  A  Uh-huh.
10  Q  Who -- who was that Swiss lawyer?
11  A  I believe it's Enriqué [sic] Monfrini.
12  Q  And what was his role?
13  A  I believe he was hired by the Government of
14  Nigeria to assist them in tracing some of the
15  $5 billion that was stolen by the Abacha regime.
16  Q  And did you ever have any communications
17  directly with Mr. Monfrini?
18  A  I told you I spoke with him once.
19  Q  And what was the substance of that
20  communication?
21  A  I was in Switzerland and he was there, and
22  it was hi, I'm Debbie LaPrevotte, I'm the agent on the