# Exhibit 22

1.  *Identify and describe in detail the routine supervision, reporting, and approval processes and procedures in effect from 1999 to the present at the Department of Justice (the "DOJ"), including, but not limited to, the DOJ's Money Laundering and Asset Recovery Section ("MLARS"), formerly the Asset Forfeiture and Money Laundering Section, Office of International Affairs (the "OIA"), Federal Bureau of Investigation (the "FBI"), related to, among other things:*

    a.  *Commencement and closing of asset forfeiture investigations;*
    b.  *Logging of information related to any asset forfeiture investigations; (asked OIA)*
    c.  *Authorization and process for drafting asset forfeiture complaints;*
    d.  *Authorization and process for commencement of civil asset forfeiture actions;*
    e.  *Coordination with other U.S. government agencies concerning asset forfeiture investigations and proceedings;*
    f.  *Coordination with foreign authorities concerning asset forfeiture investigations and proceedings, including, but not limited to, responding to, and service of, requests for obtaining information and documents under Mutual Legal Assistance Treaties ("MLATs") and other international mechanisms for requesting and obtaining information and documents; and*
    g.  *Electronic and hard copy document filing, storage, and retention. (asked OIA)*

Approval Processes

- Authority for the initiation of investigations, criminal prosecutions and forfeiture actions is vested in the Attorney General and the relevant law enforcement agencies as delegated by federal law and Department practice.

    o   Between 1999 and the present the authority to initiate proceedings and investigations for the Money Laundering and Asset Recovery Section (formerly the Asset Forfeiture and Money Laundering Section) was the responsibility of the Chief of the Section, subject to any additional approvals required by the Assistant Attorney General of the Criminal Division and his or her Deputy Assistant Attorneys General.

    o   During this period, various Deputy Assistant Attorneys General and other senior Criminal Division personnel had responsibility for oversight of investigations and proceedings initiated by MLARS/AFMLS.

- DOJ decisions to initiate or close investigations or to file criminal or civil matters were made consistent with the principles of federal prosecution set forth in the U.S. Attorney's Manual.

- Although the particular internal procedures varied somewhat from chief to chief and front office management over the past 20 years, a forfeiture action could not be initiated without the approval of the Section Chief.

1



EXHIBIT

Hicks-5

8-14-18

- Prior to 2010, AFMLS/MLARS had a single Litigation Unit, which was responsible for almost all of the sections' affirmative litigation. The International Unit, primarily in partnership with U.S. Attorneys' Offices, handled a few cases.

- In April 2013, MLARS formalized its approval requirements for filing cases. The filing of a civil forfeiture complaint could be approved by either the section's chief or principal deputy chief.

## Coordination with Other U.S. Government Agencies

- The Justice Department investigates assert forfeiture matters with our law enforcement partners, including the FBI, DEA and DHS.   In this way, investigative actions are closely coordinated.

- Given the complexity of maintaining assets, coordination with additional agencies, such as the U.S. Marshals Service or contractors, can also be necessary.

- On occasion, the Department of Justice will inform the State Department or other agencies that it has initiated a criminal prosecution or civil forfeiture action.  Prior to initiation of an action, the State Department may become aware of an investigation as a result of meetings with foreign governments abroad.

## Coordination with Foreign Authorities

- Formal coordination with foreign authorities in connection with civil forfeiture investigations is channeled primarily through the Criminal Division's Office of International Affairs ("OIA").  Where appropriate, other DOJ components, including AFMLS/MLARS facilitates cooperation related to forfeiture related matters.

- The United States sends and receives mutual legal assistance requests through OIA and it is in this manner that we coordinate with foreign authorities concerning asset forfeiture investigations and proceedings.  The exact manner in which coordination occurs, and scope of assistance that can be provided, is delineated in the bilateral and multilateral agreements governing mutual legal assistance.

- The United States also obtains and shares information with foreign authorities where a formal request is not required.  Such coordination may be through DOJ or law enforcement attaches posted abroad or as a result of foreign authorities traveling to the United States.

US v. All Assets…Doraville (Abacha/Bagudu)          30(b)(6) Deposition
                                                    13 Aug 2018

2. *Identify, and describe in detail the roles of, all domestic and foreign government agencies and representatives involved in, or who have knowledge of, Plaintiff's investigation into the allegations of the Verified Complaint for Forfeiture In Rem (the "Complaint") that are related to Plaintiff's Claims for Forfeiture against the in rem defendants identified at Paragraphs 4(i) and 4(k) of the Complaint (the "Claimed Property"), and any interests, benefits, or assets Plaintiff alleges are traceable to the Claimed Property.*

Domestic Government Agencies

- The FBI has been the investigative agency.
- The Department of Justice is the prosecuting authority, as it is for all federal judicial forfeiture actions.

- Other than the Justice Department and FBI

    o The Treasury Department shepherded Egmont requests to and from foreign jurisdictions.

Foreign Government Agencies.

    o The Central Authorities of France, Jersey, the United Kingdom, Nigeria, and the British Virgin Islands all have knowledge of the allegations in the Verified Complaint for Forfeiture.

    o The United Sent mutual legal assistance requests to these jurisdictions. The mutual legal assistance requests contain information about the conduct being investigated in support of the requested assistance.

    o This action is a publicly filed action and is likely widely known by other governments.

