**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>  Plaintiff,<br><br>  v.<br><br>**ALL ASSETS HELD IN ACCOUNT NUMBER 80020796, IN THE NAME OF DORAVILLE PROPERTIES CORP., AT DEUTSCHE BANK INTERNATIONAL, LTD. IN JERSEY, CHANNEL ISLANDS, AND ALL INTEREST, BENEFITS OR ASSETS TRACEABLE THERETO, et al.,**<br><br>  Defendants. | Civil Action No. 13-1832 (JDB) |

**MEMORANDUM OPINION**

After years of litigation in this in rem action, the government and the only remaining claimant, Ibrahim Bagudu, are proceeding in discovery. Bagudu has asserted a claim to assets that were allegedly stolen from Nigeria and laundered through U.S. banks by Nigeria's former de facto president Sani Abacha and Bagudu's brother, Abubakar Bagudu ("Abubakar"). Ibrahim Bagudu now has provided notice that he intends to depose Daniel Claman, the government's supervisory trial counsel. Bagudu claims that Claman, who was the lead attorney responsible for the investigation of the Abacha matter prior to the filing of this case, has information essential to Bagudu's defenses to the forfeiture action. See Mem. of P. & A. in Opp'n to Pl.'s Mot. for Protective Order to Preclude Dep. of Pl.'s Trial Counsel Daniel H. Claman ("Cl.'s Opp'n") [ECF No. 260] at 2–3. In response to the deposition notice, the government moves for a protective order to preclude the deposition of Claman. See Pl.'s Mot. for Protective Order to Preclude Dep. of Pl.'s

1

Trial Counsel Daniel H. Claman ("Gov't's Mot.") [ECF No. 258]. For the reasons that follow, the Court will grant the government's motion.

## BACKGROUND

As alleged and as described more fully in this Court's March 19, 2015, Memorandum Opinion, see United States v. All Assets, 83 F. Supp. 3d 360, 364–366 (D.D.C. 2015), the defendant assets in this in rem proceeding were "involved in an international conspiracy to launder proceeds of corruption in Nigeria" that allegedly began in 1994 "during the military regime of General Sani Abacha," Compl. [ECF No. 1] ¶¶ 1, 25. Abacha died in 1998, id. ¶ 8, and in 1999 the United States received a Mutual Legal Assistance Treaty ("MLAT") request from Nigeria seeking assistance with the investigation and recovery of the allegedly laundered funds, see Ex. 2 to Gov't's Mot. ("Touhy Letter") [ECF No. 258-3] at 2. According to the government, the Department of Justice's ("DOJ") Office of Internal Affairs ("OIA") and the U.S. Attorney's Office in the Southern District of New York ("SDNY") were responsible for responding to the MLAT request. See Pamela J. Hicks 30(b)(6) Dep., Ex. 1 to Cl.'s Opp'n ("Hicks 30(b)(6) Dep.") [ECF No. 260-2] at 81:12–15. Another unit, the DOJ's Money Laundering and Asset Recovery Section ("AFMLS"),[1] "provided consultations on asset forfeiture and money laundering prosecutions and legal issues" in connection with the MLAT and served as a liaison between the U.S. Attorney's Office and its foreign counterparts. Id. at 74:11–16, 78:12–17; 81:16–19. Claman worked at AFMLS and assisted OIA in its investigation, including by meeting with foreign law enforcement officials who were also investigating the Abacha matter. Id. at 74:11–77:17, 79:5–18, 332:11–20.

---

[1] The DOJ's Money Laundering and Asset Recovery Section was formerly known as the Asset Forfeiture and Money Laundering Section. Both parties use the acronym "AFMLS" to refer to the unit, and this Court will do the same.

According to the U.S. government, its investigation into the Abacha funds "lost steam" between 2004 and 2007 as European countries were litigating the potential forfeiture of assets and criminal actions against Abacha's alleged accomplices. Id. at 412:3–413:14, 415:15–416:12.[2] In 2007, the investigation apparently picked up again, and AFMLS drafted an affidavit in support of a request for a seizure warrant. See Email from Daniel Claman to David O'Mahoney, Ex. 13 to Cl.'s Opp'n [ECF No. 262-13] at 3–25; Cl.'s Opp'n at 11–12. Shortly thereafter, in 2008, AFMLS drafted a forfeiture complaint. See Debra LaPrevotte Griffith Dep., Ex. 15 to Cl.'s Opp'n [260-16] at 399:6–15.

