UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

**DEC 2 3 2019**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

UNITED STATES OF AMERICA,

Plaintiff,

v.

ALL ASSETS HELD IN ACCOUNT
NUMBER 80020796, IN THE NAME OF
DORAVILLE PROPERTIES
CORPORATION, AT DEUTSCHE BANK
INTERNATIONAL, LIMITED IN
JERSEY, CHANNEL ISLANDS, AND
ALL INTEREST, BENEFITS OR ASSETS
THERETO, et al.,

Defendants.

Civil Action No. 13-1832 (JDB)

**SEALED**

## MEMORANDUM OPINION

Before this Court is (1) the United States's motion to re-open the deposition of claimant Ibrahim Bagudu for an additional three hours and (2) the United States's motion to de-designate two documents as confidential so that they may be unsealed on the docket. For the reasons explained below, the Court grants both motions.

## BACKGROUND

In 2013, the United States filed a verified complaint seeking civil forfeiture of a host of assets, including five corporations, seven banks accounts, and four investment portfolios, that it alleges were part of "an international conspiracy to launder proceeds of corruption in Nigeria during the military regime of General Sani Abacha." Compl. [ECF No. 1] ¶¶ 1, 4. General Abacha, his son Mohammed Sani Abacha, their associate Abubakar Atiku Bagudu, and others allegedly "embezzled, misappropriated, defrauded, and extorted hundreds of millions of dollars from the government of Nigeria and others." Id. ¶ 1. The United States claims that the proceeds were

laundered through conduct in and affecting the United States and thus the proceeds are subject to forfeiture as property involved in money-laundering offenses in violation of U.S. law. Id.

Within the first year of the United States's forfeiture action, eight relatives of Abubakar Bagudu filed verified claims of interest in the four defendant investment portfolios. Two of the portfolios are held in the name of "Blue Holding (1)" and two are in the name of "Blue Holding (2)." Id. ¶ 4. The investment portfolio assets are located in the United Kingdom and subject to a U.K. court's prohibition order that enforces this Court's arrest warrants in rem and freezes the assets. See Warrant for Arrest In Rem [ECF No. 56] ¶ 2.

In March 2018, this Court struck the claims of seven of the eight Bagudu claimants for lack of standing, but held that Ibrahim Bagudu—Abubakar Bagudu's brother—does have standing to contest the forfeiture of the two investment portfolios held in the name of Blue Holding (2) because Ibrahim's $100,000 annual annuity from Blue Family Trust II vests him with a proprietary interest in the trust assets, which consist entirely of shares of stock in Blue Holding (2). United States v. All Assets, 299 F. Supp. 3d 121, 128–29, 140 (D.D.C. 2018). Accordingly, in September 2018, the Court entered judgment in favor of the United States with respect to the Blue Holding (1) investment portfolios while discovery continued regarding Ibrahim's claim to the Blue Holding (2) investment portfolios. See United States v. All Assets, 330 F. Supp. 3d 150, 161 (D.D.C. 2018).

Claimant was deposed in London on August 9, 2018. However, discovery in this case has dragged on for four and half years at least in part because of the difficulty in obtaining evidence abroad and arranging depositions of witnesses that live overseas. Discovery was scheduled to finally end in November 2019. On September 27, 2019, claimant produced over 850 pages of additional documents, including (1) an October 26, 2018 agreement among the Federal Republic

of Nigeria, the Blue Holding companies, the Trustee of the Blue Family Trusts, and Abubakar Bagudu, on his own behalf and on behalf of his "identified affiliates" including his siblings, see Ex. A to Mot. to De-Designate Docs. (the "2018 Agreement") [ECF No. 307-2]; and (2) an amendment to that 2018 Agreement, see Ex. B to Mot. to De-Designate Docs. (the "2019 Deed of Variation") [ECF No. 307-3].

Some background is necessary to understand the relevance of these two documents. In 2003, there was an agreement between Nigeria and Abubakar Bagudu to settle all of Abubakar's civil claims against Nigeria and all of Nigeria's civil, administrative, and criminal claims against Abubakar stemming from his involvement in government corruption. Ex. I to Mot. to Dismiss Gov't's Verified Compl. for Forfeiture In Rem (the "2003 Settlement Agreement") [ECF No. 55-10] at 8 (page number designated by ECF). In that 2003 Settlement Agreement, Nigeria renounced any interest whatsoever in Abubakar's trust assets, which included the Blue Holding investment portfolios at issue here. Id. at 12; see also 2018 Agreement at CLS 22898.

