## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

      **v.**

**ALL ASSETS HELD IN ACCOUNT
NUMBER 80020796, IN THE NAME OF
DORAVILLE PROPERTIES
CORPORATION, AT DEUTSCHE BANK
INTERNATIONAL, LIMITED IN
JERSEY, CHANNEL ISLANDS, AND
ALL INTEREST, BENEFITS OR ASSETS
THERETO, et al.,**

    **Defendants.**

**Civil No. 13-1832 (JDB)**

## MEMORANDUM OPINION

The United States has moved for reconsideration of the Court's March 5, 2018 ruling, arguing that the Court should strike Ibrahim Bagudu's claim because he no longer has an interest in the assets subject to forfeiture, and alternatively, that he only has Article III standing to challenge the United States's forfeiture action as to a much smaller set of assets.  See Pl.'s Mot. for Recons. of the Court's March 5, 2018 Ruling on Claimant Ibrahim Bagudu's Article III Standing ("Pl.'s Mot. for Recons.") [ECF No. 339] at 1; United States's Resp. to Claimant's Suppl. Br. ("Pl.'s Suppl. Br.") [ECF No. 352] at 3–4.  Claimant opposes the motion.  See Claimant's Mem. of P. & A. in Opp'n to Pl.'s Mot. for Recons. ("Opp'n to Mot. for Recons.") [ECF No. 342] at 1; Claimant's Mem. of P. & A. in Resp. to the Court's May 1, 2020 Order ("Claimant's Suppl. Br.") [ECF 349] at 1.

At the same time, claimant has moved to dismiss the United States's forfeiture action for lack of subject matter jurisdiction, arguing that the Court lacks authority to issue a final, binding decision and that under the United States's interpretation of the facts, it is actually the United

1

States's forfeiture claim—not claimant's claim of interest—that is no longer redressable.  See Claimant's Mot. to Dismiss the Compl. for Lack of Subject Matter Jurisdiction ("Claimant's Mot. to Dismiss") [ECF No. 353] at 1.  The United States opposes that motion.  See United States' Opp'n to Claimant's Mot. to Dismiss ("Opp'n to Mot. to Dismiss") [ECF No. 354].

The Court is not persuaded by either party's challenge to its Article III jurisdiction.  The Court's March 2018 decision was and remains correct: claimant has Article III standing to challenge the United States's forfeiture action against all Blue Holdings (2) assets and his claim is not moot.  The Court also has authority to issue a final, binding decision regarding the forfeiture of property located abroad, and the United States's forfeiture claim remains redressable.  Accordingly, the Court will deny both the United States's motion for reconsideration and claimant's motion to dismiss.

## BACKGROUND

The Court has set forth the factual background and procedural history of this case in its previous memorandum opinions, see, e.g., United States v. All Assets, 299 F. Supp. 3d 121, 124–27 (D.D.C. 2018); Dec. 23, 2019 Mem. Op. [ECF No. 330] at 1–6, and will repeat here only those facts relevant to the pending motions.

In March 2018, the Court held that claimant has standing to contest the forfeiture of two investment portfolios held in the name of Blue Holdings (2) because claimant's $100,000 annual annuity from the Blue Family Trust II vests him with a proprietary interest in the trust assets, which consist entirely of shares of stock in Blue Holdings (2).  See All Assets, 299 F. Supp. 3d at 128–29, 140.  At the time of that decision, the United States agreed that the annuity gave claimant a proprietary interest in the trust assets sufficient to establish standing even though claimant's annuity could be revoked at the discretion of the trustee.  See Tr. of Oct. 26, 2017 Hr'g [ECF No.

2

200] at 31:19–32:15;  Tang Dep. Tr. [ECF No. 187-21] at 253:10–21.  The United States only took issue with the scope of claimant's standing, arguing that he should be permitted to challenge just the forfeiture of assets equal to the value of his annuity.  See Tr. of Oct. 26, 2017 Hr'g at 31:21–32:2.  The Court rejected that argument and held that claimant's interest in a portion of the Blue Holdings (2) assets was sufficient to establish a concrete interest in the forfeiture proceedings against those assets as a whole.  See All Assets, 299 F. Supp. 3d at 130.  After the Court's March 2018 decision, discovery regarding claimant's interest in the assets continued.

At the end of 2019, the Court learned of an October 2018 agreement among the Federal Republic of Nigeria, the Blue Holdings companies, the trustee of the Blue Family Trusts, and Abubakar Bagudu, on his own behalf and on behalf of his "identified affiliates" (including claimant) that complicates the status of claimant's interest in the Blue Holdings (2) assets.  See Ex. A to Mot. to De-Designate Docs. (the "2018 Agreement") [ECF No. 307-2].  Prior to the 2018 Agreement, Nigeria had renounced any interest in the relevant trust assets in a 2003 settlement agreement with Abubakar Bagudu.  See Ex. I to Mot. to Dismiss Gov't's Verified Compl. for Forfeiture in Rem [ECF No. 55-10] at 12.  But the 2018 Agreement amends that old settlement agreement and provides that "[Nigeria] legally owns the Relevant Trust Assets . . . to the extent possible or permissible under the terms of the Prohibition Order."  2018 Agreement at CLS 22902 ¶ 7.  The prohibition order is a U.K. court order that froze the Blue Holdings (2) assets pursuant to this Court's arrest warrants in rem, prohibiting any "dealing" of the assets while this forfeiture action is pending.  See Prohibition Order, Ex. K to Decl. of Jonathan B. New [ECF No. 312-12] at 2; Return of Service for Warrants of Arrest In Rem [ECF No. 56] ¶ 2.