Attorneys Representing Foreign Governments

- The forfeiture action is publicly filed, and we cannot possibly know who all of the persons representing foreign governments are that are aware of the action. Some of the attorneys representing other governments include:

    o James Maton (representing Nigeria in UK proceedings)
    o Colin Joseph (representing Nigeria in UK proceedings)
    o Enrico Monfrini (representing Nigeria primarily in Swiss proceedings)
    o Yves Klein (representing Nigeria primarily in Swiss proceedings)
    o David O'Mahony (representing Jersey)
    o Anthony Egbase (representing Nigeria)
    o Sedoo Manu (representing Nigeria)
    o Oladipo Okpeseyi (representing Nigeria)

3

3. *Identify and describe in detail the actions taken by Plaintiff to investigate the allegations of the Complaint related to Plaintiff's Claims for Forfeiture against the Claimed Property, and any interests, benefits, or assets Plaintiff alleges are traceable to the Claimed Property, from 1999 to present, including, but not limited to:*

   a. *The circumstances under which Plaintiff commenced any investigations, including, but not limited to, (i) any requests by other countries to conduct any investigations, (ii) who authorized any investigations, and (iii) the factual reasons for commencing any investigations;*

   b. *The steps Plaintiff took in the course of any investigations, including, but not limited to, (i) who supervised and conducted any investigations, (ii) the nature and timing of any interactions and coordination between and among U.S. government agencies concerning any investigations, and (iii) the nature and timing of Plaintiff's interactions and coordination with any foreign authorities concerning any investigations; and*

   c. *The circumstances under which any complaints or charging documents were drafted, including, but not limited to, (i) who requested and/or authorized the drafting of any complaint or charging document, (ii) the factual reason(s) for the determination to draft a complaint or charging document, and (iii) who drafted the complaint or charging document.*

- After the death of General Sani Abacha in 1998, the United States received requests from the government of Nigeria setting forth some information concerning some of the facts later alleged in the Complaint. These requests were in the form of requests for mutual legal assistance and letters from the government of Nigeria.
- The United States executed the 1999-2002 Nigerian requests for bank records from New York, as well as its request for certain other evidence in Georgia. The United States provided that information to Nigeria, and has produced in this case the evidence it has been able to locate from those queries.
- The United States also executed mutual legal assistance requests from Switzerland and Jersey, and an extradition request from Jersey.
- The facts concerning those investigations and the factual reasons supporting those requests are set forth in the mutual legal assistance requests and additional correspondence provided in discovery in this action.
- DOJ OIA assisted in the coordination of the execution of foreign requests through the attorneys responsible for the execution of requests from the particular countries
- From 2001-2003, the Department of Justice attended meetings in Switzerland with other nations that either had received requests for mutual legal assistance from Nigeria or had initiated investigations on their own into conduct related to General Abacha and his associates. The Department of Justice also attended bilateral meetings with Nigeria about the Abacha assets.
- Summaries of these meetings are provided in Plaintiff's First, Second, and Third Supplemental Responses to Claimant's Fourth Set of Interrogatories.
- The only updated information learned since these interrogatory responses were filed is that SDNY AUSA Richard Strassberg was present in the 2001 Bern meeting (in addition to the other DOJ representatives at that meeting).

- In 2007 Jersey approached the United States to ask whether we might be able to forfeit the funds located in Jersey.  These funds have since been forfeited and are not the Claimed Assets.

    o Jersey provided some background information in the form of narrative statements and referred AFMLS/MLARS to its 2003 extradition request to the United States for Abubakar Bagudu for additional information.  This information has been produced.

- After the Jersey inquiry, the United States also began to collect additional evidence.

    o As set forth in our response to Interrogatory 9 from Claimants' First Set of Interrogatories, a substantial effort was to obtain evidence through mutual legal assistance and law enforcement cooperation from the United Kingdom, the Bailiwick of Jersey, France, the British Virgin Islands, and from Nigeria through its Swiss counsel.

    - In some instances we were able to benefit from an orientation to evidence from representatives of foreign governments who had been involved in litigation with the Abacha family in other jurisdictions.

        - In late 2007, the law firm representing Nigeria in Switzerland (Monfrini Crettol & Associates) provided copies of records primarily from Swiss criminal proceedings to which Nigeria was a *partie civile*.

        - Another step was our November 11, 2008 outgoing MLAT request to the United Kingdom.  This request resulted in a July 2009 production order being served in the UK and our eventual receipt in October 2009 of approximately 57 boxes of documents in hard copy.

4. *Identify and describe in detail the circumstances under which Plaintiff requested and obtained information from foreign authorities and other third parties concerning the allegations of the Complaint related to Plaintiff's Claims for Forfeiture against the Claimed Property, and any interests, benefits, or assets Plaintiff alleges are traceable to the Claimed Property, including, but not limited to, (a) any requests for information and documents Plaintiff served on Nigeria, the U.K., the Bailiwick of Jersey ("Jersey"), France, Switzerland, and the British Virgin Islands (the "BVI"), pursuant to MLATs or otherwise, and (b) any subpoenas or other requests for information and documents served by Plaintiff on any other third party, including, but not limited to, Australia and New Zealand Banking Group Limited, Euroclear, Credit Agricole Indosuez, or Citibank.*

- Based on publicly available information, information from investigation and consultations, and information received in incoming MLAT requests, the Plaintiff identified records that might help build the case, and sent mutual legal assistance requests or made other requests to obtain them.

- In some circumstances, jurisdictions already in possession of records could provide evidence without an MLA request:
    - For example, Nigeria as *partie civile* in Swiss proceedings had evidence it could provide and authenticate with a cover letter.
    - Similarly, Jersey transmitted to the U.S. some evidence it received through mutual legal assistance from the U.K.  This is reflected in an email exchange produced.
    - Other times it was necessary to make a formal request.

- As set forth in some of the communications and other documents produced in this case, consultations with foreign governments and their representatives to identify mechanisms for obtaining records and orientation to evidence was often necessary

- The United States also obtained information from third parties in response to mutual legal assistance requests from Nigeria and Switzerland.

    - Based on the information provided by Nigeria in a 1999 MLA request to the United States, the USAO in SDNY (AUSA Diane Gujarati) issued Commissioner's subpoenas to seven banks: Citibank, Northern Trust International Bank, Barclays Bank, Credit Lyonnais, United Bank for Africa, Australian and New Zealand Banking Group, and Harris Bank International Group.  The results of each of the subpoenas was provided to Nigeria in July or October 2000.