Five years later, on November 18, 2013, the United States filed a verified complaint for civil forfeiture of the defendant assets. Purported claims to various assets were subsequently filed by third parties, nearly all of which ultimately were struck. See United States v. All Assets, 330 F. Supp. 3d 150, 153–54 (D.D.C. 2018). The only remaining third-party claim in this litigation is Bagudu's asserted claim to certain defendant assets, which is based on an annuity he receives from investment portfolios in which the defendant assets are held. Id. at 154.

The government and Bagudu are now conducting discovery. Bagudu provided notice to the government that he intends to depose Claman, the current Deputy Chief of the International Unit of AFMLS and the government's supervisory trial counsel in this case. Bagudu claims that Claman has unique, nonprivileged factual evidence that supports two of Bagudu's defenses.

First, Bagudu asserts that the United States is bound to a settlement agreement between Abubakar, the Federal Republic of Nigeria, and the Bailiwick of Jersey, which Bagudu claims precludes this forfeiture proceeding. In 2003, Abubakar was arrested in Texas for extradition to the Bailiwick of Jersey for his involvement in the Abacha matter. See Compl. ¶ 77. Abubakar

---

[2] Portions of Bagudu's opposition brief and its attachments have been filed under seal and are cited in this Memorandum Opinion with the government's and Bagudu's consent.

subsequently agreed to a settlement with Nigeria and Jersey by which he would return more than $163 million of the allegedly laundered assets to Nigeria in exchange for Jersey's withdrawal of the extradition request and Ababukar's return to Nigeria. Id. The U.S. government then released Abubakar from detention on bond at the request of the United Kingdom on behalf of Jersey.[3] Gov't's Mot. at 5. Although Bagudu admits that the U.S. government is not a signatory to the 2003 settlement agreement, he asserts that it nevertheless is bound to the agreement because either it acted as the agent of Nigeria by attempting to recover the funds on behalf of Nigeria or it facilitated the agreement by dismissing the extradition proceeding against Abubakar. See Cl. Ibrahim Bagudu's Resps. & Objs. to the United States' 2d Set of Interrogs., Ex. 1 to Gov't's Mot. ("Cl.'s Resps. to Interrogs.") [ECF No. 258-2] at 14, 28–30.

Second, Bagudu asserts that the government delayed bringing this in rem proceeding until 2013 for tactical reasons, resulting in prejudice to his claim. See Cl.'s Opp'n at 3. Specifically, Bagudu claims that the U.S. government has known about the underlying criminal conduct alleged in the complaint since November 1999 and had identified funds traceable to the claimed defendant property in 2002. Cl.'s Resps. to Interrogs. at 7–8. Because the government intentionally did not bring this action until 2013, Bagudu asserts, relevant documents and witnesses are no longer available and his due process rights under the Fifth Amendment have been violated. Id. at 7, 11–14.

Bagudu claims that, as lead AFMLS investigator, Claman has information that is essential to both of his defenses. Specifically, Bagudu seeks testimony from Claman relating to (1) Claman's role in the U.S. government's investigation of the Abacha matter; (2) his participation in meetings with foreign officials concerning the Abacha matter; (3) Claman's knowledge of the

---

[3] The Bailiwick of Jersey is a dependency of the United Kingdom.

2003 extradition proceeding against Abubakar; (4) the government's involvement in the 2003 settlement agreement between Abubakar, Jersey, and Nigeria; (5) steps the U.S. government took to investigate the Abacha matter from 1999 to 2008, including all information the government obtained during this period; and (6) the reasons why the government did not commence this action until 2013. Cl.'s Opp'n at 13–14; Touhy Letter at 5–6. Bagudu also seeks testimony regarding Claman's document retention practices, as well as other topics relating to Claman's or the government's knowledge of the Abacha matter. See Cl.'s Opp'n at 14; Touhy Letter at 6.