However, in 2012, Nigeria requested the United States' assistance in reclaiming its assets, and the United States, soon after, filed this action. Id.; Request for Mutual Assistance, Ex. D to Decl. of Jonathan B. New [ECF No. 314-3]. In response, Abubakar and the Blue Holding companies filed a claim against Nigeria in the United Kingdom, alleging that Nigeria's request breached the 2003 Settlement Agreement. 2018 Agreement at CLS 22899. Nigeria then withdrew its request for the United States's assistance with respect to the Blue Holding assets and disavowed any claim to the assets, see June 16, 2014 Letter, Ex. H to New Decl. [ECF No. 314-3], but the United States continued to pursue this forfeiture action. Abubakar and the Blue Holding companies' claim against Nigeria for breaching the 2003 Settlement Agreement resulted in a

default judgment for damages against Nigeria. See Breach Judgment Order, Ex. L to New Decl. [ECF No. 314-10].

Claimant, in challenging the United States's forfeiture action, has relied on the 2003 Settlement Agreement as an affirmative defense, arguing that the 2003 agreement declares the claimed assets to be free and clear "from any claims existing or future" and thus bars the United States's forfeiture claims. Answer [ECF No. 86] at 22. Other affirmative defenses made by claimant, including his argument that forfeiture is barred by equitable estoppel, collateral estoppel and/or issue preclusion, as well as his allegation that the United States acted in bad faith, also refer to the facts surrounding the 2003 Settlement Agreement. Id. at 20.

The 2018 Agreement that claimant recently produced amends the 2003 Settlement Agreement, purporting to shift legal ownership of Abubakar Bagudu's trust assets—including the Blue Holding companies' investment portfolios—to Nigeria. See 2018 Agreement at CLS 22899. Specifically, the 2018 Agreement amends the 2003 Settlement Agreement to say that Nigeria is now "the legal owner of the relevant Trust Assets," id., and that the parties will "use all reasonable endeavors" to obtain a "variation" of the U.K. court's prohibition order so that the assets, which total €141 million ($157.5 million), may be transferred to Nigeria, id. at CLS 22901–22902. The agreement further provides that once the assets are transferred, Nigeria will send €98.5 million ($110 million) of the defendant assets to an account identified by the Trustee of the Blue Family Trusts, allowing Abubakar Bagudu and his identified affiliates to have "peaceful enjoyment" of the money. Id. That payment of €98.5 million, according to the agreement, will satisfy Abubakar and the Blue Holding companies' default judgment against Nigeria for breaching the 2003 Settlement Agreement. Id.

4

Almost a year after signing the 2018 Agreement, on September 6, 2019, parties to the agreement signed the 2019 Deed of Variation, which amends the 2018 Agreement by extending its "longstop date"—the date after which either Nigeria or Abubakar Bagudu may terminate the agreement—from August 30, 2019, to February 28, 2020. 2019 Deed of Variation at CLS 22916. A few days later, Nigeria submitted the 2018 Agreement and 2019 Deed of Variation, along with 800 pages of other exhibits, to the U.K. court in support of its application to vary the prohibition order and unfreeze the assets. New Decl. [ECF No. 314-1] ¶ 2. On September 27, 2019, claimant produced the documents as part of discovery in this case and designated them as confidential under the Litigation Protective Order. See Scheduling & Protective Orders [ECF No. 85] at 11–22.

That same week, on September 25, 2019, the government deposed Suraj Yakubu, a former employee of Union Bank in Nigeria. Yakubu testified that claimant had contacted him in July 2019 and sought to dissuade him from testifying. Surajuddeen Balarabe Yakubu Dep. [ECF No. 308-5] at 139:3–8, 143:3–144:22. In October 2019, claimant provided an interrogatory response denying that allegation. Claimant Ibrahim Bagudu's Supp. Am. Resps. & Objections to the United States's First Set of Interrogatories, Ex. F. to Pl.'s Mot. to Re-Open Dep. [ECF No. 308-6] at 3–4. Claimant said that while he did have a July 7th phone call with Yakubu, he told Yakubu that "he had nothing to say about Plaintiff's request to depose [him]." Id. Claimant also said he could not "recall the substance" of a separate, 29-second telephone call with Yakubu on July 8th. Id. at 4.