In the 2018 Agreement, Nigeria promises to use all reasonable endeavors to vary the prohibition order.  2018 Agreement at CLS 22902 ¶ 2.  If the U.K. court varies or dissolves the

prohibition order (i.e., unfreezes the assets), the 2018 Agreement requires that the trustee and the Blue Holdings companies transfer the relevant trust assets to Nigeria. Id. at CLS 22902 ¶ 3. In return, Nigeria is then required to pay €98.5 million to an account identified by the trustee of the Blue Family Trusts. Id. at CLS 22901, 22902 ¶ 4. Either Abubakar Bagudu or Nigeria may terminate the 2018 Agreement by giving 30 days' notice in writing, and, once the agreement is terminated, the parties are released from "further obligations" under certain clauses while "other provisions . . . continue in full force and effect in perpetuity." Id. at CLS 22902–22903.

In accordance with its obligations under the contract, Nigeria has filed an application with the U.K. court to vary the prohibition order and unfreeze the trust assets so that the assets may be transferred to Nigeria. Decl. of Jonathan B. New [ECF No. 314-1] ¶ 2. That application remains pending. Meanwhile, the United States has moved for reconsideration of the Court's March 2018 decision, arguing that claimant always lacked Article III standing to challenge the forfeiture proceedings as to the entirety of the Blue Holdings (2) assets, and now, in light of the 2018 Agreement, claimant has no Article III standing whatsoever. See Pl.'s Mot. for Recons. at 1. In reviewing that motion, the Court determined that the United States's argument regarding the 2018 Agreement raised a mootness, as opposed to standing, issue and ordered supplemental briefing. See May 1, 2020 Order [ECF No. 347] at 1–3. Claimant then moved to dismiss the United States's entire forfeiture action for lack of subject matter jurisdiction. Claimant's Mot. to Dismiss at 1. A hearing on both motions, including the mootness issue raised by the Court, was held on June 24, 2020. These matters are now ripe for decision.

## LEGAL STANDARDS

The United States's motion for reconsideration is governed by Federal Rule of Civil Procedure 54(b), which provides that an interlocutory order—like the March 2018 ruling—"may

be revised at any time before the entry of a judgment." Fed. R. Civ. P. 54(b). Motions for reconsideration of such orders are granted or denied "as justice requires." In Def. of Animals v. Nat'l Insts. of Health, 543 F. Supp. 2d 70, 75 (D.D.C. 2008). A court may consider whether it "'patently' misunderstood the parties, made a decision beyond the adversarial issues presented, made an error in failing to consider controlling decisions or data, or whether a controlling or significant change in the law has occurred." Id. Claimant's motion to dismiss "presents a threshold challenge to the Court's jurisdiction" that obligates the Court "to determine whether it has subject-matter jurisdiction in the first instance." Curran v. Holder, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) (quotation omitted).

"The objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation." Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006) (internal citation omitted). Because "[f]ederal courts are courts of limited jurisdiction," "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) (internal citation omitted). Where there is "a dispute over the factual basis of the court's subject matter jurisdiction[,] . . . the court may not . . . merely . . . assum[e] the truth of the facts alleged." Feldman v. FDIC, 879 F.3d 347, 351 (D.C. Cir. 2018) (quotation omitted). Rather, the Court "must go beyond the pleadings and resolve any disputed issues of fact . . . necessary to a ruling." Id. (quotation omitted). In doing so, however, the Court must also ensure that the party seeking to establish jurisdiction has been accorded "ample opportunity to secure and present evidence relevant to the existence of jurisdiction." Id. (quotation omitted).

In a forfeiture action, "it is really the government which is invoking the power of the federal courts to effect the forfeiture," and thus the government must establish jurisdiction. United States v. $557,933.89, More or Less, in U.S. Funds, 287 F.3d 66, 79 n. 9 (2d Cir. 2002). At the same time, "[w]hen," as here, "the government moves to strike a claim for lack of standing, a claimant has the burden to establish standing by a preponderance of the evidence." United States v. $17,900.00 in U.S. Currency, 859 F.3d 1085, 1089 (D.C. Cir. 2017) (citing Suppl. R. G(8)(c)). "To prevail, a claimant must meet both Article III and statutory standing requirements." Id. (internal quotation marks omitted). "[S]tanding is assessed at the time of filing." Wheaton Coll. v. Sebelius, 703 F.3d 551, 552 (D.C. Cir. 2012) (per curiam).

"[S]tanding," however, "is not enough" to satisfy Article III's case or controversy requirement. Chamber of Commerce of U.S. v. EPA, 642 F.3d 192, 199 (D.C. Cir. 2011). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) (some internal quotation marks omitted). "[I]t is not enough that a dispute was very much alive when suit was filed, . . . The parties must continue to have a personal stake in the outcome of the lawsuit." Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477–78 (1990) (internal quotation marks omitted). "[T]he party urging mootness . . . bears the 'heavy burden' of establishing that the case is moot." Zukerman v. U.S. Postal Serv., No. 19-5168, 2020 WL 3053344, at *6 (D.C. Cir. June 9, 2020) (quoting Honeywell Int'l, Inc. v. Nuclear Regulatory Comm'n, 628 F.3d 568, 576 (D.C. Cir. 2010)).