    - Prior to the MLA request, in approximately October 1999 FBI Legal Attaché and Assistant Legal Attaché communicated with Nigerian officials regarding Nigeria's investigation.

    - Nigerian authorities met in Washington in November 1999 regarding procedures for obtaining mutual legal assistance.

30(b)(6) Deposition
                                                                  13 Aug 2018

- o In 2001, Nigeria supplemented its request.  The Supplement was received on October 4, 2001.

- o Nigeria also informed FBI Lagos of the requested information and provided some banking documents.

*Identify, describe in detail, and authenticate, or provide information concerning the authenticity of, all information and documents produced to Plaintiff under the requests for information described in Topic 4 above, including, but not limited to, by:*

    a. *Nigeria, in response to the mutual legal assistance requests referred to in Plaintiff's Response to Request No. 27 of Claimant's First Set of Requests for Production ("Request No. 27");*

    b. *The U.K., in response to the MLAT requests referred to in Plaintiff's Response to Request No. 27, including, but not limited to, the documents identified as Bates Nos. DOJ_00006262-63, DOJ_00029293-306, DOJ_00029311-326, DOJ_00029329-29340, and DOJ_00032625-38.*

    c. *Jersey, in response to the mutual legal assistance requests referred to in Plaintiff's Response to Request No. 27;*

    d. *France, in response to the MLAT requests referred to in Plaintiff's Response to Request No. 27; and*

    e. *The BVI, in response to the MLAT requests referred to in Plaintiff's Response to Request No. 27.*

Documents received pursuant to MLAT communication with foreign authorities can be individually authenticated by looking to the face and contents of each document and by looking to the United States authorities' communications requesting the document, or to the foreign authorities' communications transmitting the document to the Department of Justice. The United States may obtain additional information authenticating these documents at any time before trial.

Examples of specific communications currently in the United States' possession that may authenticate documents received pursuant to MLA requests:

## 5 (a) – Nigeria

- Documents Bates stamped with a number prefixed with MLAT-N were received in connection with multiple MLATs from Nigeria, with the earliest-received documents being attached to a Nigerian MLAT from November, 1999 produced as DOJ_00145627.

- Documents Bates stamped with a number prefixed with N were received by the DOJ in 2007 from the law firm Monfrini Crettol and Associates ("Monfrini"), which represented Nigeria in various proceedings and was designated as Central Authority for international cooperation with the United States in the Abacha matter. Receipt and transmission of these documents via USB drive is memorialized in a letter from Monfrini dated November 23, 2007 and produced as DOJ_00149827.

- Documents Bates stamped with a number prefixed with NF were received by the DOJ in 2012 from Monfrini. Receipt of these documents is memorialized in a letter from Monfrini dated February 7, 2012 and produced as DOJ_00090646.

## 5 (b) – The United Kingdom

- Documents Bates stamped with a number prefixed by A, B, or C were initially collected by counsel for the Federal Government of Nigeria, Edwards Angell Palmer & Dodge ("EAPD"). These documents were produced to the United States by the United Kingdom through the UK's Serious Fraud Office and the Home Office, which obtained and served a production order for these records EAPD. These records were transmitted to the DOJ in 57 boxes that we cataloged and organized. The chain-of-custody and receipt of these documents by the DOJ are memorialized in the following documents:
  - DOJ_00164130 – an email confirming transmission of EAPD documents to the United States
  - Cover letters and correspondence confirming the request and receipt of EAPD documents by the United States.
  - DOJ_00148078 – an official MLA request to UK authorities requesting documents in the possession of EAPD.

- Documents Bates stamped with a number prefixed by NCA were received from the UK's National Crime Agency via three produced MLAT communications memorializing transmission, dated August 19, August 21, and December 29, 2014 (produced as DOJ_00149833, DOJ_00149832, and DOJ_00149831).

- Documents Bates stamped with a number prefixed by UKMLA were received pursuant to an MLAT request to the United Kingdom, and many were accompanied with certifications satisfying Federal Rule of Evidence 803(6), including document DOJ_00092718 at DOJ_00092720.

## 5(c) – Jersey

- Documents Bates stamped with a number prefixed by DDC were received as part of Jersey's extradition request to the United States. They primarily consist of the original request to the United States to extradite Bagudu and the United States' filings in DDC to execute the request. These documents can be authenticated by their contents, including original transmission documents dated April 24, 2003 and April 29, 2003, produced as DOJ_00145721 and DOJ_00149906.
- Documents Bates stamped with a number prefixed by J in part were received as part of the file assembled by Jersey to support extradition of Bagudu from the United States. Other documents Bates stamped with a number prefixed by J may have been received in response to the United States' MLA requests dated April 6, 2009 and December 19, 2011, seeking documents pertaining to Bagudu's extradition (DOJ_00150113 and DOJ_00148029).
- The only documents Bates stamped with a number prefixed by JMISC may have been received from Jersey authorities. (DOJ_00092044.)
- Documents Bates stamped with a number prefixed by K were received from Jersey authorities in response to MLA requests from the United States, as detailed in multiple Jersey MLAT communications accompanying the transmission of each group of documents. Different groups of documents with this prefix are authenticated by certifications satisfying Rule 803(6), including DOJ_00124608.

### 5 (d) – France
- Documents Bates stamped with a number prefixed by MLAT-F were received from French authorities on or around October 9, 2012 in response to an MLA request from the United States, as described in the document produced as DOJ_00113028.
- Documents Bates stamped with a number prefixed by F-A, F-HE, F-RI or F-SA were received in response to an United States MLA request to France dated January 20, 2012 [P-DOJ-00009402] seeking documents regarding the Abica Investment Company, Harbour Engineering, Rayville International, and Standard Alliance Financial Services Ltd.