In response, the government has moved for a protective order to preclude the deposition of Claman. The government argues that the Court should prohibit Bagudu from deposing Claman because much of the information can be obtained by other means, is privileged or irrelevant, or is not crucial to Bagudu's defenses. Gov't's Mot. at 18. In opposition, Bagudu argues that he is not seeking to depose Claman about the government's trial strategy or any privileged matters. Cl.'s Opp'n at 2. Rather, he claims that he seeks only factual information pertaining to the government's investigation of the Abacha matter that is unavailable by other means. Id. at 18. The government's motion is now fully briefed and ripe for consideration.

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 26(b) permits a party to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," in light of "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). However, although the rules governing the permissible scope of discovery are liberal, they are not boundless. Rule 26(c) provides that a "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" due to a discovery request. This rule "confers broad

discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984). However, the district court "must limit the . . . extent of discovery" if it determines that the proposed discovery (1) "is unreasonably cumulative or duplicative," or "can be obtained from some other source that is more convenient, less burdensome, or less expensive"; (2) could have been obtained by the party earlier in the action; or (3) is outside the permissible scope. Fed. R. Civ. P. 26(b)(2)(C). Generally, the party seeking a protective order to preclude a deposition bears the burden of showing that the protective order is warranted, "and that burden of proof is particularly great when the party seeks to prevent a deposition entirely rather than merely modify it." Guantanamera Cigar Co. v. Corporacion Habanos, S.A., 263 F.R.D. 1, 8 (D.D.C. 2009) (citing Westinghouse Elec. Corp. v. City of Burlington, 351 F.2d 762, 766 (D.C. Cir. 1965)).

However, "[w]hen a party seeks to depose opposing counsel, the normally permissive discovery rules become substantially less so." Coleman v. District of Columbia, 284 F.R.D. 16, 18 (D.D.C. 2012). Although depositions of opposing trial counsel are not expressly prohibited by the Federal Rules of Civil Procedure, they are generally disfavored. Sterne Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co., 276 F.R.D. 376, 380 (D.D.C. 2011). "When attorney depositions are sought, courts should also consider 'all of the relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden or hardship.'" Id. at 382 (quoting In re Subpoena Issued to Dennis Friedman, 350 F.3d 65, 70 (2d. Cir. 2003)). Such considerations include "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted." In re Friedman, 350 F.3d at 70.

## ANALYSIS

I. **Burden of Proof**

As a preliminary matter, the parties contest which party has the burden of proving that the deposition should, or should not, proceed. The government argues that depositions of opposing trial counsel are presumptively disallowed and may only be taken if the party seeking the deposition satisfies the test set forth by the Eighth Circuit in Shelton v. American Motors Corp., 805 F.2d 1323 (8th Cir. 1986). See Gov't's Mot. at 7–8; Reply Br. in Supp. of Gov't's Mot. ("Gov't's Reply") [ECF No. 264] at 2–4. Under Shelton, the party seeking to depose opposing trial counsel must show "that (1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." 805 F.2d at 1327 (citation omitted).

In response, Bagudu contends that there is no presumption against deposing opposing trial counsel where the attorney played a role in the underlying acts as a fact witness, and that any such presumption is contrary to the Federal Rules of Civil Procedure. Cl.'s Opp'n at 20–22. Instead, Bagudu argues, the Court should consider whether the government has demonstrated that there is "good cause" to preclude the deposition in light of the burden the deposition would impose. Id. at 24–25.

The D.C. Circuit has not addressed whether the Shelton test applies to depositions of opposing trial counsel.[4] But this Court need not decide whether Shelton is applicable here because it finds that the standards set forth in the Federal Rules of Civil Procedure are sufficiently robust to resolve the instant motion. "Rule 26(c) is highly flexible, having been designed to accommodate

---

[4] The Shelton test has been adopted by some judges on this court, however. See, e.g., Guantanamera, 263 F.R.D. at 8 (finding party did not meet its burden to prove the deposition testimony of opposing counsel was necessary); Corp. for Pub. Broad. v. Am. Auto. Centennial Comm'n, No. 1:97CV01810, 1999 WL 1815561, *1–2 (D.D.C. Feb. 2, 1999) (applying Shelton).