The United States now moves to reopen its deposition of claimant for an additional three hours because the new documents produced since the initial deposition are relevant to claimant's affirmative defenses and because claimant's interrogatory responses regarding his July phone call with Yakubu conflict with Yakubu's testimony. See Pl.'s Mot. to Re-Open Dep. of Claimant Ibrahim Bagudu for an Additional Three Hours ("Mot. to Re-Open Dep.") [ECF No. 308]. The

United States also moves to have the 2018 Agreement and 2019 Deed of Variation de-designated as confidential so that the documents may be publicly filed on the docket in support of the United States's discovery motion to reopen its deposition of the claimant. See Pl.'s Mot. to De-Designate Docs. ("Mot. to De-Designate") [ECF No. 307].

## ANALYSIS

### I.    Motion to Reopen Claimant's Deposition

A party seeking to reopen a witness deposition must seek leave of court. Fed. R. Civ. P. 30(a)(2)(A)(ii).  District courts have "broad discretion in structuring discovery," Hussain v. Nicholson, 435 F.3d 359, 363 (D.C. Cir. 2006), but courts "must grant leave to the extent consistent with Rule 26(b)(1) and (2)," Fed. R. Civ. P. 30(a)(2).  Rule 26(b)(1) broadly permits parties to obtain relevant discovery that is proportional to the needs of the case, though Rule 26(b)(2) requires the district court to limit discovery if it would be cumulative, could have been obtained earlier in the action, or can be obtained through less burdensome means. Fed. R. Civ. P. 26(b)(1), (2).  A second deposition is often permitted when "new information is unearthed only after the initial deposition," Le v. Diligence, Inc., 312 F.R.D. 245, 246 (D. Mass. 2015), "triggering questions that the discovering party would not have thought to ask at the first deposition," Keck v. Union Bank of Switz., 1997 WL 411931 at *1 (S.D.N.Y. July 22, 1997).

The United States contends that it is entitled to a new deposition so that it can question claimant about "(a) his communication(s) with Mr. Yakubu; (b) any other steps that may have been taken to impede depositions in this case; and (c) the documents produced since his 2018 deposition, including the 2019 production." Mot. to Reopen Dep. at 12.

A. Documents Produced Since Claimant's 2018 Deposition

The Court agrees that claimant's deposition should be reopened so that the United States may question claimant about the documents produced since his 2018 deposition because the documents are relevant to the underlying dispute and reopening the deposition is proportional to the needs of this case. In this litigation, claimant argues that the forfeiture action is barred because Nigeria, in the 2003 Settlement Agreement, declared the assets "free and clear from any claims existing or future, direct or indirect, contemplated or otherwise by [Nigeria] . . . ." Answer at 22 (internal quotation marks omitted); see also Claimant Ibrahim Bagudu's Resps. & Objections. to the United States's Second Set of Interrogatories, Ex. 1 to Pl.'s Mot. for Protective Order [ECF No. 258-1] at 23. Surely, it is relevant that the settlement agreement has been amended to declare just the opposite: that Nigeria owns the assets. In addition, the 2018 Agreement and other documents filed since claimant's deposition are relevant to Nigeria's application to vary the U.K. court's prohibition order, which effectively contests the enforcement of this Court's arrest warrant in rem and asserts new, separate ownership rights to the assets at issue.

The Court is unpersuaded by claimant's argument that his "knowledge or beliefs about" the 2018 Agreement have no bearing on the legal effect of its terms and are thus not relevant. Claimant's Mem. of P.&A. in Opp'n to Pl.'s Mot. to Reopen Dep. ("Opp'n to Mot. to Re-Open Dep.") [ECF No. 311] at 24. For one thing, claimant's knowledge of the 2018 Agreement could certainly be relevant to the legal effect, if any, of that agreement given that it purports to shift ownership of assets that claimant, in this case, asserts he is entitled to. Additionally, claimant's knowledge of the 2018 Agreement and its affect on the 2003 Settlement Agreement could be relevant to his equitable estoppel arguments alleging that he relied on the 2003 agreement. The United States does not need to put forth a detailed, bullet-proof argument based on the new

7

documents. All that matters is that the new documents are relevant to the underlying dispute and may "trigger[] questions that the discovering party would not have thought to ask at the first deposition. " Keck, 1997 WL 411931 at *1.