## ANALYSIS

In a forfeiture action, the government's motion to strike "must be decided before any motion by the claimant to dismiss the action," Fed. R. Civ. P. Supp. R. G(8)(c)(ii)(A), because if

claimant's claim is stricken, then "he is out of the case," "has no legally cognizable interest in the outcome of the forfeiture action," and "his motion to dismiss is moot," United States v. $284,950.00 in U.S. Currency, 933 F.3d 971, 975 (8th Cir. 2019) (internal quotation marks omitted), cert. denied sub nom. Thompson v. United States, No. 19-8121, 2020 WL 1979024 (U.S. Apr. 27, 2020).   Accordingly, the Court will first address the government's motion for reconsideration and then turn to claimant's motion to dismiss.

I.      **United States's Motion for Reconsideration**

The United States argues that the Court, in its March 2018 decision, wrongly determined that claimant has standing to challenge the forfeiture action with respect to all of the Blue Holdings (2) assets, and that new factual developments—namely, the 2018 Agreement—have extinguished claimant's interest in the assets entirely.  See Pl.'s Mot. for Recons. at 1.  The Court first reconsiders whether claimant had standing to challenge the forfeiture of all Blue Holdings (2) assets at the time he intervened in this action and then considers whether claimant continues to have a concrete interest in the forfeiture proceedings.

A. **Scope of Claimant's Standing**

The "irreducible constitutional minimum of standing" under Article III consists of three elements: (1) an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992); accord Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016).  In the forfeiture context, a claimant may satisfy the Article III standing requirement by demonstrating "a colorable interest in the property, for example, by showing actual possession, control, title, or financial stake" that is "redressable, at least in part, by a return of the

property." United States v. All Assets Held at Bank Julius Baer & Co., 959 F. Supp. 2d 81, 95 (D.D.C. 2013) (quotations omitted). "In general, any colorable claim on the property suffices—typically, an ownership or possessory interest." $17,900.00 in U.S. Currency, 859 F.3d at 1089.

"While ownership or possession of property may provide evidence of standing, and in some circumstances act as, in effect, a surrogate for an inquiry into whether there is injury direct enough and sufficient enough to sustain standing, it is injury that is at the heart of the standing question." United States v. Cambio Exacto, S.A., 166 F.3d 522, 527 (2d Cir. 1999); see also United States v. Emor, 785 F.3d 671, 676 (D.C. Cir. 2015) (stating that "any colorable claim on the property suffices, if the claim of injury is 'redressable, at least in part, by a return of the property'"); United States v. JP Morgan Chase Bank Account No. Ending 8215 in the Name of Ladislao V. Samaniego, VL: $446,377.36, 835 F.3d 1159, 1166 n.7 (9th Cir. 2016) (noting that "for standing inquiries, the guiding question is whether the claimant would be injured through the seizure of the property"); Via Mat Int'l S. Am. Ltd. v. United States, 446 F.3d 1258, 1262 (11th Cir. 2006) ("At the heart of Article III standing is the existence of an injury, not ownership.").

Finally, "[t]he function of standing in a forfeiture action is . . . truly threshold only—to ensure that the government is put to its proof only where someone with a legitimate interest contests the forfeiture." $557,933.89, More or Less, in U.S. Funds, 287 F.3d at 79. A claimant need not "definitively prove the existence of [his] interest," Bank Julius Baer & Co., 959 F. Supp. 2d at 95, and the requirements for a claimant to establish standing to contest a forfeiture are "very forgiving," Emor, 785 F.3d at 676.

The United States moves the Court to reconsider its prior March 2018 ruling that claimant has standing to challenge the forfeiture action as to all assets held in the investment accounts associated with Blue Family Trust II (Assets 4(i) and 4(k)). See Pl.'s Mot. for Recons. at 1, 9. In

that ruling, the Court determined that claimant had standing as to the Blue Family Trust II assets because "[b]y a deed of appointment dated September 3, 2010, the trustee established an annuity of $100,000 from Blue Family Trust II for the benefit of Ibrahim Bagudu," "Bagudu received four annuity payments (totaling $400,000) between January 2011 and July 2013," and "when the assets of the Blue Holdings Companies were frozen pursuant to English court orders in connection with this litigation, Ibrahim Bagudu's annuity payments ceased." All Assets, 299 F. Supp. 3d at 128.

At the time, the United States had "conceded that the annuity provides Ibrahim Bagudu with a vested proprietary interest in the trust assets," id., but argued that his standing "should be limited to the present value of his annuity," id. at 129. The Court rejected that argument, reasoning that the claimant "need only show a colorable interest in at least a portion of the defendant property to establish Article III standing." Id. at 129 (internal quotation marks omitted); see also id. at 129–30 (gathering cases). The Court did, however, agree with the United States that claimant's standing was limited to the properties he had an interest in, which were the assets held in the investment accounts associated with Blue Family Trust II and not the assets of Blue Family Trust I. Id. at 130–131.

The United States now argues that the Court should reconsider its prior determination that claimant need only show an interest in a portion of the defendant property (the Blue Family Trust II assets) for standing to challenge the United States' forfeiture action against the property. Pl.'s Mot. for Recons. at 12. Specifically, the United States argues that the Court's prior decision "has been undermined by the Supreme Court's intervening Gill opinion," which establishes that a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." Id. at 12 (quotation omitted). Because "[c]laimant's only cognizable injury . . . is the loss of his $100,000 annuity,"

the United States maintains that claimant "only has standing to contest forfeiture of the portion of the Blue Holdings (2) accounts equal to the present value of his annuity." Id.