### 5 (e) – British Virgin Islands
- Documents Bates stamped with a number prefixed by F-A, F-HE, F-RI or F-SA were received by United States authorities in response to an MLA request sent to the authorities of the British Virgin Islands, as memorialized by documents such as the MLA communication dated May 8, 2013 and produced as DOJ_00113056.

6. *Identify the date when, and describe in detail the circumstances under which, Plaintiff first became aware of:*

    a. *The allegations of the Complaint related to Plaintiff's Claims for Forfeiture against the Claimed Property, and any interests, benefits, or assets Plaintiff alleges are traceable to the Claimed Property;*

    b. *The Claimed Property, or any interests, benefits, or assets Plaintiff alleges are traceable to the Claimed Property;*

    c. *The Ridley Group Limited, the Ridley Trust, Mecosta Securities, Inc., or Eagle Alliance International Limited; and*

    d. *Information and documents that could support a civil asset forfeiture action against the Claimed Property, or any interests, benefits, or assets Plaintiff alleges are traceable to the Claimed Property.*


Aware of Allegations of Criminal Conduct

- Security Votes Scheme:
  - On October 12, 1999, representatives of the Nigerian investigation (Obera and Game) advised the FBI Legal Attaché Burt Weldon and Assistant Legat John Quinn of the general outline of the security votes scheme, including:
    - General Abacha and National Security Advisor Gwarzo illegally took $2.2 billion from the Central Bank of Nigeria.
    - Cash or travelers checks were delivered to Bagudu, who deposited them into Bagudu's accounts at Inland Bank and Union Bank and transferred them out of Nigeria to foreign accounts through the Central Bank of Nigeria
  - November 22, 1999, the United States received a mutual legal assistance request from Nigeria (dated November 4, 1999), that included some information concerning the "Security Votes Fraud", including similar information and that General Abacha entrusted part of this looted money to Abubakar Bagudu.

- Other Schemes (Ajaoukuta Steel Debt-Buy-Back)
  - In June 2001, at a meeting in Switzerland, the U.K. and Liechtenstein and possibly other jurisdictions provided other summary information regarding mutual legal assistance requests they had received from Nigeria concerning other criminal schemes, including the Debt-Buy-Back Fraud involving Ajaoukuta Steel, as well as some limited information regarding other schemes.

  - In July 2003, the United States received additional information regarding the "Debt Buy-Back Fraud" when the United States received an extradition request from the Bailiwick of Jersey.

- On or about September 21, 2011, the Serious Organised Crime Agency (now the National Crime Agency) of the United Kingdom gathered intelligence which identified the specific Claimed Property's involvement in the criminal conduct alleged in the Complaint.

      o   The Serious Organised Crime Agency generated a report containing this
information on February 2, 2012. Counsel for the United States became
aware of the content of this report no later than July 24, 2012. This report
was produced to the Claimants and is identified by Bates Nos.
DOJ00113021 to DOJ00113027

-  The draft MLAT request (together with cover email) was produced
in this case bearing Bates numbers DOJ-00147887-950." (6 14 18 Supplemental
Response.)
- On approximately July 11, 2003, the Bailiwick of Jersey provided information in
support of an extradition request to the United States, including the Fourth Affidavit of
Abubakar Bagudu from the "Noga" civil litigation in the High Court of Justice, Queen's
Benk Division, Commerical Court proceedings 1999 Folio 83
  - o   Bagudu's Fourth Affidavit identifies the transfer of bonds from Mecosta at ANZ
Bank to Ridley Group at Credit Agricole.

*7.   Identify, and describe in detail the roles of, Plaintiff's representatives responsible for authorizing the commencement of this action, and the factual reason(s) for Plaintiff's decision to commence this action on November 18, 2013, and not to commence any action concerning the Claimed Property, or any interests, benefits, or assets Plaintiff alleges are traceable to the Claimed Property, prior to November 18, 2013.*

- MLARS' International Unit received authorization to initiate the civil forfeiture action on July 24, 2013, by its Section Chief.

- The Complaint was finalized between July 24, 2013, and the date of filing.

- The United States brought one action to forfeit all of the Abacha-related assets over which it had jurisdiction.

- In order to accomplish this, we had to identify where the outstanding assets were located, and the present balances in the accounts.

- We did not obtain that information from France and the United Kingdom until 2012 (June-July 2012 for UK; September 2012 for France).

- The case was brought consistent with the principles of federal prosecution laid out in the United States' Attorneys Manual (USAM)

8.      *Identify and describe in detail Plaintiff's knowledge of and involvement in (a) any meetings with representatives of any of Nigeria, Jersey, the U.K., France, Switzerland, or Lichtenstein, concerning any resolutions, proposed resolutions, or potential resolutions, or (b) any settlements of any investigation or proceeding, in connection with the alleged theft or misappropriation of funds from Nigeria during the administration of General Sani Abacha, the Claimed Property, or any interests, benefits, or assets Plaintiff alleges are traceable to the Claimed Property.*

- o   See Responses and supplemental responses to Claimant's Fourth Set of Interrogatories.
- o   See also Swiss summary of 2001 meeting, produced.

*9.   Identify and describe in detail plaintiff's knowledge of and involvement in Jersey's request for extradition of Abubakar Atiku Bagudu from the U.S. in 2003, and identify, describe in detail, and authenticate, or provide information concerning the authenticity of, all documents Plaintiff received in connection with Jersey's extradition request, including, but not limited to, documents identified as Bates Nos.  DOJ_00125898-130014.*

- The Documents identified by Bates Nos. DOJ_00125898 to DOJ_00130014 were provided to the United States by Jersey.  They were materials submitted in support of Jersey's request to arrest Abubakar Bagudu and extradite him to the Jersey.