7

all relevant interests as they arise." United States v. Microsoft, 165 F.3d 952, 959 (D.C. Cir. 1999). It demands a fact-specific inquiry that "requires an individualized balancing of the many interests that may be present in a particular case." Id. at 960. Upon weighing these interests, the Court has broad discretion "to tailor discovery narrowly," including by applying "a measure of extra protection" where required by the relevant interests at stake. In re Sealed Case, 381 F.3d 1205, 1215 (D.C. Cir. 2004) (citations omitted). The Court will therefore consider both the government's interests in precluding the deposition of its trial counsel and Bagudu's interests in obtaining discovery from Claman.

## II. The Deposition of Claman

### A. The Government's Interests

The government's interests in precluding the deposition of its trial counsel are significant. Claman has been involved in investigating the Abacha matter, including investigating whether and when to prosecute for violations of U.S. law, since shortly after the MLAT request was first made to the United States, and he became the lead AFMLS attorney responsible for the investigation in 2007. See Gov't's Mot. at 6–7; Hicks 30(b)(6) Dep. at 85:19–88:9, 92:17–94:13, 332:11–20. Bagudu concedes that Claman was investigating the Abacha matter, in part, "to determine whether there was any basis for [the U.S. government] to commence its own criminal or civil asset forfeiture action." Cl.'s Opp'n at 4. Because the investigation was "based upon a suspicion of specific wrongdoing and represent[s] an attempt to garner evidence and to build a case against the suspected wrongdoer," it "was undertaken with litigation in mind" and implicates attorney work-product concerns. SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1202 (D.C. Cir. 1991); see also U.S. Airline Pilots Ass'n v. Pension Ben. Guar. Corp., 274 F.R.D. 28, 30 (D.D.C. 2011) (finding work-product privilege protected counsel's investigation that was focused on "specific events" and

8

"specific possible violation[s]"). There is therefore substantial risk that questioning Claman about nonprivileged matters, such as what he conveyed to or learned from his foreign counterparts during his investigation, may lead to the revelation of privileged work product, including his legal theories of the case. Claman also was allegedly involved in the drafting of a complaint and in the government's decision whether to file this action, a topic which Bagudu specifically seeks to probe. Gov't's Mot. at 11. Hence, the deposition may "present a unique opportunity for harassment," and may be used to disrupt and delay the case, drawing the parties (and the Court) into disputes regarding collateral matters related to assertions of privilege, scope, and relevancy. Sterne Kessler, 276 F.R.D. at 381 (citation omitted); see also M & R Amusements Corp. v. Blair, 142 F.R.D. 304, 303 (N.D. Ill. 1992) ("Deposing an opponent's attorney is a drastic measure. It not only creates a side-show and diverts attention from the merits of the case, its use also has a strong potential for abuse.").

The deposition of trial counsel also strains the adversarial process itself. Preparing and sitting for a deposition is time-intensive, particularly so when the deponent must strive in both his recollection and ultimate testimony to parse protected work-product from discoverable information. Such distractions would detract from Claman's work as supervising counsel in this case and could lead to a decrease in the quality of representation. See Sterne Kessler, 276 F.R.D. at 381. Finally, the deposition of Claman could potentially disqualify him from representing the government in this action. See id. Such interests weigh heavily on the side of precluding his deposition.

### B. Bagudu's Interests

Bagudu nevertheless asserts that his interests in obtaining discovery exceed the government's interests in opposing the deposition. According to Bagudu, Claman possesses

9

relevant information as a fact witness because, in the course of his investigation, Claman participated in meetings with foreign representatives about the Abacha matter beginning in 1999 and may have communicated with foreign officials about the settlement agreement. Cl.'s Opp'n at 5, 25–26. Bagudu asserts that Claman also could testify as to what facts he had gathered in his investigation and when, and why the government did not commence this action until 2013. Id. at 25–26, 31–32. Bagudu claims that this information could answer key questions at the core of his defenses, including whether the U.S. government acted as an agent of Nigeria such that it should be bound by Abubakar's settlement agreement, when the U.S. government obtained sufficient information to bring this action, and why the government delayed bringing this action. Id. at 35. And, according to Bagudu, this information is not available, or at least not easily obtainable, from other sources. See id. at 1–3, 28–31.