Claimant's assertion that the United States could get information about these documents from Nigeria, Opp'n to Mot. to Re-Open Dep. at 22, is equally unavailing given that Nigeria has repeatedly made clear that it will not cooperate in this litigation, see Claimant's Mem. of P.&A. in Opp'n to Pl.'s Mot. to Extend Disc. Deadlines [ECF No. 297] at 1 (noting "Nigeria's consistent, repeated and numerous statements to the U.S. that it would not provide any assistance to Plaintiff's efforts to forfeit Claimant's property"). Further, the fact that the United States had some information about some of the matters that the new discovery pertains to, Opp'n to Mot. to Re-Open Dep. at 23, is of no consequence because the United States may nonetheless now have new questions based on the new information. Thus, because some of the documents produced (and created) since claimant's deposition reflect significant factual developments that are relevant to claimant's affirmative defenses and the underlying forfeiture action, the Court shall grant leave to reopen the deposition of claimant for questioning related to those documents.[1]

B. Communications With Yakubu & Any Other Steps to Impede Depositions

The United States also seeks to reopen the deposition so that it may question claimant about his July phone calls with Yakubu and whether he has taken any steps to impede depositions in this case. First, this Court agrees with the United States that whether claimant lied in his interrogatory

---

[1] Claimant asserts that the United States "must identify the specific documents on which it seeks to re-depose Claimant." Opp'n to Mot. to Re-Open Dep. at 21–22. The Court disagrees. No such specification of documents is required for an initial deposition, and it's not clear why such specification would be required here. The Court understands that, according to claimant, many of the documents recently produced were either available to the United States earlier, are publicly available, or do not relate to the instant action. New Decl. ¶ 2. At the same time, it's clear that at least some documents—like the 2018 Agreement—are entirely new and highly relevant. The Court will not conduct a page-by-page review of the documents produced to determine which the United States may ask questions about. The three-hour time limit will dis-incentivize any redundant questioning.

responses and whether he tried to dissuade Yakubu from testifying are relevant factual questions. Such facts could be used to attack claimant's credibility and could even, in some circumstances, warrant sanctions for obstructing discovery. See, e.g., Kensington Int'l Ltd. v. Republic of Congo, 2007 WL 2456993, at *1 (S.D.N.Y. Aug. 24, 2007) (sanctioning attorneys for attempting in bad faith to dissuade non-party witness from attending deposition). Further, questions about claimant's efforts to impede depositions in this case are part and parcel of questions about claimant's communications with Yakubu. It is not a fishing expedition to ask claimant whether he has taken any steps to impede depositions in this case when Yakubu has alleged that claimant did just that.

Second, "[c]ourts will typically reopen a deposition where there is new information on which a witness should be questioned." Ganci v. U.S. Limousine Serv., Ltd., 2011 WL 4407461, at *2 (E.D.N.Y. Sept. 21, 2011); see also Vincent v. Mortman, 2006 WL 726680, at *1–2 (D. Conn. Mar. 17, 2006) (allowing plaintiff to reopen deposition when one witness's deposition contradicted defendant's deposition and medical records); Keck, 1997 WL 411931 at *2 (deposition reopened where affidavit provided evidence conflicting with witness testimony). Here, the United States is seeking to question claimant about events that occurred nearly a year after his deposition and where his interrogatory responses regarding the events directly conflict with a witness's recent testimony.

Finally, the Court agrees with the United States that claimant's interrogatory response is not enough to ensure equitable discovery. While claimant was able to depose Yakubu about the alleged July telephone conversation he had with claimant, the United States has not had an opportunity to depose claimant about that same conversation. At minimum, a deposition is more advantageous to the party seeking discovery than is a written interrogatory. See Shoen v. Shoen, 5 F.3d 1289, 1297 (9th Cir. 1993) ("Written interrogatories are rarely, if ever, an adequate

9

substitute for a deposition when the goal is discovery of a witness' recollection of conversations.");

P.H. Int'l Trading Co. v. Christia Confezioni S.p.A., 2004 WL 2538299, at *1 (N.D. Ill. Sept. 24,

2004) (Written interrogatories "den[y] plaintiff's counsel the opportunity to ask follow-up

questions, observe the witness's demeanor, or evaluate his credibility."). Claimant's discussion

about when and how credibility determinations are made, see Opp'n to Mot. to Re-Open Dep. at

15, is beside the point. Depositions are frequently used when questioning witnesses at trial, and

the credibility and demeanor of a deponent may also inform a party's trial strategy. Thus, equitable

concerns warrant reopening claimant's deposition so that the United States may question him about

the July telephone call and any other efforts he may have made to impede depositions.