In Gill v. Whitford, several Wisconsin voters challenged the drawing of district boundaries for the Wisconsin state legislature as an unconstitutional partisan gerrymander. 138 S. Ct. 1916, 1923–26 (2018).  In remanding the case on standing grounds, the Court "caution[ed]" that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." Id. at 1934.  The Court explained that "[r]emedying the individual voter's harm . . . does not necessarily require restructuring all of the State's legislative districts.  It requires revising only such districts as are necessary to reshape the voter's district—so that the voter may be unpacked or uncracked, as the case may be." Id. at 1931.

But the Supreme Court's decision in Gill is not an intervening change in the law of standing.  The Court's analysis was merely an application of the longstanding "rule that a 'remedy must . . . be limited to the inadequacy that produced the injury in fact that the plaintiff has established.'" Id. (quoting Lewis v. Casey, 518 U.S. 343, 357 (1996)).  The United States asserts that this rule was not clearly established as an Article III standing requirement in Lewis, but many courts, including the Supreme Court, had recognized this principle as an Article III standing requirement prior to this Court's March 2018 decision.  See, e.g., DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 353 (2006); Nat. Res. Def. Council v. Pena, 147 F.3d 1012, 1024 n.4 (D.C. Cir. 1998); Imprisoned Citizens Union v. Ridge, 169 F.3d 178, 188 (3d Cir. 1999); Doe 1–13 By & Through Doe, Sr. 1–13 v. Chiles, 136 F.3d 709, 722 (11th Cir. 1998).

The Court does, however, agree with the United States that whether Gill materially changed standing law is of little consequence; if the Court previously failed to properly apply case law requiring courts to narrowly tailor relief to redress a party's injury in fact, then reconsideration is

warranted.  See Reply in Supp. of Pl.'s Mot. for Recons. ("Reply Br.") [ECF No. 344] at 17–18.

But upon review of its March 2018 decision, the Court concludes there was no such failure.  The

Court recognized that a claimant "must establish standing as to each of the . . . in rem defendants

named in the plaintiff's complaint in which it asserts an interest."  All Assets, 299 F. Supp. 3d at

130 (quotation omitted).  Hence, claimant's standing, and therefore his claim, was limited to the

Blue Family Trust II assets.  The question then, and again now, is whether claimant's standing

should be further limited to the present value of his annuity, which is the source of his interest in

the Blue Family Trust II assets, or whether his interest in the assets provides him standing to

challenge the United States's forfeiture action as to the entirety of those assets.

In its March 2018 ruling, the Court determined that "a claimant need only show a colorable

interest in 'at least a portion of the defendant property' to establish Article III standing" to

intervene in a forfeiture proceeding against that property.  See id. (citing United States v.

$31,000.00 in U.S. Currency, 872 F.3d 342, 348 (6th Cir. 2017); United States v. All Assets Listed

in Attachment A, Civil No. 1:14-cv-969, 2015 WL 1221392, at *3 (E.D. Va. Mar. 13, 2015)).  This

standard remains the proper legal standard; indeed, courts have continued to apply this standard

since the Supreme Court's decision in Gill.  See United States v. Wallis, Criminal No. 15-CR-285,

2020 WL 1901091, at *3 (E.D. Va. Apr. 15, 2020) (quoting United States v. Munson, 477 F. App'x

57, 62–63 (4th Cir. 2012)); United States v. $99,500.00 U.S. Currency Seized on Mar. 20, 2016,

795 F. App'x 332, 337 (6th Cir. 2019), cert. denied sub nom. Primm v. United States, No. 19-991,

2020 WL 1325875 (U.S. Mar. 23, 2020).

It's true that few cases address, at any length, whether a claimant with an interest in only a

portion of a defendant property has standing to challenge the forfeiture of the entire property.  But

the United States does not cite a single case that supports the proposition that when a claimant

11

establishes a partial interest in a single in rem defendant, the court should limit the claimant's ability to contest the forfeiture action to the value of that interest.  In its motion for reconsideration, the United States relies on United States v. 2511 E. Fairmont Ave., 722 F. Supp. 1273 (D. Md. 1989), in which the court opined that claimants likely had standing to contest the forfeiture of the land, but not of the expensive house that sat on the land and was paid for solely by someone else, id. at 1280.  But in that case, the court decided that a final ruling on the question of whether claimants have standing to contest the forfeiture of the house would not be made until trial because it could not determine "whether some of or all of the underlying land which surrounds the home may . . . be subject to forfeiture."  Id.  Thus, even at the motion for summary judgment stage, and in a case where claimants asserted no interest in the house itself, the court did not parse the in rem defendant and limit claimants standing to just the land.

Additionally, in 2511 E. Fairmont Ave. the "claimants admit[ted] that they advanced no sums toward construction of th[e] house, and they have presented no evidence of any other type of cognizable ownership interest in the home."  Id.  By contrast, here the claimant and the United States agreed that claimant had "a vested proprietary interest in the trust assets."  All Assets, 299 F. Supp. 3d at 128.  A more apt comparison to the case here would be if the claimants in 2511 E. Fairmont Ave. had partially contributed to the construction of the expensive home, and the court had held that the United States could simply pay the claimants for their contributions and proceed with the forfeiture action against the house.  But that was not the holding, and the United States presents no case supporting such an approach.[1]

---

[1] The United States also cites United States v. Alquzah, 91 F. Supp. 3d 818, 831–32 (W.D.N.C. 2015), but that case is about whether a wife of a criminal defendant has statutory standing to contest a criminal forfeiture order against her husband's property.  It does not address the partitioning of forfeitable properties in the context of Article III standing.