- They include:

  - The request was notarized under the Hague Convention of October 5, 1961. It contains a certificate (apostille) which certifies the documents' authenticity. Under the convention, such an apostille is sufficient to certify a document's validity, and removes the need for double-certification, by the originating country and then by the receiving country.
  - An affidavit and exhibits signed under penalty of perjury by a Crown Royal Advocate of the Royal Court of Jersey (Stephen Baker).
  - The charges against Mr. Bagudu
  - The Jersey Prosecutor's Summary of the case, with exhibits.
  - Witness statements, signed under penalty of perjury, with exhibits
  - A Schedule of exhibits
  - The arrest warrant

- The extradition request was signed on July 11, 2003.  It had 3,465 pages of exhibits (although the pagination stopped at 3,429.)

- A supplemental witness statement with two exhibits was signed on July 15, 2003.

  - Supplemental Affidavit of Stephen Baker
  - Witness Statement of Detective Constable Mark Grieve with two exhibits Claimant has a copy and produced it to us CLS 04010

**Other Helpful Information**

- Charges:
  - Initial request:
    - 2 counts fraud
    - 2 counts obtaining services by false pretenses
    - 2 counts receiving or being in possession of property obtained illegally abroad

**Extradition Timeline**

- On April 24, 2003, Jersey sends an extradition request to the United States
- April 25, 2003, OIA (Jason Carter) refers the extradition to Ed Gallagher (SDTX) via email.
- May 22, 2003, Bagudu is arrested following a complaint filed on May 7, 2003 in DDC.
- May 23, 2003, DiMarco files a complaint in SDTX
- DDC Complaint is dismissed.
- May 28, 2003, Bagudu remanded by Magistrate Judge without bond
- June 23, 2003, District Court bond appeal and hearing held in SDTX.
- June 24, 2003, bond denied.
- June – October Extradition hearing continued and extradition request supplemented
- Jersey and Bagudu agreed on resolution through which he would transfer 50% of the Doraville account to Nigeria, he would return to Nigeria, and Jersey would withdraw its extradition request.
- As proposed by Bagudu's U.S. counsel, Bagudu released on $500,000 bond and agreed to report to Nigeria within 14-days
- March 8, 2004, complaint for extradition was dismissed upon motion of the government based on a dip note from the British embassy requesting the withdrawal.

See Extradition Docket sheet: DOJ_00136537

US v. All Assets…Doraville (Abacha/Bagudu)

30(b)(6) Deposition
13 Aug 2018

*10. Identify and describe in detail the circumstances surrounding Mr. Bagudu's 2010 application to expunge the judicial record of his extradition proceeding, including, but not limited to, the factual reason(s) underlying Plaintiff's decision not to oppose Mr. Bagudu's application, who made the decision, the process for making the decision, and whether any records were destroyed by Plaintiff in connection with the expungement proceeding.*

- 2010 Abubakar Bagudu requested court record of his extradition proceedings in Texas be expunged
- The United States took no position on the expungement. It did not involve executive branch records.
- Further details in Ed Gallagher deposition transcript

*11. Identify and describe in detail Plaintiff's interactions with Nigeria concerning the alleged theft or misappropriation of funds from Nigeria during the administration of General Sani Abacha, the Claimed Property, or any interests, benefits, or assets Plaintiff alleges are traceable to the Claimed Property, from 1999 to present, including, but not limited to, any discussions concerning any written or oral contemplated, proposed, draft, informal, or formal agreement(s) Plaintiff maintains or maintained with Nigeria regarding the disposition of any funds forfeited as a result of this action.*

- The United States has not entered into an agreement concerning the disposition of any Claimed Property that might be forfeited as a result of this action.
- The United States has shared some communications regarding Nigeria's interest in recovery of the assets that have already been forfeited.

**Other Helpful Information**

- See responses to Interrogatory Number 1 from Second Set of Interrogatories

*12. Identify and describe in detail the steps Plaintiff, including, but not limited to, the DOJ, MLARS, the OIA, the FBI, and the Department of State, took to locate documents and information in response to Claimant's Requests for Production and Interrogatories served in this action, including, but not limited to, the sources and locations of information searched for responsive documents and the individuals Plaintiff consulted to locate responsive documents.*

## FBI

- In anticipation of discovery, MLARS contacted the FBI Office of General Counsel on March 16, 2015 and asked for their entire file associated with the investigation and identified Renee Michael and Debra LaPrevotte as FBI personnel associated with it. The custodian list was expanded to include Michelle Rankin and Jerome Simpson
- FBI OGC's office confirmed that a legal hold was issued on March 24, 2015.
- On July 1, 2015, the FBI Transmitted to the United States two CDS:
  - The first CD contained a redacted version of the FBI case files relevant in this matter, specifically file number 272G-WF-236485 and its forfeiture subfile
  - The second CD contains a log of responsive documents that are being withheld from production, as well as an unredacted version of those documents.

- The United States forwarded the Claimants' first RFP to the FBI on August 7, 2015.
- Following receipt of the case file, the FBI provided the DOJ with relevant ESI, identified by search terms.
- The FBI conducted a privilege review and provided documents to the United States on a rolling basis.  Documents were received on August 14, 2015 (PDFs of responsive paper documents provided by Michele Rankin and Renee Michael, Responsive ESI) and June 30, 2015 (Swiss documents)

- Additional documents obtained from Nigeria were provided on February 17, 2016.

- We forwarded them the RFP in approximately June 2018

## MLARS/OIA

- OIA stores their documents in a system called Oracle.
- We scanned the entire OIA Oracle file into Relativity for production
- We scanned into Relativity all material that we received from foreign jurisdictions in connection with either incoming our outgoing MLA requests.
- The case team was asked to review their own files to identify any responsive material. Responsive material was uploaded into Relativity.
- Litigation hold was circulated to OIA on March 5, 2014.
- Litigation hold was circulated to MLARS on March 11, 2014.
- With regard to electronic communications, we provided ITM with a list of search terms and custodians to pull all email without date limitations
- Custodians (provided by OIA)

- o 49 OIA personnel who had responsibility for the countries involved during the duration of the investigation, including Attaché personnel located overseas.