But Bagudu overstates the relevance of any testimony Claman might provide. Although Bagudu claims that Claman is an important fact witness because he played a "central role" in the government's investigations, Claman participated in the Abacha matter only as government counsel. See id. at 4. This is not a case in which opposing counsel was involved in the underlying events giving rise to the action. Cf. Sadowski v. Gudmundsson, 206 F.R.D. 25, 26 (D.D.C. 2002) (permitting defendant to depose plaintiff's trial counsel on facts underlying plaintiff's copyright registration in an unfair competition and copyright infringement action); Adeniya-Jones v. State Farm Mut. Auto. Co., Civ. No. 17-7101, 2015 WL 6180965, *1 (E.D. Pa. 2015) (finding deposition of opposing counsel was appropriate when plaintiff's counsel allegedly entered an oral agreement with defendant that was central to plaintiff's claim of bad faith). Claman's involvement in the Abacha matter stems solely from his investigation and litigation of the underlying events as

counsel, not from any involvement in the events that underlie this action themselves, which weighs against permitting his deposition.

Moreover, it does not appear that Claman has personal knowledge about each of the topics about which he has been asked to testify. For example, Bagudu seeks to question Claman about the 2003 extradition proceeding against Abubakar, which Bagudu asserts is relevant to his defense that Abubakar's settlement agreement precludes this litigation. Although Bagudu asks the Court to treat Claman as a fact witness, no evidence has been presented that Claman was involved in this proceeding. The extradition process was managed by the U.S. Attorney's Office for the Southern District of Texas. See Cl.'s Opp'n at 18. As Bagudu has asserted, Claman only received information pertaining to the extradition proceedings four years later, in 2007, through conversations with one of the Texas Assistant United States Attorneys who was involved in the extradition. See Touhy Letter at 3. And Bagudu has already deposed the OIA attorney and one of the Assistant United States Attorneys responsible for coordinating execution of the extradition request. Gov't's Reply at 10 n.6. The limited value of any second-hand information Claman could provide about the extradition proceeding is hence vastly outweighed by the burden imposed on the government. Questioning Claman about this topic is accordingly outside the permissible scope of discovery. See Fed. R. Civ. P. 26(b)(1) (noting the scope of discovery depends on "whether the burden or expense of the proposed discovery outweighs its likely benefit").

Nevertheless, by virtue of his role as lead AFMLS investigator, Claman likely has some knowledge that is relevant to Bagudu's asserted defenses, including knowledge of any meetings with foreign representatives in which the government discussed Abubakar's settlement agreement or through which Claman obtained information relevant to this action. The Court therefore will

11

consider Bagudu's asserted interests in deposing Claman together with the government's asserted interests in precluding the deposition.

### C. Availability of Less Burdensome Sources

The Court first considers the government's argument that the testimony Bagudu seeks from Claman is available from other, "less burdensome" sources. Under the Federal Rules, district courts "must limit" discovery that "can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i). Here, the government has already produced thousands of pages of records from its investigation as well as responses to Bagudu's interrogatories. See Gov't's Mot. at 2, 13; see also Pl.'s 1st Suppl. Resp. to Cl.s' 4th Set of Interrogs., Ex. 4 to Cl.'s Opp'n [ECF No. 262-4] at 2–5; Swiss Meeting Notes, Ex. 5 to Cl.'s Opp'n [ECF No. 262-5]; Fax from Stephen Baker to Daniel H. Claman, Ex. 6 to Cl.'s Opp'n [ECF No. 262-6]; Email from Daniel Claman to Stephen Baker, Ex. 7 to Cl.'s Opp'n [ECF No. 262-7].[5] Bagudu also had the opportunity to depose other government agents involved in the investigation, including two OIA attorneys, two FBI agents, and an FBI forensic accountant. Gov't's Mot. at 3.

Most importantly, Bagudu had the opportunity to depose the government's Rule 30(b)(6) deponent about nearly every topic included in Bagudu's deposition notice to Claman. The 30(b)(6) notice included topics addressing (1) the actions the U.S. government took to investigate the Abacha matter; (2) meetings with foreign officials concerning the Abacha matter; (3) the U.S. government's involvement in the 2003 settlement agreement between Abubakar, Jersey, and

---

[5] Although Bagudu asserts that the government's document production is incomplete, see Cl.'s Opp'n at 14–16, the government has responded that there is no evidence that substantive documents are missing from its production, see Gov't's Reply at 14; Hicks 30(b)(6) Dep. at 258:1–259:1 ("We cannot find any documents or have not discovered any cache of documents, any subject of documents, that were ever destroyed . . . in this case."). Regardless, it is undisputed that the government has provided Bagudu with more than 170,000 pages of documents in discovery. See Cl.'s Opp'n at 14.