Claimant complains about the costs of reopening the deposition and further delaying this

case based on an unsubstantiated allegation. Opp'n to Mot. to Re-Open Dep. at 13–20. The Court

is sensitive to claimant's concern and the decision to re-open the deposition would be more

difficult if Yakubu's allegation was the only reason for re-opening the deposition. But that's not

the case. Because the Court concludes that the deposition should be re-opened to allow the United

States to ask questions about documents produced (and, in some instances, created) since

claimant's initial deposition, there is little to no additional cost in allowing the United States during

a three-hour deposition to also ask questions about claimant's July phone calls with Yakubu and

any other steps he may have taken to impede depositions in this case.[2]

\* \* \* \* \*

_____

[2] In his sur-reply, claimant argues that the United States should not be permitted to inquire about his knowledge of Nigeria's alleged interest in the outcome of this case. Sur-Reply in Further Opp'n to Pl.'s Mot. to Re-Open Dep. [ECF No. 325] at 1. But the newly produced documents, namely the 2018 Agreement, and Yakubu's allegation that claimant told him Nigeria had no interest in this case, naturally raise questions about Nigeria's interest in, and efforts related to, this case, as well as claimant's role in those efforts. Such questions could be relevant to interpreting the 2003 Settlement Agreement and understanding the competing claims to the assets. The Court sees no reason to aggressively police the questions that the United States may ask during a short, three-hour deposition, so long as those questions are relevant to the underlying dispute.

Thus, in accordance with Rule 26, the Court will reopen the deposition of claimant for an additional three hours so that the United States may question him about the new documents and Yakubu's allegation.

## II.   Motion to De-Designate Documents as Confidential

The United States also moves to de-designate the 2018 Agreement and 2019 Deed of Variation as confidential and unseal them on the public record pursuant to the common law right of public access to judicial proceedings. See Mot. to De-Designate at 8–15. The common law right of public access applies to "public records and documents, including judicial records." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978); see also United States v. Hubbard, 650 F.2d 293, 314–15 (D.C. Cir. 1980) (recognizing "common law tradition of public access to records of a judicial proceeding"). "Whether something is a judicial record depends on the role it plays in the adjudicatory process." SEC v. Am. Int'l Grp., 712 F.3d 1, 3 (D.C. Cir. 2013) (internal quotation marks omitted). Judicial records are documents that a court makes "decisions about" or "otherwise relie[s] on." Id. at 3–4. "A court proceeding . . . is in its entirety and by its very nature a matter of legal significance . . . . Indeed, the meaning and legal import of a judicial decision is a function of the record upon which it was rendered." Wash. Legal Found. v. U.S. Sentencing Comm'n, 89 F.3d 897, 906 (D.C. Cir. 1996).

"The right of public access is a fundamental element of the rule of law, important to maintaining the integrity and legitimacy of an independent Judicial Branch. Although the right is not absolute, there is a strong presumption in its favor, which courts must weigh against any competing interests." Metlife, Inc. v. Fin. Stability Oversight Council, 865 F.3d 661, 663 (D.C. Cir. 2017). "The burden to rebut the presumption of disclosure rests with the objecting party." In re McCormick & Co., Pepper Prod. Mktg. & Sales Practices Litig., 316 F. Supp. 3d 455, 464

11

(D.D.C. 2018).  The party seeking to seal court documents must "come forward with specific reasons why the record, or any part thereof, should remain under seal." Johnson v. Greater Se. Cmty. Hosp. Corp., 951 F.2d 1268, 1278 (D.C. Cir. 1991).

When presented with a motion to unseal a judicial record, courts should consider "(1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings." EEOC v. Nat'l Children's Ctr., Inc., 98 F.3d 1406, 1409 (D.C. Cir. 1996) (citing Hubbard, 650 F.2d at 317–322).