To the contrary, in the few cases that address the issue, courts have held that an interest in a portion of seized funds supports standing to contest forfeiture of the entire amount because "what is adjudicated in a judicial civil forfeiture proceeding is the <u>government's</u> right to the property, not the claimant's." <u>United States v. $421,090.00 in U.S. Currency</u>, No. 11-CV-00341 (JG), 2011 WL 3235632, at *5 (E.D.N.Y. July 27, 2011) (quotation omitted). "[B]ecause 'a single set of funds was seized together, and the propriety of forfeiting those funds is the subject of a single controversy,' the claimant's 'colorable ownership interest in even a portion of the funds is sufficient to establish a concrete interest in the proceedings as a whole.'" <u>United States v. $272,000</u>, No. 1:16-cv-06564 (AMD), 2018 WL 948752, at *3 (E.D.N.Y. Feb. 16, 2018) (quoting $421,090.00 in U.S. Currency, 2011WL 3235632 at *5 & n.3); <u>see also</u> <u>United States v. $3,585.00 U.S. Currency</u>, No. 1:18-CV-00581 EAW, 2019 WL 422660, at *3 (W.D.N.Y. Feb. 4, 2019) (determining that claimant who alleged ownership interest in some but not all of the currency seized had constitutional standing to challenge government forfeiture action).

Finally, the Court need not even go so far as to hold that a claimant asserting an interest in some portion of funds always has standing to contest forfeiture of the full amount of funds. Unlike a claimant who asserts an interest in a specific dollar amount of a large pool of cash subject to forfeiture, claimant here asserts an interest in all of the Blue Holdings (2) assets based on an ongoing annuity that is funded by the assets and the income generated by the assets. <u>See</u> Opp'n to Mot. for Recons. at 14. More importantly, the annuity is revocable by the trustee, <u>see</u> Deed of Appointment of an Annuity, Ex. B to Decl. of Joshua L. Sohn [ECF No. 344-2] at 4, which makes it especially hard to disentangle claimant's $100,000 annuity interest from the Blue Family Trust II assets as a whole. If all of the assets in Blue Family Trust II are forfeited except those up to the value of claimant's present annuity, the trustee may very well revoke or decrease claimant's

annuity given that claimant is not the sole beneficiary of the trust.  Claimant has a slice of the pie, but if the pie gets smaller, so too may his slice.

In this case, unlike a forfeiture case against a divisible pool of cash, there is no mechanism by which the Court can ensure that claimant's partial interest in the assets is fully protected while the United States's forfeiture action against the remaining portion of the assets proceeds. Claimant's interest—even if that interest is limited to the value of his $100,000 annuity—is threatened by the United States's forfeiture action against all the Blue Family Trust II assets.  Cf. Gill, 138 S. Ct. at 1921 (distinguishing Gill from "malapportionment cases" where "the only way to vindicate an individual plaintiff's right to an equally weighted vote was through a wholesale restructuring of the geographical distribution of seats in a state legislature") (internal quotation marks omitted).  The Supreme Court in Gill advised that the "'remedy must . . . be limited to the inadequacy that produced the injury in fact that the plaintiff has established." Id. at 1931 (quotation omitted).  And here, that inadequacy is the allegedly unlawful forfeiture of the Blue Holdings (2) assets.

Thus, claimant has standing to challenge the United States's forfeiture action as to the Blue Holdings (2) assets because claimant need only show a colorable interest in at least a portion of the defendant property.  And even if there are cases in which claimants should only be permitted to challenge the forfeiture of assets equal to the value of their proprietary interest, this is not one because if claimant is only permitted to challenge forfeiture of assets equal to the value of his annuity, then his injury may not be fully redressed.[2]

---

[2] The United States also moves, in the alternative, to amend its complaint under Federal Rule of Civil Procedure 15(a) to seek only forfeiture of the Blue Holdings (2) assets up to, but not including, the value of claimant's $100,000 annuity.  The United States, however, "makes this alternative request only if the Court were to agree that default judgment would then be proper against the new, smaller res."  Pl.'s Mot. for Recons. at 15 (first emphasis added).

The Court cannot "agree that default judgment would then be proper" because the Court cannot decide the merits of a proposed amended complaint at the motion to seek leave to amend stage.  As explained, the discretionary

**B. Claimant's Continued Interest in the Assets**

The United States next argues that the 2018 Agreement extinguishes any interest that the claimant had in the Blue Holdings (2) assets.[3]  As noted, "even where litigation poses a live controversy when filed," a court "must dismiss a case as moot 'if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'"  Chamber of Commerce, 642 F.3d at 199 (quoting Clarke v. United States, 915 F.2d 699, 701 (D.C. Cir. 1990)).  A case is moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  Knox v. Serv. Emps. Int'l Union, Local 1000, 567 U.S. 298, 307 (2012) (internal quotation marks omitted).  "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."  Chafin v. Chafin, 568 U.S. 165, 172 (2013) (quotation omitted).  Hence, "even the availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot.'"  Byrd v. EPA, 174 F.3d 239, 244 (D.C. Cir. 1999) (quoting Calderon v. Moore, 518 U.S. 149, 150 (1996)).  The United States bears the "heavy burden" of establishing that claimant's injury is no longer redressable.  Honeywell Int'l, Inc., 628 F.3d at 576.