- We pulled responsive email into Relativity, reviewed them privilege and produced non-privileged documents.

## NDGA

- We forwarded the RFP to AUSA Elizabeth McBath, whose contact information was provided by OIA on December 9, 2015. On January 26, 2016, McBath received the file from their archives. They scanned and emailed it to us on February 1, 2016. We imported it into Relativity for production.

## SDNY

- On August 10, 2015, Diane Gujarati (the commissioner) pulled the files from storage.
- Bank records obtained via commissioner's subpoena were included in the FBI production. Gujarati confirmed sealing order did not preclude this.
- Relevant correspondence was in the OIA file which was scanned into Relativity, reviewed for privilege, and produced.

## DDC

- On December 9, 2015, we forwarded the Claimants RFP to DDC (Zia Faruqui)
- One relevant DDC matter was identified: USAO#2003R01346
- The file was pulled from storage.
- DDC received it on December 17, 2015. They FedEx us a copy, and we confirmed we received it on January 4, 2015.
- We uploaded it into Relativity, reviewed it for privilege, and produced it.

*13. Identify and describe in detail any documents or information sought responsive to Claimant's Requests for Production and Interrogatories served in this action that once were, but no longer are, in Plaintiff's possession, custody, and control, and the reason(s) why such documents or information are no longer in Plaintiff's possession, custody, or control.*

- Some attachments to FBI files are not currently stored with those files and thus are not readily obtainable, though Plaintiff is unaware whether those attachments are actually no longer in Plaintiff's possession.
- Other than that, Plaintiff is unaware of any documents or information sought responsive to Claimant's Requests for Production and Interrogatories served in this action that once were, but no longer are, in Plaintiff's possession, custody, and control.

*14. Identify and describe in detail the sources and bases of each of the factual allegations in the (a) Complaint, (b) February 24, 2014, and March 26, 2014, affidavits of Debra Lynn LaPrevotte, former Supervisory Special Agent for the FBI and case agent for this matter, filed in the U.K. action United States v. Abacha, Claim No. 2014 Folio 209 (collectively, the "LaPrevotte Affidavits"), and (c) February 24, 2014, affidavit of Renee Maria Michael, forensic accountant for Plaintiff, filed in United States v. Abacha (the "Michael Affidavit," and together with the LaPrevotte Affidavits, the "U.K. Affidavits"), relied upon by Plaintiff to support its Claims for Forfeiture in the Complaint against the Claimed Property, or any interests, benefits, or assets Plaintiff alleges are traceable to the Claimed Property.*

- I understand that you have deposed Special Agent LaPrevotte on the sources and bases of each of the factual allegations in the Complaint.

- The principal sources and bases of the factual allegation is derived from the same financial records, documentary evidence, and testimonial evidence reviewed by Special Agent LaPrevotte and FBI forensic accountant Renee Michael.

- Ms. LaPrevotte reviewed financial records, witness testimony, contractual agreements, security votes letters, purchase records, which have been provided to you in discovery and many of which are exhibited to the affidavits in the UK proceedings.

- Similarly, Ms. Michael reviewed financial records, witness testimony, contractual agreements, security votes letters, purchase records, which also have been provided to you in discovery and many of which are exhibited to the affidavits in the UK proceedings.

- These materials are the primary basis for the factual allegations in the Complaint.

**Relevant Information from Interrogatory Responses:**



30(b)(6) Deposition
13 Aug 2018



**Other Information**

- Seeking exhaustive detail about the sources and bases for each individual allegation in a 119-paragraph Complaint is unduly burdensome and not a proper deposition topic.

*15. Identify, describe in detail, and authenticate, or provide information concerning the authenticity of, any document exhibited to the U.K. Affidavits, including, but not limited to, documents located at (a) pages 151, 191-92, and 262-65 of the exhibits to the February 24, 2014 affidavit of Ms. LaPrevotte, and (b) pages 1-95, 101-13, 142, 168-72, 174-77, 182-83, 189-204, 214, 216, 222, 244-45, 249-51, 274, and 304 of the exhibits to the Michael Affidavit.*

- Documents can be individually authenticated by looking to the face and contents of the document, considering the circumstances under which the document was obtained, and persons or other documents that may provide information regarding the documents.

*16. Identify, describe in detail, and authenticate, or provide information concerning the authenticity of, any reports generated by the Special Investigation Panel referenced at Paragraph 29 of the Complaint, and any exhibits or appendices to such reports, including, but limited to, documents identified as Bates Nos. DOJ_00012109-12383 and DOJ_00100260-389.*

Authentication

- These two cited documents (DOJ_00012109-12383 and DOJ_00100260-389) are from mutual legal assistance requests to and from Nigeria [prefix "N"], and their authentication is covered by 5(a) above.  Other documents from the Special Investigatory Panel are likely received from Nigeria or other jurisdictions described above, particularly 5(a), 5(b), and 5(c).  Looking to the Bates number for any provided document will allow authentication using the prefix-specific approach detailed above.

*17. Identify and describe in detail the sources and factual bases of any alleged conduct and monetary transfers relied upon by Plaintiff to support its Claims for Forfeiture against the Claimed Property, or any interests, benefits, or assets Plaintiff alleges are traceable to the Claimed Property, that are not alleged in the Complaint or U.K. Affidavits.*

As set forth in the Complaint and the U.K. affidavits of S/A LaPrevotte and Forensic Accountant Renee Michael, Mr. Bagudu and his associates were involved in numerous criminal schemes and money laundering transactions. Although these documents present many of the transactions, by the length and purpose of those documents they cannot specify every transaction contained in every relevant financial document among the thousands of pages of records. Nor is it appropriate to identify every transaction in a 30(b)(6) deposition. Claimant has already indicated his intention to depose Ms. Michael, which may be more appropriate for identification of transactions.