Nigeria; (4) the U.S. government's knowledge of and involvement in the extradition proceeding against Abubakar and Abubakar's 2010 motion to expunge records of that proceeding; and (5) the reasons why the government did not commence this action until 2013. Notice of Dep., Ex. 4 to Gov't's Mot [ECF No. 258-5] at 3–6. The 30(b)(6) notice also required the government to identify specifically the date when, and to describe in detail how, it first became aware of the alleged criminal conduct, the claimed property, and any "[i]nformation and documents that could support a civil asset forfeiture action against the Claimed Property." Id. at 5.[6]

The only relevant topics not specifically encompassed by the 30(b)(6) notice pertain to Claman's personal knowledge of the Abacha investigation and proceedings and his personal document retention practices. But any information personally known to Claman in his capacity as a government employee investigating and litigating the Abacha matter should have been available to the government's Rule 30(b)(6) witness, Pamela Hicks. See Fed. R. Civ. P. 30(b)(6) ("The persons designated must testify about information known or reasonably available to the organization."); see also In re Vitamins Antitrust Litig., 216 F.R.D. 168, 173 (D.D.C. 2003) (finding that employees' knowledge is "imputed to the [organization] itself" (citation omitted)). As Bagudu concedes, Claman did in fact provide extensive information to Hicks to prepare her for the Rule 30(b)(6) deposition. See Touhy Letter at 4–5. Bagudu's need to depose Claman himself about his personal knowledge is therefore diminished by Bagudu's ability to question the government directly about the topics included in Claman's deposition notice.[7] Hence, given that

---

[6] The Rule 30(b)(6) deposition notice also included topics pertaining to (1) the government's knowledge of, or involvement in, potential resolutions of investigations and proceedings connected with the Abacha matter; (2) Bagudu's Fourth Set of Interrogatories and the government's responses; (3) the existence of any documentation of discussions with foreign representatives; and (4) the identity of all individuals involved in the Abacha investigation and their roles. See id. at 2–3, 5–7. These topics were within the notice to Claman, see Touhy Letter at 5–6, but were not the focus of the parties' briefs.

[7] Although the 30(b)(6) notice included a topic pertaining to the reasons why the government did not commence this action until November 2013, Bagudu did not question the government's witness about the delay. See Gov't's Reply at 9. Hence, Bagudu cannot now claim that he has great need to depose Claman personally about the

Bagudu could have obtained or did obtain the information from a less burdensome source, the Court will preclude Bagudu from deposing Claman. See Fed. R. Civ. P. 26(b)(2)(C)(i); see also Sterne Kessler, 276 F.R.D. at 385 (quashing deposition of counsel when party could obtain information from a more convenient witness); cf. Breiterman v. U.S. Capitol Police, 323 F.R.D. 36, 50 (D.D.C. 2017) (quashing subpoena requesting documents from a third party when documents were already provided by the defendant).

In addition to deposing the government's Rule 30(b)(6) witness, Bagudu could have deposed other witnesses who participated in the investigation and meetings with foreign officials. The evidence Bagudu seeks to obtain—nonprivileged information Claman conveyed to or learned from third parties—by its very nature involves multiple witnesses and hence is not likely to be possessed exclusively by Claman. In some instances, other U.S. government officials attended relevant meetings with foreign officials but were not deposed by Bagudu. See, e.g., Jason Edward Carter Dep., Ex. 2 to Cl.'s Opp'n ("Carter Dep.") [ECF 260-3] at 73:5–77:2 (FBI Legat Joseph Brent attended May 2001 meeting);[8] Hicks (30)(b)(6) Dep. at 344:16–346:5 (SDNY Assistant U.S. Attorney Richard Strassberg attended June 2001 meeting);[9] Carter Dep. at 61:21–64:21 (Brent attended December 2002 meeting); Email from Daniel Claman to David O'Mahoney, Ex. 10 to Cl.'s Opp'n [ECF No. 260-11 at 1 (AFMLS trial attorney Jack de Kluiver attended May 2007 meeting). And in instances where a knowledgeable domestic deponent was not available, Bagudu