The first question is whether the 2018 Agreement and 2019 Deed of Variation are judicial records.  The Court concludes that they are.  Both documents have been filed on the docket in support of the United States's motion to reopen claimant's deposition.  The documents were filed "to influence the court," and this Court "base[s] its decision" regarding that motion, at least in part, on the contents of the documents.  Metlife, 865 F.3d at 667.  Claimant argues that the documents are not judicial records, so the Hubbard analysis does not apply.  See Claimant's Mem. of P.&A. in Opp'n to Pl.'s Mot. to De-Designate Docs. ("Opp'n to Mot. to De-Designate") [ECF No. 314] at 12–13.  But the cases claimant relies on are not on point; they stand only for the proposition that, under the Hubbard balancing test, the public may have less interest in certain judicial records than others.  See EEOC, 98 F.3d at 1409–10 (recognizing certain portions of the record may have a "private character," but remanding so district court may weigh the Hubbard factors); In re McCormick, 316 F. Supp. 3d at 464 (recognizing original source documents "may be of less value to public's understanding of the judicial process" while applying Hubbard factors).  The degree to

which a court relied on a particular exhibit in reaching its decision may affect the balance of interests under the six factors laid out in Hubbard, but it does not dictate what constitutes a judicial record. See, e.g., Metlife, 865 F.3d at 668 (recognizing documents are judicial records that a court relied on even when "the court did not cite or quote" them and relied on them "only to determine that they did not dissuade it from its bottom-line conclusion").

Claimant's argument that only the dates—not the content—of the 2018 Agreement and 2019 Deed of Variation are relevant to this Court's decision to reopen claimant's deposition is equally unavailing. In evaluating the United States's motion to reopen the deposition, the Court does not just consider when the documents were created; it also considers whether the documents are relevant and important enough to justify the costs of reopening the deposition and further delaying this case. See supra at 5–8. Accordingly, the United States's motion to reopen the deposition relies, rightfully so, on the actual contents of the documents. See Mot. to Re-Open Dep. at 15–16.[3]

Because the documents are judicial records, the Court turns to the second question: whether claimant has come forward with specific reasons why the documents should remain sealed that overcome the strong presumption in favor of public access. In answering this question, the Court considers the six Hubbard factors.[4]

A. Need for Public Access to the Documents at Issue

First, the Court considers "the need for public access to the documents." Hubbard, 650 F.2d at 317. The United States alleges that the 2018 Agreement—dated just seven weeks after this

---

[3] If the United States's motion to reopen the deposition based on these documents was frivolous because the documents were truly irrelevant to the underlying claims, then claimant could argue that the motion was merely a tool to get around the "judicial records" requirement and publicly disclose the information. But here, there is no such gamesmanship. The documents are highly relevant to the underlying case. See supra at 6–7.

[4] If the Hubbard factors weigh in favor of unsealing the 2018 Agreement, then they also weigh in favor of unsealing the 2019 Deed of Variation. Claimant identifies no reason to seal the 2019 Deed of Variation if the 2018 Agreement is publicly released.

Court entered judgment for the United States with respect to the Blue Holding (1) assets—serves "to secrete the forfeited and remaining restrained assets out of the United Kingdom and away from this Court's judgment and arrest warrant in rem." Mot. to De-Designate at 4. The United States further contends that the 2018 Agreement outlines a scheme "designed to wrest control of the proceeds of corruption away from the U.S. and U.K. courts, so that €98.5 million ($110.3 million) can be secreted into the hands of one of the primary architects of the kleptocracy scheme alleged in the Complaint." Id. at 12. Claimant counters that the United States has mischaracterized the documents as "some sort of illegal or improper scheme" when really the documents are just the contents of a court filing in a U.K. court. Opp'n to Mot. to De-Designate at 18.

The Court need not assess the propriety of the 2018 Agreement to recognize that there is a need for public access. The agreement describes an orchestrated effort to acquire over €141 million ($157.5 million) in assets allegedly born out of an international conspiracy to launder proceeds from government corruption in Nigeria through the United States, including at least $15 million[5] in assets that this Court has already ordered forfeited to the United States. See 2018 Agreement at CLS 22901–22902; see also Compl. ¶¶1, 4(h)–(k). The agreement also indicates that €98.5 million ($110 million) of the defendant assets will then be returned to trusts enjoyed by Abubakar Bagudu, who allegedly helped steal and launder the money to begin with. See 2018 Agreement at CLS 22901–22902. Whether the 2018 Agreement is proper or not, it's a matter of both national and international significance that gives rise to a strong public interest in access. See, e.g., In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig., 101 F.R.D. 34, 38 (C.D. Cal. 1984) (finding heightened public interest in filings about an alleged international

---

[5] The precise figure is unclear. At the time this Court ordered forfeiture of the Blue Holding (1) assets, they were worth approximately $15 million, All Assets, 330 F. Supp. 3d at 161, though the government's brief states that those assets are valued at approximately $29 million, Mot. to De-Designate at 11.

price-fixing scheme in the oil industry because either "state and local governments have been cheated out of many millions of dollars" or "public officials . . . have abused their discretion in the management of public resources" by prosecuting fruitless cases).