---

nature of claimant's annuity makes it difficult to disentangle his interest from the Blue Family Trust II assets as a whole.  If, under the proposed amended complaint, the trustee "would immediately regain access to sufficient funds to pay out Claimant's annuity in perpetuity" as the United States proposes, see id., there is no telling whether the funds would in fact be paid to the claimant.  If the trustee did pay the claimant all of the funds, then it may be that the claimant no longer has an interest in the ongoing forfeiture action.  If the trustee paid the claimant only some or none of the funds, then the claimant may argue that his interest in the United States's forfeiture action remains because he suffered an injury and will likely receive some relief if the remaining Blue Family Trust II assets are not forfeited to the United States.  The Court cannot predict what events will transpire or what legal arguments claimant may or may not raise if it grants the United States's motion to amend.  Thus, because the Court cannot agree, at this stage, "that default judgment would then be proper," the Court assumes the United States is not moving to amend its complaint.

[3] This argument was first presented as a challenge to claimant's standing, see Pl.'s Mot. for Recons. at 9–10, but as the Court previously explained, this argument is not really a standing argument but is instead an argument that claimant's claim is moot.  See May 1, 2020 Order [ECF No. 347] at 1–3.  The Court therefore considers the United States's arguments regarding the 2018 Agreement in the context of mootness.  See United States's Suppl. Br. at 3–4.

The United States contends that if claimant succeeds in this litigation, the prohibition order will be dissolved and "clause 7 of the Settlement Agreement would immediately spring into effect[,] . . . automatically vest[ing] full title to the Trust Assets in [Nigeria], free and clear of any prior interests—including Claimant's annuity interest."  See Pl.'s Mot. for Recons. at 10.  The United States urges that this would "destroy[]" claimant's "annuity interest" and that the subsequent payment of €98.5 million to the Blue Family Trusts would not "re-create Claimant's annuity."  Id.  Therefore, according to the United States, claimant "no longer has a financial stake" in this forfeiture proceeding and claimant's claim of interest is moot.  Id.

In response, claimant argues that he continues to have an interest in preventing the forfeiture of the assets to the United States because "[i]f [Nigeria] fails to obtain an appropriate variance [of the prohibition order] from the U.K. court, then the transfer of assets and the settlement payment will not occur."  Opp'n to Mot. for Recons. at 17–20.  Claimant points to clause 7 of the 2018 Agreement, which states that Nigeria obtains title to the assets only "to the extent possible or permissible under the terms of the Prohibition Order," and argues that, therefore, the transfer of assets to Nigeria is contingent on obtaining a U.K. court order that varies the prohibition order to permit the transfer provided for in the 2018 Agreement.  Id. at 20.  According to claimant, the parties to the 2018 Agreement did not intend for the agreement to remain in effect "if [Nigeria] is unsuccessful in obtaining a variance."  Id. [4]

---

[4] Claimant, in support of his position, filed a letter written on behalf of the trustee of the Blue Family Trusts to the Attorney General of Nigeria indicating that should Nigeria's application to vary the prohibition order fail, the 2018 Agreement would be terminated.  See May 8, 2020 Letter, Ex. A to Claimant's Suppl. Br. [ECF No. 349-2] at 1.  Two weeks later, claimant moved for leave to file an additional letter—this one from Abubakar Bagudu to the Nigerian Attorney General indicating that he takes the same position expressed by the trustee in the May 8th letter.  See Claimant's Mot. for Leave to Supplement the Record [ECF No. 351] at 1; May 25, 2020 Letter, Ex. A to Claimant's Mot. for Leave to Supplement the Record [ECF No. 351-3] at 1.  The United States opposes the motion.  See United States' Opp'n to Claimant's Mot. for Leave [ECF No. 355] at 1.  The letters do not appear to be legally binding documents, nor does claimant allege that these letters have any legal effect on the 2018 Agreement.  Neither letter influences this Court's analysis.  Because the Court ultimately concludes that the 2018 Agreement does not moot

The United States replies that the 2018 Agreement transferred legal title of the relevant assets to Nigeria on the day that it was signed. See Reply Br. at 2–3. Even if Abubakar Bagudu terminated the agreement, the termination provision relieves parties only from certain "further obligations" under the agreement but would not reverse the transfer of legal title to the assets. See id. at 6 (citing 2018 Agreement at CLS 22901–22902). "To the extent permissible under the Prohibition Order," the United States argues, "[Nigeria] already 'owns' the Assets." Id. 6.

The prohibition order, however, prohibits the "dealing" of the assets, see Prohibition Order at 2, so claimant's proprietary interest in the assets is, at this time, unaffected by the 2018 Agreement. The 2018 Agreement calls into question only the redressability of claimant's injury because, as the United States concedes, it has no legal effect until after the prohibition order is varied or dissolved. The only question that the Court needs to consider, then, is whether it is no longer "likely as opposed to merely speculative that [claimant's] injury will be redressed," even partially, "by a favorable decision of the court.'" Spectrum Five LLC v. FCC, 758 F.3d 254, 260 (D.C. Cir. 2014) (citation omitted); see also Garden State Broad. Ltd. P'ship v. FCC, 996 F.2d 386, 394 (D.C. Cir. 1993).