[Refer to separate hard-copy doc for certain transaction information]

*18. Identify and authenticate, or provide information concerning the authenticity of, all financial accounts related to the Plaintiff's Claims for Forfeiture against the Claimed Property, or any interests, benefits, or assets Plaintiff alleges are traceable to the Claimed Property, including, but not limited to, the (a) identity of the persons with signing authority on those accounts, (b) records used to establish each transfer into and out of each account, the daily balances before the transfers, and the daily balances after the transfers, (c) identities of each of the parties transmitting or receiving money, (d) identity of the persons authorizing and effectuating the transfers, and (e) purpose(s) of each transfer.*

1. The records used to establish transfers in and out of the following accounts were obtained through mutual legal assistance requests. They are authenticated consisted with the treaties authorizing mutual legal assistance, including through business records certifications.

- Seeking exhaustive detail about each financial transaction is unduly burdensome and not a proper 30(b)(6) deposition topic.

<u>US v. All Assets...Doraville (Abacha/Bagudu)</u>                    30(b)(6) Deposition
                                                                     13 Aug 2018

*19. Identify and describe in detail any connection between the U.S. and Ibrahim Bagudu, the Claimed Property, the alleged financial transactions involving the Claimed Property, Blue Holdings (2) Pte. Ltd., Blue PTC Pte. Ltd., or Blue Family Trust II.*

- We are unaware of any connection between Ibrahim Bagudu and the United States beyond that identified in the Claimants' pleadings and discovery.
- We are unaware of any connection between Ibrahim Bagudu and the Claimed Property beyond that identified in the Claimants' pleadings and document productions.
- The alleged conduct and transactions involving the Claimed Property and the United States include those identified in paragraphs 34, 35, 51, and 53 to 85 of the Complaint.
- The U.K. affidavits Ms. LaPrevotte and Ms. Michael and the records exhibited thereto also detail numerous financial transactions into and out of the United States.
- In addition, the Claimed property is directly derived from the proceeds of the sale of Nigerian Par Bonds.
- NPBs were U.S. dollar-denominated securities whose interest (known as "coupon interest") payments were guaranteed by the U.S. Treasury. This type of security was created as part of the Brady Bond program to help developing countries holding substantial debt to restructure their debt into bonds. Under this program, U.S. zero-coupon (i.e., interest free) bonds were held in escrow to guarantee the payment of interest on bonds issued by developing nations, such as Nigeria. The U.S. dollar-denominated securities, issued by developing nations, were offered for sale around the world through commercial financial institutions that elected to participate in this market.
- Nigeria first offered NPBs under the Brady Bond program in 1992. To encourage investors to purchase NPBs, the Nigerian government also issued PAWs, another type of investment, with each purchase of NPBs. A set formula determined how many PAWs would accompany each NPB purchase. The NPBs and PAWs could be traded together or separately. The PAWs yielded dividend payments, which were paid twice per year.
- Citibank NA, New York (Citibank (New York)) served as the Fiscal Agent, Registrar, and Calculation Agent for the Nigerian government in connection with the issuance and sale of NPBs and PAWs. In this capacity, Citibank (New York) was responsible for disbursement of coupon interest payments on the NBPs and for payment of dividends on the related PAWs. The Nigerian government periodically transferred money to Citibank (New York) to fund these payments. Coupon interest payments and dividend payments were then made from the United States by Citibank (New York) in U.S. dollars to the financial institution designated by each bond holder.
- As set forth in detail in the complaint, these Nigerian Par Bonds were purchased in accordance with a Master Deferred Purchase agreement that directed payments to be made in U.S. dollars to ANZ Bank in New York. Transactions to transfer these bonds and in the liquidation of the bonds also involved transactions in the United States.

| Date | Activity |
|---|---|
| November 1993 | General Abacha seizes power in coup |
| 1994-1998 | $2 billion stolen through use of false security votes letters from National Security Advisor Gwarzo authorizing cash and other disbursements from Central Bank.  Scheme included hundreds of millions in cash to Bagudu, who wired funds out of Nigeria through Union Bank of Nigeria and Inland Bank |
| September 1995 | Bagudu starts buying Nigerian Par Bonds (NPBs) with security vote monies |
| May 1996 | Nigeria pays Mecosta (Bagudu/M.Abacha) DM 486 million payment for Ajaokuta Steel Debt-Buy-Back |
| April 1997 | Finance Minister Ani authorizes second payment of DM 486 million (in USD) to Mecosta for Ajaoukuta debt |
| July 1997 | Abubakar Bagudu acquires Ridley Group |
| September 1997 | Abubakar Bagudu establishes Ridley Trust |
| June 8, 1998 | General Abacha Dies |
| Shortly After June 8, 1998 | Special Investigations Panel is stood up in Nigeria under General Abdulsalami Abubakar |
| November 1998 | AB transfers NPBs $90 million (face value) from ANZ Mecosta to Credit Agricole |
| May 29, 1999 | President Obasanjo takes office |
| September 11, 1999 | President Clinton states in a letter to President Obasanjo of Nigeria that we would assist in asset recovery efforts |
| August 16, 1999 | Nigeria and Mohammad Abacha and Bagudu enter into an agreement, later disputed, to return DEM 300 |
| October 12, 1999 | Legat Weldon Burt, ALAT John Quinn meet with GON |
| November 1999 | GON officials visit Washington, DC DOJ/OIA including re requirements for MLA for bank records |
| November 4, 1999 | MLA request "presented" to US by then AG Agabi |
| November 9-10, 1999 | Senate Permanent Subcommittee on Investigations has public hearings on Private Banking and Money Laundering.  Abacha family is one of four case studies of corruption |
| April 3, 2000 | Mohammad Abacha testifies in NOGA proceedings |
| August 14, 2000 | Switzerland sends letters rogatory to US |
| October 2000 | ALAT Quinn delivers records requested to Assistant Commissioner of Police Peter Gana |
| December 28, 2000 | US Sends response to Switzerland Letters Rogatory |
| June 15, 2001 | President Obasanjo letter to President Bush requesting further assistance |
| September 5, 2001 | Letter from Nigeria to President Bush enclosing forensic accountant's report from Monfrini's firm |
| December 2002 | OIA/John Harris and Nigeria exchange MLAT drafts |
| April 24, 2003 | Jersey sends extradition request to US via letters rogatory. Letter is dated April 11, 2003. |
| April 29, 2003 | Jersey sends supplement to extradition request |