---

timing of the filing of this case. If Bagudu was unable to obtain information pertaining to other requested topics from the Rule 30(b)(6) deponent, he could have moved to compel a new Rule 30(b)(6) witness or for additional interrogatories. See, e.g., Alexander v. FBI, 186 F.R.D. 137, 141–42 (D.D.C. 1998) (permitting interrogatories instead of new oral deposition of 30(b)(6) deponent when original deponent was knowledgeable about some, but not all, topics).

[8] Carter also attended the May 2001 meeting and was deposed about the topic, but he apparently was not questioned by Bagudu about the substance of the meeting. See, e.g., id.; Cl.'s Opp'n at 6.

[9] Bagudu's counsel attests that he spoke with Strassburg after the deposition notice period had concluded, and Strassberg indicated that he could not recall the relevant meeting. See Decl. of Jonathan B. New, Ex. 1 to Cl.'s Opp'n [ECF No. 260-1] at 4. However, an informal conversation with a potential witness is not a substitute for probing relevant issues via sworn testimony in a deposition.

could have sought the relevant information from Claman's foreign counterparts. See Coleman, 284 F.R.D. at 19 (noting party did not "explain why she could not individually move to compel . . . non-attorney witnesses to testify instead of jumping straight to" opposing counsel). Although obtaining foreign discovery can be challenging, it is not categorically impossible. Indeed, the parties have already taken fact and expert depositions of witnesses who reside overseas, and many of Claman's foreign counterparts now work in private practice rather than as government officials. See Gov't's Reply at 6. And although the process of obtaining foreign discovery can be burdensome, timely, and costly for the party seeking it, foreign discovery, unlike counsel depositions, does not endanger the adversarial process itself. See Sterne Kessler, 276 F.R.D. at 380–81 (noting depositions of opposing counsel threaten the adversarial system). There is therefore good cause to preclude Bagudu from deposing Claman.

### D. The Risk of Revealing Privileged Work Product

Even if Bagudu could not have obtained some of the information he seeks from other sources, the risk of revealing privileged work product if Claman is deposed outweighs the potential benefit of obtaining additional discovery. Bagudu asserts that he seeks only facts that would shed light on the government's investigation and communications with foreign representatives. Cl.'s Opp'n at 2, 13–14. But testimony from counsel about what information he received during a decade-long investigation would essentially provide a roadmap of the government's litigation theory, including what facts it deemed sufficiently important to record and how it marshaled those facts during the investigation. By requiring counsel to recount orally how he prepared his case and what facts he learned in the course of investigating the matter, the deposition would force Claman to "sharply focus[]" and "weed[] the materials." In re Sealed Case, 124 F.3d 230, 236 (D.C. Cir. 1997), rev'd on other grounds sub nom. Swidler & Berlin v. United States, 524 U.S.

399 (1998). This is textbook work product. See Director, Office of Thrift Supervision v. Vinson & Elkins, LLP, 124 F.3d 1304, 1308 (D.C. Cir. 1997) ("[A] lawyer's factual selection reflects his focus; in deciding what to include and what to omit, the lawyer reveals his view of the case.").

Moreover, it may be difficult for Claman to parse discoverable statements he made to others from privileged mental impressions he had at the time. See Gov't's Reply at 7–8. For example, Bagudu seeks to probe discussions Claman had with Stephen Baker, a representative from Jersey, concerning a theory of U.S. jurisdiction referred to as "dollar jurisdiction." See Touhy Letter at 2. Although any statements made to Baker are not privileged, Claman's legal theory of U.S. jurisdiction over the Abacha matter is. To successfully walk the tightrope between what is discoverable and what is privileged, Claman would have to distinguish what he affirmatively disclosed to third parties more than 17 years ago from his own mental impressions of the case. Even the exercise of distinguishing what he learned at the meetings from what he learned in his capacity as counsel poses substantial risks of intrusion into protected work product. The depositions of other witnesses, including Baker, would not have posed such risks. See Sterne Kessler, 276 F.R.D. at 385 ("Clearly a deposition of [counsel] would require diligent efforts to avoid disclosure of attorney-client communications and protected work-product material, a painstaking process that poses risks that other sources of discovery do not.").[10] The substantial risk of encountering privilege and work-product issues through Claman's testimony provides further cause to preclude the deposition.