Finally, the United States government's role as plaintiff in this litigation heightens the need for public access. See EEOC, 98 F.3d at 1409 ("The appropriateness of making court files accessible is accentuated in cases where the government is a party.") (quoting Federal Trade Comm'n v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 410 (1st Cir. 1987))). A primary purpose of the public right of access is to ensure that the public can "keep a watchful eye on the workings of public agencies" and "the operation of government." See Nixon, 435 U.S. at 597–98. Here, the public has an interest in understanding and monitoring the United States's response to the alleged laundering of proceeds of foreign government corruption through the United States.

B.  Extent of Previous Public Access to Documents

As to the second factor, the extent of previous public access to the documents, the parties agree that the two documents at issue were filed in a U.K. court but not made public. See Mot. to De-Designate at 13–14; Opp'n to Mot. to De-Designate at 16–17. Thus, this factor neither favors nor disfavors disclosure. See Am. Prof'l Agency, Inc. v. NASW Assurance Servs., Inc., 121 F. Supp. 3d 21, 24 (D.D.C. 2013) ("[T]he second Hubbard factor is 'neutral' where there has been no previous access.").

C.  Objections to Disclosure, Strength of Interests Asserted, and Possibility of Prejudice

Like the parties, this Court assesses the third, fourth, and fifth factors together. These factors "are interrelated, and require courts to look at the strength of the property and privacy interests involved, and to take into account whether anyone has objected to public disclosure and the possibility of prejudice to that person." Id. at 25. Here, claimant objects to the unsealing of

documents, which "counsels in favor of sealing." EEOC, 98 F.3d at 1410. However, there have

been "no objections to unsealing by third parties," and it was third-party objections that "the Circuit

in Hubbard found to be particularly problematic." United States v. ISS Marine Servs., Inc., 905

F. Supp. 2d 121, 141 (D.D.C. 2012). The parties to the 2018 Agreement have been notified of the

government's motion to de-designate the documents as confidential, see Order, Oct. 31, 2019 [ECF

No. 301], and none have intervened in this action to object to disclosure or otherwise allege that

they would suffer some particularized harm from disclosure, see United States's Reply in Supp.

of Mot. to De-Designate Docs. [ECF No. 326] at 9 n.5. This fact weighs in favor of unsealing the

documents. See ISS Marine Servs, 905 F. Supp. 2d at 141; Am. Prof'l Agency, 121 F. Supp. 3d

at 25.

Claimant makes three arguments as to why he and the parties to the 2018 Agreement would

be prejudiced if the documents were unsealed. First, he notes that the 2018 Agreement contains a

confidentiality clause that the parties to the agreement bargained for. Opp'n to Mot. to De-

Designate at 17. "Although confidentiality agreements between private parties may weigh against

disclosure, they do not dictate whether documents can be filed under seal." Grynberg v. BP PLC,

205 F. Supp. 3d 1, 3 (D.D.C. 2016); see also Am. Prof'l Agency, 121 F. Supp. 3d at 25 ("The

desire for a confidential settlement cannot alone justify sealing a consent order."). And here,

neither claimant nor the parties to the 2018 Agreement have identified any specific harm that they

would suffer if the documents were disclosed in violation of the confidentiality provision.

Second, claimant argues that the parties to the 2018 Agreement "expected the rules of the

U.K. Court to govern their filings with the U.K. Court." Opp'n to Mot. to De-Designate at 17–18.

But rules of civil procedure from the United Kingdom do not apply to litigation in a court in the

United States. Claimant goes on to suggest that this Court should defer to the U.K. court's rules

out of comity, id. at 18, but "[t]he fact that the courts of another country would arguendo require sealing, especially when they take a much different approach than American courts to the publicity of judicial proceedings more broadly, cannot in and of itself override the pressing interest in open access to court records." Redeemer Comm. of Highland Credit Strategies Funds v. Highland Capital Mgmt., L.P., 182 F. Supp. 3d 128, 133–34 (S.D.N.Y. 2016). "[O]ther jurisdictions cannot relieve the Court of its obligation to apply the Hubbard factors, which are binding D.C. Circuit precedent." Grynberg, 205 F. Supp. 3d at 4 n.5. Furthermore, there isn't even a U.K. court order requiring sealing (Nigeria's filing is merely, by default, not public), and if there were such an order, it would seal only that U.K. court's docket—not the docket of a U.S. district court. See U.K. Civil Procedure Rule 5.4C.