Based on the record before it, the Court concludes that a favorable decision will likely redress, at least partially, claimant's injury. First, if Nigeria's application to vary the U.K. prohibition order fails, Abubakar Bagudu will likely terminate the 2018 Agreement before this forfeiture action is resolved. The agreement is a bargain for Nigeria's cooperation in varying the U.K. court's prohibition order. If Nigeria's efforts prove fruitless, the Court sees no reason why Abubakar Bagudu and the trustee of the Blue Family Trusts would proceed to trade the Blue Holdings (2) assets for less than they are worth. If the 2018 Agreement is terminated before

---

claimant's interest in the forfeiture proceedings, without considering Abubakar Bagudu's letter, claimant's motion to supplement the record will be denied as moot.

claimant secures a favorable decision, it is likely that the assets would <u>not</u> be transferred to Nigeria because the termination provision expressly allows the parties to cease further obligations under the 2018 Agreement, including the obligation to provide the instructions necessary to enable the assets to be transferred to Nigeria.   <u>See</u> 2018 Agreement at CLS 22902–22903 ¶¶ 3, 11. Accordingly, the assets would remain in the Blue Family Trust II and claimant's annuity payments would likely resume.

The fact that formal legal title to the assets may vest in Nigeria the moment that the prohibition order is dissolved is unimportant.  Legal title is not necessary for a claimant to establish an Article III interest in property subject to forfeiture, so acquiring legal title is not necessary to redress injury to that Article III interest.  <u>See</u> <u>Emor</u>, 785 F.3d at 676 (recognizing that claimant with less than legal title to the defendant property may still have standing to challenge the forfeiture action); <u>United States v. Sum of $70,990,605</u>, 234 F. Supp. 3d 212, 230 (D.D.C. 2017) ("The relevant question . . . is not merely whether the claimant's name appears on the title—or on the bank account—but whether he will suffer a distinct and palpable injury to himself . . . that is likely to be redressed if the claimant is successful in the litigation." (internal quotation marks omitted)). Here, if the 2018 Agreement is terminated before claimant secures a favorable decision, the Blue Family Trust will be under no obligation to enable the actual transfer of the assets to Nigeria and claimant's injury—a lack of annuity payments—will likely remain redressable.

But even if the 2018 Agreement is <u>not</u> terminated before claimant secures a favorable decision, resulting in the dissolution of the U.K. prohibition order and the transfer of the Blue Holdings (2) assets to Nigeria, claimant's injury will still likely be redressable, at least in part.  The 2018 Agreement provides that Nigeria would then—in exchange for the assets—pay €98.5 million to an account identified by the trustee of the Blue Family Trusts.  2018 Agreement at CLS 22901–

22902.  Given that the trustee has not canceled or amended claimant's Deed of Appointment that provides for the $100,000 annuity from the Blue Family Trust II, it is likely that the trustee would use at least some of the €98.5 million to continue to fund, or at least partially fund, that annuity. Claimant's annuity is tied to the Blue Family Trust II and not to the particular assets that would be transferred to Nigeria.  See Deed of Appointment at 2.

The United States argues that the €98.5 million payment is irrelevant because claimant will no longer have an interest in "the specific assets that the Government seeks to forfeit in this action" and that he therefore has no "present rights to any specific trust property."  Reply Br. at 10–11. But first, as the United States has conceded, the prohibition order prohibits any dealing of the assets, so the 2018 Agreement has no legal effect on the rights to the Blue Holdings (2) assets at this time.  Claimant therefore continues to have a present proprietary interest in the trust property in the form of his $100,000 annuity.  Second, an actual ownership interest in the specific assets subject to forfeiture is not necessary for a claimant to establish an Article III case or controversy. There need only be an injury, like "substantial economic harm," that is "the direct result . . . of an allegedly unlawful forfeiture . . . [that] would be redressed by a successful challenge to the forfeiture."  Cambio Exacto, 166 F.3d at 528.  "Article III does not require more."  Id.  Here, claimant has already established a concrete injury to a proprietary interest in the assets that was caused by the United States' forfeiture action.  The only remaining question is whether a favorable decision could provide claimant with some redress for the economic injury he has allegedly suffered—and the €98.5 million payment from Nigeria in exchange for the trust assets would provide the means for that relief.

The United States next argues that the trustee, upon receiving the payment, could choose not to place any of the €98.5 million in the Blue Family Trust II, leaving claimant's annuity

unfunded.  Reply Br. at 11.  But it is likely that the trustee—at a minimum—has a fiduciary obligation to compensate claimant for the past several years during which his annuity existed but the assets were frozen.  As the Court previously found, the annuity created a "vested proprietary interest" in the assets, see All Assets, 299 F. Supp. 3d at 128, but since this litigation began, claimant has not received the payments he is owed, now totaling several hundred thousand dollars.  Moreover, claimant's annuity was never guaranteed to be permanent—the trustee has always had discretion to revoke the annuity.  See Deed of Appointment at 4.  Despite that uncertainty, the Court determined (and the United States did not dispute) that it was likely that the trustee would continue to fund claimant's annuity once it regained access to the frozen assets because it had consistently made annuity payments to claimant before the assets were frozen.  If the relevant trust assets are exchanged for €98.5 million, the trustee will have regained access to less, but still substantial, funds to continue to operate the Blue Family Trusts as it did prior to the United States's forfeiture action.  It is no less likely, then, that claimant's annuity will again be funded and paid from the €98.5 million than from restored trust assets.  Hence, because claimant's asserted injury may still be redressed, at least in part, by a favorable decision, claimant's interest (and therefore his claim) is not moot.