| Date | Activity |
|---|---|
| April-July 2003 | Jersey requests extradition of AB |
| November 2003 | AB released on bond to return to Nigeria |
| March 2004 | Jersey withdraws extradition request, complaint dismissed |
| January 2005 | Ridley Trust NPBs transferred from Credit Agricole (Calyon Corporate and Investment Bank) to J.O. Hambro Investment Management |
| November 2006 | NPBs redeemed and bonds cancelled |
| June 2007 | Jersey AG and Nigerian President exchange letters. Nigerian President supports US restraint and forfeiture |
| July 2007 | MLARS requests assistance of WFO to restrain, seize and forfeit monies derived from Abacha corruption |
| September 2007 | MLARS meets with SFO, Maton and others re obtaining records via mutual legal assistance |
| September 2007 | MLARS meets with Monfrini and Klein in Geneva re obtaining records |
| November 23, 2007 | Nigeria (Monfrini) sends US a USB Key with documents with no use restrictions |
| February 1, 2008 | Monfrini writes to US on behalf of Nigeria enclosing an October 26, 2007, letter, stating that any US to Nigeria MLA Request should go through Monfrini |
| November 19, 2008 | US MLAT Request to the UK signed (sent on November 21, 2008) |
| April 6, 2009 | US Sends MLA request to Jersey (evidence) |
| October 2, 2009 | SFO writes to OIA, and confirms that the EAPD evidence was collected on our behalf, and confirms transmission of evidence. Includes index of documents received. |
| December 9, 2009 | BVI Pulls Ridley Group Information in response to US MLAT Request |
| July 15, 2010 | AG Approves Kleptocracy Initiative Funding in FY 2011 |
| July 23, 2010 | FBI WFO requests assistance of Legat Paris to obtain records |
| August 2010 | Ridley assets transferred to Blue Holding 1 and Blue Holding 2 at J.O. Hambro |
| September 2010 | €70 million transferred from J.O. Hambro to James Hambro & Partners LLP |
| February 28, 2011 | FBI WFO requests assignment of Financial Analyst |
| March 1, 2011 | FBI Requests reassignment of case to Michelle Rankin |
| July 21, 2011 | US further inquiry to UK re Ridley assets believed at Credit Agricole |
| December 19, 2011 | US sends supplemental MLAT to Jersey |
| January 22-27, 2012 | FBI WFO travels to Geneva to review evidence |
| January 27, 2012 | US sends MLAT request to France (evidence) |
| March 26, 2012 | France receives our MLAT Request dated January 20, 2012 |
| May 21, 2012 | Jersey issues notice compelling Deutsche Bank to produce records |
| August 21, 2012 | Jersey sends US letter re authentication of DBIL records with Business Records Certification |
| August 28, 2012 | Nigeria (AG Adoke) signs an request to the US asking for mutual legal assistance in asset recovery matters related to Abacha and identifies Monfrini as the POC. |
| September 20, 2012 | Yves Klein sends Aloi August 28, 2012, request from Nigeria via email. |
| November 7, 2012 | US Sends Supplemental MLAT request to the UK (evidence) |

| Date | Activity |
|---|---|
| November 14, 2012 | US Sends MLAT Request dated November 8, 2012, to BVI |
| December 19, 2012 | US Sends Second Supplemental Request to UK (evidence) |
| January 29, 2013 | US Sends MLAT to BVI |
| March 7, 2013 | US Sends Third Supplemental MLAT to UK (evidence) |
| April 3, 2013 | US Sends Fourth Supplemental Request to UK (evidence) |
| August 30, 2013 | United States receives Deutsche Bank evidence from United Kingdom |
| November 18, 2013 | Complaint is filed under seal |
| December 6, 2013 | Date US MLAT Request to France is signed (enforcement) |
| December 20, 2013 | US sends first supplemental request to France (service/enforcement) |
| January 24, 2014 | US sends second supplemental request to Jersey (enforcement) |
| February 24, 2014 | LaPrevotte and Michael sign affidavits in UK Section 25 proceedings detailing conduct |
| February 27, 2014 | Aloi sends Litigation Hold to: LaPrevotte, Bishop, Rankin, Michael, Gibbs, and others (case under seal – Aloi asks folks not to circulate widely at this time) |
| February 28, 2014 | US Sends MLAT to BVI (notice/enforcement) |
| March 5, 2014 | Litigation hold sent to OIA, FBI (case agent, and Legat Nigeria) |
| March 10, 2014 | US sends MLAT to Nigeria for notice |
| March 11, 2014 | Erin Dawson circulates litigation hold to MLARS |
| July 18, 2014 | UK Court issues disclosure order for James Hambro Records and Waverton Records |
| June 9, 2014 | US Sends Fifth Supplemental MLAT to UK (enforcement of arrest warrants) |
| December 29, 2014 | US embassy sends Aloi by email  evidence they have obtained from UK authorities to include Ridley documents |
| March 31, 2015 | State Department identifies document custodians for MLARS; MLARS sends State draft litigation hold letter.<br>State POC is Ron Katwan from L/LEI. |