---

[10] Bagudu nevertheless suggests that even if there were other witnesses who could testify about relevant foreign communications, he is entitled to depose Claman because "each individual's unique perspective is independently discoverable." See Cl.'s Opp'n at 28 (quoting Adeniyi-Jones, 2015 WL 6180965, at *1). But what makes Claman's perspective "unique"—how he perceived events and what facts he deemed sufficiently important to commit to memory—is invariably bound up in his protected attorney work product. And Bagudu's insistence that he has an unqualified right to the unique testimony of Claman ignores the substantial body of law limiting the right to depose opposing counsel.

### E. Preclusion of the Deposition

Given the government's significant interests in precluding the deposition of its trial counsel, the risk of encountering privilege and work-product issues, and Bagudu's diminished need to depose Claman due to the availability of other, less burdensome sources, including the government's Rule 30(b)(6) witness, the Court finds that the deposition of Claman "would entail an inappropriate burden or hardship." Id. at 382 (quoting In re Friedman, 350 F.3d at 72). The Court therefore will preclude the deposition of Claman and grant the government's motion for a protective order.

### III. Interrogatories

Although Bagudu may not depose Claman, the Court concludes that Bagudu may submit limited additional interrogatories to the government regarding certain communications it had with foreign officials. The government admits it participated in meetings with foreign officials concerning the Abacha matter from 2004 through June 2007, see Hicks 30(b)(6) Dep. at 412:2–19, but it has not provided any relevant documents from, or interrogatory responses about, this time period. See Cl.'s Opp'n at 9, 14. The Court therefore will permit Bagudu to submit to the government additional, targeted interrogatories concerning meetings or communications with foreign officials during this time period.[11] To the extent the government has not already provided nonprivileged information about relevant meetings with foreign officials that occurred outside this time period, the government must also supplement its responses to Bagudu's prior interrogatories as required by Rule 26(e)(1).

---

[11] The Court expects that the government will obtain all relevant nonprivileged information within its possession or control, including nonprivileged information known to Claman, to respond adequately to Bagudu's interrogatories.

Finally, Bagudu has suggested that the government did not properly preserve relevant evidence in this case, including documents and communications with foreign representatives that he alleges were within Claman's or the government's possession. Because the government's retention practice depended on each employee saving each document he believed might be relevant, Bagudu asserts that Claman had, or may still have, relevant documents that were not produced. See Cl.'s Opp'n at 15–16. Bagudu specifically points to notes from a June 2001 meeting with foreign officials that were produced from Claman's files late in the discovery period as evidence that Claman may have additional discovery in his possession. See Touhy Letter at 4; Cl.'s Opp'n at 6–7, 16. The government's Rule 30(b)(6) witness could not provide an explanation for how the notes were discovered or why they were not obtained earlier. See Hicks 30(b)(6) Dep. at 295:9–297:8. The Court therefore concludes that Claman likely possesses information regarding his possession and retention of relevant evidence that is not available from a more convenient source. However, given the burdens Claman's deposition would impose on the government, the Court finds that requiring Claman to sit for a deposition solely to explore this single topic would be disproportionate to Bagudu's need for that testimony. Instead, the Court will permit Bagudu to submit an interrogatory to the government relating to Claman's document retention practices. Cf. Coleman, 284 F.R.D. at 20 (permitting limited interrogatories in lieu of a deposition of counsel).

## **CONCLUSION**

For the foregoing reasons, the government's motion for a protective order will be granted. Bagudu may submit limited interrogatories to the government pertaining to Claman's document retention practices and any meetings attended by or communications between the United States government and foreign officials relating to the Abacha matter that occurred between 2004 and June 2007. A separate Order accompanies this Memorandum Opinion.

18

/s/
                                                    JOHN D. BATES
                                              United States District Judge

Dated: January 3, 2019