Third, claimant argues that both he and the parties to the 2018 Agreement will be prejudiced because the United States has selectively sought disclosure of two documents and misrepresented them as part of a nefarious scheme. Opp'n to Mot. to De-Designate at 18–19. He explains that the documents were in fact part of a much larger collection of documents that Nigeria submitted to the U.K. court in support of its application to vary the prohibition order, which is both legal and proper. Id. at 14–15. But even assuming the United States's representation of the 2018 Agreement is misguided, "[t]he remedy for speech that is false is speech that is true." United States v. Alvarez, 567 U.S. 709, 727–28 (2012); see also Whitney v. California, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.").

Claimant has not explained why the United States's alleged misrepresentation of the 2018 Agreement cannot be corrected through further transparency. To the contrary, he has stated that

"[t]here is nothing illegal, secret, or otherwise improper about [the U.K.] proceedings, or the 2018 Settlement Agreement." Opp'n to Mot. to De-Designate at 15. Claimant is thus free to de-designate additional documents, providing the public with more context, or to otherwise speak out about the ongoing litigation in the United Kingdom. He has not pointed to any U.K. protective order that prevents him from speaking about the 2018 Agreement, and he claims that he is not a party to the 2018 Agreement that contains the confidentiality provision. See id. at 19. Furthermore, the parties to the agreement have not intervened to oppose disclosure and the Court sees no reason why they too could not explain the context surrounding the 2018 Agreement after it is publicly released. Finally, claimant's assertion that the selective release of these documents would prejudice his right to a fair trial is wholly unpersuasive because "any risk of jury prejudice caused by disclosure of . . . settlement documents . . . can be addressed through appropriate voir dire." In re Fort Totten Metrorail Cases, 960 F. Supp. 2d 2, 10 (D.D.C. 2013).

D. Purpose for Which Documents Were Introduced

Finally, the Court considers the purpose for which the documents were introduced during the judicial proceedings. Hubbard, 650 F.2d at 321. Under this prong, "[t]he public's entitlement to judicial records is commensurate with the documents' importance to the judicial proceeding in question." Matter of Leopold to Unseal Certain Elec. Surveillance Applications & Orders, 300 F. Supp. 3d 61, 96 (D.D.C. 2018). Here, the documents were filed in support of the United States's motion to reopen claimant's deposition. It's true that a discovery motion is not as central to the underlying forfeiture proceeding as, say, a motion for summary judgment might be. But this factor still "weighs in favor" of disclosure because this Court "described" and "expressly relied upon" the documents in its decision to reopen claimant's deposition and the documents are also highly "relevant to" the underlying forfeiture action generally. Cf. Hubbard, 650 F.2d at 321 (holding

documents should remain sealed when they "were not determined . . . to be relevant to the crimes charged[,] . . . were not used[,] . . . nor were described or even expressly relied upon by the trial judge in his decision"); see also Grynberg, 205 F. Supp. 3d at 3 (holding sixth Hubbard factor favors disclosure when documents are "exhibits submitted to the court with the intent that the court will rely on them in adjudicating a dispute.").

\* \* \* \* \*

In sum, the 2018 Agreement and 2019 Deed of Variation are judicial records and the Hubbard factors weigh in favor of disclosure.  Although the documents contain a confidentiality clause, there is a strong public need for access, claimant has failed to show how he—or anyone else—will be harmed by disclosure, and these documents are central to this Court's decision to reopen claimant's deposition. [6]

## CONCLUSION

For the foregoing reasons, this Court will (1) grant the United States's motion to reopen its deposition of claimant for three hours, and (2) grant the United States's motion to de-designate the 2018 Agreement and 2019 Deed of Variation as confidential so that the documents—and the parties briefing related to the documents—may be unsealed.  A separate order has been issued on this date.

/s/

JOHN D. BATES
United States District Judge

Dated: December 23, 2019

---

[6] Because the Court concludes that the documents should be unsealed pursuant to the common law right of public access, it need not assess whether the documents should also be unsealed pursuant to the First Amendment right of public access.