*      *      *

The Court therefore concludes that claimant has Article III standing to challenge the forfeiture of the Blue Holdings (2) assets in their entirety and that the 2018 Agreement does not moot claimant's ongoing interest in this case.  Accordingly, the Court will deny the United States's motion for reconsideration of the March 2018 ruling.

II.       **Claimant's Motion to Dismiss**

Claimant has moved to dismiss the United States's forfeiture action for lack of subject matter jurisdiction.  Although claimant could have, and indeed should have, raised this challenge much earlier in this litigation, the Court is obliged to consider a challenge to its jurisdiction whenever raised.  To begin, claimant argues that this Court lacks jurisdiction to issue a final, binding decision because the assets at issue are located in the United Kingdom and subject to the control of a U.K. court.  Claimant's Mot. to Dismiss at 6.  According to claimant, "the court's judgment cannot bind the property but, instead, merely advises the foreign sovereign that does control the property as to how a United States court believes the rights in the property should be settled."  Id. (quoting United States v. Batato, 833 F.3d 413, 439 (4th Cir. 2016) (Floyd, J., dissenting)).  Claimant argues that the Court does not have jurisdiction to issue such an advisory opinion.  See id. 6–12.

However, the D.C. Circuit has rejected this sort of argument, explaining that "[i]t may well be that a forfeiture order of a United States court will not have its full effect until the res—the money—is brought within the territory of the United States," but a foreign country's "compliance and cooperation determines only the effectiveness of the forfeiture orders of the district courts, not their jurisdiction to issue those orders."  See United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito, Spain ("Banco Espanol"), 295 F.3d 23, 27 (D.C. Cir. 2002).[5]  "Congress intended the District Court for the

---

[5] The Fourth Circuit's majority decision in Batato did not address whether, in forfeiture actions against property located outside the United States, the government must establish, for jurisdictional purposes, that it is likely that a foreign country would execute the district court's forfeiture order.  See Batato, 833 F.3d 413 at 422 ("We need . . . not wade into the potentially thorny issues raised by claimants because . . . the government has demonstrated that it is likely, rather than speculative, that these courts will honor a forfeiture order from the United States.").

District of Columbia, among others, to have jurisdiction to order the forfeiture of property located in foreign countries." Id.

Claimant argues that, in Banco Espanol, the D.C. Circuit failed to consider the question of justiciability because the claimant raised no constitutional objections. See Claimant's Mot. to Dismiss at 9–10. But that is not how other judges in this District have interpreted the D.C. Circuit's decision. See United States v. One Gulfstream G-V Jet Aircraft, 941 F. Supp. 2d 1, 7 & n.4 (D.D.C. 2013) (relying on Banco Espanol for proposition that courts have Article III jurisdiction to order the forfeiture of property located in foreign countries); United States v. All Assets Held at Bank Julius Baer & Co., 772 F. Supp. 2d 205, 211 (D.D.C. 2011) (same). Moreover, courts have an independent obligation to assure themselves of their Article III jurisdiction, see Mendoza v. Perez, 754 F.3d 1002, 1018 (D.C. Cir. 2014), so the D.C. Circuit had to consider whether there was Article III jurisdiction when deciding the case.

Based on this precedent, the Court concludes that it has jurisdiction to decide the United States's forfeiture action against the Blue Family Trust II assets located abroad. If the United States prevails, the United Kingdom's cooperation may be necessary to enforce the forfeiture order, but that does not make the forfeiture order a nonjusticiable advisory opinion. See Banco Espanol, 295 F.3d at 27. And even if the United States did need to prove that it is "likely, rather than speculative, that [the U.K. court] will honor a forfeiture order from the United States," it has done so because here, already, "the foreign sovereign[] ha[s] cooperatively detained the res by issuing orders restraining the defendant property pursuant to this litigation." Batato, 833 F.3d at 422.

Claimant's second argument as to why this Court lacks jurisdiction over the United States's forfeiture action fares no better. Claimant argues that the 2018 Agreement, as interpreted by the

United States, means that the United States's forfeiture claim is no longer redressable. Claimant's Mot. to Dismiss at 12–15. If the 2018 Agreement transfers legal title of the assets to Nigeria, as the United States claims, that means—according to claimant—that the assets will never be returned to the United States and the United States's alleged injury will never be redressed. This argument, however, is fundamentally flawed. The 2018 Agreement binds only the parties to the 2018 Agreement, and the United States was not a party to it. Opp'n to Mot. to Dismiss. at 8–9. The 2018 Agreement does not dictate who has legal title to the assets under U.S. law, nor does it tell this Court what the U.K. court—or, for that matter, the parties to the 2018 Agreement—will do if the United States succeeds in its forfeiture action.

Accordingly, the Court continues to have subject matter jurisdiction over these forfeiture proceedings because a favorable decision for the United States would not be a mere advisory opinion and, notwithstanding the 2018 Agreement, the assets could still be forfeited to the United States.

## CONCLUSION

For the reasons explained above, the Court will deny both the United States's motion for reconsideration and claimant's motion to dismiss. The Court will also deny as moot claimant's motion for leave to supplement the record with the May 25, 2020 letter from Abubakar Bagudu to the Nigerian Attorney General. A separate order will be issued on this date.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated: July 9, 2020